MHN

FILED
cw

SEP 0 2 2008
SEP 02 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

RONALD RUHL, R-12207                    )
                                        )
        Petitioner,                     )
                                        )        **08CV4980**
                                        )     **JUDGE HOLDERMAN**
vs.                                     )     **MAG. JUDGE COLE**
                                        )
                                        )
TERRY McCANN,                           )     JUDGE:_____
                                        )
        Respondent,            **EXHIBITS IN SUPPORT**
                               **OF HABEAS CORPUS**
                               **PETITION**

**EXH.**                         **CONTENTS**                    [Top Right] **PAGE**

A)    Detective Stanek supplemental report of January          1-5
      6, 2002 (DM. 129-133)

B)    Detective Stanek supplemental report of January          6-7
      8, 2002 (DM. 155-156)

C)    Detective Weyker supplemental report of January          8-11
      8, 2002 (DM. 147-150)
      Decedent Neubauer's December 18, 2001 Drug Charges
      Domestic Battery.                                         12-14

D)    Detective Lucci supplemental report of January, 12-13th
      2002 (DM. 160)                                            15
      E-Mails received from Neubauer computer.                 16-19
      records re: schubat's hotel stay and flowers
      from Serio via Serio transcripts.                        20-23

E)    Detective Lucci supplemental report of April             24-26
      4, 2002 (DM. 188-190)
      Neubauer Child Support Record.                           27-30
      Record re: Life Insurance and Social Security
      payments via Neubauer's death, from Serio
      transcripts                                              31-34

| EXH. | CONTENTS | [Top Right] PAGE # |
|------|----------|---------------------|
| F) | Detective Hafke supplemental report of April 4, 2002 (DM. 203-206) | 35-38 |
| G) | Detective Jonites Affidavit application for over hear Warrant based on informant (Amanda Barbaro) | 39-41 |
| H) | Detective Stanek supplemental report of March 28, 2002 (DM. 185-187) | 42-44 |
| | Serio traffic stop information search (DM. 224-229) | 45-50 |
| | Officer Lamanna Transcripts via Serio trial | 50(a)-50(f) |
| I) | Michael Cunningham Statement to Police. | 51-72 |
| J) | Detective Lucci supplemental report of January 9, 2002 (DM. 157) | 73 |
| | Crime lab reports regarding Melhem Riachi fingerprints (KL. 173-176) | 74-77 |
| | Investigation reports on Melhem Riachi/Transcripts on Riachi. | 78-80 |
| | Illinois State Police Forensic reports eliminating Ronald Ruhl from all DNA recovered from victim and crime scene. | 81-86 |
| K) | Detective Urquhart supplemental report of February 15, 2002 (DM. 139-144) | 87-92 |
| | Richard Neubauer cell phone records. | 93-95 |
| | Ray Serio cell phone records (GS. 1-99) | 96-116 |
| L) | Marcy McIntosh Affidavit. | 117-121 |
| | Trial Counsel Edens faxed Motion in Limine argument | 122-124 |
| M) | Jim Natywa Affidavit. | 125-126 |

| EXH. | CONTENTS [Top Right] | PAGE # |
|---|---|---|
| N) | Jennifer Shoblom Affidavit. | 127-130 |
| | Denise Schubat's time cards from Whiplash bar | |
| | Dated AFTER Neubauer's Murder. | 130(a)-130(f) |
| O) | Scott Owens Affidavit. | 131-132 |
| | Police reports of violence between Neubauer and | |
| | Schubat. | 133-139 |
| P) | William Niemi information. | 140-142 |
| Q) | Ronald Ruhl Affidavit. | 143-146 |
| | Trial Counsel Eden's Motion to dismiss on venue | 147 |
| | Stipulation to venue signed by Edens | 148-149 |
| | Dr. Levin testimony via Ruhl trial (Edens cross) | 150-154 |
| R) | Judge Booras dismissal order (Post Conviction) | 155-162 |
| | Judge Booras comments on Schubat's credibility | |
| | via Serio pre-trial transcripts. | 163-164 |
| | Minutes Query of trial counsel Edens appearences. | 165-168 |
| S) | Appellate Court Order No. 2-03-0920 (Direct Appeal) | 169-187 |
| T) | Appellate Court Order No. 02-06-0227 (Post | |
| | Conviction). | 188-197 |
| U) | Correspondence between Appellate/Post Conviction | |
| | Counsel Thomas Brandstrader regarding agreed | |
| | upon issues to be raised for review. | 198-200 |

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

DATE OF SUPPLEMENT: 01/10/2002
DATE-TIME REPORTED: 01/06/02  0847Hrs.
)Death Investigation

CASE OR EVENT NUMBER: 2002- 2243
PAGE: 1 OF 5

| | |
|---|---|
| VICTIM: | NEUBAUER, Richard A. M/W 12/27/1974<br>24076 W. Grand Avenue Lake Villa, IL 60046<br>Phone: (847) 265-1982 |
| INVOLVED: | NEUBAUER, Richard P. M/W 06/28/1937<br>SAA |
| INVOLVED: | NEUBAUER, Nancy C. F/W 12/17/1948<br>SAA |
| INVOLVED: | SCHUBAT, Denise K. F/W 11/15/1977<br>39414 Lake Avenue Lake Villa, IL 60046<br>Phone: (847) 356-7455 |
| INVOLVED: | CZESZEWSKI, Robert A. M/W 08/03/1961.<br>290 Anita Terrace #202 Antioch, IL 60002<br>Phone: (847) 838-1187 |
| INVOLVED: | LAKE COUNTY SHERIFF'S DEPARTMENT<br>Deputy John Krempotic<br>25 S. Utica Street Waukegan, IL 60085<br>Phone: (847) 984-5250 |

On 01/06/2002 at approximately 9:00am, Sgt. McCarthy #128, advised Detective Lucci 130, Detective Urquhart #166, and I to respond to the 12100 block of 128th Street with regards to a body having been found inside a vehicle near the Bristol Renaissance Fair. We were advised that a Lake County Sheriff's Deputy was checking on the vehicle when he observed the body inside.

Upon arriving at the scene, we met with Deputies Beth#122, Conforti#138, and ole#181. Deputy conforti#138 advised that upon arriving on scene he spoke with Lake County Sheriff's Deputy John Krempotic who informed him that he had found the body. Deputy Conforti#138 so advised that upon his initial view of the scene he observed the body of a male white positioned ce down in the front passenger seat of the vehicle.

We then spoke with Deputy Krempotic who advised that the vehicle a 1997 Ford Taurus 4-door with Illinois Registration ZFF60 was registered to Nancy Neubauer 24076 W. Grand Avenue, Lake Villa, Illinois. Deputy Krempotic also indicated that the victim might possibly be Richard Neubauer. He indicated that his department recently had contact with Richard Neubauer regarding egal drugs. Deputy Krempotic indicated that he would obtain a photo and booking sheet of Richard assist our investigation.

DM-129

REPORTING OFFICER:
et. S. Stanek #156

SUPERVISOR:

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

---

**DATE OF SUPPLEMENT:** 01/10/2002
**DATE-TIME REPORTED:** 01/06/02  0847Hrs.
 ⁚ **Death Investigation**

**CASE OR EVENT NUMBER:** 2002- 2243
**PAGE: 2 OF 5**

---

As I approached the area of the scene, I observed a green Ford Taurus GL 4-door with IL Registration ZFF60. This vehicle was facing north and was parked in the eastern most entrance to the Bristol Renaissance fair along 128th Street. The vehicle was positioned in the center of the gravel entrance drive and was approximately two feet to the south of a horizontal utility pole, this pole is approximately 3 feet above ground level, and is used as a barricade to the property. Immediately to the north of the utility pole there are two metal gates positioned across the entrance. These gates are red in color and were chained together. The east gate appeared to have been broken from its hinges and was lying partially on the ground.

Damage to the Ford Taurus indicated that it had struck the utility pole as well as the metal gate. It appeared as though the vehicle traveled partially under the utility pole, prior to striking the metal gate. Once the (east) metal gate broke from its hinges, the vehicle continued to travel under the utility pole causing damage to the vehicle hood and windshield. There was red paint transfer on the front bumper of the vehicle from the gate, as well as small flakes of what appeared to be red paint on the hood. I also observed minor damage to the hood of the vehicle as well the windshield where it made contact with the underside of the utility pole. I observed fragments of wood from the utility pole imbedded in the windshield wiper arms. I also observed two tire impressions in the gravel on the north side of the utility pole that appeared to have been made by the Ford Taurus.

While looking at the vehicle I observed the trunk to be locked shut, and that all the doors were closed and unlocked with the windows in the up position. The exterior of the vehicle was cool to the touch. The exterior of the vehicle was dirty/covered with road film.

While looking inside the vehicle I observed a male white lying face down in the front passenger seat of the vehicle, which was in the reclined position. The victim was wearing glasses, and his face was resting against the backrest of the seat. The victim's left arm was bent at the elbow and was positioned behind his back. The palm of his left hand was facing up. The victim's right arm was bent at the elbow and was positioned underneath his body. The victim's legs were bent at the hips and knees with his knees resting on the front passenger side floorboard. The victim's right leg was bent tight with the top of his right foot resting on the top of the dashboard. The victim's left leg was bent toward the driver's side floorboard and was pinched between the floorboard and lower dash assembly. The victim was wearing a black short sleeve shirt, tan pants, black socks, and black shoes. The victim's face was positioned against the backrest of the seat. Due to the circumstances viewed at the scene, it was evident that the victim was deceased. (See detective Lucci's report regarding further evidence located inside and outside the vehicle.)

While at the scene I photographed it using a Department authorized 35mm camera. The film was later logged into the PSB Identification Bureau.

---

DM-130

**REPORTING OFFICER:**
Det. S. Stanek #156

**SUPERVISOR:**

## KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

DATE OF SUPPLEMENT: 01/10/2002
DATE-TIME REPORTED: 01/06/02  0847Hrs.

CASE OR EVENT NUMBER: 2002- 2243
PAGE: 3 OF 5

T: Death Investigation

---

Once the scene was processed for evidence the Kenosha County Medical Examiners Office was contacted and asked to respond to the scene for removal of the victim's body. At approximately 11:35am Medical Examiner Doctor M. Lavin and Assistant Medical Examiner Mike Carpenter arrived on scene. Prior to physically removing the body from the vehicle, a new sheet was placed over the body. Another sheet was placed on the ground outside the body. The sheets were used to secure any evidence that may have possibly separated from the body during its removal from the vehicle. After securing the body in the sheets it was placed into an unused body bag. I escorted Mike Carpenter as he transported the body to the Kenosha Hospital Morgue.

Once at the morgue, the body bag was opened so that I could obtain some Polaroid photographs of the victim's tattoos/face for identification purposes. The body bag was then closed and I sealed it using evidence lock#10123. Assistant M.E. Mike Carpenter then placed the body into the morgue cooler, where it was secured behind a locked metal gate. I then sealed the gate using evidence tape that I dated and initialed. The body was logged as evidence under log#103499.

At approximately 5:00pm Detective Lucci#130 and I responded to the Neubauer residence 24076 W. Grand Avenue in Lake Villa, IL to notify Richard Neubauer's family of his death. Lake County Sheriff's Deputies Willis Werner and Brad Meister accompanied us. After informing Richard and Nancy Neubauer of their son death, they embraced each other and began crying. Both parents appeared extremely upset and in disbelief over the death of their son. They confirmed Richards identity by describing his tattoos and where they were located on his body.

While speaking with the parents, we asked them if they knew of anyone who may have wanted to kill Richard. They indicated that they had no idea who would want to kill him. Nancy indicated that she doesn't even know who Richards friends are. She indicated that Richard lives with them, but sleeps on the couch because he doesn't have a bedroom. She advised us that on 12/17/01 Richard was involved in an accident where his Cadillac was rear-ended. She indicated he was subsequently arrested on a warrant and for possession of illegal drugs/cocaine. Nancy indicated due to his vehicle damage, he had occasionally been using her Ford Taurus.

While speaking with Nancy Neubauer she indicated that on this date 01/06/02 Richard left the house at approximately 1:45am. Nancy indicated that she assumed that Richard was leaving to pick-up his girlfriend Denise Schubat from the Whiplash tavern (STH-83&Grasslake Road) where she works as a bartender. Nancy advised that Richard always picked up Denise after she was done working. Nancy indicated that Denise and Richard have a 3 ½ year old daughter (Ashley) together, and that they had recently gotten back together and were trying to work out their relationship. Nancy indicated that they had been back together for approximately 6 weeks. Nancy also indicated that either Denise or Richards former girlfriend Cathy Davis might have more information regarding Richards friends.

DM-131

REPORTING OFFICER:
et. S. Stanek #156

SUPERVISOR:

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

DATE OF SUPPLEMENT: 01/10/2002
DATE-TIME REPORTED: 01/06/02  0847Hrs.
Death Investigation

CASE OR EVENT NUMBER: 2002- 2243
PAGE: 4 OF 5

Nancy indicated that Richard was a very secretive person who had severe mood swings. She indicated one day he would be pleasant to talk with, and the next day he would be difficult to get along with. Nancy indicated Richard would not tell anyone more than they needed to know about his personal dealings.

While at the residence Richards brother-in-law Robert Czeszewski entered the residence and was informed that Richard was deceased. While speaking with Robert he indicated that he didn't know any of Richards friends and had no helpful information to offer.

While at the residence Nancy indicated that she would contact Denise Schubat and ask that she respond to their residence so that she could be notified of Richards death, and to see if she had any information that may assist us in our investigation. Within ½ hour Denise arrived at the Neubauer residence, where Richard and Nancy informed her that Richard was deceased. Denise also began crying and was visibly upset over the news.

While speaking with Denise she indicated that on 01/05/2002 at approximately 6:00pm she spoke with Richard. She indicated that Richard informed her that he would pick her up from work between 2:00am and 2:15am. Denise indicated that at 2:15am she looked out the tavern window and didn't see Richard parked in the lot. She indicated she looked again at 2:30am, but he still wasn't here. Denise indicated that Richard always waited inside his vehicle for her to come out of the tavern. Denise indicated that Richard had never been inside the Whiplash Tavern.

As Detective Lucci#130 and I were speaking with Denise, I received a page from Detective Urquhart#166 asking that I contact him immediately reference information that may aid in our interviews. Detective Lucci#130 continued interviewing Denise while I spoke with Detective Urquhart#166 by phone.

After making phone contact with Detective Urquhart he informed me that he recovered several first names and telephone numbers from Richards Nextel Cellular phone which was recovered from the Ford Taurus. Denise provided the last names. The list of names and numbers is as follows:

| Name | Time | Date | Duration | Number |
|---|---|---|---|---|
| PMK | 0220Hrs | 01/06/002 | 8 Seconds | 773-406-3855 |
| Carrie Nasello | 0104Hrs | 01/06/02 | 58 Seconds | 847-826-5775 |
| Loui Vines | 0039Hrs | 01/06/02 | 1Min 6 Sec | 773-370-7398 |
| Scott Schumer | 0037Hrs | 01/06/02 | 3Min 27 Sec | 262-745-9563 |
| Smitty | 2324Hrs | 01/05/02 | 3Min 33 Sec | ___-925-2170 |

DM-132

REPORTING OFFICER:
et. S. Stanek #156

SUPERVISOR:

DM 132

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

DATE OF SUPPLEMENT: 01/10/2002
DATE-TIME REPORTED: 01/06/02  0847Hrs.
: Death Investigation

CASE OR EVENT NUMBER: 2002- 2243
PAGE: 5 OF 5

|  |  |  |  |  |
|---|---|---|---|---|
| ———— | 2311Hrs | 01/05/02 | 31 Seconds | 312-907-8669 |
| ———— | 2218Hrs | 01/05/02 | 3Min 30 Sec | 847-356-0227 |
| Donnie Cooper (Coop) | 2212Hrs | 01/05/02 | 4Min 32 Sec | 773-427-7702 |

Other names mentioned by Denise and Richards parents were:

Monica
Jackie
Mike Oconell
Eric Johnson

See Detective Lucci's report for further information. Investigation continuing.

DIM- 133

REPORTING OFFICER:
Det. S. Stanek #156

SUPERVISOR:

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

DATE OF SUPPLEMENT: 01/22/02
DATE-TIME REPORTED: 01/06/02 0847Hrs.
  Death Investigation

CASE OR EVENT NUMBER: 2002-2243
PAGE: 1 OF 2

INVOLVED:

SCHUBAT, Denise K. F/W 11/15/1977
39414 Lake Ave. Lake Villa, IL 60046
Phone: (847) 356-7455

On 01/08/02 at approximately 2:00pm Detective Weyker#148 and I met with Denise Schubat at her residence to re- interview her regarding this investigation. Detective Weyker#148 and I transported Denise to the Antioch Police Department where we used their interview room. While speaking with Denise, she informed us that on Saturday night 01/05/02 she drove to work and started at 6:00pm.

Denise indicated that she and Richard were planning on going to an after hours party in Chicago after she got off of work at 2:15am. Denise indicated that Richard was to pick her up from work and that they were going to go to the party. Denise indicated that earlier in the evening, she recalled Richard mention meeting Louie Vine. Denise stated that Louie Vine is Richards "Liquid G" supplier. Denise stated that "Liquid G" is the "date rape drug". She stated that it is in liquid form and that it has a blue tint similar to Windex.

When Denise was asked if Richard owned or carried a gun, she indicated he did buy a pistol from Bass Pro Shop approximately 3 years ago. Denise stated that she thought the pistol was a Smith&Wesson 9mm with a silver finish. Denise indicated that she was unsure if Richard kept the pistol in his possession/vehicle or if he kept it at his house. Denise advised me that she told Richard to buy the pistol. She stated that she wanted the pistol because at the time they were living together in Chicago with their daughter Ashley who was approximately 6 months old. She stated that a residence across the alley from where they lived was broken into and she wanted a pistol for protection when she and Ashley were home alone.

When Denise was asked who has the initials PMK she thought it might be a man by the name of Pete or Mike who lives in the Pavilion apartments in Rosemont. She indicated the Pavilion is near Higgins Road and River Road. Denise indicated that PMK refused to supply Richard with any more drugs after Richards 12/17/01 arrest for possession. Denise indicated that PMK also told Richard to forget about the $1200.00 that he owed him (PMK). Denise indicated that PMK told Richard to use the money that he owed him for an attorney. It was learned that Attorney Robert Rosas 312-629-1400 out of Chicago was representing Richard.

DM-155

REPORTING OFFICER:
t. S. Stanek #156

SUPERVISOR:

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

**DATE OF SUPPLEMENT: 01/22/02**
**DATE-TIME REPORTED: 01/06/02 0847Hrs.**
**7: Death Investigation**

**CASE OR EVENT NUMBER: 2002-2243**
**PAGE: 2 OF 2**

---

While speaking with Denise she advised that Richards friend Johnny, also known as Johnny Bin Laden, didn't make an appearance at Richards wake or funeral. Denise indicated that that she got the impression that Johnny and Richard were really good friends, because Richard had talked about getting an apartment in Chicago with Johnny. Denise also advised me that when she and Richard would go into Chicago, Richard would always make arrangements over his cellular phone to meet with Johnny at the Glow Club 1615 N. Clybourn. Denise indicated that it was her belief that the Glow Club is "Mob run". Denise indicated that it is believed that Johnny is a member of a Syrian gang. Denise indicated that whenever she saw Johnny at the Glow Club he was well dressed, and he always had VIP status in the club. Investigation continuing.

DM-156

**REPORTING OFFICER:**
et. S. Stanek #156

**SUPERVISOR:**

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

Ex.C 8

---

**DATE OF REPORT: 01-14-02**
**DATE-TIME REPORTED: 01-06-02  0847**
**RE: Death Investigation**

**CASE OR EVENT NUMBER: 02-2243**
**PAGE:  1 OF 4**

---

INVOLVED:

SCOTT R. SCHUMER
M/W  dob: 02-09-78
619 Vincent Rd.
Twin Lakes, WI  53181
(262)745-9563

INVOLVED:

HENRY M. ACKER
M/W  dob: 12-09-76
460 Birchwood Dr.
Antioch, IL.  60002
(847)838-1133

INVOLVED:

DENISE K. SCHUBAT
F/W  dob: 11-15-77
39414 Lake Ave.
Lake Villa , IL.  60002
(847)356-7455

INVOLVED:

MICHAEL J. WOHLFEIL
M/W  dob: 6-20-69
441 Windsor Dr.
Antioch, IL.  60002
(847)395-1649
(630)695-9140 Pgr.

INVOLVED:

CATHY L. DAVIS
F/W  dob: 01-21-76
641 S. Wisconsin
Villa Park, IL  60181
(630)832-2335
(708)508-8949 cell

VICTIM:

RICHARD A. NEUBAUER
M/W  dob: 12-27-74
24076 W. Grand Ave.
Lake Villa, IL  60046
(847)265-1982

OM. 147

**REPORTING OFFICER:**
Det. Ken Weyker 148

**SUPERVISOR:**

## KENO█A SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

DATE OF REPORT: 01-14-02
DATE-TIME REPORTED: 01-06-02  0847
RE: Death Investigation

CASE OR EVENT NUMBER: 02-2243
PAGE: 2 OF 4

INVOLVED:

MIKE (nmi) CUMMINGS
M/W dob: 06-13-73
5700 W. Wilson
Chicago, IL.
(Unknown phone #)

On 01-07-02 I assisted Det. Stanek in the death investigation of RICHARD NEUBAUER. During this assistance I accompanied Det. Stanek while interviewing multiple people about NEUBAUER.

On 01-07-02 we met with SCOTT SCHUMER and HENRY ACKER at ACKER's residence. Both stated they were friends of the victim and were subsequently interviewed separately. SCHUMER stated he had been friends with the victim for the past few months. He stated they often partied together and otherwise had a good relationship. SCHUMER stated that everyone liked the victim and had no idea who would have killed him. He stated the night of this incident he was at a party at JEFF NEUBISER's house in Antioch. After the party he also went to the LIMERICK TAVERN in Antioch at approx. 2:00am. SCHUMER stated he had left voice mail messages on the victim's phone that he wanted to meet the victim at NEUBISER's party but, got no response.

When asked about the victim's social life, SCHUMER informed us that he was aware that our victim was into drugs. He stated he knew he would sell cocaine / marijuana and would often bring it to parties. He also stated he would get some marijuana from him on occasion. SCHUMER claimed to have accompanied the victim to the GLOW CLUB in Chicago, IL in the past. At this club the victim would often meet people SCHUMER was not aquatinted with.

After SCHUMER we spoke with HENRY ACKER. ACKER stated he was a friend with the victim since 7th grade. He reiterated much of SCHUMER's claim's that the victim was well liked. ACKER stated he knew the victim was into drugs but could not elaborate on his dealings. He stated he did not go with the victim to any Chicago clubs and did not know any of his associates from there. He stated the last time he saw the victim was on 1-04-02 at his home when they were all there partying. Nothing unusual happened at that time, according to ACKER.

After speaking with ACKER and SCHUMER we met with JEFF NEUBISER at his home. NEUBISER confirmed that he had the party on 1-05-02 and SCHUMER was in attendance. He stated he did not know the victim other then seeing him at parties. NEUBISER informed us he is scheduled to leave for the US Navy at the end of January 2002.

DM.148

REPORTING OFFICER:
Det. Ken Weyker 148

SUPERVISOR:

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

DATE OF REPORT: 01-14-02
DATE-TIME REPORTED: 01-06-02  0847
RE: Death Investigation

CASE OR EVENT NUMBER: 02-2243
PAGE: 3 OF 4

INVOLVED:

JEFFREY R. NEUBISER
M/W   dob: 01-05-80
602 Hillside
Antioch, IL.  60002
(847)395-7177

On 1-07-02 at approx. 5:45pm myself and Det. Stanek met with CATHY DAVIS at her home in Villa Park, IL. DAVIS is the ex-girlfriend of the victim. She stated she has had an on and off relationship with the victim that ended in October of 2001. DAVIS informed us that the victim was very secretive about his personal affairs with her. She stated she knew he had a drug problem both with use and dealing and it lead to their break up. The last time she saw the victim was at Resurrection Hospital (Chicago) when the victim sustained a broken jaw in an altercation with MIKE CUMMINGS. That was approx. 3 months prior to this incident, since that time, she had tried to end her relationship with the victim but was experiencing stalking type behavior from him.

DAVIS informed us that she was opposed to the victims drug involvement and ended the relationship because of it. She stated the victim was involved with a M/W named LOU VEINS or VINES (information unknown) that he had met in Chicago. She felt VEINS was trouble because he was into drugs and previously arrested for it.

On 1-08-02 we went to the residence of DENISE SCHUBAT in Lake Villa, IL. SCHUBAT is the current girlfriend of the victim and the mother of a child fathered by him. SCHUBAT was escorted to the Antioch Police Dept. where we questioned her for approx. 1 hour. She offered no explanations into his death and stated he was generally well liked. The victim often picked up SCHUBAT who, is a bartender at the Whiplash Tavern in Antioch from work. Even though she had her own car at the tavern, he would often show up to see her off from work. On 1-06-02, SCHUBAT stated she was expecting the victim to pick her up at the bar around 2:00 – 2:30 am. When she checked the parking lot that evening she saw he had not arrived. Routinely the victim would park next to the rear stairs of the tavern to await SCHUBAT's exit. She stated she continually checked because they had plans to go to an after bar party but, the victim never arrived. According to SCHUBAT the victim never came inside and had little contact with the bar patrons.

SCHUBAT is also involved with a subject named MICHAEL WOHLFEIL. This is another boy friend of hers that has been attempting to date her. She says he is obsessed with her and is jealous of any other boy friends she dates. WOHLFEIL has not yet been contacted but according to SCHUBAT does not know the victim.

DM.149

REPORTING OFFICER:
Det. Ken Weyker 148

SUPERVISOR:

## KENOSHA SHERIFF'S DEPARTMENT
## JPPLEMENTARY INVESTIGATION REPORT

**DATE OF REPORT:** 01-14-02
**DATE-TIME REPORTED:** 01-06-02  0847
**RE:** Death Investigation

**CASE OR EVENT NUMBER:** 02-2243
**PAGE:** 4 OF 4

---

The Whiplash Tavern is located on STH 83 and Grass Lake Rd. It has been open for business for approx. 6 months and is operated by RAYMOND SERIO and his brother CHARLES SERIO. According to local police agencies it is a known source of narcotics trafficking. Local investigators also stated SCHUBAT and the victim were involved in this culture and the SERIO brothers.

After stopping at the tavern I met CHARLES SERIO in the parking lot. I showed him a picture of the victim and asked if he knew him and his girlfriend. SERIO stated he never saw the victim before and SCHUBAT's boyfriend was a guy named Charles (LNU). This information is suspect based on the intelligence reports from the local drug unit.

INVOLVED:  RAYMOND (mnu) SERIO
M/W  dob: 11-16-73
34680 N. Peterson Ave.
Ingleside, IL  60041
SSN: 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

CHARLES R. SERIO
M/W  dob: 12-08-66
912 Lunga Dr.
Round Lake, IL  60073
SSN: 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

All the subjects we spoke with stated NEUBAUER (victim) was a well liked individual. It is known that NEUBAUER was involved in drug trafficking however, kept most of those details secret from his friends. Information about these facts is still being investigated.

DM.JSC

**REPORTING OFFICER:**
Det. Ken Weyker 148

SUPERVISOR:

IN THE CIRCUIT COURT OF THE 19TH JUDICIAL CIRCUIT

LAKE COUNTY

## NOTICE OF APPOINTMENT

TO: DAVID P BRODSKY
    LAKE COUNTY PUBLIC DEFENDER
    15 S COUNTY ST
    WAUKEGAN, IL 60085

DATE APPOINTED: DECEMBER 18, 2001

DEFENDANT: RICHARD A NEUBAUER

CASE NUMBER(S) / VIOLATION(S)

| 01CF4223 | MANU/DEL 01-15 GR COCAINE/ANLG |
| 01CF4223 | POSS AMT CON SUB EXCEPT(A)/(D) |
| 99CM7131 | DOMESTIC BATTERY/BODILY HARM |
| 99CM7131 | DOMESTIC BTRY/PHYSICAL CONTACT |
| 99CM7131 | KNOWINGLY DAMAGE PROP<$300 |

AT TIME OF APPOINTMENT: IN CUSTODY

NEXT COURT DATE: JANUARY 14, 2002 COURTROOM: C120 AT 1:30 P.M. FOR:

PRELIMINARY HEARING

DATED: 12/18/2001

SALLY COFFELT
CLERK OF THE CIRCUIT COURT
BY DEPUTY CLERK:
MICHELLE G
PHONE NO: (847) 377-3380

CLERK OF THE CIRCUIT COURT
LAKE COUNTY, ILLINOIS

13

# REMAND

DATE: 12-18-01    A.M. /    P.M. ___

To SHERIFF, Keeper of the Lake County Jail

**NAME :** Richard Neubauer

a prisoner within the jurisdiction of this court is
herewith remanded to your custody.

**JUDGE :** Wallnik

CASE NO.(S) 99 CM 1123    CHARGE(S) dub

CASE NO.(S) 01CF 4253    CHARGE(S) UPLS

CASE NO.(S) ___    CHARGE(S) ___

CASE NO.(S) ___    CHARGE(S) ___

CASE NO.(S) ___    CHARGE(S) ___

CASE NO.(S) ___    CHARGE(S) ___

Next Court Date: 1-14-02    Judge: ___

Time: 1:55 A.M. ___ P.M. X    Courtroom 120

☐ Sentenced to Lake County Jail for: ___

☐ Sentence stayed until: ___

☐ Sentenced to D.O.C. for: ___

☐ Mittimus stayed until: ___

☐ Sentenced to periodic imprisonment for a period of: ___

☐ at the Lake County    ☐ at the ___
Work Release Center    treatment facility

☑ Other: 3 days Court

___

☐ Day for Day Credit GRANTED    ☐ Injury as result of offense
NO Day for Day Credit

**BOND AMOUNT:** $ 7,500

☑ 10%    ☐ FULL    ☑ UMBRELLA BOND    ☐ COMBINATION BOND

Conditions of Bond 44 PT - no Dor A. P and to s/5-

DEPUTY CLERK: ___ AMP    COURTROOM: 120

96

## KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

14

DATE OF REPORT: 01-29-02
DATE-TIME REPORTED: 01-06-02
RE: Death Investigation

CASE OR EVENT NUMBER: 02-2243
PAGE: 1 OF 1

INVOLVED:

STEPHANIE A. PAGLIARONI
F/W   dob: 07-29-81
5856 W. Leland Ave.
Chicago, IL. 60630
(no phone)

On 1-28-02 STEPHANIE PAGLIARONI came to the PSB to answer questions about her acquaintance with RICHARD NEUBAUER. According to information received from CATHY DAVIS (NEUBAUERS X-girlfriend), PAGLIARONI was approached by NEUBAUER to make drug pick-up's and drop off's for him. I informed PAGLIARONI about this information and informed her we needed to know where and whom these pick-ups involved.

PAGLIARONI seemed to be cooperative. She stated that she was approached by NEUBAUER but never made any of the pick-ups prior to his death. She felt he had asked her to do this because he was under house arrest at the time. NEUBAUER was killed before it started; therefore, she could not offer any information on NEUBAUER's drug source(s).

According to PAGLIARONI, NEUBAUER's drug dealing involved marijuana. She had knowledge that he was dealing and often saw him in possession of a lot of money (approx. $200.00). She stated that NEUBAUER often-frequented Kenosha's SOS (Shenanigans on Sheridan) Club usually on Wednesday night. She also confirmed NEUBAUERS association with MICHAEL DELANEY who, lives in Kenosha.

REPORTING OFFICER:
Det. Ken Weyker 148

SUPERVISOR:

# KENOS█ SHERIFF'S DEPARTMENT█
## SUPPLEMENTARY INVESTIGATION REPORT

Ex.D  15

ATE OF REPORT:01-13-02
ATE-TIME REPORTED:  / /
ᴱ· DEATH INVESTIGATION
 )

CASE OR EVENT NUMBER:2002-002243
PAGE: 1 OF 1

---

Reference death investigation above case number.  On 01-12-02 Detective Stanek and I ᵣeturned to the Neubauer residence and spoke with Nancy Neubauer regarding recovery of some ᵤllets. Nancy located two 50-count boxes of 9mm Luger 115-grain metal jacket bullets. One box ᵣas full and the other had ten rounds remaining. She located the bullets amongst some personal ᵉms of the victim. She states she knows he also had a pistol but she had not located it at this time ᵣd would be going through some items in a closet that Rick was using while residing with them. The ⁿm bullets recovered were collected. These round are not consistent with the rounds recovered ᵒm the victim in this case.

On 01-13-02, Nancy Neubauer called to inform us she had located the victim's pistol in a ᵒset of her home. The pistol, a 9mm Smith and Wesson semi auto was in a plastic case along with ₐ loaded magazine, which was not in the pistol. There was also a trigger lock in the case with the ₐstol. The pistol was noticeably dusty giving the appearance it had not been used for some time. ⁿis and the fact it was located at the home would exclude it from being directly involved with this ₐse.

We spoke again with Nancy in regards to the victims' demeanor the night of 01-05-02. She ₐted that she had gotten into an argument about the computer with Rick earlier that day.  That Rick ₐs in a crabby mood but that he had settled down by that evening. She had returned home from ᵣk that night at around 0030 after dropping off a friend, Diane Kellor. She also remembers hearing ᵢck on the phone with someone at what she believes was around 0100 and telling that person that ᵉ would meet with him or her. She states that it also may have been closer to 0200 when she heard ᵢck on the phone because she had already gone from the couch to the bedroom.

We then did a search of the home computer in attempts to locate other possible leads. We ₗated several email addresses of acquaintances of Rick's and portions of e-mail messages from his ₓ-girlfriend Cathy Davis.

Investigation continued.

DM-160

PORTING OFFICER:
ᵈtective Vincent Lucci #130

SUPERVISOR:

Scott Stanek

$E_x * s$

From:
Sent:
To:

PRETTEE RICKY [pretteericky@yahoo.com]
Thursday, January 03, 2002 3:55 AM
CATD121@AOL.COM

16

HOPE U HAD A GOOD NEW YEAR.

im sure u did i wasnt with u.  < <http://us.i1.yimg.com/us.yimg.com/i/mesg/tsmileys/1.gif>

---

**Do You Yahoo!?**
Send your FREE holiday greetings online at Yahoo! Greetings <http://rd.yahoo.com/mail_us/tag/?
http://greetings.yahoo.com/>.

Ex⁴ 9

Scott Stanek

17

From:           CATD121@aol.com
Sent:           Friday, January 04, 2002 12:06 PM
To:             pretteericky@yahoo.com
Subject:        (no subject)


My new years was just wonderful actually.
But I am not the one with a felony on my record now am I? I am not the one who shouldn't be able to sleep at night thinking about how I fucked up my life.
U really did it good this time didn't u Neubauer?
Let's just see what you take out of this.
Will you learn your lesson? I really doubt it.
I give you a little bit of time before you go dealing again. That's the only life u know.
I had no idea that u were in this as bad as u are.
You let me down more than any person I have ever known.
And to think that I was wanting a future with you. Me and drugs don't mix. I am way above that kind of life Ricky. Way above that. Too bad u are not smart enough.
Or at least weren't smart enough.
You sit there & rip on Denise, but u are no better. I am sure that is why you will be or maybe already are back with her. Birds of a feather flock together.
Maybe someday you & Denise can show Ashley how to roll a joint or pack a bowl or snort a line or pop a pill, hey maybe you will move up to smoking crack. That would be a real treat! I feel so bad for that little girl. She has two selfish parents that don't have a clue in the world. It is people like you that make this world an ugly place.
Well, I start my school orientation tonight. I am doing the right things with my life. YOu would not know about that though, because all you do is associate with trash. Hmmm and look where it has taken you.
Why don't you take a lesson from your father. Be a real man & make a living the honest way. At least your father can look at himself & be proud of who he is. It's just too bad he can't look at his only son & feel the same way.

1

Scott Stanek

From:          rick neubauer [pretteericky@hotmail.com]
Sent:          Friday, January 04, 2002 3:51 PM
To:            catd121@aol.com

have no feolony on my record gossip queen thats what great lawyers r 4. im
over u cath so live your pathetic life with your nerds.im done with that
lifestyle 2 bad you cant witness it.


MSN Photos is the easiest way to share and print your photos:
http://photos.msn.com/support/worldwide.aspx

1

Scott Stanek

19

From:           rick neubauer [pretleericky@hotmail.com]
Sent:           Friday, January 04, 2002 7:23 PM
To:             catd121@aol.com


friday night no way youre home
happy gilmore is on i just thought of u.
same as ace ventura,and especially austin powers.
i consider those our movies. not like u.u dont even think of me anymore.
thats good 4 u. youre probably not sad. obviously,youre having sex. lucky
him.

Join the world's largest e-mail service with MSN Hotmail.
http://www.hotmail.com

1
190

INVOICE

235 N. West Street
Waukegan, IL 60085
Office: (847) 662-5828
Fax:    (847) 662-5838

| DATE | INVOICE NO. |
|------|-------------|
| 5/20/2003 | 193 |

**BILL TO**

Mark C. Curran, Jr., Attorney at Law
235 N. West Street
Waukegan, Illinois 60085

| IN RE: | TERMS | INV | SHIP VIA | EPS FILE # | CLAIM # |
|--------|-------|-----|----------|------------|---------|
| Raymond Serio | Net 30 | ALS | US Mail | 03-020814 AT | 02 CF 128 |

| SERVICE DATE | ITEM | DESCRIPTION | QTY | RATE | AMOUNT |
|--------------|------|-------------|-----|------|--------|
| 5/26/2003 | Interviews | Interview/statement acquisition of: Interview of Ricardo Rivas, 39235 N. Walnut, Lake Villa, IL Efforts to locate AND interview of Sandra Morton, 37255 N. Lakeshore, Lake Villa, IL | 2 | 65.00 | 130.00 |
| 5/26/2003 | Mileage | Mileage charge | 12 | 0.50 | 6.00 |
| 5/27/2003 | Gen'l Invest. | Expenses - Ray Serio attire for court: Big K-Mart, 3110 Belvidere Rd., Waukegan, IL Men's socks $3.99 USC, Men's shirt $12.99 USC. Men's belt $9.99 USC, Men's slacks $18.99 USC, slip on shoes $19.99 USC | 1 | 70.90 | 70.90 |
| 5/28/2003 | Gen'l Invest. | Expenses - Ray Serio attire for court: Super K-Mart, 800 E. Rollins Rd., Round Lake Beach, IL Men's shirt $19.99 USC, Men's slacks $9.00 USC | 1 | 31.02 | 31.02 |
| 5/29/2003 | Interviews | Follow Up: Antioch Floral response to subpoena Follow Up: Best Western (Antioch, IL) response to subpoena | 0.5 | 65.00 | 32.50 |
| 5/29/2003 | Field Invest. | Attempt service of process upon Lake County Jail for visitation and custody records of Ronald Rush, M/W, 10/1/69 | 1 | 65.00 | 65.00 |
| 5/29/2003 | Mileage | Mileage charge | 26 | 0.50 | 13.00 |
| 5/29/2003 | Field Invest. | Follow up with Theresa Ann Caragher, Linda Carpenter regarding court appearance 5/30/03 @ 0900 hours, at C-201, 18 N. County Street, Waukegan, IL | 1.5 | 65.00 | 97.50 |
| 5/29/2003 | Mileage | Mileage charge | 26 | 0.50 | 13.00 |

Thank you for your business.
TAX ID # 36-4431067

**Total**

21

```
 1                      jury:)
 2              THE COURT:  Sustained.  Jurors are
 3     instructed to disregard the last question.
 4     BY MR. CURRAN:
 5         Q    Now, Ray had a lot of girlfriends at the
 6     Whip Lash, is that correct?
 7         A    Yes.
 8         Q    And you observed him with a lot of
 9     different girls going in back rooms and off with
10     them, is that correct?
11         A    Yes.
12         Q    And isn't it true that the one time you
13     claim you had sex with Ray was, in fact, November of
14     2002?
15         A    No, it was before Halloween.
16         Q    Did you go to the Best Western on
17     November -- excuse me.  I said November, and I meant
18     to say December, December 15th of 2002?
19         A    Yes, I did.
20         Q    And you went there on that day with Ray?
21         A    Yes.
22         Q    And you were required to give
23     identification on that day?
24         A    Yes.
```

25

22

1    A    No, not every single time, no.

2    Q    Let me ask you this.  After that one time

3    that you allege Ray and you had sexual relations,

4    did you receive flowers the next day from Ray?

5         MR. STRICKLAND:  Objection.  Beyond the

6    scope of redirect and irrelevant.

7         MR. CURRAN:  May I approach, your Honor?

8         THE COURT:  No, you may proceed and ask

9    the question.  I will overrule the objection.

10   BY MR. CURRAN:

11   Q    Did you receive flowers the next day?

12   A    Yes, I did.

13   Q    Was that the only time you received

14   flowers from Ray?

15   A    No.  On Saturday nights, there was a

16   little old man that used to come into the bar with a

17   bucket of flowers and people -- customers would buy

18   flowers.

19   Q    Where did these go to?

20        MR. STRICKLAND:  Objection.  Your Honor,

21   how are flowers relevant that anybody has given her;

22   drinks at the bar?

23        THE COURT:  I sustain the objection.

24        MR. CURRAN:  Judge, I don't have any other

**44**

23

1    THE COURT: Nothing else? You may step

2    down, ma'am. Thank you very much.

3              (Witness excused.)

4    MR. CURRAN: Judge, I believe our next two

5    witnesses would be by way of stipulation.

6    THE COURT: You may present the

7    stipulations, and they will be admitted.

8    MR. CURRAN: If called to testify, an

9    employee from the Antioch Floral Shop located at 959

10   Main Street in Antioch, Illinois, would testify that

11   on December 15th of 2002, a Raymond Serio sent

12   flowers to a Denise Schubat at 39414 Lake Avenue in

13   Antioch. So stipulated?

14   MR. STRICKLAND: So stipulated.

15   MR. CURRAN: The other stipulation is that

16   Ronald Ruhl was in the custody of the Lake County

17   Jail from January 28, 2002, through April, 2002. So

18   stipulated?

19   MR. STRICKLAND: So stipulated.

20   MR. CURRAN: Judge, I have marked the

21   first one as Defendant's No. 2 and the second one as

22   Defendant's No. 3.

23   THE COURT: For the record, one is a

24   written stipulation; the other one is an oral

Ex. E 24

## KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

DATE OF REPORT:04-10-02
DATE-TIME REPORTED: / /
RE: DEATH INVESTIGATION

CASE OR EVENT NUMBER:2002-2243
PAGE: 1 OF 3

INVOLVED:

DENISE K. SCHUBAT F/W 11-15-77
39414-LAKE AV
LAKE VILLA, IL.
847-356-7455

Reference death investigation above case number. On 04-04-02 following additional surveillance attempts the following individuals were brought to the Lake County Sheriff Detective Bureau for interviews:

AMANDA J BARBARO F/W 03-26-76

DENISE K SCHUBAT F/W 11-15-77

RONALD E RUHL M/W 10-01-69

RAYMOND SERIO M/H 11-16-73

DERRICK D BANKS M/B 10-17-75

At approximately 0830hrs I along with Detective Stanek made contact with Denise Schubat to interview her in regards to the new information. She had been seated in a conference room prior to our contact with her. Detective Stanek and I along with Detective Hafke have had several previous contacts with Denise earlier in this investigation in which she accompanied us to the Chicago nightclub areas. Denise was very familiar with us at this point. She was taken into a conference room where she was advised she was not under arrest and that we needed to speak with her further about the investigation. At this point I advised Denise that we now knew the truth of what happened to Rick and that she needed to come forward and tell us the truth about the whole story. We then began to advise her we knew he was killed in the parking lot of the Whiplash Tavern, that Serio was involved and the fact that she was there when it occurred. Denise began to cry and became very nervous in appearance. She said ok and said she would tell us what she remembered.

Denise states she was dating a guy named Charlie who was in a band the time Ray Serio started talking to her and being nice. Denise broke up with Charlie and Charlie moved to Florida. Denise then got back together with Rick the father of her child. Ray was upset about this. Denise and Ray had sexual relations prior to Denise getting back together with Rick. Denise had told Ray that Rick had beat on her in the past and it would be nice if he was just out of the way. Ray said he could kill Rick and he and Denise could be together. Denise states she never took him seriously. She states on that Saturday night 01-05-02 she had made plans for Rick to pick her up from the Whiplash when she got off of work. Rick usually comes at around 2:10 -2:15AM. She stated she overheard Ray Serio on his Nextel phone talking with Ron Ruhl. Denise states Ray was telling Ron just knock on the

DM-188                                                                DM-188

REPORTING OFFICER:                                                    SUPERVISOR:

25

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

DATE OF REPORT:04-10-02                    CASE OR EVENT NUMBER:2002-2243
DATE-TIME REPORTED:  / /                    PAGE: 2  OF 3
RE: DEATH INVESTIGATION

window and just shoot him in the head, just shoot him in the fucking head. She states Ray was sitting next to her in the bar and shortly after he had the conversation with Ron on the Phone she heard a gun shot. Denise states she ran to the doorway and looked out a window and saw Rick in the driver seat of his car. She states she could see that his head was tilted back and toward the passenger side of the car and that his jaw was moving like he was gagging. She then said something to the effect of I can't believe you did it. She states Ray grabbed her and brought her back over by the bar and she then heard pounding followed by glass breaking. She then saw Ron Ruhl enter the bar. She states Ron said to Ray something to the effect of, hurry up lets get the body out of here. Ray allegedly then told Denise to go home, to walk out and not look over at Rick and to act like nothing happened. He allegedly told her to go home and not to let anyone ever know that Rick ever showed up. She states that if she told Ray said she would never see her daughter. She states when she arrived home she looked at the clock on the microwave oven and it read 2:48AM. At that time she called Rick's cell phone to make it look like she was still trying to contact him.

In addition Denise was questioned if she had seen the gun used to shoot Rick . She stated she had noticed a small silver colored gun in a drawer behind the bar a couple days prior to Rick being shot. She was asked if she knew this was going to happen or if she was part of a set up. She stated she never took Ray seriously. That she never thought he would do it.

During the course of the interview Denise was very nervous and appeared deceptive when asked various questions that would indicate her possible involvement. She had very little eye contact and squirmed frequently in her chair. Denise agreed to a taped audio/ video statement of the details she had just provided.

It should be noted that when Denise was interviewed in the taped statement she began to minimize her previous statement. Such as now saying she didn't recall if Ron said they had to get rid of the body. She also did not relay information freely and was noticeably giving body language which is consistent with being deceptive.

Following the taped interview Denise was returned to the conference room and given soda, cigarettes and the use of the restroom as needed. Meanwhile others involved were in the process of being interviewed by various other Kenosha and Lake County Detectives.

Denise was asked if she would be willing to take a truth verification test known as a CVSA computer voice stress analyzer. She agreed and was transported to the Kenosha County Sheriff Department Detective Bureau by Detective Peggy Hafke. Detective Dave Smith administered the test to Denise and was given information for type of questioning.

Following the test, Detective Hafke transported Denise back to the Lake County Sheriff Department. Detective Smith advised that Denise was deceptive on her responses to the test questions as follows. When asked if she saw who shot Rick Neubauer she indicated NO. This was

DM-189

DM-189

REPORTING OFFICER:                                                    SUPERVISOR:
Detective Vincent Lucci #130

26

## KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

DATE OF REPORT:04-10-02
DATE-TIME REPORTED:  / /
RE: DEATH INVESTIGATION

CASE OR EVENT NUMBER:2002-2243
PAGE: 3 OF 3

also shown as deceptive. When asked if she asked anyone to shoot Rick, she indicated NO. This was also shown as deceptive.

Due to the results of the test Denise was interviewed a second time. This time Detective Hafke and myself interviewed her. Once again Denise was very uneasy during the interview. Detective Hafke conducted most of the questioning during this interview as I was in and out of the room on several occasions. Detective Hafke obtained more detailed information in regards to the gun observed at the Whiplash and various other points of the investigation. See Detective Hafkes' report for details.

Following this interview Denise again agreed to give a taped audio/ video account of this additional information. Again she was very unsettled during her account and had to be redirected several times by Detective Hafke in regards to information she gave prior to the taped interview.

Following the taped interview, myself and detective Hafke transported Denise back to her residence.

OM-190

OM-190

REPORTING OFFICER:                                                                   SUPERVISOR:

 ...nois Department of Public Aid

27

IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

DENISE SCHUBAT
Obligee/Custodial Parent , RIN NO 112045919

vs.
                                                      Order No.

RICHARD A. NEUBAUER
Obligor/Non-Custodial Parent , RIN NO 120615653  IV-D No. C00298025

## PROOF OF SERVICE OF JUDICIAL ORDER/NOTICE
## TO WITHHOLD INCOME FOR CHILD SUPPORT

Copies of the attached Order/Notice to Withhold Income for Child Support,
prepared in the above case on DECEMBER 03, 1999                     F I L E D
ESCHE-LEE INC                         , payor and RICHARD A. NEUBAUER have been delivered to
                                                                        obligor; by:

   (X) Ordinary mail                                                  DEC 13 1999

   ( ) Certified mail, return receipt requested

   ( ) Facsimile transmission or other electronic means               CIRCUIT CLERK

   ( ) Personal delivery

   ( ) Other method provided by law for service of a summons

Service was made on the  3RD  day of DECEMBER, 1999

## CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of
Civil Procedure, the undersigned certifies that the statements set forth in
this instrument are true and correct, except as to matters therein stated to
be on information and belief and as to such matters the undersigned certifies
as aforesaid that he/she verily believes the same to be true.

                              Division of Child Support Enforcement

                         By:    BARBARA WERTMAN
                                Name of IDPA Staff

                                NORTHERN REGION-FIELD STAFF
                                Address

                                280 E. INDIAN TRAIL
                                Address

                                AURORA IL  60505
                                Address

2584  (R-10-98)

IL478-1238

  Illinois Department of Public Aid

28

IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

DENISE SCHUBAT
Obligee/Custodial Parent _____, RIN NO 112045919

vs.

Order No. 99F000224

RICHARD A. NEUBAUER
Obligor/Non-Custodial Parent _____, RIN NO 120615653  IV-D No. C00298025

## PROOF OF SERVICE OF JUDICIAL ORDER/NOTICE
## TO WITHHOLD INCOME FOR CHILD SUPPORT

Copies of the attached Order/Notice to Withhold Income for Child Support,
prepared in the above case on _SEPTEMBER 09, 1999_____, payor and _RICHARD A. NEUBAUER__ have been delivered to
DON STOLTZNER MASON CONST._____, obligor; by:

(X) Ordinary mail

( ) Certified mail, return receipt requested

( ) Facsimile transmission or other electronic means

( ) Personal delivery

( ) Other method provided by law for service of a summons

Service was made on the ___9TH___ day of _SEPTEMBER, 1999___

### CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of
Civil Procedure, the undersigned certifies that the statements set forth in
this instrument are true and correct, except as to matters therein stated to
be on information and belief and as to such matters the undersigned certifies
as aforesaid that he/she verily believes the same to be true.

Division of Child Support Enforcement

By:      BARBARA WERTMAN
         Name of IDPA Staff

         NORTHERN REGION-FIELD STAFF
         Address

         280 E. INDIAN TRAIL
         Address

         AURORA IL  60505
         Address

584  (R-10-98)

IL478-1238

⋯⋯⋯is Department of Public Aid                                    29

IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

DENISE SCHUBAT
Obligee/Custodial Parent _____, RIN NO _112045919_

           vs.
                                              Order No. _99F000224_
RICHARD A. NEUBAUER
Obligor/Non-Custodial Parent _____, RIN NO _120615653_  IV-D No. _C00298025_

PROOF OF SERVICE OF JUDICIAL ORDER/NOTICE
TO WITHHOLD INCOME FOR CHILD SUPPORT

Copies of the attached Order/Notice to Withhold Income for Child Support,
prepared in the above case on _DECEMBER 07, 1999_
_CALUMET FLEXICORE CORPORATION_, payor and _____ have been delivered to
_____, obligor; by:

   (X) Ordinary mail

   ( ) Certified mail, return receipt requested

   ( ) Facsimile transmission or other electronic means

   ( ) Personal delivery

   ( ) Other method provided by law for service of a summons

Service was made on the ___7TH___ day of _DECEMBER, 1999_

CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of
Civil Procedure, the undersigned certifies that the statements set forth in
this instrument are true and correct, except as to matters therein stated to
be on information and belief and as to such matters the undersigned certifies
as aforesaid that he/she verily believes the same to be true.

                        Division of Child Support Enforcement

                   By:    _BARBARA WERTMAN_
                          Name of IDPA Staff

                          _NORTHERN REGION-FIELD STAFF_
                          Address

                          _280 E. INDIAN TRAIL_
                          Address

                          _AURORA IL    60505_
                          Address

2584  (R-10-98)
     42F)

IL478-1238

STATE OF ILLINOIS )
                  )SS
COUNTY OF LAKE    )

FILED
JUL 27 1999

IN THE CIRCUIT COURT OF THE
NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

Denise Schubat
              Petitioner
          vs
Richard A. Neubauer
              Respondent
9502 Glenlake, Apt. #217
Rosemont, IL  60018

)
)   Gen. No.  99 F 224
)
)

## ALIAS SUMMONS

**YOU ARE HEREBY SUMMONED** and required to appear before this Court, at the Lake County, Illinois Courthouse, 18 N. County St, Waukegan, Ilinois, **Courtroom C-107**, at **9:00 A.M.** on **AUGUST 26, 1999**, to answer the complaint in this case, a copy of which is hereto attached. IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT.

IF YOU DO NOT APPEAR AS INSTRUCTED IN THIS SUMMONS, YOU MAY BE REQUIRED TO SUPPORT THE CHILD NAMED IN THIS PETITION UNTIL THE CHILD IS AT LEAST 18 YEARS OLÆ.  YOU MAY ALSO HAVE TO PAY THE PREGNANCY AND DELIVERY COSTS OF THE MOTHER.

## TO THE OFFICER:

This Summons must be returned by the Officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service and not less than three (3) days before the day for appearance.  If service cannot be made, this Summons shall be returned so endorsed.

This Summons may not be served later than three (3) days before the day for appearance.

WITNESS  JUL 0 6 1999 , 19

_Sally D. Loffelt_
_/kc/_

(Seal of Court)

## ***YOU MUST BRING A PICTURE ID WITH YOU TO COURT

MICHAEL J. WALLER,
STATE'S ATTORNEY OF LAKE COUNTY
33 North County Street,
Suite #205
Waukegan, Il 60085
(847) 360-6538

31

1        Q        First of all, Denise, do you remember

2    Mr. Curran asking you a question if you have been

3    made any promises about your not being charged for

4    your "involvement" in this case?

5        A        Yes.

6        Q        Has anybody from the Lake County State's

7    Attorney's Office, the Lake County Sheriff's

8    Department or the Kenosha County Sheriff's Office

9    ever told you in preparing for this trial that we

10   believe that you were involved in Rick's death?

11       A        No.

12               MR. CURRAN:   Objection to what they

13   believed.

14               MR. STRICKLAND:   I am sorry, I am asking

15   what she was told.   Mr. Curran went into that.

16               THE COURT:   Overruled.

17               MR. STRICKLAND:   Thank you.

18       Q        No one ever accused you from law

19   enforcement in preparation of this trial of that, is

20   that correct?

21       A        That's correct.

22       Q        All right.   Now, regarding the life

23   insurance that Mr. Curran asked you questions about,

24   I believe that the settlement for that was $22,000,

34

32

1      is that correct?

2          A      No, my daughter, she got a check for

3      $30,000.

4          Q      Okay.  Is that the total amount?

5          A      Yes.

6          Q      Now, you were getting -- how much child

7      support had you already gotten from Rick just in two

8      years that you were getting?

9          A      I don't know, over 10, $12,000.

10         Q      That's in two years, correct?

11         A      Yeah.

12         Q      He would have been paying child support --

13     and Ashley is how old now?

14         A      She is five now.

15         Q      Until she was __ years old, correct?

16         A      Yes.

17         Q      For the next 13 years?

18         A      Yes.

19         Q      Over $7,000 a year?

20         A      Yes.

21         Q      Over $91,000 or so if he had been paying

22     at the rate that he was continuing to pay?

23         A      Yes.

24         Q      So as opposed to getting the $91,000 that

35

33

1    you would have gotten plus anything else, the total

2    amount that you have now to support her till she is

3    18 as a result of Rick is $30,000, is that right?

4        A    Yes.

5        Q    As a matter of fact, there is a judge that

6    oversees the spending of that money, is that also

7    correct?

8        A    Yeah.  I have it set up to where if, for

9    whatever reason, I needed that money, I have to go

10   in front of the judge and give him reasons why, and

11   then he can decide if I can take it out or not.

12       Q    Okay.  And so the money has to be used for

13   her benefit, correct?

14       A    That's correct.

15       Q    You have a lawyer named Charles Smith who

16   represents you on that?

17       A    Yes, I do.

18       Q    Now, in the preparation for this trial,

19   Denise, you were allowed to review some three dozen

20   pages of reports that you gave to the various police

21   departments, is that right?

22       A    That's correct.

23       Q    And did we ask you to review those for

24   accuracy?

36

34

```
1       A        , I did.

2       Q        What did you have?

3       A        About four or five shots.

4       Q        It wasn't six or seven?

5       A        No.

6       Q        What?

7       A        I don't recall exactly how many.

8       Q        Did Rick have a life insurance policy?

9       A        Yes, he did.

10      Q        And are you collecting social security

11   now?

12      A        My daughter is, yes.

13      Q        How much is that amount?

14      A        She gets $803 a month.

15      Q        And have you had other relations since

16   Rick?

17              MR. STRICKLAND:  Objection.

18              THE COURT:  Sustained.

19              MR. STRICKLAND:  I ask that the jury be

20   instructed, your Honor.

21              THE COURT:  Jurors are instructed to

22   disregard the last question.

23   BY MR. CURRAN:

24      Q        Is it a frequent occurrence with you that
```

22

# KENOA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

Ex.F 35

DATE OF REPORT:04/05/02
DATE-TIME REPORTED:01/09/02  0847
RE: HOMICIDE

CASE OR EVENT NUMBER:2002-2243
PAGE: 1 OF 4

INVOLVED:          DENISE K. SCHUBAT
                   F/W  11-15-77
                   39414- LAKE AVENUE
                   LAKE VILLA, IL. 60046
                   847-356-7455

INVOLVED:          RAYMOND (NMI) SERIO
                   M/W  11-16-73
                   912- LUNGA DR.
                   ROUND LAKE, IL. 60073

INVOLVED:          RONALD E. RUHL
                   (AKA: POKEY OR POKEYMON)
                   M/W  10-01-69
                   223 BRIARWOOD ROAD
                   CRYSTAL LAKE, IL. 60014
                   815-693-1498

INVOLVED:          AMANDA J. BARBARO
                   F/W  03-26-79
                   20884- VERONA AVE.
                   LAKE VILLA, IL. 60046
                   847-356-2753

On 04-04-02 I, Det. P Hafke was assigned to assist on a homicide investigation. It was requested that Det. K. Urquhart and I respond to Lake County Sheriff's Dept. to meet with Det. V. Lucci and Det. S Stanek.

Upon our arrival we were assigned to transport Amanda Barbaro to point out the residence of Derrick Banks. Information received is that Derrick Banks, (8-ball), may be in possession of a gun used in the homicide of Richard Neubauer. (See Det. Urquhart's report).

As part of the assist, it was requested that I transport Denise Schubat to the Public Safety Building in Kenosha. Denise agreed to take a C.V.S.A., (Computer voice stress analyzer). We left Lake County at approx. 12:10PM. Det. D. Smith met with Denise to conduct the test. I transported Denise back to Lake Co. at approx. 2:10PM. Det. Smith relayed the results of the C.V.S.A to Det. Stanek.

Upon are arrival at the Lake Co. Sheriff's Dept. Det. Lucci and I met with Denise in a private conference room to discuss the results of the test. Det. Lucci did excuse himself from the interview

DM-203

REPORTING OFFICER:
Detective Peggy Hafke, 129

SUPERVISOR:

**KENOSHA SHERIFF'S DEPARTMENT**
**SUPPLEMENTARY INVESTIGATION REPORT**

36

DATE OF REPORT:04/05/02                                         CASE OR EVENT NUMBER:2002-2243
DATE-TIME REPORTED:01/09/02  0847                               PAGE: 2 OF 4
RE: HOMICIDE

---

on several occasions as I continued to speak with Denise. I explained to Denise that it was important that she tell us all of the details that she can remember from the night that Rick was killed. (During a prior taped interview Denise did admit that she was present when Rick was killed).

Denise then began to tell me more details about the night. She indicated that she arrived to work at approx. 6:00PM at the Whiplash tavern. When she got there Ray Serio asked her if she wanted to spend the night with him. She told him No because she and Rick were going to go to Chicago after work. She stated that Ray was upset about this because he wanted to spend the night with her. Ray then made the comment, "I'm just gonna get rid of him to get it over with", Denise stated that she didn't have much of a response to his comment and just laughed it off. She told him, "Your crazy".

During the interview Denise stated that early in her shift, which started at 6:00PM, she went into a drawer at the end if the bar. She noticed that the revolver gun, which was wrapped in a blue towel, was there. ((She had seen this gun in the drawer on previous occasions and had told Ray to get rid of it because she didn't want to get into trouble with the cops if they ever came in and found it).

Denise stated that later in the evening, around 10:00PM or so a guy named Ron Ruhl came into the bar. She stated that his nickname is Pokey or Pokeymon. She indicates that Ron and Ray went into the kitchen for about ½ hour or so. After Ron left, (around 10:30PM), she went into the drawer again for something and saw that the gun and towel were now gone. At this point she thought Ray had gotten rid of it because she had told him earlier, and on other occasions to get it out of the bar.

Later in the evening Ray asked her again to spend the night with him. She again told him no, and again told him she would be spending the night with Rick. He then made the comment, "Let me kill him". She said she responded to his comment by saying, "No!" They didn't talk about it anymore during their shift. At closing time they kicked everyone out and she began to clean the bar. She stated that she overheard Ray talking to Ron, (Pokey) on their Nextel (direct connects). Ray was talking to Ron. She believes Ray was telling Ron to come and pick him up, as he did not have a car.

Ray told Denise that he wanted her to wait at the bar with him until Ron got there because he didn't want to wait alone. She told him that when Rick got there she was going to be leaving with him. A short time later she heard Ray talking to Ron again on their Nextels. Ray asked Ron, "Where ya at?" Ray then walked into kitchen, out of her sight, for approx. 5-10 minutes. She stated that she has no idea if he stayed in the kitchen or went outside. When Ray came back into the bar area, she heard him have another conversation with Ron on the Nextel. She heard him ask Ron if the car (described it), was still in the lot. Ron answered yes. Denise then said, "That must be Rick", as she got her purse and coat and began to walk towards the door. Ray stopped her. Ray then told Ron on the Nextel, " Go up to the window and shoot him in the head". Denise stated that Ray had a smirk on

DM-204

REPORTING OFFICER:                                              SUPERVISOR:
**Detective Peggy Hafke, 129**

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

37

DATE OF REPORT:04/05/02
DATE-TIME REPORTED:01/09/02  0847
RE: HOMICIDE

CASE OR EVENT NUMBER:2002-2243
PAGE: 3 OF 4

---

his face and she thought that he was just, "fucking with her". She then told him, "Alright that's enough. Ray said, "I'm doing it tonight". This is when Ray told Ron to go up to the window and shoot him in the head. Ron responded by saying, "Are you sure?" Ray then said, "I want to hear a gun shot". Denise stated that moments later she heard a gun shot.  She states that she ran to the door but was stopped by Ray. From where she was standing she could see Rick sitting in the drivers seat with his head tilted, she noticed that his jaw quivering. She stated that she almost collapsed so Ray walked her back to the bar where she sat down to collect her thoughts. She stated that she heard banging, then glass braking. Ray then came into the bar carrying the gun in the blue towel. He tried handing the gun to Ray but then sat it on the bar. Ray picked it up and began to wipe it off. Ray told her to leave the bar and go home as if nothing had happened. He also told her to call Rick as she routinely does, when she gets home. (From the time she heard the gun shot to the time she left the bar to go home was about 5-10 minutes.) She states she got home at 2:48AM, according to the clock on her microwave. She further indicated that it takes her 3-5 minutes to get to her house from the bar.

During the investigation we received information that Denise was aware that Rick was going to be killed and that she played a part in setting it up. I asked Denise if she ever told Ray that she wanted Rick dead. She admitted that she did make a comment in the past when she was upset with Rick, such as, "It would be better if he was just gone". She made this comment to Ray.

I asked Denise if Ray has ever talked in the past about killing Rick. She stated that they did. She went on to say that about a week before Rick was killed she was in the kitchen of the Whiplash tavern with Ray. He approached her and told her that he was serious about killing Rick. She stated that she told him, "Don't make me tell my daughter that her daddy is dead". She also told him that he can't kill her daughters' daddy. (It should be noted that during this portion of the interview Denise became very nervous. She would not make eye contact with me when I asked certain questions about her being more involved that she reports to be. Denise would yawn when in middle of answering a question about her knowledge of what was going to happen to Rick. She would look down at the table, put her head on the table and stand up and stretch).

I asked Denise if it is possible that she asked Ray to do this because Rick was abusive towards she and her daughter. She stated that everything was just fine between she and Rick and he did not abuse them.

Denise admitted that Ray has tried to have her, "SET RICK UP". She stated that on one occasion he told her to tell Rick that she was going to a party and he should pick her up there. Denise stated that Ray didn't give her a particular address or anything during this conversation. Apparently he was going to be waiting for Rick at this location to kill him. Denise states that she told him, "No". She stated that this conversation occurred the night he told her in the kitchen of the Whiplash that he was serious about killing Rick. (Approx. one week before Rick was killed).

DM-205

REPORTING OFFICER:
**Detective Peggy Hafke, 129**

SUPERVISOR:

## KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

38

**DATE OF REPORT:04/05/02**
**DATE-TIME REPORTED:01/09/02  0847**
**RE: HOMICIDE**

**CASE OR EVENT NUMBER:2002-2243**
**PAGE: 4 OF 4**

The next time Ray wanted her to set Rick up was on Friday night, the night before he was actually murdered. She stated that Ray told her to have Rick pick her up from work and bring her home. Once she got in the house she was suppose to call him, (Ray), and let him know she was no longer with Rick. She indicates that she again told him that she would not do this. (The next day Ray told her that he waited near her house until early in the AM so he could kill Rick). Denise stated that she and Rick went to the home of a mutual friend that night and they did not get home until early the next morning.

The next night, Saturday night, is when Rick was murdered. I asked Denise why she did not warn Rick that Ray was going to kill him. Denise was very uncomfortable with this portion of the interview as well. She would not make eye contact with me and often put her head down on the table. She answered my question by saying that she did not think Ray was serious. I talked to her about all of her conversations with Ray about killing Rick and how he wanted her to help set it up. She continued to say that she thought he was just joking.

After talking to Denise I asked her if she would be willing to give another taped interview regarding this additional information. She agreed to have this information documented as she did the first interview with Det. Lucci and Stanek. (See taped statement for details).

After taking the taped statement from Denise, Det. Lucci and I gave her a ride home.

DM-206

**REPORTING OFFICER:**
**Detective Peggy Hafke, 129**

SUPERVISOR:

·Ex. G  39

STATE OF ILLINOIS)
                            )    SS
COUNTY OF LAKE               )

### IN THE CIRCUIT COURT OF THE NINETEENTH
### JUDICIAL CIRCUIT, LAKE COUNTY, ILLINOIS

### APPLICATION FOR AUTHORIZATION TO USE
### EAVESDROPPING DEVICES

Now comes Det. Timothy Jonites, an investigator with the Lake County Sheriff's Office and J. Doe, upon the authorization of Assistant State's Attorney, Daniel B. Shanes, Chief of the Drug Prosecutions Division, who has been approved for such authorization by MICHAEL J. WALLER, State's Attorney of Lake County, Illinois, and hereby makes application for an authorization to use eavesdropping devices and in support thereof states as follows:

1.   Your affiant has reasonable grounds to believe that the crime of First Degree Murder, a felony offense under the laws of the State of Illinois, in violation of 720 Illinois Compiled Statutes 5/9-1(a), has been committed by Ray Serio.

2.   Your affiant bases his belief that the crime of First Degree Murder has been committed upon the following: Your affiant, Det. Timothy Jonites, states that on January 6, 2002 a body was found inside a vehicle located at the Renaissance Faire, Bristol, Wisconsin. Investigation revealed that the victim had been shot twice in the head. The victim was subsequently identified as Richard Neubauer.

Your affiant states that on March 27, 2002 your affiant was contacted by J. Doe and J. Doe related the following:

J. Doe states that J. Doe is not J. Doe's true name. J. Doe states that since the middle of January, 2002, J. Doe has had several conversations with a subject known as Ray Serio. J. Doe states that during their conversations, Ray Serio related that he had shot Richard Neubauer in the head while in the parking lot of Whiplash Bar located at Route 83 and Grass Lake Road in Antioch. Ray Serio further stated that Richard Neubauer was sitting inside Neubauer's car, when Ray Serio came up to the driver's side window and shot him. Ray Serio subsequently drove the car to the area of the Renaissance Faire in Bristol, Wisconsin. Ray Serio stated to J. Doe that at the Faire

88

grounds, Serio feared that Richard Neubauer may still be alive and he shot Richard Neubauer in the head a second time.

Your affiant states that J. Doe intends to talk with Ray Serio within the next thirty days regarding the offenses described above.

Your affiant states that there have been no known previous applications for overhear involving Ray Serio.

3.    J. Doe has consented to the use of eavesdropping devices to monitor all telephone and in person conversations between J. Doe and Ray Serio.  A signed consent to the use of those eavesdropping devices is attached.

4.    Assistant State's Attorney, Daniel B. Shanes, Chief of the Drug Prosecutions Division, who has been approved for such authorization by Michael J. Waller, Lake County State's Attorney, has consented to this application and that consent is attached.

5.    Your applicant states that the eavesdropping devices are to be maintained for a period of time beginning at March 28, 2002 at 4:00 p.m., and ending at April 27, 2002 at 4:00 p.m.  Your applicant further requests that the authorization for use of eavesdropping devices shall not terminate automatically when the above-described communication is overheard or recorded, in that Det. Timothy Jonites states that J. Doe will continue to speak with Ray Serio concerning the events surrounding this incident.

Respectfully submitted,

Det. Timothy Jonites
Affiant

J. Doe

41

I, Det. Timothy Jonites, being duly sworn upon oath, state that I have read the foregoing Application and that it is true.

_____
Det. Timothy Jonites

_____
J. Doe

SUBSCRIBED and SWORN to before me on March 28, 2002. 3:85 P.M.

_____
J U D G E

90

STATE OF ILLINOIS

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT

LAKE COUNTY, ILLINOIS

## COMPLAINT FOR SEARCH WARRANT

Det. ~~Timothy Jonnes~~ Curtis Gregory of the Lake County Sheriff's Offic   Complainant, now appears before the undersigned Judge of the Circuit Court and requests the issuance of a Search Warrant to search:

A.    The following described property: the property grounds, shed, and residence at the common mailing address of 912 Lunga, Round Lake, Lake County, Illinois. Said residence is a single-story single family mobile home having white and gray exterior siding. Said building has a flat roof and is situated on the south side and faces northwest out on to Lunga. The numerals "912" are attached to the residence west of the entry door. There is a white carport and brown wooden porch attached to the residence. There is a white shed located south of the residence.

Complainant requests a Search Warrant for the purpose of seizing the following described instruments, articles and things: firearms, firearm components, firearm ammunition, any and all firearm accessories.

The afore-described instruments, articles and things have been used in the commission of or constitute evidence of the offenses of: First Degree Murder, 720 ILCS 5/9-1(a).

Complainant has probable cause to believe, based upon the following facts, that the above listed things to be seized are now located upon the person and or property set forth above. Your Affiant, Det. ~~Timothy Jonnes~~ Curtis Gregory, states he is a police officer employed by the Lake County Sheriff's Office and has so been employed for the past 14 years.

Your affiant, Det. ~~Timothy Jonnes~~, states that on January 6, 2002 a body was found inside a vehicle located at the Renaissance Faire, Bristol, Wisconsin. Investigation revealed that the victim had been shot in the head. The victim was subsequently identified as Richard Neubauer.

Your affiant states that Ray Serio has been recorded on tape claiming involvement and responsibility for the shooting. This was recorded pursuant to a court ordered overhear.

On April 4, 2002, ~~your affiant~~ Det. Tim Parks spoke with a subject identified as Ray Serio. During this interview, Ray Serio acknowledged involvement and responsibility for the shooting death of Richard Neubauer. Ray Serio further stated the shooting was done with a chrome revolver handgun. Ray Serio stated that after the shooting Ray Serio transported the gun away from the scene.

Investigation has revealed that Ray Serio resides at 912 Lunga, Round Lake, Illinois. This is the residence of Ray Serio's mother as well.

Further investigation has revealed that Ray Serio has 1995 convictions for Residential Burglary and Unlawful Use of Weapon by Felon (Lake County) and Defacing Firearm Identification Markings (Cook County) and a 1998 conviction for Unlawful Possession of Cannabis in a Penal

## KENO●●A SHERIFF'S DEPARTMEN●
## SUPPLEMENTARY INVESTIGATION REPORT

Ex. H 42

DATE OF REPORT:04-07-02
DATE-TIME REPORTED:  / /
DE: DEATH INVESTIGATION

CASE OR EVENT NUMBER: 2002-2243
PAGE: 1 OF 3

NVOLVED:

AMANDA J BARBARO F/W 03-26-76
23315 w. Liberty
Lake Villa, IL. 60046
847-445-8770

Lake County Sheriff Dept.
Lake County IL.
847-360-6300

DENISE K SCHUBAT F/W 11-15-77
39414-LAKE AVE
LAKE VILLA, IL
847-356-7455

RON DALUM
CANADIAN NATIONAL-
WISCONSIN CENTRAL DIVISION
CHIEF TRAIN DISPATCHERS OFFICE
STEVENS POINT, WI. 54481
PH. 715-345-2461

On 03-28-02 at approximately 0830hrs., I received information from Lake county Sheriff
epartment concerning the homicide investigation of Richard Neubauer. A subject by the name of
manda Barbaro was currently in custody in Lake County and indicated she had knowledge of who
id where Neubauer was shot and killed. I made contact with Detective Stanek #156 and we
aveled to Lake County Sheriffs' office and made contact with Detective Tim Jonites who directed us
an interview room where we met and obtained a statement from Amanda Barbaro.

Amanda had previously provided similar information the night before to a Round Lake officer
ter being stopped for a traffic violation. After further discussing the information with Amanda, It
ppeared she was being forthright with the information and the information she provided seemed
ausible to the circumstances known to us about the case.

She indicated that a Raymond Serio confided this information to her on two occasions. This
st time being sometime in January 2002, at which time he eluded to knowing what happened to
eubauer. The later time being approximately a week prior to our meeting with her at which time he
ve great detail of what occurred and who had been involved. See statement.

She also gave information regarding Denise Shubat and her involvement. Serio allegedly told
manda that Denise was present at the time Rick was shot and that she was aware it was going to

DM-185

PORTING OFFICER:
tective Vincent Lucci #130

SUPERVISOR:

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

43

DATE OF REPORT:04-07-02
DATE-TIME REPORTED:  / /
RE: DEATH INVESTIGATION

CASE OR EVENT NUMBER: 2002-2243
PAGE: 2  OF 3

happen as it was planned on prior occasions. Amanda states that Serio also implicated another subject known as Ron Ruel, AKA "POKE". Poke allegedly moved the victim over to the passenger seat after he was shot in the head and then drove the victims' vehicle to the area it was left at the Renaissance Fair.

After obtaining the statement from Amanda she advised that she could possibly meet with Serio and engage him in conversation about the shooting, as it seemed to her she liked talking to her about it.

An overhear was granted through Lake Co. Courts and surveillance was set up with two adjoining rooms at the Best Inns Motel, located on hwy 31 in Waukegan Ill.. No contact was made with Serio as he reportedly gotten sick and could not make the trip to the motel. The surveillance was terminated at approximately 0030hrs on 03-29-02.

At no time did Amanda ask for or receive compensation for her information. When asked why she was coming forward with the information, she indicated because what Serio did was not right and there were a lot of people in jail already for things they didn't do.

Amanda was given contact information for Detective Stanek and I and advised she would call set up another meeting. See Detective Staneks' reports for further.

During our interview with Amanda she had indicated that Serio had made mention that after dropping the vehicle with the victim at the Renaissance Fair that he and Poke were stopped by Waukegan PD on a unrelated matter and that the vehicle was searched. She states the vehicle that Serio had at the time was an 89-91 Mercury Marquee 4door silver or gray in color. She states he had obtained the vehicle from Rock n Bock Chevrolet in Grays Lake IL.. She also stated that something didn't go through with the loan for the vehicle and Serio had to give the vehicle back to the dealership. Amanda also indicated that Serio had made mention of a train passing by the Whiplash Tavern at the time Neubauer was shot.

Later on 03-29-02 Detective Stanek and I went to the area of the Whiplash Tavern. We noticed the Wisconsin Central Rail line travels north and south directly east of the Whiplash Tavern. I contacted the railroad and spoke to Ron Dalum and inquired as to if he could give me specific times that various trains would have past through the crossing at Grass Lake rd. east of Hwy. 83 in IL. on the night in question. Dalum faxed me a report of trains passing over Grass Lake road between the hours of 0045 and 0415 on 01-06-02. The report lists four northbound and two southbound trains for the time inquired. The time of one of the northbound trains is listed at 0220hrs. which is consistent with the time Neubauer would be at the Whiplash Tavern to pick up Denise.

An inquiry with the office of the FBI for an offline search was made on Serio to attempt to verify the traffic stop on Serio and the vehicle described by Amanda. The search came back with a

DM-186

PORTING OFFICER:
Detective Vincent Lucci #130

SUPERVISOR:

## KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

44

DATE OF REPORT:04-07-02
DATE-TIME REPORTED:  / /
⌐ ⌐; DEATH INVESTIGATION

CASE OR EVENT NUMBER: 2002-2243
PAGE: 3  OF 3

confirmation of contact with Raymond Serio on 01-06-02 at 06:17:52 by Waukegan PD. The search also indicates a VIN of 2MECM75F2LX652274. Checking the VIN it lists to a 1990 Mercury Grand Marquis which is also consistent with information provided by Amanda. It should be noted that the time of the contact is listed in Eastern Time Zone, which would make it 05:17:52 Central Time Zone.

Additional contact was made with Amanda Barbaro regarding additional surveillance attempts. See other reports for details.

DM-187

PORTING OFFICER:
etective Vincent Lucci #130

SUPERVISOR:

45



# FBI FACSIMILE

## COVER SHEET

| PRECEDENCE | CLASSIFICATION | |
|---|---|---|
| ☐ Immediate | ☐ Top Secret | Time Transmitted: _____ |
| ☐ Priority | ☐ Secret | Sender's Initials: __JZM__ |
| ☒ Routine | ☐ Confidential | Number of Pages: __5__ |
| | ☐ Sensitive | (including cover sheet) |
| | ☒ Unclassified | |

To: KENOSHA CO SO _____     Date: 04/02/2002
        Name of Office

Facsimile Number: 262/605-5195 _____

    Attn: DET. STANEK _____ 262/605-5140
        Name         Room     Telephone

From: FBI/NCIC/IOAU _____
             Name of Office

Subject: RESULTS OF YOUR NCIC OFF-LINE SEARCH

       REQUEST. _____

_____

Special Handling Instructions: _____

_____

Originator's Name: JO ANN Z. MOOR _____ Telephone: 304/625-3176

Originator's Facsimile Number: 304/625-5393 _____

Approved: _____

Brief Description of Communication Faxed: _____

_____

_____

## WARNING

Information attached to the cover sheet is U.S. Government Property. If you are not the intended recipient of this information, disclosure, reproduction, distribution, or use of this information is prohibited (18 USC, § 641). Please notify the originator or the local FBI Office immediately to arrange for proper disposition. DM-224

46

# INVESTIGATIVE AND OPERATIONAL ASSISTANCE UNIT

## CASE QUESTIONNAIRE

ORI :                    WI0300101

DATE:                    04/02/2002

CASE NO:                 2002002808

ANALYST NAME:            MOOR, JOANN

REQUESTOR'S NAME:        STANEK. DET.

AGENCY:                  KENOSHA CO SO


ENCLOSED ARE THE RESULTS OF YOUR OFF-LINE SEARCH REQUEST.

SO THAT NCIC CAN ANALYZE THE EFFECTIVENESS OF THE OFF-LINE SEARCH PROGRAM,
PLEASE COMPLETE THE FOLLOWING QUESTIONNAIRE AFTER DETERMINING WHAT BENEFITS THE SEARCH
PROVIDED TO YOUR INVESTIGATION.

* NUMBER OF:

    INDIVIDUALS CHARGED OR ARRESTED:

    MISSING PERSONS LOCATED:

    OTHER (SUSPECTS DEVELOPED,
    ALIBIS SUBSTANTIATED ETC.)
    PLEASE SPECIFY:



* APPROXIMATE VALUE OF PROPERTY OF
  CONTRABAND RECOVERED OR SEIZED:

* NO BENEFITS:

* ANY ADDITIONAL COMMENTS OR DETAILS:


PLEASE RETURN QUESTIONNAIRE TO FAX NUMBER (304) 625-5393 OR CALL (304) 625-3000. THANKS!

OM-225



47

# EXAMPLE OF NCIC OFF-LINE TRANSACTION LOG SEARCH

## Sample I

H    *    A    *    B    *
53      1991-01-10-04.15.51.930000
1L0181TCQWW59MLXPF34J.QW.WASPD0000 NAM/RUTHERFORD, EMORY.SEX/M.RAC/W.DOB/010161
*    C    *    D*    E    *    F
*[NCIC "inquiry" Transaction]*

H    *    A    *    B    *
53      1991-01-10-04.15.51.970000
1L0181TCQWW59MLXPF34J *C*
WASPD0000 *E*
*G*
*[Response from NCIC to "inquiry"]*

MKE/WANTED PERSON
ORU/DCB1NWAQ8 NAM/RUTHERFORD,HOWARD EMORY SEX/M RAC/W DOB/19610101
HGT/507 WGT/230 HAIRED
OFF/PUBLIC ORDER CRIMES SEE MIS
DOW/19980615    OCA/TEST
MIS/PUBLIC ORDER
NIC/W063186235

## Sample II

H    *    A    *    B    *
53      1991-06-17-23.01.01.320000
1L0181TCQWW59MLXPF34J.QW.WASPD0000.NAM/RUTHERFORD, EMORY.SEX/M.RAC/W.DOB/050170
*    C    *    D*    E    *    F
*[NCIC inquiry Transaction]*

H    *    A    *    B    *
53      1991-06-17-23.01.01.330000 (A and B)
1L0181TCQWWF59MLXPF34J *C*
WASPD0000 *D*
*[Response from NCIC to "inquiry"]*

NO NCIC WANT   NAM/RUTHERFORD,EMORY   DOB/050171   SEX/M
*G

### KEY

Sample I. Transaction with a positive response.
A. Date of inquiry (Year - Month - Day")
B. Time of transaction (always in eastern time / hour, minute, seconds, milliseconds)
C. Header (sequence of characters acceptable to NCIC which is used to provide message information for the control terminal agency.
D. Message Key
E. ORI (Originating Agency Identifier, agency who initiated the inquiry)
F. Searchable information
G. Record information response or "no record" response.
H. Line number of circuit over which transaction was received and response was returned
Sample II. Inquiry with a negative response (A-H see key above)

DM-226

APR-02-2002   10:12    FBI

48

S-17

SA  2002-01-06.17.52.149950
1LO1XXXLT16IZZZ    .ZW .1L0492IE1.NAM/SERIO,RAYMOND.SEX/M.DOB/19731116.VIN/2WECM75F2LX852274.OLN/S6007207332G

6A  2002-01-06.05.17.52.844762
1LO1XXXLT16IZZZ
1LO492IE1

MKE/WANTED PERSON
ORI/VA1120000 NAM/SIERRA,JOSE ANDRADES SEX/M RAC/N POB/PR DOB/19721116
HAT/510 WGT/175 EYE/BRO HAI/BLK FBI/3130A1PB2
MNU/OA-VA13167BBM SOC/5591417908
OLN/S6147908 OLS/VA DLY/2001
OFF/FAILURE TO APPEAR - SEE MIS
DOW/20010710 DCA/T86071108
MIS/NDEX H/M ORIG CHARGE POSSESS COCAINE ALSO 1 CAPIAS FTA ON SHOW CAUSE FOR
MIS/ASAP REVOCATION DOW/20010821
ORI IS HARRISONBURG PD 540 434-2545
AKA/ANDRADES,JOSE
NIC/WN01754286 DTE/20010712 1602 EDT
IMMED CONFIRM WARRANT AND EXTRADITION WITH ORI
NO NCIC WANT OLN/S6007207332G
NO NCIC WANT VIN/2WECM75F2LX852274

ORI IS WAUKEGAN PD

847 599-2608

ABSS1111 C1111

BY N FAN 9

848 99

DM-227

49

```
5F    2002-01-06-06.19.49.243509
1LO1532              .QW .1LO492IA3.MAIN/SERIO.RAYMOND.SEX/M.DOB/19731116

5F    2002-01-06-06.19.49.395846
1LO1532
1LO492IA3

NKE/WANTED PERSON
ORI/VA1120000 NAM/SIERRA,JOSE ANDRADES SEX/M RAC/W POB/PR DOB/19741116
HGT/510 WGT/175 EYE/BRO HAI/BLK FBI/313041PB2
NMU/OA-VA01A7BOW SOC/36141790B
OLN/S08141790B DLS/VA DLY/2001
OFF//FAILURE TO APPEAR - SEE MIS
DOW/20010710 OCA/TB6011100B
MIS/WOEX M/W ORIG CHARGE POSSESS COCAINE ALSO 1 CAPIAS FTA ON SHOW CAUSE FOR
MIS/ASAP REVOCATION DOW/20010821
ORI 15 HARRISONBURG PD 540 434-2545
AKA/ANDRADES,JOSE
NIC/W8517542B6 OTE/2001D712 1802 EDT
IMMED CONFIRM WARRANT AND EXTRADITION WITH ORI

ORI IS WAUKEGAN PD
***END OF REPORT***
```

REPORT DATE:  03-29-2002   847 599-2608   RECORDS REPORTED:

2

DM-228

:28:08 AM

## VINassist(R) Version 1.23

### (c) by NICB   1991

#### Law Enforcement Edition

#### VIN:2MECM75F2LX652274

| :T | DESCRIPTION | MEANING |
|---|---|---|
| | Country of Origin | CANADA |
| | Manufacturer | MERC   MERCURY |
| | Vehicle Type | PASSENGER CAR |
| | Restraint System | AIR BAG & ACTIVE BELTS |
| | Line | MERCURY |
| | Body Style | GRAND MARQUIS LS 4 DR SEDAN |
| | Engine | 5.0L V8 EFI |
| | Check Digit | CHECK DIGIT VALID |
| | Year | 1990 |
| | Assembly Plant | ST. THOMAS:TALBOTVILLE, ON (CANADA) |
| 274 | Sequence Number | IN RANGE |

*********** VIN Passed Test ************

VIN indicates a 1990 MERCURY GRAND MARQUIS LS 4 DR SEDAN

(c) by NICB, 1991

1      A      Yes, it is.

2      Q      So you are a very busy officer?

3      A      Yes, sir.

4      Q      And regarding this particular case of

5   which you have testified to having made this stop,

6   did you write a report regarding this particular

7   stop?

8      A      No, I did not.

9      Q      And when did you first have contact with

10   the State's Attorney's Office regarding the stop on

11   Raymond Serio?

12      A      Maybe two days before the actual trial, I

13   would say.

14      Q      Earlier this year, is that right?

15      A      Yes, sir.

16      Q      So it wouldn't have been in 2002.  And in

17   the interim, you stop approximately how many cars a

18   day, would you say?

19      A      On a weekday, five, six, seven.  It

20   varies, depending on the type of night it is.

21      Q      I am sorry.  In your work, at least five

22   days a week, probably trying to get overtime, maybe

23   six, if you can, six or seven.  And you multiply

24   that by the number of days you work every month, and

1    it adds up to be a humongous number of traffic stops                 506

2    you make every month, is that correct?

3          A    Yes, sir.

4          Q    Now, do you remember why you stopped that

5    car on that morning?

6          A    Not specifically, no.

7          Q    There were no violations that you recall?

8          A    There was a violation; I just don't recall

9    what it was.

10          Q    You don't know who said what, do you?

11          A    I am sorry?

12          Q    Actually, strike that question.  Do you

13    remember what anyone was wearing in the car?

14          A    I do not.

15          Q    And other than the open alcohol, there was

16    nothing unusual that you saw regarding Raymond

17    Serio, is that correct?

18          A    The best way that I remember the traffic

19    stop --

20          Q    Other than appearance.

21          A    -- was --

22               MR. STRICKLAND:  Objection.  The witness

23    is answering the question.

24               MR. CURRAN:  Judge, may I approach?

50 a

1                    (The following proceedings were

2                    had outside the hearing of the

3                    jury:)

4          MR. STRICKLAND:  You have already ruled on

5    this.

6          MR. CURRAN:  He doesn't have to beat it

7    over the head, which is what he is trying to do.

8          MR. STRICKLAND:  Mr. Curran is the one

9    asking the questions about all the different traffic

10   stops he has made in the interim.  He is the one

11   that's going in this direction.

12         MR. CURRAN:  Judge --

13         THE COURT:  What do you want to do?

14         MR. CURRAN:  Nothing, Judge.  I will

15   withdraw the question.

16         THE COURT:  I am just asking you.

17         MR. CURRAN:  The question was so

18   prejudicial, I didn't want to get into the picture

19   any more than it's already been gotten into.

20         MR. STRICKLAND:  Just keep in mind, there

21   is a videotape in this case.

22         THE COURT:  If it's so prejudicial, you

23   are the one that's bringing it up.  It's not

24   prejudicial.  I did not find it is prejudicial

177

50 o

1    because it has more probative value.

2              MR. STRICKLAND:  The door was open several

3    questions ago, but the fact is, he is still trying

4    to answer a question, and he was interrupted because

5    Mr. Curran didn't want to hear the answer to the

6    question.

7              MR. CURRAN:  I didn't anticipate that that

8    was going to get snuck into his answer, but --

9              THE COURT:  They haven't talked --

10             MR. STRICKLAND:  Not only has this not

11   been snuck in, but we told Mr. Curran prior to this

12   trial that he was testifying based on his memory;

13   based on his appearance.  This is not being snuck

14   in.  We had pretrial motions on this.

15             THE COURT:  That's what made him remember,

16   if I recall correctly from the first trial, too,

17   Mr. Curran.  What do you want to do?

18             MR. CURRAN:  I don't have anything else of

19   the officer.

20             THE COURT:  All right.

21                       (The following proceedings were

22                        had within the hearing of the

23                        jury:)

24             THE COURT:  I take it the question is

1    withdrawn?

2              MR. CURRAN:  Withdrawn, Judge.

3              THE COURT:  Redirect, if any.

4              MR. PAPPAS:  Yes, your Honor, just

5    briefly.

6                   REDIRECT EXAMINATION

7    BY MR. PAPPAS:

8        Q    Officer Lamanna, you mentioned -- on cross

9    examination, you indicated that this was brought

10   to -- or the first time you spoke to the State's

11   Attorney's Office regarding that traffic stop was

12   two days before the hearing or the trial.  That's

13   not this trial, correct?

14       A    No, no, that was --

15       Q    That was some time ago?

16       A    Correct, Ronald Ruhl's trial.

17             MR. PAPPAS:  Thank you.  I have no further

18   questions.

19             MR. CURRAN:  Judge, I just have one

20   question.

21             THE COURT:  Sure.

22             MR. CURRAN:  Thank you, your Honor.

23                  RECROSS EXAMINATION

24   BY MR. CURRAN:

50F

1        Q    Did you conduct a patdown search, if you

2    recall?

3        A    I would say yes, I did, because that would

4    be standard practice if you were having two subjects

5    step out of the vehicle.  I believe the officer that

6    was the secondary officer on the scene, he went to

7    the passenger side and conducted -- he asked that

8    the passenger pull out, so I would assume that he

9    completed a pat search of the passenger while I

10   completed a pat search of the driver.

11            MR. CURRAN:  Thank you.  I don't have

12   anything else.

13            MR. PAPPAS:  No follow-up, your Honor.

14            THE COURT:  You may step down.  Thank you.

15               (Witness excused.)

16            THE COURT:  I think we should take our

17   afternoon recess.

18            MR. STRICKLAND:  Fifteen minutes, Judge?

19            THE COURT:  Approximately.  You may take

20   the jury out.

21                    (A recess was taken, after which

22                    the following proceedings were

23                    had:)

24            THE COURT:  Do you wish to approach?

Ex. I  S1

KU    Detective Urquhart
JW    John Willer
SS    Detective Stanek
MC    Michael Cunningham


KU    This is ah Detective Ken Urquhart of the Kenosha County Sheriff's
      Department. I'm here with ah Detective Stanek also with the Kenosha
      County Sheriff's Department. And then also...

JW    Deputy John Willer, Lake County Sheriff's Department.

KU    And we're here talking with ah MICHAEL CUNNINGHAM. Ah, we're here
      just as a interview. We're not looking for any charges against MICHAEL.
      We are simply here for ah information as to the death ah and possible
      suspects in in the death of RICHARD NEUBAUER. Ah MICHAEL, If you
      could please give us your full name, date of birth, and address.

MC    My name is MICHAEL CUNNINGHAM. 4-7-69. Ah currently was residing
      at 311 Ida Street, Antioch Illinois.

SS    And you have no problem with this conversation being tape recorded?

MC    No, none whatsoever. I'm doing this on my free will to help the detectives
      and John find a possible suspect or clues in this homicide.

KU    Okay, and we have given you no promises or...

Speaker unknown          Or anything.

MC    No sir.

KU    Okay. Um, why don't you start by telling us what your affiliation or
      association was with RICK NEUBAUER.

MC    Um, I would frequently go to the ah ah tavern, which is called Whiplash
      which is on ah Grasslake Road and 83. Ah, I was kind of seeing a girl that
      was a bartender there. Her name was NICOLE JOHNSON. Um, I knew
      RICK um as a ah acquaintance at the at the tavern. Would go there ah
      shooting pool. I would go there to buy cocaine ah go there to listen to
      bands. Ah, sometimes I had boughten cocaine from RICK in small
      increments such as fifty dollar packages or sixteenths. Um, I have went
      with him from there to another bar in Antioch called the Limerick which we

52

would go there frequently after the Whiplash would close. Um, I know that ah RICK had affiliation with RON and CHUCK the owners of the Whiplash and would ah sell cocaine to the patrons in the Whiplash um which the people I'd you know, just would know by face from being in there. Um, not really sure where he would get the cocaine. I do believe he would get it through CHUCK which is one of the owners and ah they would break it up into fifties and teeners and would sell it to the patrons in the bar. Um, they would have, I don't know if called competition, but ah the ah SARRANO brother um Ped, is it JOSE or PEDRO?

JW    There's a couple....

MC    Okay.

JW    (inaudible) JOSE.

MC    JOSE (inaudible) one okay. JOSE SARRANO would come in there and they would have um both of them would be selling that would be basically his competition. Um....

KU    When you when you say "His competition" you mean that was RICK'S competition was JOSE or RAY'S competition?

MC    It it would be RICK'S, RAY'S and CHUCK'S but not in the sense....I'm saying from my point of view competition. I did never saw em go head to head whether it was a problem...

SS    So JOSE would actually come into the Whiplash?

MC    Yes.

SS    And sell drugs there?

MC    Yes.

SS    Okay.

MC    I've boughten drugs from him. Um, I went from JOSE me JOSE and NICOLE ah a month ago. Left the Whiplash and went to Limerick cause Limerick stays open an hour after the Whiplash and be due to the fact that NICOLE was bartending and couldn't drink while she was working we would like to go there for cocktails. The three of us um, JOSE, I and NICOLE went to um Whiplash or to Limerick when we go pulled over coming back from my house. And ah we got some cocaine from that night and he h hid the rest of the cocaine in his car. Antioch dropped him back

53

up at my house and I drove him to ah a gentlemen's house by the name of FREGAS where ah RON was, the owner of the Whiplash.

KU    Okay.

MC    I let RON use my car at four o'clock in the morning to drive JOSE SARRANO to his house in Lake Villa which is off of Grand Avenue ah across from the fire station, okay. And then, RON, I and NICOLE JOHNSON went back to the Whiplash and got a six pack of beer and some more cocaine there.

SS    What's RON'S last name?

MC    I don't know. I don't know what his last name is. He's a bald gentleman with a tattoos of horns on his skull. Affiliated with the Latin Kings. Um, his brother's name is CHUCK. Ah..

KU    Now is JOSE SARRANO, is he also a Latin King? Is also got gang affiliation?

MC    I don't know. I just talked to some friends of mine he here. Ah, he's a Maniac and his brother ah PED er THUNDER is the chief and calls the shots for the Maniac's.

KU    Okay.

MC    Okay. The Maniac's and the Latin Kings do not get along. Okay. Now RON, the owner....

SS    Bar RON or RAY.

MC    ....RAY, I'm sorry.

JW    It's RAYMOND, right?

MC    Yes. RAY and CHUCK. Ray is the bald headed one.

JW    Okay.

MC    RAY an and his friends the affiliation in the bar of th the Whiplash are predominately Latin Kings. They're two ones which are two one boys from the twenty first street in Chicago. I ah other that asked they says there might be a twenty first street here in Waukegan which would be a branch . of the Latin Kings but he wasn't sure. Okay.

KU    Okay.

3

54

MC    The Maniac's which THUNDER and his brother are, do not get along with the Latin Kings but they will join together if there is money to be made. Okay.

KU    Okay.

MC    Like persay, I'll front you cocaine and you sell it in your establishment, I want my cut out of it. Other than that if there's any problems, the they will have it out....

KU    Okay.

MC    ....this is where I did find out ah ah about the two the two gangs. Um, from what I've heard and I've mentioned the name around the pot just since yesterday THUNDER and the SARRANO'S that ah you don't want to fuck with them. You fuck with them we wi they'll get ya.

KU    Okay. "Get ya" as in I mean....

MC    They can take you out.

KU    Okay.

MC    And ah, I've talked with these are some gang bangers that I've talked too ah...

KU    Okay.

MC    ...some other Maniac's that are in there and some ah SD's and some GD's that know....

KU    Have you heard anything as far as NEUBAUER being into the SARRANO'S in for money or for cocaine or being fronted money or cocaine?

MC    Honestly, since I've been in here tw in the last two months, no I haven't.

KU    Okay.

MC    I cannot answer that sp put anything on there. To take an educated guess, yes. I would...

KU    Okay.

SS

**MC**    ...say that he I d d I don't w go as far as that not in to him but would he go through him to get his drugs, absolutely.

**KU**    Okay.

**MC**    I can go I can put that I can put a little wager on that that say that sure. On neutral terms to start out with, SARRANO would front him something. Hey, here's a quarter ounce, give me my money back tomorrow or at the end of the night. I can see that happening....

**KU**    Okay.

**MC**    ....without hesitation I'll answer that. Is it possible that he could get into him for some money, yes because NEUBAUER was a user. Now JOSE from what I've watched from him, he was about the money. The man wouldn't do the cocaine and would drink and he was about the money. As opposed to NEUBAUER or myself that would get some drugs would sell it just to keep myself high and break even. You know, he was a user, SARRANO uh uh, money.

**KU**    Okay. Okay.

**MC**    Money guy. Um, also the NEUBAUER ah a couple times I didn't go with him but they went from Limerick and they would go to Ralph's, a bar up on C and 83.

**KU**    Alright.

**MC**    And NICOLE would tell me that. NICOLE would go with them, up there with RON.

**SS**    Do sh does she (inaudible) up there?

**MC**    I, to be honest with gentleman I can't say yes or no but they would go up to Ralph's. I don't want to put...

**KU**    Okay.

**MC**    ....I don't...

**KU**    Um, now you were pretty good friends with NEUBAUER or just kind of an associate.

**MC**    Associate.

**KU**    Okay.

MC    I'll be absolutely honest with you.

SS    What do you know about his girlfriend DENISE the bartender?  DENISE SCHUETTE.

MC    Sell ah packages ah a user um...

SS    She would sell right at the bar?

MC    Yes and so would NICOLE. Um, that was that's that's in ah to a drug dealer, that's a good thing and I'm gonna tell how they how to use that to their advantage. If I'm bartending and I've been there for a couple months I know I don't know you and I don't know you so you guys might be cops. But these other three guys I know them so their cool that I can sell them fifties and fifties and fifties. So, if I have a half ounce, I'm going to cut all my packages up and I'm gonna front it up to the bartender. Okay, I'm going to give it to you to sell because I know you're not going anywhere from six until close.. And I know you're going to have my money so I'm gonna give you five packages to sell but I'm gonna give you one for free and that's going to be your commission. Now don't fuck with those five bags. So what they were doing is that they were using the girls. They're using NICOLE to get her packages off through there and while they would sit in the corner and play the video game or shoot pool and keep an eye on their business makes sure no one will fuck with the bartender but the bartender, it was her best judgment who was cool and who was not cool. So they would filter....

KU    So...

MC    ...their packages through her and NICOLE.

KU    ...NICOLE and DENISE then were were selling for who? For SARRANO or for...

(Unknown)    For RAY.

KU    ...for RAY and CHUCK?

MC    Yes.

KU    RAY and CHUCK they were.

MC    Yes. SARRANO would go through NICOLE but the times when I saw him I would be in there Sunday or Monday night or it would be a slower night, SARRANO would have it on him per on his person or he would go out to

57

his car and get it. And the car that he would keep it in or come there with would be was in brother's name. It's THUNDER'S because when we got pulled over they ran the plates and the VIN number and it came back to THUNDER.

KU   Okay.

MC   And the and they said "Where's he at?" da da dah. And he say's "I don't know".

SS   Now how often would you frequent that tavern?

MC   Three times a week.

SS   What time would you s get there.

MC   Friday. I'd be there Friday's, Saturday's for sure um what time, from nine, ten from nine or ten until closing and then I'd usually to the Limerick with them. Because I lived a couple of blocSS from the Limerick. We park my the car at my house and walk.

SS   Now now when they would close, would ah DENISE'S boyfriend RICHARD NEUBAUER be there to pick....

MC   Yeah.

SS   ...her up every night?

MC   Or see he was pretty tight with RON. Everybody would be out...

SS   With RAY...

MC   Yeah....

SS   ...you mean?

MC   ...Yeah. Why do I keep saying RON.

SS   I don't know.

MC   Um, he would chew everybody out of the bar except them guys and now he RON RAY would also like to now NICOLE was bisexual and so was DENISE kind of in a way so if there were women in the bar that RAY wanted to stick around, he would send NICOLE or her after them, boom get her high or turn them on to some toots and then keep the the women

in there.   RON'S not too of attractive guy so I wou my m m my impression was he liked to watch them freak....

SS     Would...

MC     ....over drugs.

SS     .....would ah RICHARD NEUBAUER ever come into the bar?

MC     To the Whiplash?

SS     When one of you would pick her up?

MC     Yeah.

SS     When you picked DENISE up.

MC     Yeah.

SS     He didn't always just pull up to right around closing time and wait in his car and wait in his car...

MC     No.

SS     ...for DENISE to get done counting her tips and...

MC     No.

SS     ...whatever else...

MC     No he'd come in.

SS     ...and then she'd come out to the car.   He'd come in.

MC     Absolutely.

SS     Okay.

MC     Yeah.

SS     So, RAY and CHUCK know exactly what NEUBAUER looks like?

MC     Yeah.  Absolutely.  Them guys them guys got more going on then what what you know is going on there John.

JW     Yeah.

MC    And I told JOHN that I was going to help him do some buys there etc etc
      because they keep the dope in there when they close. RAY never takes
      the dope home with him. But RAY has dope and I'm going to tell you why.
      Because we me and NICOLE would be at my house sometimes at four,
      four thirty in the morning and you know and I'm a user and NICOLE would
      run out of cocaine and I wouldn't have any cocaine but NICOLE would
      have all her tip money because she just got off so she'd have about two
      fifty on her. So she would call RAY and say hey RAY man I need a teener
      da da dah. And RAY be like no it's at the bar it's at the bar. On numerous
      times he's say it's at the bar at the bar but he didn't have a car and he
      didn't have a license because he just got out of the joint. So I'd say hey
      we'll come and we can come and pick you up and drive you to the bar just
      to get the shit because we were you know jonesin'. And he would never
      do that. But then the last time that we went over to FREGAS'S (sp?)
      house and I let him give ah JOSE SARRANO a ride home, he said we're
      going to stop by the bar to get get some beer and ironic when we were at
      FREGAS'S (sp?) house I went in the fridge. FREGAS has like two and
      one half cases of beer in there. Said he went in for a six pack so I got out
      of the car and went to take a a a leak around the side of the Whiplash so I
      was in between the tracks and there is that window there. Him and
      NICOLE went in and I went and took a piss and looked in the window and
      they we they were behind the bar and the kitchen light came on etc etc.
      So I didn't really see anything further than that but me and NICOLE had
      done the last of the cocaine before me hi SARRANO and and I left my
      house to go to there bu wh when she got back in the car she had a fresh
      sixteenth.

SS    Who supplies RAY and CHUCK.

MC    CHUCK got it, now here's what the other thing that I did here I sold RAY
      my python and I was going to collect I gave RAY my python that night that
      I drove...

KU    By "python" you mean a snake.

MC    Snake.

KU    Oh, okay.

MC    A snake.

KU    Okay.

MC    And ah cause I knew I was coming to jail and I had to get rid of my snake.

**KU**     Okay.

**MC**     So I fronted it to ah to RAY and I was going their a couple times at nighttime to get the money and finally CHUCK paid me out of the register but the night he paid me out of the register, I was sitting there and there's another girl th gal that bartends there and her name is do uh she said her name is TEA. She's a heavy set gal, drives a gold Astrovan. Kind of a ugly looking unattractive broad. But anyway, she bartends there in the daytime and she's I think she's screwing with with ah CHUCK and ah she keep getting on the phone calling calling calling so I'm like watching TV and I'm doing a little ear hustling on the phone seeing what's going on eh trying to get a hold of RAY, trying to get my fifty bucks. So anyways, these two other broads come in and they're kind of unattractive to, but they sat down right here where the bar comes around there's like two seats there where you can sit and I was sitting two seats away. So, I see these broads come in and you know, I've seen dope deals go down a million thousand times. Ah CHUCK goes into the register, starts counting out the significant amount of money for what ever he needed, did the cuff, came to the corner of the bar, gave it to ah TEA, his girlfriend or the women he's screwing whatever, she gave it to the other two chicks they copped from these chicks then that's when DENISE came in and those guys left from what I'm assuming to go cut it up for the night, bag it up or what have you. They left in a hurry.

**SS**     You never you never seen these two chicks before.

**MC**     In there I have.

**SS**     Yeah.

**MC**     Didn't see the dope transaction, but I know...

**SS**     You know what happened.

**MC**     ....I know a dope transaction. I'm not you know, Willie Lumploaf. The the know the four a ca facial express a little more animated like Hey, we got the shit, you know and poof. So, and like I said I was gonna help JOHN out further, I'm I was really out there bad and I got put in here otherwise it maybe all this could have been prevented by shutting that fucking place down a long fucking time ago which it needs to be done.

**KU**     Have you ever heard of RAY or CHUCK having any type of conflicts with any other gangs such as a motorcycle gang...

**MC**     Yeah the uh uh Outlaws.

KU     What's going on with that?

MC     I was in there one night uh a Outlaw brother comes in there does the ah ah Hey I want ah part of what's going on here.

JW     Were you actually there when he said....

MC     No. Got this from NICOLE. Got a litt wanted a little something of what's going on a the business in here. Ah, RAY assertively I don't know what your talking about etc etc. Can I buy you a drink you know. No no no, I think you know what I'm talking about. Ah ah I want some of the business what's going on there, real ah persistent towards RAY. Finally got into ah RAY says Hey man, you know, I'll buy you a drink, play you a game of pool, or whatever, otherwise you know you're gonna have to leave because you're being kind of abrasive here. He didn't want to leave, then the biker got loud, then RAY had some of his King buddies escort the guy out. Dude verbally said ah, can't quote it exactly, I'll be back, you guys are fucking in trouble for fucking with me kicking me out, I don't know exactly how they manhandled the dude out to the parking lot but, from what I've seen the way they put people out, I mean, It's pretty abrasively.

SS     Was this guy wearing colors?

MC     Wasn't there. NICOLE JOHNSON...

SS     NICOLE tell you whether he was?

MC     No she didn't, Outlaw.

SS     Was there anything else other than cocaine that ah they deal out of there?

MC     Woudn't put it past if they wouldn't sell anything that came in from out of town. I mean if there was Ecstasy, or Acid, you know...

SS     Okay.

MC     ...Th I mean that place it ah that place is anything goes. You know the Boobyhatch, remember ah ...

SS     Yep.

MC     ...Come on Inn? Man, just like the Come on Inn. Just like the pre the the the clientele that comes in there.

KU     How can I get a hold of NICOLE JOHNSON?

MC    4-1-4-0-9-9-0.

KU    0-9-9-0?

MC    Yes sir. And that's ah...

KU    Cell phone?

MC    8-4-7.

KU    8-4-7. do you know her address?

MC    Yes sir. I can tell, well her, I don't know the numerical number but we know how to get there.

JW    We can get ya there.

KU    Okay.

MC    Okay? So, hey but it's just like ah remember the problems you guys had up there at the Come on Inn and then Ralph's and then Dine's? Same fucking....

SS    (inaudible)

MC    ....same crew, same crew man. Same crew maybe just a couple different faces.

KU    Um.

MC    Same crack pot of a joint. Same trouble going to happen and more troubles going to happen because of this murder, I guarantee it....

KU    Now...

MC    ....and you know it too.

KU    ...NICOLE said that she was there the night that this...

SS    (inaudible) came in..

KU    She was bartending.

MC    She's the one that related this to me.

KU    Okay. Did she ever relay any other problems after that date, how long ago was it that they kicked this guy out?

MC    (Sigh)....Be safe I would say within the last four months.

KU    Okay.

MC    Maybe even closer, maybe two. It it had to been three months.

KU    Okay, but there...

MC    No further than three months.

KU    ...there was never any type of retribution after that?

MC    No, not that I've heard of.

KU    Okay.

SS    Ah, do you know if any of those guys RAY or CHUCK are known to be packing a gun with them?

MC    To be honest with you, no. Would I would I put it past would I put it past a patron in there, now there you go a pretty close network I mean I would say five or six and if you go in there starting trouble, somebody's going to fucking get ya and and the Kings were hanging there at the corner of the bar. Have I seen a gun? No. Would I put it past, there's not one, whether it'd be underneath the fucking pool table or in the garbage. I wouldn't put it past it that there ain't a pistol in that place at all times. But, no I've never seen one gentleman to be honest with you. But there ah did not put it past you from talking to 'em and knowing the Kings and knowing the crew in there, there's something under the floorboard or if something broke out, somebody's gonna grab something.

SS    Ah, RICHARD NEUBAUER known to ah possess a a gun?

MC    Can't honestly ans answer that either gentlemen.

KU    Okay. Do you known RICHARD to have been involved in any of the gangs, was he was he a Maniac, was he a Latin King, did he....

MC    Can't a honestly answer that but he gelled right with the Kings.

SS    Now you mentioned something about ah two one.

MC    Yeah.

64

SS    Meaning...

MC    Two one, that's twenty first that's twenty-first street and that's the Kings now there's a set down in Chicago which is real heavy for the the Kings okay and that's twenty-first street.

KU    Okay.

MC    Ah John had thought that it was to twenty the twenty blocks in a pyramid which would go for the Black Stone Rangers and there's only twenty blocks in the pyramid the a ah e the blocks represent the chiefs that they've had in their organization. The twenty-first block is yet to come so there's not twenty-first chief yet. So, ah my s source that told me about the twenty-first being coming out of Chicago is a guy that's from Humble Park and....

KU    Okay.

MC    ....ah he he's it's real reliable source.

KU    Where where you aware of RICK having a tattoo on his neck that was one dot twenty-one?

MC    Yes.

KU    What was that about?

MC    No, a that's what I figured the twenty-one came in and then John just told me about that.

KU    Okay.

MC    And that's why I said to John I said let me let me find out about it and then boom I shot John a letter tonight and said you know dot twenty-one would be twenty first street Kings.

KU    Okay.

MC    Now here there's a pretty heavy set which is on tenth street in Waukegan which is the tenth street Kings.'

SS    So what would the one in front of the dot have what significance would that be?

MC    I don't know. I thought it was dot twenty-one John.

115

65

JW    There was one dot twenty one.

SS    One dot twenty one.

MC    I ah I'll tell you what I absolutely can find out for you gentlemen and I will
      send him another letter through through the jail...

KU    Did RICK ever talk about that being a bible verse like a chapter verse out
      of the bible that he had there?

MC    No.

KU    Okay.

MC    Um, I'm I would never I I'm I know what tattoos are what and stuff like that
      eh e for me, um e um you know not to insin or brag about street-wise
      smarts where I wouldn't ask someone about that, about their affiliation.
      That to me that would be...

KU    Um hum.

MC    ....trouble. Um, do to the fact that I was using drugs and and this may
      sound stupid and it is stupid, I don't want to mess up my connect by going
      in there and being like hey that fucker's asking too many questions.

KU    Okay.

MC    So, sorry about that gentlemen, I can't, you know, I don't want to be like
      hey this...

KU    So...

MC    ....guy's a cop because I'm asking too much.

KU    ...um, as far as you recall though you never knew of anybody or saw
      anybody that was continually packing a gun or that bragged about packing
      a gun or even um was represented as an enforcer type for either the Kings
      or for RAY and CHUCK?

MC    (hesitation) No. I can't honestly answer that either.

KU    Okay.

MC    If I would've known that we needed this information back then I mean if I
      wo I could've I would gentlemen I can get info I'm a good....

KU    Um...

MC    ....information source. I can find out and ah I did find this out but I can find out who's calling the shots for the Kings though and I can also send John a letter on that.

JW    Don't be doing that, you're going to get yourself killed.

MC    Alright.

JW    Leave that alone.

KU    Um, who do you think we should be looking at in this investigation? Who would you focus in on if you were doing the investigation?

MC    I'm going to tell ya, through NICOLE your going to find out a lot on information from NICOLE, okay.

SS    Should going to be willing to talk.

MC    Can't answer that gentlemen. Um....

SS    Do do d d do RAY and CHUCK have themselves make themselves look to be such bad asses that...

MC    Yes.

SS    ...their employees would be afraid to talk.

MC    Yes. NICOLE wants out of there though. She wants to move...

SS    She wants to move to Lake Geneva you said?

MC    ...no, ah le Wisconsin Dells.

SS    Wisconsin Dells okay.

MC    NICOLE wants out of there, I feel she should be out of there. I don't have any love or any feelings for her but I mean you'll find that you know we all have potential in life and she's caught up in dope game herself. What could she be doing, she could be doing anything from telemarketing to house cleaning. She doesn't need to be there. Ah I I I thought about it last night and I wouldn't have been surprised and it wouldn't have been shocking that she wasn't in the passenger seat with NEUBAUER and her and a couple of the other cronies going to a bar and could've got capped

in the head too. You know, I don't where the bullet came from the back or the side...

KU     Okay.

MC     ...but, that could've been me, going to fucking Ralph's. That could've been any one of us and that's that's pretty close to home so. Wo I okay, back to do I think she'd willing to be talk, yes.

KU     Alright.

MC     Okay. You're going to find out a lot of information for her she she's a she's a sponge of information. Um, who would I be focusing on? I who would I be focused on if it were me? I would s taking an educated guess on how it went down and he got caught up short changed somebody on some dope, I wouldn't say it was over territory, I think he got something fronted or couldn't pay somebody, ripped somebody off... excuse me, or he had a lot of dope that he had gotten fronted and someone took it from him.

SS     You don't know if the initials PMK stand for do you?

MC     P...M...K...

KU     A guy that goes by PMK?

MC     No.

SS     A guy that ah RICHARD NEUBAUER had contact with, cell phone to cell phone?

MC     Ah, honestly gentlemen, no I don't.

KU     Okay. How about a guy by the name of DAMIEN...

MC     Yeah.

KU     ...REVIS or.....

MC     Yeah I know DAMIEN, big boy.

KU     What's what's his story, who is....

MC     Kind of now he would be the enforcer. There's some fucking shit going, excuse my language, if there was some problems in that bar, something they bounced around the band nights or something, dude would dude would rip your spine out and you'd be out in the gravel, big boy.

KU    Not the type of person to carry a gun?

MC    Sure. Wouldn't put it past, like I said gentlemen, I wouldn't put it past anybody to be packing a gun in that place. Wouldn't put it past ya. First your gonna get your gonna get beat with a stick or or physically and if you pull out a gun, there's gonna be some guns coming out of somewhere in there....whether it's a woman's purse that wouldn't get searched because the police might come in there there...

KU    Who who would he be loyal to SARRANO'S or to RAY or to CHUCK.

MC    Who DAMIEN?

KU    Yeah.

MC    CHUCK and RAY. I do SARRANO'S are on their own boy. Now as they go up in there and ain't nobody really say nothing to them and they keep that dude he keeps to himself ah JOSE. yeah, keeps to himself. Right there and he's got his own hustling he'd sat by us I don't know if you've ever been there that's right by the video game. Real cold stone face and didn't say don't sa doesn't say much to anybody. No one really says nothing to him. I mean NICOLE me and NICOLE went over to his house in Gu in Lake Villa and bought dope. NICOLE'S pretty close with him, SARRANO. But ah, a ka the guy comes and goes with some weight and no one really says nothing to him. They know what his business is but ah you know.

KU    Now is DAMIEN loyal enough for if RAY or CHUCK say hey RICK needs to be out of the picture that he'd do it?

MC    Doesn't seem smart enough.

KU    Okay.

MC    Heh, doesn't seem smart enough to me.

KU    Okay.

MC    But that but that again, well you want a flunky to fucking go cap somebody in the head wouldn't ya? Somebody that doesn't really care about the time or something like that? I don't know.

JW    You spoke the other day you brought up someone with a tattoo on his neck, is that DAMIEN or is that someone else?

MC   No, no that's the guys who MIKE SMITH beat up in the bar.

JW   Unable to find that so (inaudible) looking around.

MC   Real distintive he's got a big crown right on his neck and this other side he's got na a tattoo on his neck. Wears his hair real short.

KU   Did you ever meet a guy by the name of LOUIE? Puerto Rican type guy or Italian? Stocky guy?

MC   Not ah LOUIE that owns the garage out in Kenosha? LOUIE ah, what's the, the dad owns the place out there. LOUIE ah, you guys are waiting for me to say the name and I can't think of it.

KU   Which garage?

MC   Down from Dine's.

KU   Salem Auto there?

MC   Nope. Off of 83 you go west on down from Dine's ah...

KU   Oh ah....

MC   ....he lives upstairs. What was her name LOUIE and ah....

SS   Right there on 264th and ah SA what's that?

KU   Towne Auto.

SS   Towne Auto.

MC   Yeah, remember they were fucking dealing dope a long time.

SS   LOUIE, I know who he is.

MC   Yeah.

SS   Ah, short bad(inaudible).

MC   Yeah and his dad is (inaudible).

SS   His dad just passed away.

MC   Oh, did he. Didn't know that yeah they were....

SS    That was a year ago.

MC    ...they're big time dope dealers.

KU    What about a JENNY HANSEN?

MC    I know of JENNY HANSEN.

KU    She carry a Nextel phone?

MC    Yeah.

KU    Talks though it. She can talk directly to...

MC    (makes a beep beep sound)

KU    ...RICK?

MC    Walkie talkie like.

KU    Okay, um...

MC    You know what gentlemen, this is such a little butt hole town out there you guys should I don't know shouldn't have any problems getting that stuff. Can I ask you guys a couple questions, where I mean where did they get him, in between North Avenue and and C on 83?

KU    Still trying to find that out.

MC    Oh, he might have been dropped off like?

SS    Was ah, was RICHARD known to ah travel into the Kenosha County area?

MC    Up to Ralph's is...

SS    With the exception of Ralph's.

MC    Honestly don't know that either.

KU    You familiar with the SOS Club in Kenosha?

MC    No.

KU    It actually stands for Shenanigan's on Sheridan, it's the old Shenanigan's on...

MC    No.

KU    Alright.

MC    My um, when I used to live in ah Shaingrala the farthest I would go would be the Hatch, we go to the Come on Inn and then Ralph's, Dine's or Papa Gus's. Other than that I only go I wouldn't go downtown.

KU    Mm.

MC    And I haven't lived in Shaingrala since 97 so.

KU    (pause) Let me just go through my notes here quick....

SS    RICHARD act like a big shot?

MC    Yeah. Clumsy big shot, mouth, real boisterous.

SS    Yeah?

MC    Yeah.

KU    Is he known to flash a lot of cash?

MC    Yeah. Be knowing that he's got (inaudible) stupid.

KU    How much cash would he normally carry? On average.

MC    No not like a big not thousands.

KU    Alright, so maybe five hundred?

MC    Five hundred down.

KU    Okay.

MC    Two hundred and down. I mean that I would see. Eh a you know gentlemen like I wouldn't I would not ah when I would see NEUBAUER, I wouldn't look at him like I needed to be his friend because to me ah I don't know, I just didn't feel I ne I needed to be and ah this comes from a dope fiend type of thing, I didn't need to be cool with him. I don't know why.

KU    How close...how close was he and DENISE?

MC    Pretty close.

KU    Alright.

MC    I mean, I didn't really see much of ah I mean their intimacy or how close you know how well he treated her etc etc.

SS    Was he very possessive of her?

MC    Yeah.

SS    In what way?

MC    Ah jealousy type talk and I've seen ah coming to the bar or something and ah the eye contact, body posture, who's at.

SS    Would that be one reason why he'd always pick her up at night?

MC    Yeah.

SS    From the bar?

MC    My opinion, this is all sc ah speculation, yes.

KU    Would ah, RAY and CHUCK have enough power over her that if they told her to keep her mouth shut if something happened if they told her to shut up that she'd...

MC    You'll be fired or something like that, yeah. Now tha RAY has a lot of mind power over NICOLE and a and you know, I thought it was just very manipulative and a and just stupid. I don't know what it is. I think it was the dope in NICOLE'S case that he could basically do what she wanted

SIDE A ENDS ON TAPE. STARTING SIDE B.

KU    This is side two, we're still talking with ah MICHAEL CUNNINGHAM at ah Lake County Sheriff's Department. Go ahead MIKE.

MC    And ah, yes to answer your question, RAY has a lot of ah had a lot of manipulative power over NICOLE and uh as I would assume DENISE also. Um, don't do what I say you're going to lose your job or or drugs.

SS    Would he have that same power over DENISE too?

MC    I'd say yes. I'd say I'm not I mean I can't say as much as I knew for a fact of NICOLE because NICOLE wanted the cocaine.

## KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

Ex. J 73

TE OF REPORT:01-09-02
TE-TIME REPORTED:  / /
)DEATH INVESTIGATION

CASE OR EVENT NUMBER:2002-2243
PAGE: 1  OF 1

--

·eceived a call from a Detective Mike Meislish of Phoenix Arizona Police Department.  Phone
mber is (602)438-0134.  Cell phone number (602)768-9175.

advised he is currently working a homicide in his jurisdiction regarding a ARCHIE LANGOO the
eceased party in their case.  He is 27 years of age.  This person was a roommate with an individual
the name of MEL HAM RIACHI who claims is a Jordanian or Albanian decent.  The victim is also
ssible Albanian decent.  RIACHI'S date of birth is 12/14/74.  He is a white male.  His social security
imber is 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.  RIACHI drives a 2002 Cadalliac Escalade SUV.  This was his last known
hicle.  He indicates RIACHI traveled frequently back and forth from Arizona to Chicago and the
eresting part was that RIACHI who is a suspect in their case is retained by Atty KOOZAS out of
hicago who is also the Attorney for our deceased in this case RICHARD NEUBAUER.  Mr. Meislish
ıot sure what the exact connection is yet.  He indicated that they located a business card of
·OZAS underneath their victim when they did their crime scene.  KOOZAS has been in contact
th Investigator  Meislish but Meislish indicates that he's not really giving him a lot of information.  A
·· phone number was located belonging to RIACHI, number of (602)690-0046.  He asked if we
ıld check into see if this came up in our investigation at all as far as any contacts.

can be reached anytime on his cell phone number otherwise he works Monday through Friday
n 6 to 2 and would be happy to provide information as needed.

·estigation continued.

DM.157

)RTING OFFICER:
ctive Vincent Lucci #130

SUPERVISOR:

74

## Identification Unit Worksheet  SCL-MIw 12-96

| Case Number | Add'l Evid | Scientist | Date Rec'd | From |
|---|---|---|---|---|
| RO2-247 | ☐ | ES | 2-12-02 | WiNKe ES |

Describe how sealed

Evid Tape sealed plastic bag

| Date items transferred to another unit | Item designation(s)/ transferred to |
|---|---|
| 2-13-01 | S-1 thru S-9 photo |

### Statistical Data

| Record | lp | Latent pp | imp | fw | Identifications ☑Yes ☐No | Verified by |
|---|---|---|---|---|---|---|
| 70 | 3 | 0 | 0 | | | MAY  ∅#5 2-13-22G |
| Exams  ∉∉ 23✓  2-13-02 | | Exhibits  13 | | | | |

### Examination Notes

Date

2-12 + 01  Item #A S-1 Lat lift marked "RT. Rear PassenGer side window"
2-12-02
Item S-2  Lat lift marked "LT Front Above Door handle"
Item S-3  5 sheets of finger tops for Riach. Melhem
"  S-4  strip of fgprts for Keller, Darlene M.
Item S-5  "  "  "  " Czeszewski, Tricia.
"  S-6  strip of fgprts for NEUBAUER, Richard P.
Item S-7  "  "  "  " Czeszewski, Robert.
"  S-8  strip of fgprts for Schubat, Denise
"  S-9  "  "  "  " NEUBAUER, Darcy C.
1 latent fgpr previously reported  not  compared to  ES 2-13-02
S-3 thru S-9 no matching imp revealed.  A  2-13-02
Item S-1 1 latent fgpr of val of #5 Schubat, Denise Item S-8
2-13-02  "  S-2  1  "  "  &  " Compared to S-3 thru S-9
no matching impression revealed. AFIS search
Items to photo when returned will place in Go
Back FR 0202.

KL-173

**Identification Unit**

| page # | of pages | initials |
|---|---|---|
| 1 | 3 | ES |

Reviewed

KL

75

**AFIS Entry Worksheet**

Case No. _R 02-247_

Date: _2-13-02_

No. Candidates: _10_

| Exh | Item | Finger | Region | Sex | Rac | Pattern | Age +/- | Orient | Hit? | SID | Finger | Name/DOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S201 | 01 | (1 2 3 4 5) (6 7 8 9 0) | wrd/ | u | u | )w/ | )/# | 0 | ys | | | Registered to u c DB |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |
| | | 1 2 3 4 5  6 7 8 9 0 | | | | | | | | | | |

KL-174

rev 6/95

# Request for Imaging Analysis

76

## Work Order Number: R02-247
(PHW)

Date In: 02/13/2002                                                                                 Assigned:

Requester Priority: **Low**

Court Date:                                  Submitting Agency:  Kenosha County Sheriff's Office

Requester: IDENTIFICATION EJ          Submitter/Phone:  Vince Lucci

Request Type: General Evidence Photography    Offense:  HOMICIDE-SHOOTING

| Analysis Requested | | | | | |
|---|---|---|---|---|---|
| ___B&W | ___Color | ___Dupes | **X** Negative | ___Polaroid | ___Slides |
| ___E-Image | ___Digital Printing | ___Video | ___Graphic Prep | ___Laminating | ___Audio |

Finishing          ☐Labels          ☐Mounting          ☐ Border

**Required Analysis and Comments**

Item S-1: Latent print lift.
Item S-2: Latent print lift.
Item S-3: Finger and palm prints for Riachi, Melhem.
Item S-4 thru S-9: Six strips of fingerprints.

Contacts: _____     Enlargements: _____     Mag: 1 : 1     Size: ___ X ___

| Distribution | | | | | |
|---|---|---|---|---|---|
| ___ DCI | ___ FBI | ___Jacket | ___ MadLab | ___ MilLab | ___ WauLab |
| ___ DA | ___ SO | ___ PD | ___ Coroner | ___ Pathologist | |
| ___ Other: | | | | | |

Notes

KL-17-5

Exams _____     Exhibits _____

Exams _____     Exhibits _____

| page # | of pages | case # | initials | |
|---|---|---|---|---|
| 2 | 3 | R02-247 | ES | Reviewed |

KL
175

**Identification Unit Worksheet**  SCL-Milw 12-96

| Case Number | Add'l Evid | Scientist | Date Rec'd | From |
|---|---|---|---|---|
| R07-247 | ☐ | FS | 1-24-07 | MAY  middle Bay Garage |

Describe how sealed

Tape sealed Doors & Trunk lid

| Date items transferred to another unit | 1-24-02 | Item designation(s) transferred to | Parliament Cigarettes (part of Item A) |
|---|---|---|---|

**Statistical Data**

| Record | | Latent | | | Identifications | Verified by |
|---|---|---|---|---|---|---|
| 0 | fp | pp | imp | fw | ☐ Yes  ☐ No | |
| | | 8 | 10 | | | |

| Exams | Exhibits |
|---|---|
| 60 | 2 |

**Examination Notes**

1-24-02  Item A  1997 Ford (Taurus Green) Illinois
Plate # ZFF 60 & VIN 1FALP 5263VG
244638.

"A Removed from Vehicle
Pack of Marlboro Cigarettes (partial pack)
door handle drivers side.
Parliament container (for 2 packs) driver's floor
Snow Scrapper left of drivers seat floor
Jewel Osco receipt from drivers side floor  dated 11-9-01  time 8/3:37.
E-mail paper to Gail Gaile left of driver's
seat on floor. dated 12-19-01 proc w/ ninhydrin from steam iron.
pepsi bottle              }  both partially full
Ice Mountain water bottle  }  from passenger side floor
piece of Black plastic cover pass side floor
Driver's Visor 1 pack of parliament cigarettes
Eye glasses front pass seat (Appears to be blood). one
Citgo Receipt on floor between passenger & drivers
seats. Fairfield citgo dated 10-18-01 time $12.34.
Processed S/G after Vis Exam. no lats proc B/P.
Parliament from drivers visor to photo.

1-25-02   1 lot fgprt of Val for comp. AFIS negative not registered to w/DB.
KL-176   Receipts & E-mail proc w/nin from & steam iron no lats.
1 lot fp prt reported on parliament cigaret

**Identification Unit**

| page # | of pages | initials |
|---|---|---|
| | 84 | |

COUNTY OF KENOSHA—SHERIFF'S DEPARTMENT ☒

CITY OF KENOSHA — POLICE DEPARTMENT ☐

SUPPLEMENTARY INVESTIGATION REPORT

78

| CASE OR EVENT NO. | NO. OF PAGES |
|---|---|
| 2002-2243 | 1 OF 1 |

| DATE OF SUPPLEMENTARY | DATE — TIME REPORTED | |
|---|---|---|
| 2-12-02 | 01-6-02 | 0.845 |

INVOLVED PARTIES

CODE - V = VICTIM  S = SUSPECT    W = WITNESS  C = COMPLAINT  S = REPORTING PERSON  I = INVOLVED PERSON

| | NAME     LAST | FIRST | M. | DOB | RACE / SEX | DRIVER'S LICENSE NUMBER (IF APPLICABLE) |
|---|---|---|---|---|---|---|
| V | Neubauer, Richard | A | | 12-27-74 | W/M | |
| | ADDRESS | | | CITY — STATE — ZIP | | PHONE |

| NAME     LAST | FIRST | M. | DOB | RACE / SEX | DRIVER'S LICENSE NUMBER (IF APPLICABLE) |
|---|---|---|---|---|---|
| ADDRESS | | | CITY — STATE — ZIP | | PHONE |

| NAME     LAST | FIRST | M. | DOB | RACE / SEX | DRIVER'S LICENSE NUMBER (IF APPLICABLE) |
|---|---|---|---|---|---|
| ADDRESS | | | CITY — STATE — ZIP | | PHONE |

On this date the following item(s) were transported to the Milwaukee State Crime Lab:

1) packet containing the following items:

    2- lift cards w/ prints lifted from victims vehicle

    6- elimination prints.

    5- pages of photo copied prints from City of Phoenix P.D.
    of Melhem Biachi 12/14/78  m/w  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

REPORTING OFFICER                2ND OFFICER                SUPERVISOR

# Request for Imaging Analysis

**Work Order Number:** R02-247

(PHW)

Date In: 02/13/2002

Assigned:

Requester Priority: **Low**

Court Date:

Submitting Agency: Kenosha County Sheriff's Office

Requester: IDENTIFICATION EJ

Submitter/Phone: Vince Lucci

Request Type: General Evidence Photography

Offense: HOMICIDE-SHOOTING

## Analysis Requested

| | | | | | |
|---|---|---|---|---|---|
| __B&W | __Color | __Dupes | **X** Negative | __Polaroid | __Slides |
| __E-Image | __Digital Printing | __Video | __Graphic Prep | __Laminating | __Audio |

Finishing    ☐ Labels    ☐ Mounting    ☐ Border

## Required Analysis and Comments

Item S-1: Latent print lift.
Item S-2: Latent print lift.
Item S-3: Finger and palm prints for Riachi, Melhem.
Item S-4 thru S-9: Six strips of fingerprints.

Contacts: _____    Enlargements: _____    Mag: 1 : 1    Size: ___ × ___

## Distribution

| | | | | | |
|---|---|---|---|---|---|
| __ DCI | __ FBI | __ Jacket | __ MadLab | __ MilLab | __ WauLab |
| __ DA | __ SO | __ PD | __ Coroner | __ Pathologist | |
| __ Other: | | | | | |

Notes

Exams _____    Exhibits _____    page # | of pages | case # | Initials | Reviewed





# CHRIS DATA WAREHOUSE

**LAST NAME= RIACHI**

**FIRST NAME= MELHAM**

**DISTRICT ARREST= 11**

**ARREST DATE= 06-SEP-2000**

**ADDRESS ARREST= 1011 N CLARK ST**

**CB NUMBER= 14576361**

**IR NUMBER= 1369275**

**DOB= 14-DEC-1974**

**REPORT DATE= 14-January-2002  2:30:54 PM**

**REQUESTED BY= PC0P793**

**FOR OFFICIAL POLICE USE ONLY!**

**NOT FOR DISSEMINATION!**

80(A)

1      A    There was a pack of Parliament cigarettes

2   on the driver's visor stuck in the visor above the

3   driver's area of the car.

4      Q    Okay.  And did you take that into evidence

5   for later comparison to known fingerprints from

6   various subjects?

7      A    Yes, sir, I did.

8      Q    And you were provided with known

9   fingerprints from Denise Schubat, Ronald Ruhl,

10  Raymond Serio and Nancy Neubauer, among others in

11  this case, is that right?

12     A    I received fingerprints from Malhim Re --

13     Q    If you can, I am just specifically

14  requesting the ones I named here.  Initially, you

15  were given the fingerprints of Denise Schubat and

16  Nancy Neubauer, is that right?

17     A    Yes, sir.

18     Q    Later, you were then given known

19  fingerprints of Raymond Serio and Ronald Ruhl, is

20  that correct?

21     A    That's correct.

22     Q    Okay.  Now, this particular fingerprint

23  that was on the Parliament pack, were there any

24  known comparisons with the people that I just

80 (B)

1    mentioned to you?

2        A    Yes, sir, there were.

3        Q    And who is that with?

4        A    I compared them against all four

5    individuals, and the results were negative.

6        Q    Okay.  As to the Parliament cigarettes?

7        A    Cigarette pack.

8        Q    Was there any other latent fingerprints

9    you were able to lift?  I believe you indicated

10   there were two.

11       A    Yes, sir.  Well, total, there were three.

12       Q    Okay.

13       A    On February 12, 2001, I received two

14   latent print lifts from Kenosha.  One lift was

15   marked right rear passenger side window; the other

16   lift was marked left front above door handle.  I

17   compared these two prints to the four individuals

18   you named, Neubauer --

19       Q    Schubat, Ruhl and Serio?

20       A    That's correct.

21       Q    Okay.  And did you find any comparisons

22   that matched?

23       A    Yes, sir.  The latent print on the lift

24   submitted by Kenosha, which was designated S-1 right

80:(e)

1    rear passenger side window, was identified as a

2    right little finger of Schubat, Denise.

3        Q    And that was a right rear passenger

4    window?

5        A    Right rear passenger side window.

6        Q    And the third latent fingerprint, were

7    there any known associations with that one?

8        A    Comparison against the four individuals

9    named, there was no matching impression.

10        Q    By the way, you were also given the known

11    fingerprints of Richard Neubauer to compare, is that

12    correct?

13        A    Yes, sir.

14        Q    And you are aware his body was actually

15    found inside the car, is that right, or are you

16    aware of that?

17        A    I really don't know.

18        Q    Okay.  You found no comparisons of any of

19    his fingerprints in this car, is that correct?

20        A    That's correct.

21        Q    Now, is that unusual to find only three

22    latent fingerprints that are comparable on a car?

23        A    Yes, sir.  You know, you process -- I

24    removed several items from the car.  There was like

Go to pg 251, lines 5-8

81

# ILLINOIS STATE POLICE
Division of Forensic Services
Forensic Science Center at Chicago
1941 West Roosevelt Road
Chicago, Illinois 60608-1229
(312) 433-8000 (Voice) * 1-(800) 255-3323 (TDD)

George H. Ryan
*Governor*

Sam W. Nolen
*Director*

May 29, 2002

SHERIFF GARY DEL RE
LAKE COUNTY SHERIFF'S OFF. WAUKEGAN
25 SOUTH MARTIN LUTHER KING AVENUE
WAUKEGAN IL 60085

Laboratory Case #C02-020205
Agency Case #02-223

OFFENSE:    Murder
SUSPECT:    Ronald Ruhl
VICTIM:     Richard Neubauer

The following evidence was received by the Forensic Science Center at Chicago on April 30, 2002:

| EXHIBIT | ITEM SUBMITTED |
|---------|----------------|
| 1 | Head hair standard recovered from Ronald Ruhl. |
| 2 | Head hair combings recovered from Richard Neubauer. |
| 3 | Head hair standard recovered from Richard Neubauer. |
| 4 | Hair recovered from the victim's cheek. |
| 5 | Hairs recovered from the victim's neck. |

## EXAMINATION FINDINGS AND RESULTS

Caucasian head hairs were observed in Exhibits 1 and 3. These standards were used for comparison purposes.

Five (5) Caucasian head hairs were observed in Exhibit 3.

One (1) human hair of unknown racial and somatic origin was observed in Exhibit 4.

Two (2) Caucasian head hairs were observed in Exhibit 5.

The five (5) Caucasian head hairs recovered from Exhibit 2 are microscopically consistent with the head hair standard from Richard Neubauer; therefore, these hairs could have originated from Richard Neubauer. These hairs could not be microscopically associated with Ronald Ruhl.

The human hair from Exhibit 4 and the two (2) Caucasian head hairs recovered from Exhibit 5 could not be microscopically associated with Richard Neubauer nor Ronald Ruhl.

## EVIDENCE DISPOSITION

Exhibits 1 through 5 will be returned to the submitting agency.

82

LAKE COUNTY SHERIFF'S OFF. WAUKEGAN
Laboratory Case #C02-020205                    -2-                              May 29, 2002

**EVIDENCE DISPOSITION** (continued)
If you have any questions concerning this report, please feel free to contact this examiner.

Respectfully submitted,

Robert Berk
Forensic Scientist

cc: Anne Harar-NORTHERN ILLINOIS POLICE CRIME LAB

 

### Northern Illinois Police Crime Lab

ठ 3

Subject                : Homicide Investigation
Laboratory Case Number : 02-1683 Report 1      Report Date 5/9/02
Complaint Number       : 02-223
Case Officer           : (672) JONITES TIMOTHY
Submission Date        : 4/25/02

Case Names:
RUHL, RONALD
NEUBAUER, RICHARD
SERIO, RAYMOND

Agency    : Lake County Sheriff's Office
            25 S. Martin Luther King Ave.
            Waukegan, IL 60085
Attention : Sheriff Gary Del Re

**Exhibit Description(s) and/or Analysis**

Item 01       One sealed envelope with:

Exhibit 01    one sealed envelope containing the known hair standard of
              "Ruhl, Donald".

Item 02       One sealed plastic bag with:
              One sealed envelope with:

Exhibit 01    one paper towel containing one black comb.

Item 04       One sealed plastic bag with:
              One sealed envelope with:

Exhibit 01    one paper towel containing one hair or fiber.

Item 05       One sealed plastic bag with:
              One sealed envelope with:

Exhibit 01    one paper towel with one hair or fiber.

Item 06       One sealed paper bag with:

Exhibit 01    one right boot.

Item 07       One sealed paper bag with:

Exhibit 01    one left boot.

Item 08       One sealed envelope with:
              One sealed envelope with:

## Northern Illinois Police Crime Lab

84

boratory Case Number : 02-1683 Report 1
ency   : Lake County Sheriff's Office
alyst : M. Kelly Gannon
ge No : 2


Exhibit 01      one piece of filter paper with the known blood standard of
                "Richard Neubauer".

                *Conclusions*

                Chemical analysis indicated the possible presence of blood
                on item(s)/exhibit(s) 06-01 (right boot) and 07-01 (left
                boot).

                Samples are being retained at the laboratory for genetic
                marker analysis to determine the possible source of the
                stain(s).

                Chemical analysis indicated the possible presence of blood
                on item/exhibit 02-01 (comb).

                Potential "hair roots" from item(s)/exhibit(s) 02-01 (comb),
                04-01 (hair or fiber), and 05-01 (hair or fiber) were
                retained at the laboratory for comparison purposes.

                A sample of the blood comparison standard of "Richard
                Neubauer" (item/exhibit 08-01) and a sample of
                comparison standard of "Ruhl, Donald"                    -01)
                are being retained at the laboratory for comparison
                purposes.

                Biological analysis revealed that the stain(s) from
                item(s)/exhibit(s) 06-01 (right boot) and 07-01 (left boot)
                are of human origin.

                The above retained stain(s) and standard(s) were subjected
                to DNA analysis for comparison purposes. DNA profiling was
                conducted using PCR at the following loci: D3S1358, vWA,
                FGA, D8S1179, D21S11, D18S51, D5S818, D13S317, D7S820,
                D16S539, TH01, TPOX, CSF1PO, and Amelogenin.

                A partial DNA profile was identified in item(s)/exhibit(s)
                06-01 B (right boot) and 07-01 A (left boot) that was
                consistent with coming from a mixture of two, unknown male
                individuals.  "Richard Neubauer" (item/exhibit 08-01) and

**hern Illinois Police Crime Lab**                                            85

boratory Case Number      -1683 Report 1
ency  : Lake County S   ff's Office
alyst : M. Kelly Gann
ge No : 3

"Ruhl, Donald" (item/exhibit 01-01) can be excluded as a
source of the DNA.

A partial DNA profile was identified in item/exhibit 06-01 A
(right boot) that was not suitable for comparison purposes.

Item(s)/exhibit(s) 02-01 (comb), 04-01 (hair or fiber), and
05-01 (hair or fiber) failed to yield a sufficient amount of
DNA for analysis.

DNA evidence will be maintained at the laboratory should
further analysis be requested.

Trace evidence observed on item(s)/exhibit(s) 02-01 (comb),
04-01 (hair or fiber), 05-01 (hair or fiber), 06-01 (right
boot), and 07-01 (left boot) was repackaged with the
corresponding item(s) should future analysis be required.
Analysis was not conducted at this time.

Item 03 was not tested.

As requested, Item(s) 01, 02, 03, 04, 05, and 06 were sent
to the Illinois State Police for hair comparison analysis.
The results of that analysis will be the subject of a
subsequent report.

Additional analysis of the observed trace particles on
item(s)/exhibit(s) 06-01 (right boot) and/or 07-01 (left
boot) will be conducted upon specific request.

Should further analysis be required, please
contact this examiner.



### Northern Illinois Police Crime Lab

86

Laboratory Case Number : 02-1683 Report 1
Agency   : Lake County Sheriff's Office
Analyst : M. Kelly Gannon
Page No : 4


Please pick up all appropriate exhibits at your
earliest convenience.


_____              _____
Administrative Review                  Forensic Scientist
                                       M. Kelly Gannon

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

ATE OF SUPPLEMENT: 2/15/02
ATE-TIME REPORTED: 01/06/02@0847
F· HOMICIDE

**CASE OR EVENT NUMBER: 2002-2243**
**PAGE: 1 OF 6**

| | | | |
|---|---|---|---|
| ICTIM: | Richard A. Neubauer<br>24076 W. Grand Ave<br>Lake Villa, IL<br>TX: (847) 265-1982 | m/w | 12/27/74 |
| JVOLVED: | Shane A. Muchka<br>2011 Old Elm Rd<br>Lindenhurst, IL 60046<br>Cell#: (847) 791-4447 | m/w | 08/28/75 |
| | Michael S. Delaney<br>2921-24th Ave<br>Kenosha, WI 53140<br>TX: (262) 653-8320 | m/w | 08/10/74 |

On 01/06/02 I, Detective Urquhart #166, was requested to respond to the 12100 block of CTH
VG"/128th Street along with Detectives Stanek #156 and Lucci #130 to investigate a death.

Upon arriving Lake County Sheriff's Deputy Krempotic along with Kenosha Deputies Conforti
[38, Beth #122, and Cole #181 were already on scene.

While patrolling the area Deputy Krempotic observed a vehicle in an east driveway of the
1stol Renaissance Faire. Checking the vehicle, Krempotic found the body of a deceased white
ale in the vehicle and contacted Kenosha Sheriff due to it being in Kenosha County.

I observed a green Ford Taurus 4-door with Illinois registration #ZFF 60. The vehicle came
ick registered to Nancy Neubauer out of Lake Villa, Illinois. The vehicle's front end was facing
irth and the vehicle was in a gravel driveway of the Bristol Renaissance Faire, eastern most
iveway. A short distance in front of the vehicle was an old telephone pole that was supported
:ross the driveway to prevent anyone from entering the Fair grounds. There was also a red metal
ite across the driveway. The front of the vehicle appeared to have struck the metal gate and the
ephone pole. There were striations to the hood of the car and the windshield was smashed at a
ight, which was consistent with the height of the telephone pole. Red paint transfer was observed
the front bumper of the vehicle along with some damage to the front of the vehicle. It appeared
at the vehicle struck the metal gate causing it to be knocked down and the right side section to be
ocked off its hinges. The vehicle continued under the telephone pole to a position where the pole
uck the windshield. Tire marks from the vehicle were found under the pole and a short distance
rth of the telephone pole to also indicate that the vehicle had gone partially under the telephone
le. It was apparent that the vehicle had struck the telephone pole and either rolled back away from
ɔ pole or was backed away from the pole. The vehicle transmission was found to be in the "park"
sition.

Inside the vehicle I observed the body of a male white subject. The body was face down in
ɔ front passenger seat. The left arm of the subject was behind his back with the palm facing up.

DM-139

**PORTING OFFICER:**
t. Kenneth Urquhart 166

**SUPERVISOR:**

m139

**File Date:** _9-2-2008_

**Case No:** _08 cv 4980_

**ATTACHMENT #** _____

**EXHIBIT** _exhibits part 2_

**TAB (DESCRIPTION)** _____

ATE OF SUPPLEMENT: 2/15/02
ATE-TIME REPORTED: 01/06/02@0847
F HOMICIDE

CASE OR EVENT NUMBER: 2002-2243
PAGE: 2 OF 6

ne torso of the subject was on the bottom of the seat with the knees on the floor of the vehicle. The ght leg was twisted at the knee with the right foot turned upward and lodged against the dashboard the vehicle. The left foot was still on the floor of the vehicle just to the right of the vehicles gas edal. There was a noticeable amount of blood in the left temporal area of the subject's head and it as apparent that the subject was deceased.

I videotaped the scene, including the surrounding area and the vehicle interior/exterior using a partmental video camera.

On the roadway of CTH "WG" I observed tiremarks on the blacktop pavement. There were o sets of tiremarks, one set indicated a vehicle going into the driveway and a second set that peared to come out of the driveway and then head in eastern direction. The pattern of the emarks were hard to discern on the pavement and attempts to lift the prints were unsuccessful. ese marks were videotaped.

I conducted a search of the area for any bullet casings or bullet fragments using a metal tector. No casings or fragments were found.

The medical examiner arrived and the body was removed from the vehicle. While I observed e body being removed I heard the chirping of a cellphone and then a female voice from inside the hicle callout, "pickup you asshole." A Nextel "i90c" cellphone was then located on the driver's side the vehicle on the front floorboard almost under the front seat. I was given custody of the Nextel llphone.

At the Detective Bureau the following information was obtained from the Nextel telephone. lephone numbers listed in the "PHONE BOOK" of the phone are:

| | |
|---|---|
| Aaron | 847-845-7298 |
| Alex | 847-226-6672 |
| Benny | 708-917-7094 |
| Billy | 630-253-7530 |
| BJD | 847-489-1799 |
| Bottoms | 773-507-7672 |
| Brian | 847-269-1724 |
| Carrie | 847-826-5775 |
| Coop | 773-427-7702 |
| Coop | 773-452-7702 |
| Dan | 847-997-7126 |
| Daryl | 847-899-3714 |
| Delaney | 262-653-8320 |
| Elliotts | 847-427-2637 |
| Hesler | 847-973-8781 |
| Jenny H. | no service-nextel |
| Joe | no service-nextel |
| Johnny pgr | 250-0304 |
| Johnny | 312-593-6606 |
| Kenny | 847-548-9403 |

pm-140

PORTING OFFICER:
. Kenneth Urquhart 166

SUPERVISOR:

| | |
|---|---|
| Koochie | 773-718-0998 |
| Kyle | 847-863-5244 |
| Lil Rick | no service-nextel |
| Louie | 773-370-7398 |
| Man | 847-951-2357 |
| Me | 312-907-8669 |
| Mike N | 847-854-7336 |
| Mom's wk | 847-270-4815 |
| Nextel care | 800-639-6111 |
| Noah | no service-nextel |
| PMK | 773-406-3855 |
| PMK | no service-nextel |
| Ricky home | 847-265-4316 |
| Roger | 708-533-7275 |
| Scott | 262-745-9563 |
| Serge | 312-593-0850 |
| Sharon | 773-882-2808 |
| Ski | 847-265-7439 |
| Smitty | 925-2170 |
| Stephanie | 773-495-5997 |
| Sweet Lana | 630-519-3376 |
| Sybaris | 847-298-5000 |
| Troll | 847-721-9919 |
| Uncle Carl | no service-nextel |
| No name | 847-356-7455 |

Another category of the Nextel phone listed "RECENT CALLS." The following information was
tained from this category:

| | | | | |
|---|---|---|---|---|
| Incoming | Delaney | 1/06/02 | 4:49 PM | 0 seconds |
| Incoming | 847-265-1982 | 1/06/02 | | 0 seconds |
| Incoming | Jenny H | 1/06/02 | nextel | 8 seconds |
| Incoming | 847-395-1678 | 1/06/02 | 2:13 PM | 0 minutes |
| Incoming | 847-356-7455 | 1/06/02 | 1:09 PM | 0 minutes |
| Incoming | 847-343-8450 | 1/06/02 | 11:14 am | 0 minutes |
| Incoming | Daryl | 1/06/02 | 10:08 am | 0 minutes |
| Incoming | Johnny | 1/06/02 | 04:23 am | 0 minutes |
| Incoming | PMK-Nextel | 1/06/02 | 02:20 am | 8 seconds |
| Incoming | Carrie | 1/06/02 | 01:04 am | 58 seconds |
| Outgoing | Louie | 1/06/02 | 12:39 PM | 1 minute 6 seconds |
| Outgoing | Scott | 1/06/02 | 12:37 PM | 3 minutes 27 seconds |
| Outgoing | Smitty | 1/05/02 | 11:24 PM | 3 minutes 33 seconds |

DM-141

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

90

ATE OF SUPPLEMENT: 2/15/02          CASE OR EVENT NUMBER: 2002-2243
ATE-TIME REPORTED: 01/06/02@0847                       PAGE: 4 OF 6
F· HOMICIDE

| | | | | | |
|---|---|---|---|---|---|
| Voice mail | 312-907-8669 | 1/05/02 | 11:11 PM | 31 seconds |
| Incoming | 847-356-0227 | 1/05/02 | 10:18 PM | 3 minutes 30 seconds |
| Outgoing | Coop-house | 1/05/02 | 10:12 PM | 4 minutes 32 seconds |
| Outgoing | Hesler-house | 1/05/02 | 08:34 PM | 2 minutes 43 seconds |
| Outgoing | Coop-mobile | 1/05/02 | 05:58 PM | 26 seconds |
| Outgoing | Sharon | 1/05/02 | 03:05 PM | 0 minutes |
| | 773-948-4522 | 1/05/02 | 09:46 am | 0 seconds |

After obtaining this information from the Nextel I made telephone contact with Detective tanek #156 and provided him with several numbers that he requested. (See Stanek's report). etective Stanek was able to confirm with family members that the victim, Richard Neubauer, did ave a Nextel cellular phone with a telephone # 312-907-8669. The family also provided a copy of eubauer's last phone bill, which covers from 11/09/01 to 12/09/01. The bill also indicates that eubauer has a Nextel Direct Connect-Member ID 111*45*7307.

On 01/07/02 I obtained a subpoena for telephone records pertaining to Neubauer's cell phone. equested a "fraud buster report" which documents all incoming and outgoing calls for a 30 day ariod, subscriber information including "talk group matrix," include all subscriber for any persons ithin the "matrix," and information including subscriber information on "Jenny H, Joe, Little Rick, oah, PMK, Uncle Carl."

From the subpoena I obtained the 30-day report of incoming and outgoing calls. In viewing the cords I was advised by "MO" from the Subpoena Compliance Department that HOA=an outgoing all, HAT= an incoming answered call, on the document where it shows the number 312-907-6245 dicates that someone has left a voice mail, the "F" indicates a call is forwarded.

I also had contact with a local Nextel representative who was able to obtain the following formation from Neubauer's Nextel phone:

| | | | |
|---|---|---|---|
| PMK | Cell# 773-406-3855 | fleet #31 | ID# 40075 |
| Jenny H | | fleet# 18 | ID#22514 |
| Joe | | fleet# 48789 | ID# 14 |
| Lil Rick | | fleet# 24 | ID# 65018 |
| Noah Lopez | | fleet# 45718 | ID# 46 |
| Uncle Carl | | fleet# 31 | ID# 18701 |

sing this information, Nextel Subpoena Compliance was able to obtain subscriber information on ese accounts. That information is:

PMK registers to account #9533093 under the name of James Taylor, telephone number 773-6-3855, and a billing address of 6139 W. Cornelia Ave Chicago, IL 60634.

Jenny H registers to account #9648965 under the name of Mike Kilarski, telephone #847-561-05, and a billing address of 36538 Edward St, Lake Villa, IL 60046.

Joe registers to account #5269040 under the name of Bob McNally, telephone #815-378-3725 d a billing address of 4437 E. State Street, Rockford, IL 61108.

OM-142

PORTING OFFICER:                                 SUPERVISOR:
t. Kenneth Urquhart 166

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

91

ATE OF SUPPLEMENT: 2/15/02
ATE-TIME REPORTED: 01/06/02@0847
F· HOMICIDE

CASE OR EVENT NUMBER: 2002-2243
PAGE: 5 OF 6

Lil Rick registers to account #9561362 under the name of Mike Bowker with a billing address
f 1500 McConnor Parkway Suite 200, Schaumburg, IL 60173.

Noah registers under account #5447525 under the name of Michael Lynk, telephone #312-
07-1698 with a billing address of Company: ICG Interior Construction 105 W. Adams Street, Suite
00, Chicago, IL 60603.

Uncle Karl registers under account # 5515136 under the name of Karl Kusek, telephone #773-
57-6787 with a billing address of PO Box 42 Peru, IL 61354.

On 01/07/02 I obtained a fax copy of the 30-day "fraud buster report." In viewing the report I
und that the last telephone call made by Neubauer on 01/06/02 was at 2:10:33 to telephone
umber 312-593-6606 for a duration of 0:02:11 ( 2 minutes and 11 seconds). After this call, all
coming calls were forwarded to Neubauer's voice mail. I advised Nextel that there was several
oice mail messages indicated on Neubauer's phone and inquired as to how to retrieve these
essages. I was informed that a search warrant is required to have the password "reset" and then a
assword would be given to me to retrieve the voice messages.

On 01/07/02 I made contact with Michael Delaney DOB 08/10/74. Delaney is listed in
eubauer's Nextel phone with a Kenosha telephone #653-8320. Delaney came in for an interview.
elaney states that he knew Neubauer since they went to school together. Delaney last spoke to
eubauer on Friday night (01/04/02) or early Saturday morning (01/05/02) from Shana's house
#262-537-3784). They talked from 12:00 AM to 12:30 AM when Neubauer had to go pick up
ise at the bar. Delaney thinks he may have tried calling him on Saturday night around 11:30 PM
om home (TX#262-653-8320) but is not sure if they talked. Delaney confirms that Neubauer did
al narcotics, Ecstasy, marijuana and cocaine. Delaney knows that Neubauer didn't have any
arcotics available on Friday night. Delaney could not think of anyone who would want to harm
eubauer. Delaney did mention that Neubauer made comments about associating with Members of
Assyrian gang for the last 3 months and that they were Mafia type guys. Delaney states he never
et these guys and does not know who Neubauer sold to or who his suppliers were. Delaney did
call Neubauer saying that when Neubauer was arrested in December he went to a contact that he
ved $1000-1200. The contact told Neubauer to forget about the money, not to call him anymore,
d gave him the name of a lawyer. Delaney does not know the name of this person. When asked
out WHIPLASH, Delaney states that Denise has bartended there for approximately 3-4 months.
ior to WHIPLASH she worked at KEMP'S located west of HWY 59 on Grass Lake Rd. Delaney
es not know if Neubauer dealt narcotics at WHIPLASH or not. Delaney believes that Neubauer
alt the narcotics in Chicago. Delaney states that Neubauer did not like coming to Kenosha
cause he was under house arrest and feared getting caught in Wisconsin. Delaney does not know
ly Neubauer would have been in the area of the Bristol Renaissance Faire. When given the names
people in Neubauer's Nextel "phone book," Delaney states that he met Louie once and describes
n as being Puerto Rican or Italian, "big muscle guy," 5'8" 230#, stocky build. He believes that
nny would be Jenny Hanson and that Jenny Hanson does have a Nextel phone. Delaney also
ows a Mike (last name unknown) who used to room with Neubauer in Chicago at an apartment by
Hare airport. Mike had his jaw broken at one time, maybe three months ago. Delaney could not
ovide any further details to these people.

DM-143

PORTING OFFICER:
t. Kenneth Urquhart 166

SUPERVISOR:

om143

# KENOSHA SHERIFF'S DEPARTMENT
## SUPPLEMENTARY INVESTIGATION REPORT

92

| | |
|---|---|
| DATE OF SUPPLEMENT: 2/15/02 | **CASE OR EVENT NUMBER: 2002-2243** |
| DATE-TIME REPORTED: 01/06/02@0847 | **PAGE: 6 OF 6** |
| RE: HOMICIDE | |

On 01/08/02 I made contact with Lake County Sheriff's Department Detective Bureau to advised them of the case and to request there assistance in obtaining Illinois phone records and information regarding this case. Detective Jonites was assigned to assist in the investigation.

On 01/10/02 Detective Weyker #148 and I conducted surveillance of the funeral visitation at the Marsh Funeral Home located on Grand Ave in Lindenhurst, IL. I observed nothing out of the ordinary and no signs of a disturbance or problems at the wake. Video footage of the attendees was obtained and turned over to Detective Stanek #156.

On 01/14/02 I obtained a search warrant to have the password reset. The warrant was faxed to Nextel Communications Subpoena Compliance.

On 01/16/02 Nextel advised me that the password had been reset to be the telephone number. Twenty-one voice messages were retrieved from the phone. The messages were recorded on a micro-audiocassette, which was later placed into evidence. It is noted that the recorded messages are partially covered by a clicking noise which I was informed is caused by the phone. The messages are hardly audible on the tape.

The first voice message is at approximately 02:43 am where a female voice, believed to be Denise, asks, "where are you." The next voice message is not until approximately 07:00 AM where a male voice, believed to be Neubauer's father, asks where he is at. At least two more calls are from Neubauer's father asking where he is at and expressing concern. One message, stamped Thursday, was weeping on the message and then a male voice saying, I love you man, PMK. After taping the these messages I was unable to retrieve them from the phone again.

On 01/16/02 Detective Jonites obtained a GRAND JURY SUBPOENA for subscriber information on telephone #312-593-6606.

On 01/22/02 I was faxed a copy of the subscriber information. The account is to the victim, Richard Neubauer DOB 12/27/74 and address of 24076 W. Grand Ave, Lake Villa, IL. Along with the subscriber information was a telephone record for the phone dating from 12/28/01 to 01/17/02. In speaking with Detective Jonites he provided the name, Shane A. Muchka DOB 08/28/75. Muchka apparently associates with the bar owners of WHIPLASH, Serio's, and has been seen with one of the others. Muchka could possibly provide information on the victim, Neubauer, and any associates or current problems he may have had. Another name provided by Detective Jonites was Daryl K. Hatley DOB 02/07/75. Daryl allegedly sold narcotics for Neubauer, based on rumors from informants. This information was given to Detective Stanek #156. In checking the "phone book" side of Neubauer's Nextel the number lists to Johnny.

On 02/12/02 Detective Weyker #148 and I were requested to follow-up on the information regarding Shane Muchka. We attempted contact at his home residence but were advised by his mother that he was not home. We were contacted by Shane's girlfriend, Karen Herbert (address of 96 Highland Rd, Mundelein, IL cell# 791-2993). Karen was advised that we needed to speak with Shane. Shane made telephone contact with us and agreed to call us on 2/13/01 to meet with us. On 2/13/02 we contacted Shane who advised that he would not speak to us without his lawyer and then hung up.

**DM-144**

| | |
|---|---|
| REPORTING OFFICER: | SUPERVISOR: |
| . Kenneth Urquhart 166 | |

Report created on 2002-01-07 11:08:08

For Imsi: 316010000542453, from Dec 01 2001 to Jan 07 2002 -- Duration is expressed in Hours:Minutes:Seconds

| MIN/Dir Num | ESN/IMEI | Dialed Digits | Date | Duration | World Number | Cntry | LATN/OATNew |
|---|---|---|---|---|---|---|---|
| 13129078669 | | 13129076245 | 2002-01-06 19:41:07 | 0:00:32 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 18:27:14 | 0:01:13 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 18:12:57 | 0:00:06 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 16:49:57 | 0:00:29 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 16:23:52 | 0:00:11 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 16:15:48 | 0:01:48 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 15:57:09 | 0:00:10 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 15:15:27 | 0:00:12 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 15:02:14 | 0:00:26 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 14:13:02 | 0:00:06 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 13:10:38 | 0:00:30 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 11:56:59 | 0:00:07 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 11:14:57 | 0:00:22 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 10:39:54 | 0:00:04 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 10:09:14 | 0:00:15 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 09:57:16 | 0:00:15 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 09:34:01 | 0:00:14 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-05 09:11:24 | 0:00:07 | 13129076245 | 1 | HGA |
| 13129078669 | | 13129076245 | 2002-01-05 08:15:41 | 0:00:13 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 07:50:16 | 0:00:06 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 07:13:38 | 0:00:14 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 04:23:57 | 0:00:04 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 02:49:52 | 0:00:16 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-06 02:10:33 | 0:02:11 | 13125936606 | 1 | HOA |
| 13129078669 | | 8478265775 | 2002-01-06 01:05:21 | 0:02:57 | 8478265775 | 1 | H AT |
| 13129078669 | | 8478265775 | 2002-01-06 00:59:40 | 0:00:15 | 18478265775 | 1 | HOA |
| 13129078669 | | 17733707398 | 2002-01-06 00:38:31 | 0:00:11 | 17733707398 | 1 | HOA |
| 13129078669 | | 17733707398 | 2002-01-06 00:34:49 | 0:03:12 | 1262745963 | 1 | HOX |
| 13129078669 | | -9232170 | 2002-01-05 23:20:03 | 0:03:17 | 13129221210 | 1 | H A? |
| 13129078669 | | 2627459563 | 2002-01-05 23:15:57 | 0:02:17 | -2627459563 | 1 | H A? |
| 13129078669 | | 2627459563 | 2002-01-05 23:12:05 | 0:02:03 | 13125936606 | 1 | HOA |
| 13129078669 | | 3125936606 | 2002-01-05 23:10:41 | 0:00:28 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-05 23:09:46 | 0:00:20 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-05 22:14:15 | 0:00:08 | 17733707398 | 1 | HOA |
| 13129078669 | | 7733707398 | 2002-01-05 22:15:08 | 0:03:27 | 8473560227 | 1 | HOA |
| 13129078669 | | 8473560227 | 2002-01-05 22:08:37 | 0:04:25 | 17734277702 | 1 | H AT |
| 13129078669 | | 7734277702 | 2002-01-05 22:00:16 | 0:03:17 | 17734277702 | 1 | HOA |
| 13129078669 | | 7734277702 | 2002-01-05 21:45:27 | 0:00:02 | 2627459561 | 1 | HOA |
| 13129078669 | | 8478251982 | 2002-01-05 21:06:07 | 0:00:08 | 8479278632 | 1 | HOA |
| 13129078669 | | 2627459563 | 2002-01-05 20:37:09 | 0:00:39 | 17733707398 | 1 | HOA |
| 13129078669 | | 8479278632 | 2002-01-05 20:32:20 | 0:00:10 | 16479738761 | 1 | HOA |
| 13129078669 | | 7733707398 | 2002-01-05 20:31:27 | 0:02:35 | 13129076245 | 1 | HOA |
| 13129078669 | | 8479738761 | 2002-01-05 20:22:24 | 0:00:06 | 13129076245 | 1 | HOA |
| 13129078669 | | 13129076245 | 2002-01-05 19:23:19 | 0:00:28 | 8472651982 | 1 | H OA |
| 13129078669 | | 8472651982 | 2002-01-05 19:10:48 | 0:00:01 | 13129076245 | 1 | H OA |
| 13129078669 | | 13129076245 | 2002-01-05 17:59:38 | 0:00:16 | 13129076245 | 1 | HOA |
| | | 17734277702 | | 0:01:27 | 17734277702 | 1 | HGA |

Duration: 0:35:31
# Calls: 46

L = Toll, R = Roamer, I = International Toll, R = Homer, D = Originated, A = Answered, T = Terminated,
3 = 3 Way, F = Call Forwarding, 9 = Call Waiting

93

HAT = INCO

HOA = OUT G

F-133    T-100  P.002    703-433-8482    162    From-Nextel    05:47pm    Jan-07-02



Statement For: RICHARD NEUBAUER    94
Mobile Number: (312) 593-6896
Account Number: 237598591

**Customer Service Number    1-800-937-8997**

Jan 25, 2002

Page 13 of 27

## LOCAL AIRTIME , LONG DISTANCE AND INTERNATIONAL CHARGES - (Continued)

| Date | Call Destination | Time | Number Called | Call Type | Minutes | Airtime Charges | Toll Charges | Additional Charges | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1/05/02 | INCOMING | 2:37 PM | 847-265-1982 | | 3 | $ - | $ - | $ - | $ - |
| 1/05/02 | ELK GROVE, IL | 3:17 PM | 847-312-9990 | (F) | 1 | $ - | $ - | $ - | $ - |
| 1/05/02 | INCOMING | 3:51 PM | 773-836-1193 | | 1 | $ - | $ - | $ - | $ - |
| 1/05/02 | CHICAGO, IL | 3:59 PM | 312-296-3906 | | 2 | $ - | $ - | $ - | $ - |
| 1/05/02 | ELK GROVE, IL | 4:18 PM | 847-312-9990 | (F) | 1 | $ - | $ - | $ - | $ - |
| 1/05/02 | LA GRANGE, IL | 4:47 PM | 847-927-8632 | | 1 | $ - | $ - | $ - | $ - |
| 1/05/02 | CHICAGO, IL | 5:10 PM | 773-745-0650 | | 3 | $ - | $ - | $ - | $ - |
| 1/05/02 | INCOMING | 5:12 PM | 847-966-8632 | (A) | 2 | $ - | $ - | $ - | $ - |
| 1/05/02 | CHICAGO, IL | 5:14 PM | 773-745-0650 | | 1 | $ - | $ - | $ - | $ - |
| 1/05/02 | INCOMING | 5:18 PM | 773-275-9658 | | 11 | $ - | $ - | $ - | $ - |
| 1/05/02 | CHICAGO, IL | 5:28 PM | 773-616-1988 | | 3 | $ - | $ - | $ - | $ - |
| 1/05/02 | NORTHBROOK, IL | 5:38 PM | 847-302-1099 | | 1 | $ - | $ - | $ - | $ - |
| 1/05/02 | LA GRANGE, IL | 6:42 PM | 847-927-8632 | | 3 | $ - | $ - | $ - | $ - |
| 1/05/02 | LA GRANGE, IL | 7:25 PM | 847-927-8632 | | 1 | $ - | $ - | $ - | $ - |
| 1/05/02 | INCOMING | 7:30 PM | 847-927-8632 | | 3 | $ - | $ - | $ - | $ - |
| 1/05/02 | CHICAGO, IL | 7:57 PM | 312-593-0860 | (F) | 1 | $ - | $ - | $ - | $ - |
| 1/05/02 | ELK GROVE, IL | 8:03 PM | 847-312-9990 | (F) | 1 | $ - | $ - | $ - | $ - |
| 1/05/02 | LA GRANGE, IL | 8:17 PM | 847-927-8632 | | 1 | $ - | $ - | $ - | $ - |
| 1/05/02 | CHICAGO, IL | 9:00 PM | 312-296-3906 | | 2 | $ - | $ - | $ - | $ - |
| 1/05/02 | INCOMING | 9:07 PM | 860-830-5296 | | 15 | $ - | $ - | $ - | $ - |
| 1/05/02 | CHICAGO, IL | 9:37 PM | 773-743-7762 | | 3 | $ - | $ - | $ - | $ - |
| 1/05/02 | CHICAGO, IL | 10:45 PM | 773-743-7762 | | 3 | $ - | $ - | $ - | $ - |
| 1/05/02 | NORTHBROOK, IL | 11:04 PM | 847-530-8632 | | 2 | $ - | $ - | $ - | $ - |
| 1/05/02 | LOMBARD, IL | 11:07 PM | 630-519-3376 | | 1 | $ - | $ - | $ - | $ - |
| 1/05/02 | INCOMING | 11:08 PM | 773-262-8800 | | 2 | $ - | $ - | $ - | $ - |
| 1/05/02 | INCOMING | 11:13 PM | 312-907-8669 | | 3 | $ - | $ - | $ - | $ - |
| 1/05/02 | NORTHBROOK, IL | 11:21 PM | 847-302-1099 | | 3 | $ - | $ - | $ - | $ - |
| 1/05/02 | CHICAGO, IL | 11:30 PM | 312-250-0304 | | 1 | $ - | $ - | $ - | $ - |
| 1/05/02 | LOMBARD, IL | 11:34 PM | 630-519-3376 | | 4 | $ - | $ - | $ - | $ - |
| 1/06/02 | INCOMING | 12:11 AM | 847-530-1895 | | 3 | $ - | $ - | $ - | $ - |
| 1/06/02 | CHICAGO, IL | 12:57 AM | 773-972-0930 | | 1 | $ - | $ - | $ - | $ - |
| 1/06/02 | CHICAGO, IL | 12:58 AM | 773-972-0930 | | 1 | $ - | $ - | $ - | $ - |
| 1/06/02 | INCOMING | 2:10 AM | 312-907-8669 | | 3 | $ - | $ - | $ - | $ - |
| 1/06/02 | INCOMING | 3:33 AM | 847-224-1039 | | 2 | $ - | $ - | $ - | $ - |
| 1/06/02 | INCOMING | 3:36 AM | 847-224-1039 | | 1 | $ - | $ - | $ - | $ - |
| 1/06/02 | INCOMING | 3:40 AM | 847-224-1039 | | 1 | $ - | $ - | $ - | $ - |
| 1/06/02 | INCOMING | 3:43 AM | 847-224-1039 | | 1 | $ - | $ - | $ - | $ - |

Call Type: (A) Call Waiting (B) Call Forward (C) Conference Call (D) Text Message (E) Data/Fax (F) Mobile2Mobile (G) Voicemail (H) Free Calls
Internat'l Call

01/22/2002 14:20 FAX 42537860    VOICESTREAM LER    @012 95

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| H | 01/08/2002 02:57 PM | PK | 278 | Chicago | ELKGRO | IL | STD | 312-593-0850 | Voicestream | 4.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/08/2002 02:28 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 773-880-2041 | Voicestream | 3.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/08/2002 02:22 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 312-250-0304 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/08/2002 02:11 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 773-716-6130 | Voicestream | 8.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/08/2002 02:09 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 312-593-6606 | Voicestream | 2.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/08/2002 02:06 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 312-250-0304 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/08/2002 02:05 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 312-593-6606 | Voicestream | 2.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 10:25 PM | OP | 278 | Chicago | MODESTO | CA | STD | 209-345-9638 | Voicestream | 1.00 | .00 | 0.00 0.20 0.00 0.20 |
| H | 01/07/2002 09:26 PM | OP | 278 | Chicago | CHICAGO | IL | STD | 773-716-6130 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 08:06 PM | OP | 278 | Chicago | CHICAGO | IL | STD | 773-716-6130 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 07:07 PM | OP | 278 | Chicago | INCOMING | | STD | 773-370-7398 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 06:17 PM | PK | 278 | Chicago | INCOMING | | STD | 312-337-8915 | Voicestream | 12.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 06:05 PM | PK | 278 | Chicago | INCOMING | | STD | 773-716-6130 | Voicestream | 2.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 04:52 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 773-880-2041 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 04:45 PM | PK | 278 | Chicago | INCOMING | | STD | 773-848-4531 | Voicestream | 2.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 04:32 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 773-880-2041 | Voicestream | 3.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 04:32 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 773-880-7762 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 04:16 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 312-250-0304 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 04:12 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 773-880-2041 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 04:10 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 773-973-0531 | Voicestream | 3.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 04:09 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 773-743-7782 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 03:38 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 312-593-6606 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 03:01 PM | PK | 278 | Chicago | ELK GROV | IL | STD | 847-312-8990 | Voicestream | 1.00 | .00 | 0.00 0.00 3.00 0.00 |
| H | 01/07/2002 02:58 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 312-593-0850 | Voicestream | 2.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 01:29 PM | PK | 278 | Chicago | CHICAGO | IL | STD | 312-250-0304 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 12:55 PM | PK | 278 | Chicago | INCOMING | | STD | 773-848-4633 | Voicestream | 3.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/07/2002 12:33 AM | OP | 278 | Chicago | INCOMING | | STD | 773-716-6130 | Voicestream | 8.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 11:31 PM | WK | 278 | Chicago | CHICAGO | IL | STD | 773-716-6130 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 10:23 PM | WK | 278 | Chicago | INCOMING | | STD | 847-312-8990 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 10:15 PM | WK | 278 | Chicago | INCOMING | | STD | 847-312-8990 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 09:43 PM | WK | 278 | Chicago | CHICAGO | IL | STD | 773-716-6130 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 09:37 PM | WK | 278 | Chicago | MODESTO | CA | STD | 209-345-9638 | Voicestream | 6.00 | .00 | 0.00 1.20 0.00 1.20 |
| H | 01/06/2002 09:08 PM | WK | 278 | Chicago | INCOMING | | STD | 209-345-9638 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 05:18 PM | WK | 278 | Chicago | CHICAGO | IL | STD | 773-879-6444 | Voicestream | 3.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 05:04 PM | WK | 278 | Chicago | LA GRANG | IL | STD | 847-627-8632 | Voicestream | 2.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 04:58 PM | WK | 278 | Chicago | CHICAGO | IL | STD | 773-716-6130 | Voicestream | 3.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 04:54 PM | WK | 278 | Chicago | CHICAGO | IL | STD | 312-593-6606 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 05:18 AM | WK | 278 | Chicago | CHICAGO | IL | STD | 312-296-3906 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 05:08 AM | WK | 278 | Chicago | INCOMING | | STD | 312-296-3906 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 04:23 AM | WK | 278 | Chicago | CHICAGO | IL | STD | 312-907-8669 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 04:09 AM | WK | 278 | Chicago | INCOMING | | STD | 847-224-1039 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 04:01 AM | WK | 278 | Chicago | INCOMING | | STD | 847-224-1039 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 03:58 AM | WK | 278 | Chicago | CHICAGO | IL | STD | 312-286-6065 | Voicestream | 2.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 03:57 AM | WK | 278 | Chicago | CHICAGO | IL | STD | 312-286-6065 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 03:53 AM | WK | 278 | Chicago | INCOMING | | STD | 847-224-1039 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 03:48 AM | WK | 278 | Chicago | INCOMING | | STD | 847-224-1039 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 03:43 AM | WK | 278 | Chicago | INCOMING | | STD | 847-224-1039 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 03:40 AM | WK | 278 | Chicago | INCOMING | | STD | 847-224-1039 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 03:36 AM | WK | 278 | Chicago | INCOMING | | STD | 847-224-1039 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 03:33 AM | WK | 278 | Chicago | INCOMING | | STD | 847-224-1039 | Voicestream | 2.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 03:09 AM | WK | 278 | Chicago | CHICAGO | IL | STD | 312-593-6606 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 03:10 AM | WK | 278 | Chicago | INCOMING | | STD | 312-907-8669 | Voicestream | 3.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 12:58 AM | WK | 278 | Chicago | CHICAGO | IL | STD | 773-972-0930 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 12:57 AM | WK | 278 | Chicago | CHICAGO | IL | STD | 773-972-0930 | Voicestream | 1.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/06/2002 12:11 AM | WK | 278 | Chicago | INCOMING | | STD | 847-530-1695 | Voicestream | 3.00 | .00 | 0.00 0.00 0.00 0.00 |
| H | 01/05/2002 11:34 PM | WK | 278 | Chicago | LOMBARD | IL | STD | 630-519-3376 | Voicestream | 4.00 | .00 | 0.00 0.00 0.00 0.00 |

| 1,477.00 | $33.31 | $0.00 | $11.19 | $4.42 | $50.08 |

Exhibit

96

## SERIO CELLPHONE RECORDS
### condensed
( GS 1-99)

Calls between: Serio /Schubat

Schubats Mothers Home = MH
847-356-7455

Schubat /Kilarski = S/K
847-265-7439

| | DATE: | TIME DURATION: | PAGE: | CALL PLACED TO: |
|---|---|---|---|---|
| 1) | Dec,15th,2001 | 10:02AM/1:00 | Gs 26 | MH |
| 2) | Dec,16th,2001 | 6:48PM/1:25 | Gs 28 | MH |
| 3) | Dec,17th,2001 | 9:27PM/3:27 | Gs 30 | MH |
| 4) | Dec,22nd,2001 | 3:12PM/1:00 | Gs 37 | MH |
| 5) | Dec,22nd,2001 | 5:36PM/1:00 | Gs 37 | MH |
| 6) | Dec,26th,2001 | 5:58PM/1:00 | Gs 41 | MH |
| 7) | Jan,2nd,2001 | 5:44PM/1:00 | Gs 48 | S/K |
| 8) | Jan,3rd,2002 | 3:51PM/1:00 | Gs 49 | MH |
| 9) | Jan,3rd,2002 | 3:52PM/1:00 | Gs 49 | MH |
| 10) | Jan,3rd,2002 | 6:08PM/1:00 | Gs 50 | MH |
| 11) | Jan,3rd,2002 | 6:09PM/13:42 | Gs 50 | S/K |
| 12) | Jan,4th,2002 | 2:20PM/2:00 | Gs 51 | MH |
| 13) | Jan,5th,2002 | 2:51PM/11:15 | Gs 52 | S/K |

**Jan,6th,2002   Neubauers Death**

| | DATE: | TIME DURATION: | PAGE: | CALL PLACED TO: |
|---|---|---|---|---|
| 14) | Jan,6th,2002 | 7:06PM/1:00 | Gs 53 | S/K |
| 15) | Jan,6th,2002 | 7:48PM/4:51 | Gs 53 | MH |
| 16) | Jan,9th,2002 | 7:59PM/1:11 | Gs 57 | S/K |
| 17) | Jan,13th,2002 | 1:34AM/1:00 | Gs 61 | S/K |
| 18) | Jan,14th,2002 | 9:35AM/9:58 | Gs 62 | S/K |
| 19) | Jan,14th,2002 | 9:52PM/7:20 | Gs 63 | S/K |
| 20) | Jan,17th,2002 | 8:54PM/1:23 | Gs 67 | S/K |
| 21) | Jan,18th,2002 | 6:09PM/4:00 | Gs 68 | S/K |
| 22) | Jan,20th,2002 | 4:57PM/38:35 | Gs 71 | S/K |
| 23) | Jan,24th,2002 | 5:00PM/1:00 | Gs 76 | S/K |
| 24) | Jan,24th,2002 | 6:04PM/1:00 | Gs 76 | S/K |
| 25) | Jan,24th,2002 | 8:07PM/1:00 | Gs 77 | S/K |

January 31st,2002., phone records end.

| Account name | Charles L Klessner | Page 13 |
| Account number | 0009617953-6 | |
| Statement date | January 09, 2002 | |
| Billing period | December 09 - January 08, 2002 | |

## RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 469 | Dec 14 | 09:58 PM | MOBILE,CL | 847-561-7503 | OP/PU | 1:05 | 0.00 | | |
| 470 | Dec 14 | 09:59 PM | MOBILE,CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 471 | Dec 14 | 10:05 PM | MOBILE,CL | 815-693-1498 | OP/PU | 5:35 | 0.00 | | 0.00 |
| 472 | Dec 14 | 10:13 PM | MOBILE,CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 473 | Dec 14 | 10:21 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 474 | Dec 14 | 10:22 PM | NORTHBROOK,IL | 847-401-9225 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 475 | Dec 14 | 10:30 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 476 | Dec 14 | 10:32 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 477 | Dec 14 | 10:59 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 478 | Dec 14 | 11:17 PM | ROSELLE,IL | 847-804-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 479 | Dec 14 | 11:18 PM | ROSELLE,IL | 847-804-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 480 | Dec 14 | 11:28 PM | ROSELLE,IL | 847-804-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 481 | Dec 14 | 11:34 PM | WHEELING,IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 482 | Dec 14 | 11:36 PM | ROUND LAKE,IL | 847-740-4091 | OP/PU | 2:37 | 0.00 | | 0.00 |
| 483 | Dec 15 | 12:01 AM | MOBILE,CL | 815-693-1498 | OP/PU | 18:04 | 0.00 | | 0.00 |
| 484 | Dec 15 | 12:02 AM | MOBILE,CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 485 | Dec 15 | 12:02 AM | MOBILE,CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 486 | Dec 15 | 12:09 AM | WHEELING,IL | Voice Mail | OP/PU | 1:41 | 0.00 | | 0.00 |
| 487 | Dec 15 | 12:10 AM | ROUND LAKE,IL | 847-740-4091 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 488 | Dec 15 | 12:11 AM | NORTHBROOK,IL | 847-414-0990 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 489 | Dec 15 | 12:56 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 490 | Dec 15 | 01:45 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 491 | Dec 15 | 02:17 AM | ROUND LAKE,IL | 847-740-3743 | OP/PU | 1:24 | 0.00 | | 0.00 |
| 492 | Dec 15 | 02:30 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 493 | Dec 15 | 02:33 AM | | INCOMING | OP | 2:39 | 0.00 | | 0.00 |
| 494 | Dec 15 | 02:46 AM | MOBILE,CL | 815-693-1498 | OP/PU | 2:22 | 0.00 | | 0.00 |
| 495 | Dec 15 | 02:53 AM | | INCOMING | OP | 4:27 | 0.00 | | 0.00 |
| 496 | Dec 15 | 09:33 AM | | INCOMING | OP | 1:46 | 0.00 | | 0.00 |
| 497 | Dec 15 | 10:07 AM | LAKE VILLA,IL | 847-356-7455 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 498 | Dec 15 | 11:10 AM | MOBILE,CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 499 | Dec 15 | 11:20 AM | | INCOMING | OP | 2:32 | 0.00 | | 0.00 |
| 500 | Dec 15 | 11:41 AM | WHEELING,IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 501 | Dec 15 | 11:41 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 502 | Dec 15 | 12:08 PM | | INCOMING | OP | 2:21 | 0.00 | | 0.00 |
| 503 | Dec 15 | 12:12 PM | | INCOMING | OP | 4:00 | 0.00 | | 0.00 |
| 504 | Dec 15 | 02:35 PM | | INCOMING | OP | 1:57 | 0.00 | | 0.00 |
| 505 | Dec 15 | 02:49 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 506 | Dec 15 | 02:50 PM | MOBILE,CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 507 | Dec 15 | 02:51 PM | MOBILE,CL | 815-693-1498 | OP/PU | 1:04 | 0.00 | | 0.00 |
| 508 | Dec 15 | 03:02 PM | | INCOMING | OP | 1:16 | 0.00 | | 0.00 |
| 509 | Dec 15 | 03:16 PM | ANTIOCH,IL | 847-838-3200 | OP/PU | 1:34 | 0.00 | | 0.00 |
| 510 | Dec 15 | 03:24 PM | MOBILE,CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 511 | Dec 15 | 03:31 PM | MOBILE,CL | 815-693-1498 | OP/PU | 2:55 | 0.00 | | 0.00 |
| 512 | Dec 15 | 03:35 PM | MOBILE,CL | 815-693-1498 | OP/PU | 2:30 | 0.00 | | 0.00 |
| 513 | Dec 15 | 04:43 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 514 | Dec 15 | 04:48 PM | MOBILE,CL | 815-693-1498 | OP/PU | 1:57 | 0.00 | | 0.00 |
| 515 | Dec 15 | 04:51 PM | ROUND LAKE,IL | 847-740-8129 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 516 | Dec 15 | 05:41 PM | MOBILE,CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 517 | Dec 15 | 05:41 PM | MOBILE,CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 518 | Dec 15 | 05:49 PM | MOBILE,CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 519 | Dec 15 | 05:50 PM | ROSELLE,IL | 847-507-7827 | OP/PU | 1:00 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

48

| | |
|---|---|
| Account name | Charles L Kiessner |
| Account number | 0009617953-6 |
| Statement date | January 09, 2002 |
| Billing period | December 09 - January 08, 2002 |

Page  15

## RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 571 | Dec 16 | 05:51 PM | NORTHBROOK, IL | 847-946-8619 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 572 | Dec 16 | 05:51 PM | ROSELLE, IL | 847-804-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 573 | Dec 16 | 05:52 PM | ROSELLE, IL | 847-804-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 574 | Dec 16 | 05:53 PM | NORTHBROOK, IL | 847-946-8619 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 575 | Dec 16 | 05:56 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 576 | Dec 16 | 05:56 PM | ANTIOCH, IL | 847-395-6281 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 577 | Dec 16 | 05:57 PM | | INCOMING | OP | 1:36 | 0.00 | | 0.00 |
| 578 | Dec 16 | 06:01 PM | LAKE VILLA, IL | 847-356-0305 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 579 | Dec 16 | 06:14 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 580 | Dec 16 | 06:16 PM | NORTHBROOK, IL | 847-338-6667 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 581 | Dec 16 | 06:24 PM | ANTIOCH, IL | 847-838-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 582 | Dec 16 | 06:25 PM | NORTHBROOK, IL | 847-338-6667 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 583 | Dec 16 | 06:27 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 584 | Dec 16 | 06:28 PM | LAKEFOREST, IL | 847-219-2472 | OP/PU | 3:49 | 0.00 | | 0.00 |
| 585 | Dec 16 | 06:34 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 586 | Dec 16 | 06:38 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 587 | Dec 16 | 06:39 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 588 | Dec 16 | 06:46 PM | NORTHBROOK, IL | 847-338-6667 | OP/PU | 1:21 | 0.00 | | 0.00 |
| 589 | Dec 16 | 06:48 PM | LAKE VILLA, IL | 847-356-7455 | OP/PU | 1:25 | 0.00 | | 0.00 |
| 590 | Dec 16 | 07:24 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 591 | Dec 16 | 08:15 PM | | INCOMING | OP | 1:03 | 0.00 | | 0.00 |
| 592 | Dec 16 | 08:37 PM | LAKEFOREST, IL | 847-219-4192 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 593 | Dec 16 | 10:17 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 594 | Dec 16 | 10:19 PM | GRAYS LAKE, IL | 847-223-7144 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 595 | Dec 16 | 10:20 PM | GRAYS LAKE, IL | 847-223-7144 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 596 | Dec 16 | 10:21 PM | GRAYS LAKE, IL | 847-223-7144 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 597 | Dec 16 | 10:21 PM | GRAYS LAKE, IL | 847-223-7144 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 598 | Dec 16 | 10:23 PM | LAKEFOREST, IL | 847-219-4192 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 599 | Dec 16 | 10:24 PM | MOBILE, CL | 815-693-1498 | OP/PU | 4:16 | 0.00 | | 0.00 |
| 600 | Dec 16 | 10:26 PM | | INCOMING | OP/CW | 2:39 | 0.00 | | 0.00 |
| 601 | Dec 16 | 11:10 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 602 | Dec 16 | 11:11 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 603 | Dec 16 | 11:11 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:59 | 0.00 | | 0.00 |
| 604 | Dec 16 | 11:25 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 605 | Dec 16 | 11:28 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 606 | Dec 16 | 11:31 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 607 | Dec 16 | 11:32 PM | MOBILE, CL | 815-693-1498 | OP/PU | 2:37 | 0.00 | 1.19 | 1.19 |
| 608 | Dec 16 | 11:33 PM | DIR ASST, CL | 411 | OP/PU | 1:09 | 0.00 | | 0.00 |
| 609 | Dec 16 | 11:36 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:13 | 0.00 | | 0.00 |
| 610 | Dec 16 | 11:37 PM | LAKE VILLA, IL | 847-356-3535 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 611 | Dec 16 | 11:39 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 612 | Dec 16 | 11:40 PM | ROSELLE, IL | 847-507-7827 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 613 | Dec 16 | 11:40 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 614 | Dec 16 | 11:45 PM | MOBILE, CL | 815-693-1498 | OP/PU | 3:33 | 0.00 | | 0.00 |
| 615 | Dec 16 | 11:59 PM | MOBILE, CL | 815-693-1498 | OP/PU | 2:55 | 0.00 | | 0.00 |
| 616 | Dec 17 | 12:22 AM | NORTHBROOK, IL | 847-946-8619 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 617 | Dec 17 | 12:29 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 618 | Dec 17 | 12:30 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 619 | Dec 17 | 12:41 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 620 | Dec 17 | 12:42 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 621 | Dec 17 | 12:43 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

*continued...*

Account name: Charles L Klessner
Account number: 0009617953-6
Statement date: January 09, 2002
Billing period: December 09 - January 08, 2002

Page  17  99

## RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|--------|------|------|---------|---------------|--------------|---------|-------|---------------|-------------------------------|
| 673 | Dec 17 | 08:51 PM | ANTIOCH, IL | 847-395-2484 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 674 | Dec 17 | 08:52 PM | LAKEFOREST, IL | 847-219-2472 | OP/PU | 1:17 | 0.00 | | 0.00 |
| 675 | Dec 17 | 08:53 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 676 | Dec 17 | 08:57 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 677 | Dec 17 | 09:01 PM | CHICAGO, IL | 773-370-7398 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 678 | Dec 17 | 09:02 PM | | INCOMING | OP | 1:45 | 0.00 | | 0.00 |
| 679 | Dec 17 | 09:06 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 680 | Dec 17 | 09:19 PM | NORTHBROOK, IL | 847-682-8005 | OP/PU | 4:42 | 0.00 | | 0.00 |
| 681 | Dec 17 | 09:26 PM | LAKE VILLA, IL | 847-265-1982 | OP/PU | 1:06 | 0.00 | | 0.00 |
| 682 | Dec 17 | 09:27 PM | LAKE VILLA, IL | 847-356-7455 | OP/PU | 3:27 | 0.00 | | 0.00 |
| 683 | Dec 17 | 09:37 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 684 | Dec 17 | 09:53 PM | | INCOMING | OP | 3:04 | 0.00 | | 0.00 |
| 685 | Dec 17 | 09:57 PM | LAKE VILLA, IL | 847-265-1982 | OP/PU | 2:55 | 0.00 | | 0.00 |
| 686 | Dec 17 | 10:31 PM | | INCOMING | OP | 1:11 | 0.00 | | 0.00 |
| 687 | Dec 17 | 10:35 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 688 | Dec 17 | 10:38 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 689 | Dec 17 | 10:39 PM | ROSELLE, IL | 847-826-5775 | OP/PU | 2:49 | 0.00 | | 0.00 |
| 690 | Dec 17 | 10:42 PM | WHEELING, IL | Voice Mail | OP/PU | 1:56 | 0.00 | | 0.00 |
| 691 | Dec 17 | 10:56 PM | | INCOMING | OP | 2:28 | 0.00 | | 0.00 |
| 692 | Dec 17 | 10:58 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 693 | Dec 17 | 11:04 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 694 | Dec 18 | 12:00 AM | | INCOMING | OP | 1:45 | 0.00 | | 0.00 |
| 695 | Dec 18 | 12:02 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 696 | Dec 18 | 12:06 AM | | INCOMING | OP | 1:27 | 0.00 | | 0.00 |
| 697 | Dec 18 | 12:23 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 698 | Dec 18 | 12:24 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:08 | 0.00 | | 0.00 |
| 699 | Dec 18 | 12:28 AM | DIR ASST, CL | 411 | OP/PU | 1:00 | 0.00 | 1.19 | 1.19 |
| 700 | Dec 18 | 12:33 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 701 | Dec 18 | 01:08 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 702 | Dec 18 | 01:27 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 703 | Dec 18 | 01:27 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 704 | Dec 18 | 01:33 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:11 | 0.00 | | 0.00 |
| 705 | Dec 18 | 02:05 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 706 | Dec 18 | 02:50 AM | | INCOMING | OP | 3:02 | 0.00 | | 0.00 |
| 707 | Dec 18 | 03:19 AM | MOBILE, CL | 815-693-1498 | OP/PU | 2:33 | 0.00 | | 0.00 |
| 708 | Dec 18 | 04:24 AM | MOBILE, CL | 815-693-1498 | OP/PU | 2:44 | 0.00 | | 0.00 |
| 709 | Dec 18 | 05:20 AM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 710 | Dec 18 | 08:49 AM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 711 | Dec 18 | 11:49 AM | WHEELING, IL | Voice Mail | PP/PU | 1:43 | 0.00 | | 0.00 |
| 712 | Dec 18 | 11:51 AM | CHICAGO, IL | 312-375-2148 | PP/PU | 1:26 | 0.00 | | 0.00 |
| 713 | Dec 18 | 11:51 AM | TREVOR, WI | 262-862-9341 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 714 | Dec 18 | 11:52 AM | NORTHBROOK, IL | 847-414-0990 | PP/PU | 2:36 | 0.00 | | 0.00 |
| 715 | Dec 18 | 11:54 AM | WHEELING, IL | Voice Mail | PP/PU | 1:39 | 0.00 | | 0.00 |
| 716 | Dec 18 | 11:56 AM | LAKE VILLA, IL | 847-356-0305 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 717 | Dec 18 | 11:57 AM | MOBILE, CL | 815-693-1498 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 718 | Dec 18 | 12:23 PM | | INCOMING | PP | 2:58 | 0.00 | | 0.00 |
| 719 | Dec 18 | 01:45 PM | MOBILE, CL | 815-693-1498 | PP/PU | 1:03 | 0.00 | | 0.00 |
| 720 | Dec 18 | 01:46 PM | MOBILE, CL | 815-693-1498 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 721 | Dec 18 | 01:46 PM | MOBILE, CL | 815-693-1498 | PP/PU | | | | |
| 722 | Dec 18 | 01:49 PM | WHEELING, IL | Voice Mail | PP/PU | | | | |
| 723 | Dec 18 | 01:50 PM | LAKE VILLA, IL | 847-356-0305 | PP/PU | | | | |

| Footnote | Features | Networks | Services | Time Period |
|----------|----------|----------|----------|-------------|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

| | | |
|---|---|---|
| **Account name** | Charles L Klessner | Page 24 |
| **Account number** | 0009617953-6 | |
| **Statement date** | January 09, 2002 | |
| **Billing period** | December 09 - January 08, 2002 | |

100

## RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 1030 | Dec 22 | 03:05 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1031 | Dec 22 | 03:06 PM | WAUKEGAN, IL | 847-445-7176 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1032 | Dec 22 | 03:07 PM | WAUKEGAN, IL | 847-445-7176 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1033 | Dec 22 | 03:08 PM | ROSELLE, IL | 847-507-7827 | OP/PU | 2:26 | 0.00 | | 0.00 |
| 1034 | Dec 22 | 03:11 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1035 | Dec 22 | 03:12 PM | LAKE VILLA, IL | 847-356-7455 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1036 | Dec 22 | 03:13 PM | GRAYS LAKE, IL | 847-223-2361 | OP/PU | 44:15 | 0.00 | | 0.00 |
| 1037 | Dec 22 | 04:04 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1038 | Dec 22 | 04:14 PM | | INCOMING | OP | 2:02 | 0.00 | | 0.00 |
| 1039 | Dec 22 | 04:17 PM | WAUKEGAN, IL | 847-445-7176 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1040 | Dec 22 | 04:18 PM | WAUKEGAN, IL | 847-445-7176 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1041 | Dec 22 | 04:26 PM | ROSELLE, IL | 847-804-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1042 | Dec 22 | 04:50 PM | WHEELING, IL | Voice Mail | OP/PU | 2:00 | 0.00 | | 0.00 |
| 1043 | Dec 22 | 04:51 PM | ANTIOCH, IL | 847-838-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1044 | Dec 22 | 04:55 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1045 | Dec 22 | 05:12 PM | | INCOMING | OP | 4:53 | 0.00 | | 0.00 |
| 1046 | Dec 22 | 05:22 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1047 | Dec 22 | 05:33 PM | | INCOMING | OP | 1:13 | 0.00 | | 0.00 |
| 1048 | Dec 22 | 05:35 PM | NORTHBROOK, IL | 847-946-8619 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1049 | Dec 22 | 05:36 PM | LAKE VILLA, IL | 847-356-7455 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1050 | Dec 22 | 06:49 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1051 | Dec 22 | 06:53 PM | DIR ASST, CL | 411 | OP/PU | 1:23 | 0.00 | 1.19 | 1.19 |
| 1052 | Dec 22 | 06:54 PM | DIR ASST, CL | 411 | OP/PU | 2:58 | 0.00 | 1.19 | 1.19 |
| 1053 | Dec 22 | 07:08 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1054 | Dec 22 | 07:11 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1055 | Dec 22 | 07:18 PM | | INCOMING | OP | 5:37 | 0.00 | | 0.00 |
| 1056 | Dec 22 | 07:51 PM | | INCOMING | OP | 8:00 | 0.00 | | 0.00 |
| 1057 | Dec 22 | 07:59 PM | | INCOMING | OP | 1:16 | 0.00 | | 0.00 |
| 1058 | Dec 22 | 08:28 PM | NORTHBROOK, IL | 630-674-7013 | OP/PU | 1:15 | 0.00 | | 0.00 |
| 1059 | Dec 22 | 08:39 PM | | INCOMING | OP | 6:30 | 0.00 | | 0.00 |
| 1060 | Dec 22 | 09:09 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1061 | Dec 22 | 09:09 PM | ROUND LAKE, IL | 847-740-3743 | OP/PU | 1:32 | 0.00 | | 0.00 |
| 1062 | Dec 22 | 09:22 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1063 | Dec 22 | 09:24 PM | WAUKEGAN, IL | 847-445-7176 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1064 | Dec 22 | 09:45 PM | | INCOMING | OP | 1:42 | 0.00 | | 0.00 |
| 1065 | Dec 22 | 09:50 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1066 | Dec 22 | 09:56 PM | ROSELLE, IL | 847-804-6133 | OP/PU | 1:38 | 0.00 | | 0.00 |
| 1067 | Dec 22 | 10:09 PM | NORTHBROOK, IL | 847-946-8619 | OP/PU | 2:03 | 0.00 | | 0.00 |
| 1068 | Dec 22 | 11:29 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1069 | Dec 22 | 11:34 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1070 | Dec 22 | 11:53 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1071 | Dec 22 | 11:58 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1072 | Dec 23 | 12:01 AM | ROSELLE, IL | 847-909-1111 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1073 | Dec 23 | 12:15 AM | NORTHBROOK, IL | 847-946-8619 | OP/PU | 3:13 | 0.00 | | 0.00 |
| 1074 | Dec 23 | 02:08 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1075 | Dec 23 | 02:23 AM | MOBILE, CL | 312-907-8669 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1076 | Dec 23 | 02:25 AM | MOBILE, CL | 312-907-8669 | OP/PU | 1:14 | 0.00 | | 0.00 |
| 1077 | Dec 23 | 02:33 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1078 | Dec 23 | 02:34 AM | NORTHBROOK, IL | 847-946-8619 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1079 | Dec 23 | 02:52 AM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1080 | Dec 23 | 02:53 AM | NORTHBROOK, IL | 847-946-8619 | OP/PU | 8:35 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PLN-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

ICI

| Account name | Charles L Klessner | Page 28 |
|---|---|---|
| Account number | 0009617953-6 | |
| Statement date | January 09, 2002 | |
| Billing period | December 09 - January 08, 2002 | |

RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 1234 | Dec 25 | 11:42 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1235 | Dec 25 | 11:46 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1236 | Dec 26 | 12:17 AM | | INCOMING | OP | 2:01 | 0.00 | | 0.00 |
| 1237 | Dec 26 | 11:30 AM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1238 | Dec 26 | 11:37 AM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1239 | Dec 26 | 02:48 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1240 | Dec 26 | 02:50 PM | WAUKEGAN, IL | 847-445-7176 | PP/PU | 2:12 | 0.00 | | 0.00 |
| 1241 | Dec 26 | 02:53 PM | | INCOMING | PP | 9:03 | 0.00 | | 0.00 |
| 1242 | Dec 26 | 03:02 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1243 | Dec 26 | 03:03 PM | LAKE VILLA, IL | 847-356-7091 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1244 | Dec 26 | 03:04 PM | MOBILE, CL | 847-489-6332 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1245 | Dec 26 | 03:04 PM | MOBILE, CL | 847-489-6332 | PP/PU | 1:11 | 0.00 | | 0.00 |
| 1246 | Dec 26 | 03:40 PM | ROSELLE, IL | 847-217-7035 | PP/PU | 1:42 | 0.00 | | 0.00 |
| 1247 | Dec 26 | 04:13 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1248 | Dec 26 | 04:40 PM | FOX LAKE, IL | 847-973-0430 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1249 | Dec 26 | 04:45 PM | | INCOMING | PP | 1:01 | 0.00 | | 0.00 |
| 1250 | Dec 26 | 05:37 PM | FOX LAKE, IL | 847-587-7140 | PP/PU | 2:14 | 0.00 | | 0.00 |
| 1251 | Dec 26 | 05:40 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1252 | Dec 26 | 05:40 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1253 | Dec 26 | 05:45 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1254 | Dec 26 | 05:46 PM | WAUKEGAN, IL | 847-445-7176 | PP/PU | 2:58 | 0.00 | | 0.00 |
| 1255 | Dec 26 | 05:49 PM | | INCOMING | PP | 1:26 | 0.00 | | 0.00 |
| 1256 | Dec 26 | 05:51 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1257 | Dec 26 | 05:55 PM | | INCOMING | PP | 2:33 | 0.00 | | 0.00 |
| 1258 | Dec 26 | 05:57 PM | | INCOMING | PP/CW | 1:00 | 0.00 | | 0.00 |
| 1259 | Dec 26 | 05:58 PM | LAKE VILLA, IL | 847-356-7455 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1260 | Dec 26 | 06:24 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1261 | Dec 26 | 07:05 PM | ROSELLE, IL | 847-507-7827 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1262 | Dec 26 | 07:06 PM | FOX LAKE, IL | 847-587-8090 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1263 | Dec 26 | 07:41 PM | ROUND LAKE, IL | 847-740-8129 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1264 | Dec 26 | 07:42 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1265 | Dec 26 | 07:44 PM | FOX LAKE, IL | 847-587-7140 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1266 | Dec 26 | 07:44 PM | FOX LAKE, IL | 847-973-0430 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1267 | Dec 26 | 08:03 PM | FOX LAKE, IL | 847-973-0430 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1268 | Dec 26 | 08:03 PM | ROUND LAKE, IL | 847-740-8129 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1269 | Dec 26 | 08:04 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1270 | Dec 26 | 08:25 PM | ANTIOCH, IL | 847-838-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1271 | Dec 26 | 08:27 PM | ROSELLE, IL | 847-804-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1272 | Dec 26 | 08:27 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1273 | Dec 26 | 08:28 PM | ROUND LAKE, IL | 847-740-8129 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1274 | Dec 26 | 08:33 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1275 | Dec 26 | 08:39 PM | MOBILE, CL | 815-378-3725 | OP/PU | 3:38 | 0.00 | | 0.00 |
| 1276 | Dec 26 | 08:52 PM | ANTIOCH, IL | 847-838-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1277 | Dec 26 | 08:53 PM | ROSELLE, IL | 847-804-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1278 | Dec 26 | 09:09 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1279 | Dec 26 | 09:10 PM | WAUKEGAN, IL | 847-445-7176 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1280 | Dec 26 | 09:28 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1281 | Dec 26 | 09:29 PM | LA GRANGE, IL | 847-567-0419 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1282 | Dec 26 | 09:54 PM | ANTIOCH, IL | 847-838-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1283 | Dec 26 | 10:43 PM | | INCOMING | OP | 1:02 | 0.00 | | 0.00 |
| 1284 | Dec 26 | 11:00 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

165(£)

Account name    Charles L Klessner    Page   35
Account number   0009617953-6
Statement date    January 09, 2002
Billing period     December 09 - January 08, 2002

## RAYMOND (847) 561-5033 continued...

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 1591 | Jan 01 | 07:56 PM | | INCOMING | PP | 1:04 | 0.00 | | 0.00 |
| 1592 | Jan 01 | 08:02 PM | MOBILE, CL | 847-546-4979 | OP/PU | 7:42 | 0.00 | | 0.00 |
| 1593 | Jan 01 | 08:12 PM | | INCOMING | OP | 3:47 | 0.00 | | 0.00 |
| 1594 | Jan 01 | 08:27 PM | ROSELLE, IL | 847-804-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1595 | Jan 01 | 08:28 PM | WHEELING, IL | Voice Mail | OP/PU | 1:07 | 0.00 | | 0.00 |
| 1596 | Jan 01 | 08:29 PM | | INCOMING | OP/CW | 1:00 | 0.00 | | 0.00 |
| 1597 | Jan 01 | 08:34 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1598 | Jan 01 | 08:40 PM | | INCOMING | OP | 3:18 | 0.00 | | 0.00 |
| 1599 | Jan 01 | 09:36 PM | MOBILE, CL | 847-546-4979 | OP/PU | 3:13 | 0.00 | | 0.00 |
| 1600 | Jan 01 | 09:44 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1601 | Jan 01 | 09:58 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1602 | Jan 01 | 10:06 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1603 | Jan 01 | 10:21 PM | | INCOMING | OP | 2:01 | 0.00 | | 0.00 |
| 1604 | Jan 01 | 11:45 PM | WAUKEGAN, IL | 847-445-7176 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1605 | Jan 01 | 11:46 PM | ROUND LAKE, IL | 847-740-3743 | OP/PU | 2:32 | 0.00 | | 0.00 |
| 1606 | Jan 01 | 11:49 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1607 | Jan 01 | 11:50 PM | MOBILE, CL | 630-774-2707 | OP/PU | 3:57 | 0.00 | | 0.00 |
| 1608 | Jan 02 | 12:11 AM | MOBILE, CL | 847-489-6332 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1609 | Jan 02 | 01:11 AM | MOBILE, CL | 630-774-2707 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1610 | Jan 02 | 01:52 AM | MOBILE, CL | 630-774-2707 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1611 | Jan 02 | 02:02 AM | MOBILE, CL | 630-774-2707 | OP/PU | 1:06 | 0.00 | | 0.00 |
| 1612 | Jan 02 | 02:46 AM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1613 | Jan 02 | 03:02 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1614 | Jan 02 | 12:59 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1615 | Jan 02 | 01:34 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1616 | Jan 02 | 01:51 PM | NORTHBROOK, IL | 847-867-7164 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1617 | Jan 02 | 02:35 PM | MOBILE, CL | 630-774-2707 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1618 | Jan 02 | 02:37 PM | | INCOMING | PP | 1:56 | 0.00 | | 0.00 |
| 1619 | Jan 02 | 02:41 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1620 | Jan 02 | 02:42 PM | ROUND LAKE, IL | 847-740-3743 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1621 | Jan 02 | 02:42 PM | ROUND LAKE, IL | 847-740-3743 | PP/PU | 6:51 | 0.00 | | 0.00 |
| 1622 | Jan 02 | 02:50 PM | | INCOMING | PP | 1:02 | 0.00 | | 0.00 |
| 1623 | Jan 02 | 02:57 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1624 | Jan 02 | 03:01 PM | | INCOMING | PP | 1:39 | 0.00 | | 0.00 |
| 1625 | Jan 02 | 03:06 PM | ANTIOCH, IL | 847-838-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1626 | Jan 02 | 03:18 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1627 | Jan 02 | 04:23 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1628 | Jan 02 | 04:24 PM | WAUKEGAN, IL | 847-445-7176 | PP/PU | 2:04 | 0.00 | | 0.00 |
| 1629 | Jan 02 | 04:27 PM | | INCOMING | PP | 5:46 | 0.00 | | 0.00 |
| 1630 | Jan 02 | 04:33 PM | WAUKEGAN, IL | 847-445-7176 | PP/PU | 1:05 | 0.00 | | 0.00 |
| 1631 | Jan 02 | 04:35 PM | WAUKEGAN, IL | 847-445-7176 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1632 | Jan 02 | 04:37 PM | | INCOMING | PP | 3:03 | 0.00 | | 0.00 |
| 1633 | Jan 02 | 04:42 PM | WAUKEGAN, IL | 847-445-7176 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1634 | Jan 02 | 04:44 PM | POLO, IL | 815-946-3427 | PP/PU | 1:26 | 0.00 | | 0.00 |
| 1635 | Jan 02 | 04:45 PM | WAUKEGAN, IL | 847-445-7176 | PP/PU | 1:30 | 0.00 | | 0.00 |
| 1636 | Jan 02 | 04:47 PM | | INCOMING | PP/CW | 1:58 | 0.00 | | 0.00 |
| 1637 | Jan 02 | 04:54 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1638 | Jan 02 | 05:11 PM | ROSELLE, IL | 847-804-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1639 | Jan 02 | 05:43 PM | WHEELING, IL | Voice Mail | PP/PU | 1:10 | 0.00 | | 0.00 |
| 1640 | Jan 02 | 05:44 PM | LAKE VILLA, IL | 847-265-7439 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1641 | Jan 02 | 05:46 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

continued...

103

**Account name** Charles L Klessner
**Account number** 0009617953-6
**Statement date** January 09, 2002
**Billing period** December 09 - January 08, 2002

Page 36

## RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 1642 | Jan 02 | 06:24 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1643 | Jan 02 | 06:57 PM | | INCOMING | PP | 1:39 | 0.00 | | 0.00 |
| 1644 | Jan 02 | 07:09 PM | MOBILE, CL | 630-774-2707 | PP/PU | 1:09 | 0.00 | | 0.00 |
| 1645 | Jan 02 | 07:13 PM | MOBILE, CL | 815-693-1498 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1646 | Jan 02 | 07:21 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1647 | Jan 02 | 07:26 PM | MOBILE, CL | 847-489-6332 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1648 | Jan 02 | 07:30 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1649 | Jan 02 | 07:47 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1650 | Jan 02 | 07:57 PM | MOBILE, CL | 815-693-1498 | PP/PU | 1:28 | 0.00 | | 0.00 |
| 1651 | Jan 02 | 08:03 PM | | INCOMING | OP | 5:02 | 0.00 | | 0.00 |
| 1652 | Jan 02 | 08:18 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1653 | Jan 02 | 08:39 PM | MOBILE, CL | 630-774-2707 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1654 | Jan 02 | 09:29 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1655 | Jan 02 | 09:32 PM | ZION, IL | 847-912-1870 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1656 | Jan 02 | 09:33 PM | ZION, IL | 847-912-1870 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1657 | Jan 02 | 09:34 PM | WAUKEGAN, IL | 847-445-7581 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1658 | Jan 02 | 09:35 PM | ZION, IL | 847-912-1870 | OP/PU | 1:06 | 0.00 | | 0.00 |
| 1659 | Jan 02 | 09:50 PM | | INCOMING | OP | 2:53 | 0.00 | | 0.00 |
| 1660 | Jan 02 | 10:11 PM | ZION, IL | 847-912-1870 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1661 | Jan 02 | 10:20 PM | MOBILE, CL | 630-774-2707 | OP/PU | 1:19 | 0.00 | | 0.00 |
| 1662 | Jan 02 | 10:25 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1663 | Jan 02 | 11:17 PM | ZION, IL | 847-912-1870 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1664 | Jan 03 | 01:36 AM | ANTIOCH, IL | 847-395-2541 | OP/PU | 3:49 | 0.00 | | 0.00 |
| 1665 | Jan 03 | 01:41 AM | MOBILE, CL | 630-774-2707 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1666 | Jan 03 | 02:07 AM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1667 | Jan 03 | 02:27 AM | GRAYS LAKE, IL | 847-223-2361 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1668 | Jan 03 | 09:33 AM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1669 | Jan 03 | 02:25 PM | WHEELING, IL | Voice Mail | PP/PU | 1:05 | 0.00 | | 0.00 |
| 1670 | Jan 03 | 02:26 PM | WAUKEGAN, IL | 847-445-7176 | PP/PU | 1:29 | 0.00 | | 0.00 |
| 1671 | Jan 03 | 02:32 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1672 | Jan 03 | 02:33 PM | MOBILE, CL | 847-489-6332 | PP/PU | 2:04 | 0.00 | | 0.00 |
| 1673 | Jan 03 | 02:36 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1674 | Jan 03 | 02:37 PM | MOBILE, CL | 630-774-2707 | PP/PU | 2:01 | 0.00 | | 0.00 |
| 1675 | Jan 03 | 03:22 PM | MOBILE, CL | 630-774-2707 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1676 | Jan 03 | 03:23 PM | MOBILE, CL | 630-774-2707 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1677 | Jan 03 | 03:23 PM | MOBILE, CL | 630-774-2707 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1678 | Jan 03 | 03:23 PM | | INCOMING | PP/CW | 8:09 | 0.00 | | 0.00 |
| 1679 | Jan 03 | 03:34 PM | MOBILE, CL | 630-774-2707 | PP/PU | 2:04 | 0.00 | | 0.00 |
| 1680 | Jan 03 | 03:51 PM | LAKE VILLA, IL | 847-356-7455 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1681 | Jan 03 | 03:52 PM | LAKE VILLA, IL | 847-356-7455 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1682 | Jan 03 | 03:53 PM | GRAYS LAKE, IL | 847-223-2361 | PP/PU | 1:27 | 0.00 | | 0.00 |
| 1683 | Jan 03 | 03:54 PM | GRAYS LAKE, IL | 847-223-2361 | PP/PU | 21:17 | 0.00 | | 0.00 |
| 1684 | Jan 03 | 04:24 PM | MOBILE, CL | 630-774-2707 | PP/PU | 2:05 | 0.00 | | 0.00 |
| 1685 | Jan 03 | 04:31 PM | | INCOMING | PP | 3:33 | 0.00 | | 0.00 |
| 1686 | Jan 03 | 04:35 PM | WAUKEGAN, IL | 847-445-7176 | PP/PU | 1:04 | 0.00 | | 0.00 |
| 1687 | Jan 03 | 04:39 PM | ROSELLE, IL | 847-806-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1688 | Jan 03 | 04:39 PM | ANTIOCH, IL | 847-838-6133 | PP/PU | 1:28 | 0.00 | | 0.00 |
| 1689 | Jan 03 | 04:45 PM | WAUKEGAN, IL | 847-445-7176 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1690 | Jan 03 | 04:45 PM | WAUKEGAN, IL | 847-445-7176 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1691 | Jan 03 | 04:46 PM | WAUKEGAN, IL | 847-445-7177 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1692 | Jan 03 | 04:47 PM | WAUKEGAN, IL | 847-445-7176 | PP/PU | 1:13 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

**165(h)**

ʼsʃ49

*continued...*

104

**Account name** Charles L Klessner
**Account number** 0009617953-6
**Statement date** January 09, 2002
**Billing period** December 09 - January 08, 2002

RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|--------|------|------|---------|---------------|--------------|---------|-------|---------------|-------------------------------|
| 1693 | Jan 03 | 04:48 PM | LAKE VILLA, IL | 847-356-0305 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1694 | Jan 03 | 05:36 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1695 | Jan 03 | 05:39 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1696 | Jan 03 | 05:49 PM | | INCOMING | PP | 1:19 | 0.00 | | 0.00 |
| 1697 | Jan 03 | 06:08 PM | LAKE VILLA, IL | 847-356-7455 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1698 | Jan 03 | 06:09 PM | LAKE VILLA, IL | 847-265-7439 | PP/PU | 13:42 | 0.00 | | 0.00 |
| 1699 | Jan 03 | 06:26 PM | ANTIOCH, IL | 847-838-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1700 | Jan 03 | 06:27 PM | ANTIOCH, IL | 847-838-6133 | PP/PU | 1:09 | 0.00 | | 0.00 |
| 1701 | Jan 03 | 06:51 PM | ROSELLE, IL | 847-804-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1702 | Jan 03 | 06:52 PM | ANTIOCH, IL | 847-838-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1703 | Jan 03 | 06:53 PM | ANTIOCH, IL | 847-838-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1704 | Jan 03 | 06:54 PM | ROSELLE, IL | 847-804-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1705 | Jan 03 | 06:58 PM | | INCOMING | PP | 1:27 | 0.00 | | 0.00 |
| 1706 | Jan 03 | 08:08 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1707 | Jan 03 | 08:21 PM | ROUND LAKE, IL | 847-740-8129 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1708 | Jan 03 | 08:22 PM | ROUND LAKE, IL | 847-740-8129 | OP/PU | 1:45 | 0.00 | | 0.00 |
| 1709 | Jan 03 | 08:48 PM | | INCOMING | OP | 1:44 | 0.00 | | 0.00 |
| 1710 | Jan 03 | 09:15 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1711 | Jan 03 | 10:07 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1712 | Jan 03 | 10:59 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1713 | Jan 03 | 11:16 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1714 | Jan 03 | 11:20 PM | WAUKEGAN, IL | 847-445-7757 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1715 | Jan 03 | 11:26 PM | ROSELLE, IL | 847-804-6133 | OP/PU | 2:23 | 0.00 | | 0.00 |
| 1716 | Jan 03 | 11:29 PM | NORTHBROOK, IL | 847-224-7207 | OP/PU | 1:05 | 0.00 | | 0.00 |
| 1717 | Jan 03 | 11:34 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1718 | Jan 03 | 11:37 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1719 | Jan 03 | 11:41 PM | | INCOMING | OP | 1:13 | 0.00 | | 0.00 |
| 1720 | Jan 03 | 11:43 PM | WAUKEGAN, IL | 847-445-7757 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1721 | Jan 03 | 11:48 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1722 | Jan 03 | 11:48 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1723 | Jan 03 | 11:53 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1724 | Jan 03 | 11:53 PM | WAUKEGAN, IL | 847-445-7757 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1725 | Jan 03 | 11:54 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1726 | Jan 04 | 12:01 AM | | INCOMING | OP | 1:13 | 0.00 | | 0.00 |
| 1727 | Jan 04 | 12:18 AM | NORTHBROOK, IL | 847-224-7207 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1728 | Jan 04 | 12:36 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1729 | Jan 04 | 12:38 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1730 | Jan 04 | 12:39 AM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1731 | Jan 04 | 12:43 AM | | INCOMING | OP | 2:22 | 0.00 | | 0.00 |
| 1732 | Jan 04 | 12:45 AM | ROSELLE, IL | 847-804-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1733 | Jan 04 | 12:46 AM | NORTHBROOK, IL | 847-224-7207 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1734 | Jan 04 | 12:46 AM | ROSELLE, IL | 847-804-6133 | OP/PU | 2:37 | 0.00 | | 0.00 |
| 1735 | Jan 04 | 01:13 AM | ROSELLE, IL | 847-804-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1736 | Jan 04 | 01:17 AM | | INCOMING | OP | 4:50 | 0.00 | | 0.00 |
| 1737 | Jan 04 | 05:46 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1738 | Jan 04 | 09:59 AM | LAKE VILLA, IL | 847-356-8481 | PP/PF | 6:22 | 1.36 | | 1.36 |
| 1739 | Jan 04 | 10:07 AM | WHEELING, IL | Voice Mail | PP | 1:00 | 0.25 | | 0.25 |
| 1740 | Jan 04 | 10:56 AM | LAKE VILLA, IL | 847-356-0305 | PP | 1:00 | 0.25 | | 0.25 |
| 1741 | Jan 04 | 11:03 AM | LAKE VILLA, IL | 847-356-0305 | PP | 1:00 | 0.25 | | 0.25 |
| 1742 | Jan 04 | 12:24 PM | | INCOMING | PP | 1:59 | 0.00 | | 0.00 |
| 1743 | Jan 04 | 12:26 PM | LAKE VILLA, IL | 847-356-0305 | PP | 1:00 | 0.25 | | 0.25 |

| Footnote | Features | Networks | Services | Time Period |
|----------|----------|----------|----------|-------------|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

**165(i)**

continued...

105

**Account name** Charles L Klessner
**Account number** 0009617953-6
**Statement date** January 09, 2002
**Billing period** December 09 - January 08, 2002

Page   38

## RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 1744 | Jan 04 | 01:42 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1745 | Jan 04 | 02:16 PM | | INCOMING | PP | 1:18 | 0.00 | | 0.00 |
| 1746 | Jan 04 | 02:18 PM | WAUKEGAN,IL | 847-445-7176 | PP | 1:00 | 0.25 | | 0.25 |
| 1747 | Jan 04 | 02:19 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1748 | Jan 04 | 02:20 PM | LAKE VILLA,IL | 847-356-7455 | PP | 2:00 | 0.50 | | 0.50 |
| 1749 | Jan 04 | 02:48 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1750 | Jan 04 | 04:13 PM | SKOKIE,IL | 847-679-0311 | PP | 1:00 | 0.25 | | 0.25 |
| 1751 | Jan 04 | 04:14 PM | MOBILE,CL | 630-774-2707 | PP | 1:00 | 0.25 | | 0.25 |
| 1752 | Jan 04 | 04:18 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1753 | Jan 04 | 04:47 PM | MOBILE,CL | 630-774-2707 | PP | 1:00 | 0.25 | | 0.25 |
| 1754 | Jan 04 | 04:58 PM | | INCOMING | PP | 1:59 | 0.00 | | 0.00 |
| 1755 | Jan 04 | 05:01 PM | ANTIOCH,IL | 847-838-3341 | PP | 1:00 | 0.25 | | 0.25 |
| 1756 | Jan 04 | 05:06 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1757 | Jan 04 | 06:12 PM | | INCOMING | PP | 3:37 | 0.00 | | 0.00 |
| 1758 | Jan 04 | 06:29 PM | | INCOMING | PP | 2:43 | 0.00 | | 0.00 |
| 1759 | Jan 04 | 06:44 PM | MOBILE,CL | 630-774-2707 | PP | 1:00 | 0.25 | | 0.25 |
| 1760 | Jan 04 | 07:06 PM | WHEELING,IL | Voice Mail | PP | 1:00 | 0.25 | | 0.25 |
| 1761 | Jan 04 | 07:08 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1762 | Jan 04 | 07:11 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1763 | Jan 04 | 07:40 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1764 | Jan 04 | 07:51 PM | WAUKEGAN,IL | 847-445-7757 | PP | 1:00 | 0.25 | | 0.25 |
| 1765 | Jan 04 | 08:40 PM | LAKE VILLA,IL | 847-356-0305 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1766 | Jan 04 | 09:04 PM | LIBERTYVL,IL | 847-549-0110 | OP/PU | 1:59 | 0.00 | | 0.00 |
| 1767 | Jan 04 | 09:30 PM | ANTIOCH,IL | 847-838-3341 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1768 | Jan 04 | 09:31 PM | LAKE VILLA,IL | 847-356-0305 | OP/PU | 1:57 | 0.00 | | 0.00 |
| 1769 | Jan 04 | 10:21 PM | LIBERTYVL,IL | 847-549-0110 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1770 | Jan 04 | 10:37 PM | LIBERTYVL,IL | 847-549-0110 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1771 | Jan 04 | 10:48 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1772 | Jan 04 | 11:32 PM | LIBERTYVL,IL | 847-549-0110 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1773 | Jan 04 | 11:35 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1774 | Jan 04 | 11:58 PM | | INCOMING | OP | 2:00 | 0.00 | | 0.00 |
| 1775 | Jan 05 | 12:00 AM | LIBERTYVL,IL | 847-549-0110 | OP/PU | 1:41 | 0.00 | | 0.00 |
| 1776 | Jan 05 | 12:03 AM | | INCOMING | OP | 3:06 | 0.00 | | 0.00 |
| 1777 | Jan 05 | 12:07 AM | MOBILE,CL | 815-693-1498 | OP/PU | 3:19 | 0.00 | | 0.00 |
| 1778 | Jan 05 | 12:11 AM | NORTHBROOK,IL | 847-791-2993 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1779 | Jan 05 | 12:11 AM | NORTHBROOK,IL | 847-791-2993 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1780 | Jan 05 | 12:15 AM | MOBILE,CL | 630-774-2707 | OP/PU | 2:20 | 0.00 | | 0.00 |
| 1781 | Jan 05 | 12:29 AM | MOBILE,CL | 815-693-1498 | OP/PU | 2:05 | 0.00 | | 0.00 |
| 1782 | Jan 05 | 12:32 AM | NORTHBROOK,IL | 847-791-2993 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1783 | Jan 05 | 12:34 AM | | INCOMING | OP | 9:48 | 0.00 | | 0.00 |
| 1784 | Jan 05 | 01:00 AM | MOBILE,CL | 815-693-1498 | OP/PU | 4:24 | 0.00 | | 0.00 |
| 1785 | Jan 05 | 01:22 AM | MOBILE,CL | 630-774-2707 | OP/PU | 1:01 | 0.00 | | 0.00 |
| 1786 | Jan 05 | 01:32 AM | LIBERTYVL,IL | 847-549-0110 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1787 | Jan 05 | 01:55 AM | MOBILE,CL | 630-774-2707 | OP/PU | 4:03 | 0.00 | | 0.00 |
| 1788 | Jan 05 | 02:06 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1789 | Jan 05 | 02:15 AM | LIBERTYVL,IL | 847-549-0110 | OP/PU | 4:16 | 0.00 | | 0.00 |
| 1790 | Jan 05 | 02:20 AM | WHEELING,IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1791 | Jan 05 | 02:20 AM | | INCOMING | OP/CW | 2:08 | 0.00 | | 0.00 |
| 1792 | Jan 05 | 02:28 AM | LIBERTYVL,IL | 847-549-0110 | OP/PU | 1:57 | 0.00 | | 0.00 |
| 1793 | Jan 05 | 03:15 AM | ROUND LAKE,IL | 847-740-8129 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1794 | Jan 05 | 10:29 AM | WAUKEGAN,IL | 847-445-7176 | OP/PU | 2:21 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

165(j)

*continued...*

106

**Account name** Charles L Kiessner      Page 39
**Account number** 0009617953-6
**Statement date** January 09, 2002
**Billing period** December 09 - January 08, 2002

## RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 1795 | Jan 05 | 02:46 PM | WHEELING,IL | Voice Mail | OP/PU | 2:26 | 0.00 | | 0.00 |
| 1796 | Jan 05 | 02:51 PM | LAKE VILLA,IL | 847-265-7439 | OP/PU | 11:15 | 0.00 | | 0.00 |
| 1797 | Jan 05 | 03:29 PM | | INCOMING | OP | 3:23 | 0.00 | | 0.00 |
| 1798 | Jan 05 | 03:45 PM | MOBILE,CL | 630-774-2707 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1799 | Jan 05 | 03:48 PM | WAUKEGAN,IL | 847-445-7757 | OP/PU | 2:18 | 0.00 | | 0.00 |
| 1800 | Jan 05 | 03:50 PM | WHEELING,IL | Voice Mail | OP/PU | 3:20 | 0.00 | | 0.00 |
| 1801 | Jan 05 | 04:11 PM | | INCOMING | OP | 2:04 | 0.00 | | 0.00 |
| 1802 | Jan 05 | 04:14 PM | TOLL FREE,CL | 800-675-3044 | OP/PU | 7:20 | 0.00 | | 0.00 |
| 1803 | Jan 05 | 04:23 PM | MOBILE,CL | 630-774-2707 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1804 | Jan 05 | 04:24 PM | MOBILE,CL | 630-774-2707 | OP/PU | 2:31 | 0.00 | | 0.00 |
| 1805 | Jan 05 | 04:44 PM | WAUKEGAN,IL | 847-445-7177 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1806 | Jan 05 | 04:45 PM | WAUKEGAN,IL | 847-445-7176 | OP/PU | 2:18 | 0.00 | | 0.00 |
| 1807 | Jan 05 | 05:49 PM | ANTIOCH,IL | 847-838-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1808 | Jan 05 | 06:09 PM | MOBILE,CL | 630-774-2707 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1809 | Jan 05 | 06:48 PM | | INCOMING | OP | 1:30 | 0.00 | | 0.00 |
| 1810 | Jan 05 | 07:13 PM | MOBILE,CL | 630-774-2707 | OP/PU | 3:37 | 0.00 | | 0.00 |
| 1811 | Jan 05 | 07:22 PM | ROSELLE,IL | 847-909-1111 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1812 | Jan 05 | 07:29 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1813 | Jan 05 | 07:33 PM | NORTHBROOK,IL | 847-302-2139 | OP/PU | 1:31 | 0.00 | | 0.00 |
| 1814 | Jan 05 | 07:37 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1815 | Jan 05 | 07:47 PM | MOBILE,CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1816 | Jan 05 | 07:48 PM | MOBILE,CL | 630-774-2707 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1817 | Jan 05 | 07:48 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1818 | Jan 05 | 08:34 PM | LIBERTYVL,IL | 847-549-0110 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1819 | Jan 05 | 08:36 PM | | INCOMING | OP | 1:09 | 0.00 | | 0.00 |
| 1820 | Jan 05 | 08:40 PM | NORTHBROOK,IL | 847-204-6281 | OP/PU | 1:10 | 0.00 | | 0.00 |
| 1821 | Jan 05 | 09:00 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1822 | Jan 05 | 09:35 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1823 | Jan 05 | 09:47 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1824 | Jan 05 | 10:14 PM | MOBILE,CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1825 | Jan 05 | 10:16 PM | WHEELING,IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1826 | Jan 05 | 11:29 PM | | INCOMING | OP | 2:41 | 0.00 | | 0.00 |
| 1827 | Jan 06 | 12:04 AM | WHEELING,IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1828 | Jan 06 | 12:43 AM | MOBILE,CL | 630-774-2707 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1829 | Jan 06 | 12:43 AM | MOBILE,CL | 630-774-2707 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1830 | Jan 06 | 01:38 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1831 | Jan 06 | 02:25 AM | | INCOMING | OP | 1:16 | 0.00 | | 0.00 |
| 1832 | Jan 06 | 03:19 AM | WAUKEGAN,IL | 847-445-7176 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1833 | Jan 06 | 03:29 AM | WAUKEGAN,IL | 847-445-7177 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1834 | Jan 06 | 03:31 AM | LAKEFOREST,IL | 847-219-7871 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1835 | Jan 06 | 03:31 AM | LAKEFOREST,IL | 847-219-7871 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1836 | Jan 06 | 05:06 AM | MILWAUKEE,WI | 414-217-9230 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1837 | Jan 06 | 05:07 AM | MILWAUKEE,WI | 414-217-9230 | OP/PU | 7:57 | 0.00 | | 0.00 |
| 1838 | Jan 06 | 06:40 AM | WAUKEGAN,IL | 847-445-7177 | OP/PU | 1:53 | 0.00 | | 0.00 |
| 1839 | Jan 06 | 06:56 AM | MILWAUKEE,WI | 414-217-9230 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1840 | Jan 06 | 06:59 AM | | INCOMING | OP | 4:49 | 0.00 | | 0.00 |
| 1841 | Jan 06 | 09:10 AM | | INCOMING | OP | 3:31 | 0.00 | | 0.00 |
| 1842 | Jan 06 | 09:14 AM | ROUND LAKE,IL | 847-740-3743 | OP/PU | 4:31 | 0.00 | | 0.00 |
| 1843 | Jan 06 | 10:51 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1844 | Jan 06 | 10:52 AM | ROUND LAKE,IL | 847-740-3743 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1845 | Jan 06 | 10:52 AM | WAUKEGAN,IL | 847-445-7176 | OP/PU | 2:28 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

**165(k)**

| Account name | Charles L Klessner | Page 40 |
| Account number | 0009617953-6 | |
| Statement date | January 09, 2002 | |
| Billing period | December 09 - January 08, 2002 | |

RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 1846 | Jan 06 | 11:05 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1847 | Jan 06 | 11:06 AM | WAUKEGAN, IL | 847-445-7177 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1848 | Jan 06 | 11:07 AM | | INCOMING | OP/CW | 1:00 | 0.00 | | 0.00 |
| 1849 | Jan 06 | 11:12 AM | NASHVILLE, TN | 615-263-7320 | OP/PU | 1:12 | 0.00 | | 0.00 |
| 1850 | Jan 06 | 05:42 PM | WHEELING, IL | Voice Mail | OP/PU | 3:25 | 0.00 | | 0.00 |
| 1851 | Jan 06 | 05:53 PM | LAKE VILLA, IL | 847-356-0305 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1852 | Jan 06 | 05:58 PM | ROUND LAKE, IL | 847-740-3743 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1853 | Jan 06 | 05:59 PM | WAUKEGAN, IL | 847-445-7176 | OP/PU | 15:53 | 0.00 | | 0.00 |
| 1854 | Jan 06 | 06:16 PM | WHEELING, IL | Voice Mail | OP/PU | 1:28 | 0.00 | | 0.00 |
| 1855 | Jan 06 | 06:33 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1856 | Jan 06 | 06:44 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1857 | Jan 06 | 07:06 PM | LAKE VILLA, IL | 847-265-7439 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1858 | Jan 06 | 07:48 PM | LAKE VILLA, IL | 847-356-7455 | OP/PU | 4:51 | 0.00 | | 0.00 |
| 1859 | Jan 06 | 08:27 PM | | INCOMING | OP | 1:30 | 0.00 | | 0.00 |
| 1860 | Jan 06 | 08:51 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1861 | Jan 06 | 09:41 PM | | INCOMING | OP | 1:13 | 0.00 | | 0.00 |
| 1862 | Jan 06 | 09:43 PM | LAKEFOREST, IL | 847-219-7871 | OP/PU | 3:31 | 0.00 | | 0.00 |
| 1863 | Jan 06 | 09:46 PM | | INCOMING | OP/CW | 1:00 | 0.00 | | 0.00 |
| 1864 | Jan 06 | 09:47 PM | WAUKEGAN, IL | 847-445-7176 | OP/PU | 1:20 | 0.00 | | 0.00 |
| 1865 | Jan 06 | 11:24 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1866 | Jan 06 | 11:26 PM | MOBILE, CL | 630-774-2707 | OP/PU | 1:41 | 0.00 | | 0.00 |
| 1867 | Jan 06 | 11:41 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1868 | Jan 06 | 11:44 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1869 | Jan 07 | 12:15 AM | | INCOMING | OP | 1:47 | 0.00 | | 0.00 |
| 1870 | Jan 07 | 12:17 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1871 | Jan 07 | 12:19 AM | MOBILE, CL | 630-774-2707 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1872 | Jan 07 | 12:51 AM | WAUKEGAN, IL | 847-445-7176 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1873 | Jan 07 | 01:35 AM | WAUKEGAN, IL | 847-445-7176 | OP/PU | 2:34 | 0.00 | | 0.00 |
| 1874 | Jan 07 | 05:32 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1875 | Jan 07 | 05:33 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1876 | Jan 07 | 05:33 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1877 | Jan 07 | 05:34 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1878 | Jan 07 | 05:34 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1879 | Jan 07 | 05:35 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1880 | Jan 07 | 05:36 AM | ROSELLE, IL | 847-507-7827 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1881 | Jan 07 | 05:36 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1882 | Jan 07 | 05:37 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1883 | Jan 07 | 05:38 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1884 | Jan 07 | 05:44 AM | ROSELLE, IL | 847-507-7827 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1885 | Jan 07 | 10:10 AM | LAKEFOREST, IL | 847-535-1059 | PP | 1:30 | 0.38 | | 0.38 |
| 1886 | Jan 07 | 10:12 AM | WHEELING, IL | Voice Mail | PP | 1:00 | 0.25 | | 0.25 |
| 1887 | Jan 07 | 10:13 AM | ROSELLE, IL | 847-507-7827 | PP | 1:46 | 0.44 | | 0.44 |
| 1888 | Jan 07 | 10:18 AM | ANTIOCH, IL | 847-838-6133 | PP | 1:00 | 0.25 | | 0.25 |
| 1889 | Jan 07 | 10:21 AM | MOBILE, CL | 815-693-1498 | PP | 1:00 | 0.25 | | 0.25 |
| 1890 | Jan 07 | 10:22 AM | ANTIOCH, IL | 847-838-6133 | PP | 1:00 | 0.25 | | 0.25 |
| 1891 | Jan 07 | 10:25 AM | MOBILE, CL | 815-693-1498 | PP | 1:00 | 0.25 | | 0.25 |
| 1892 | Jan 07 | 10:25 AM | MOBILE, CL | 815-693-1498 | PP | 1:00 | 0.25 | | 0.25 |
| 1893 | Jan 07 | 10:28 AM | DUNDEE, IL | 847-551-0755 | PP | 1:00 | 0.25 | | 0.25 |
| 1894 | Jan 07 | 10:53 AM | LA GRANGE, IL | 847-606-2454 | PP | 1:00 | 0.25 | | 0.25 |
| 1895 | Jan 07 | 10:57 AM | ANTIOCH, IL | 847-838-6133 | PP | 1:00 | 0.25 | | 0.25 |
| 1896 | Jan 07 | 10:59 AM | | INCOMING | PP | 1:43 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

90053

continued...

108

| | |
|---|---|
| **Account name** | Charles L Kleffner |
| **Account number** | 0009617953-6 |
| **Statement date** | February 10, 2002 |
| **Billing period** | January 09 - February 08, 2002 |

Page   4

## RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 7 | Jan 09 | 02:44 AM | | INCOMING | OP | 1:26 | 0.00 | | 0.00 |
| 8 | Jan 09 | 05:21 AM | FOX LAKE, IL | 847-973-1848 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 9 | Jan 09 | 12:49 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 10 | Jan 09 | 04:43 PM | WHEELING, IL | Voice Mail | PP/PU | 1:10 | 0.00 | | 0.00 |
| 11 | Jan 09 | 05:16 PM | | INCOMING | PP | 3:14 | 0.00 | | 0.00 |
| 12 | Jan 09 | 05:42 PM | ANTIOCH, IL | 847-838-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 13 | Jan 09 | 05:43 PM | ROSELLE, IL | 847-804-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 14 | Jan 09 | 05:44 PM | WHEELING, IL | Voice Mail | PP/PU | 2:45 | 0.00 | | 0.00 |
| 15 | Jan 09 | 07:15 PM | MOBILE, CL | 815-693-1498 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 16 | Jan 09 | 07:17 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 17 | Jan 09 | 07:38 PM | WHEELING, IL | Voice Mail | PP/PU | 1:20 | 0.00 | | 0.00 |
| 18 | Jan 09 | 07:53 PM | NORTHBROOK, IL | 847-479-3953 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 19 | Jan 09 | 07:59 PM | LAKE VILLA, IL | 847-265-7439 | PP/PU | 1:11 | 0.00 | | 0.00 |
| 20 | Jan 09 | 08:01 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 21 | Jan 09 | 08:14 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 22 | Jan 09 | 08:15 PM | MOBILE, CL | 847-546-5548 | OP/PU | 1:05 | 0.00 | | 0.00 |
| 23 | Jan 09 | 09:00 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 24 | Jan 09 | 09:25 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 25 | Jan 09 | 09:26 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:10 | 0.00 | | 0.00 |
| 26 | Jan 09 | 09:33 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 27 | Jan 09 | 09:48 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 28 | Jan 09 | 10:05 PM | | INCOMING | OP | 3:09 | 0.00 | | 0.00 |
| 29 | Jan 09 | 11:31 PM | WAUKEGAN, IL | 847-445-7177 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 30 | Jan 10 | 12:08 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 31 | Jan 10 | 12:11 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 32 | Jan 10 | 12:12 AM | | INCOMING | OP | 1:37 | 0.00 | | 0.00 |
| 33 | Jan 10 | 12:49 AM | | INCOMING | OP | 1:02 | 0.00 | | 0.00 |
| 34 | Jan 10 | 01:50 AM | LAKEFOREST, IL | 847-219-7876 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 35 | Jan 10 | 01:51 AM | LAKEFOREST, IL | 847-219-7871 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 36 | Jan 10 | 02:04 AM | LAKEFOREST, IL | 847-219-7871 | OP/PU | 1:03 | 0.00 | | 0.00 |
| 37 | Jan 10 | 02:06 AM | | INCOMING | OP | 1:17 | 0.00 | | 0.00 |
| 38 | Jan 10 | 02:33 AM | LAKEFOREST, IL | 847-219-7876 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 39 | Jan 10 | 04:09 AM | FOX LAKE, IL | 847-973-1848 | OP/PU | 20:41 | 0.00 | | 0.00 |
| 40 | Jan 10 | 10:04 AM | TOLL FREE, CL | Customer Car | PP | 1:10 | 0.00 | | 0.00 |
| 41 | Jan 10 | 10:27 AM | MOBILE, CL | 847-561-7503 | PP/PU | 1:58 | 0.00 | | 0.00 |
| 42 | Jan 10 | 12:05 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 43 | Jan 10 | 12:09 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 44 | Jan 10 | 12:11 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 45 | Jan 10 | 12:13 PM | LAKE VILLA, IL | 847-265-7875 | PP/PU | 12:16 | 0.00 | | 0.00 |
| 46 | Jan 10 | 12:20 PM | ROUND LAKE, IL | 847-740-8129 | PP/PU | 1:24 | 0.00 | | 0.00 |
| 47 | Jan 10 | 04:54 PM | WHEELING, IL | Voice Mail | PP/PU | 1:51 | 0.00 | | 0.00 |
| 48 | Jan 10 | 05:02 PM | MOBILE, CL | 847-561-7503 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 49 | Jan 10 | 05:04 PM | ROUND LAKE, IL | 847-740-8129 | PP/PU | 1:48 | 0.00 | | 0.00 |
| 50 | Jan 10 | 05:05 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 51 | Jan 10 | 05:07 PM | LA GRANGE, IL | 847-638-5149 | PP/PU | 2:42 | 0.00 | | 0.00 |
| 52 | Jan 10 | 05:11 PM | ROUND LAKE, IL | 847-740-3743 | PP/PU | 1:09 | 0.00 | | 0.00 |
| 53 | Jan 10 | 05:21 PM | MOBILE, CL | 815-693-1498 | PP/PU | 1:08 | 0.00 | | 0.00 |
| 54 | Jan 10 | 05:33 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 55 | Jan 10 | 05:49 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 56 | Jan 10 | 05:58 PM | LAKE VILLA, IL | 847-356-0305 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 57 | Jan 10 | 05:59 PM | MOBILE, CL | 847-456-6955 | PP/PU | | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

92.557

*continued...*

i09

| Account name | Charles L Kleffner | Page 8 |
| Account number | 0009617953-6 | |
| Statement date | February 10, 2002 | |
| Billing period | January 09 - February 08, 2002 | |

## RAYMOND (847) 561-5033 continued...

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 211 | Jan 12 | 06:29 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 2:01 | 0.00 | | 0.00 |
| 212 | Jan 12 | 06:35 PM | ZION, IL | 847-912-1870 | OP/PU | 3:57 | 0.00 | | 0.00 |
| 213 | Jan 12 | 06:51 PM | | INCOMING | OP | 3:44 | 0.00 | | 0.00 |
| 214 | Jan 12 | 07:10 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 215 | Jan 12 | 07:11 PM | ANTIOCH, IL | 847-838-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 216 | Jan 12 | 07:13 PM | ROSELLE, IL | 847-804-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 217 | Jan 12 | 07:27 PM | | INCOMING | OP | 2:41 | 0.00 | | 0.00 |
| 218 | Jan 12 | 07:30 PM | CHICAGO, IL | 312-375-2148 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 219 | Jan 12 | 07:42 PM | CHICAGO, IL | 312-375-2148 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 220 | Jan 12 | 08:21 PM | | INCOMING | OP | 1:05 | 0.00 | | 0.00 |
| 221 | Jan 12 | 08:23 PM | | INCOMING | OP | 14:06 | 0.00 | | 0.00 |
| 222 | Jan 12 | 08:42 PM | MOBILE, CL | 847-561-8843 | OP/PU | 2:09 | 0.00 | | 0.00 |
| 223 | Jan 12 | 08:45 PM | MOBILE, CL | 847-561-8843 | OP/PU | 1:04 | 0.00 | | 0.00 |
| 224 | Jan 12 | 08:50 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 225 | Jan 12 | 09:02 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 226 | Jan 12 | 09:15 PM | | INCOMING | OP | 2:56 | 0.00 | | 0.00 |
| 227 | Jan 12 | 09:20 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 228 | Jan 12 | 09:20 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 229 | Jan 12 | 09:24 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 230 | Jan 12 | 09:37 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 231 | Jan 12 | 09:45 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 232 | Jan 12 | 09:46 PM | FOX LAKE, IL | 847-973-1848 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 233 | Jan 12 | 09:50 PM | FOX LAKE, IL | 847-973-1848 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 234 | Jan 12 | 09:51 PM | MOBILE, CL | 847-456-6956 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 235 | Jan 12 | 10:00 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 236 | Jan 12 | 10:01 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 237 | Jan 12 | 10:02 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:05 | 0.00 | | 0.00 |
| 238 | Jan 12 | 10:12 PM | | INCOMING | OP | 1:34 | 0.00 | | 0.00 |
| 239 | Jan 12 | 10:15 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 240 | Jan 12 | 10:26 PM | ZION, IL | 847-912-1870 | OP/PU | 1:19 | 0.00 | | 0.00 |
| 241 | Jan 12 | 11:31 PM | CHICAGO, IL | 773-412-9017 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 242 | Jan 12 | 11:56 PM | ROUND LAKE, IL | 847-740-3743 | OP/PU | 2:09 | 0.00 | | 0.00 |
| 243 | Jan 13 | 12:22 AM | | INCOMING | OP | 1:29 | 0.00 | | 0.00 |
| 244 | Jan 13 | 12:54 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 245 | Jan 13 | 01:27 AM | NORTHBROOK, IL | 847-946-8619 | OP/PU | 1:26 | 0.00 | | 0.00 |
| 246 | Jan 13 | 01:32 AM | WHEELING, IL | Voice Mail | OP/PU | 1:19 | 0.00 | | 0.00 |
| 247 | Jan 13 | 01:34 AM | LAKE VILLA, IL | 847-265-7439 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 248 | Jan 13 | 01:34 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:47 | 0.00 | | 0.00 |
| 249 | Jan 13 | 01:51 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 250 | Jan 13 | 01:52 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 251 | Jan 13 | 02:15 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 252 | Jan 13 | 02:21 AM | ROSELLE, IL | 847-804-6133 | OP/PU | 1:36 | 0.00 | | 0.00 |
| 253 | Jan 13 | 02:24 AM | ROUND LAKE, IL | 847-740-3743 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 254 | Jan 13 | 02:58 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 255 | Jan 13 | 02:58 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 256 | Jan 13 | 03:06 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 257 | Jan 13 | 03:06 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:24 | 0.00 | | 0.00 |
| 258 | Jan 13 | 03:16 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 259 | Jan 13 | 03:22 AM | | INCOMING | OP | 2:15 | 0.00 | | 0.00 |
| 260 | Jan 13 | 03:31 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 261 | Jan 13 | 03:36 AM | ROUND LAKE, IL | 847-740-3743 | OP/PU | 1:00 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

**165(n)**

continued...

110

| | |
|---|---|
| **Account name** | Charles L Kleffner |
| **Account number** | 0009617953-6 |
| **Statement date** | February 10, 2002 |
| **Billing period** | January 09 - February 08, 2002 |

Page 9

## RAYMOND (847) 561-5033 continued...

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 262 | Jan 13 | 04:01 AM | | INCOMING | OP | 1:51 | 0.00 | | 0.00 |
| 263 | Jan 13 | 12:15 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 264 | Jan 13 | 12:24 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 265 | Jan 13 | 12:26 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 266 | Jan 13 | 12:32 PM | ROSELLE, IL | 847-804-6133 | OP/PU | 2:06 | 0.00 | | 0.00 |
| 267 | Jan 13 | 12:41 PM | LAKE VILLA, IL | 847-356-0408 | OP/PU | 1:13 | 0.00 | | 0.00 |
| 268 | Jan 13 | 12:42 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 269 | Jan 13 | 12:58 PM | LAKE VILLA, IL | 847-356-0408 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 270 | Jan 13 | 01:05 PM | LAKE VILLA, IL | 847-356-0408 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 271 | Jan 13 | 01:27 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 272 | Jan 13 | 01:28 PM | LA GRANGE, IL | 847-606-2454 | OP/PU | 1:08 | 0.00 | | 0.00 |
| 273 | Jan 13 | 01:35 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 274 | Jan 13 | 01:36 PM | | INCOMING | OP | 1:39 | 0.00 | | 0.00 |
| 275 | Jan 13 | 01:40 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 276 | Jan 13 | 01:49 PM | | INCOMING | OP | 1:23 | 0.00 | | 0.00 |
| 277 | Jan 13 | 01:50 PM | ROUND LAKE, IL | 847-740-3743 | OP/PU | 2:02 | 0.00 | | 0.00 |
| 278 | Jan 13 | 03:14 PM | GRAYS LAKE, IL | 847-223-2361 | OP/PU | 1:19 | 0.00 | | 0.00 |
| 279 | Jan 14 | 09:31 AM | MOBILE, CL | 815-693-1498 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 280 | Jan 14 | 09:32 AM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 281 | Jan 14 | 09:32 AM | MOBILE, CL | 815-693-1498 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 282 | Jan 14 | 09:34 AM | LA GRANGE, IL | 847-606-2454 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 283 | Jan 14 | 09:34 AM | LA GRANGE, IL | 847-606-2454 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 284 | Jan 14 | 09:35 AM | LAKE VILLA, IL | 847-265-7439 | PP/PU | 9:58 | 0.00 | | 0.00 |
| 285 | Jan 14 | 10:40 AM | MOBILE, CL | 847-561-8843 | PP/PU | 2:01 | 0.00 | | 0.00 |
| 286 | Jan 14 | 10:55 AM | WHEELING, IL | Voice Mail | PP/PU | 1:03 | 0.00 | | 0.00 |
| 287 | Jan 14 | 10:57 AM | | INCOMING | PP | 1:37 | 0.00 | | 0.00 |
| 288 | Jan 14 | 11:27 AM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 289 | Jan 14 | 11:54 AM | LA GRANGE, IL | 847-606-2454 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 290 | Jan 14 | 12:22 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 291 | Jan 14 | 12:23 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 292 | Jan 14 | 12:24 PM | | INCOMING | PP | 3:06 | 0.00 | | 0.00 |
| 293 | Jan 14 | 12:27 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 294 | Jan 14 | 12:29 PM | WAUKEGAN, IL | 847-445-7177 | PP/PU | 1:55 | 0.00 | | 0.00 |
| 295 | Jan 14 | 12:31 PM | | INCOMING | PP | 1:07 | 0.00 | | 0.00 |
| 296 | Jan 14 | 12:32 PM | | INCOMING | PP/CW | 1:00 | 0.00 | | 0.00 |
| 297 | Jan 14 | 01:32 PM | ROUND LAKE, IL | 847-740-1099 | PP/PU | 1:12 | 0.00 | | 0.00 |
| 298 | Jan 14 | 01:34 PM | ROUND LAKE, IL | 847-740-7488 | PP/PU | 1:01 | 0.00 | | 0.00 |
| 299 | Jan 14 | 01:39 PM | GRAYS LAKE, IL | 847-223-8186 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 300 | Jan 14 | 01:42 PM | ROUND LAKE, IL | 847-740-6000 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 301 | Jan 14 | 02:05 PM | MOBILE, CL | 815-693-1498 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 302 | Jan 14 | 02:07 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 303 | Jan 14 | 02:13 PM | LAKE VILLA, IL | 847-356-0408 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 304 | Jan 14 | 02:18 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 305 | Jan 14 | 02:21 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 306 | Jan 14 | 02:22 PM | LAKE VILLA, IL | 847-356-0408 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 307 | Jan 14 | 02:24 PM | | INCOMING | PP | 1:04 | 0.00 | | 0.00 |
| 308 | Jan 14 | 02:28 PM | LAKE VILLA, IL | 847-356-0408 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 309 | Jan 14 | 03:03 PM | ZION, IL | 847-912-1870 | PP/PU | 1:17 | 0.00 | | 0.00 |
| 310 | Jan 14 | 03:22 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 311 | Jan 14 | 03:23 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 312 | Jan 14 | 03:26 PM | ROSELLE, IL | 847-804-6133 | PP/PU | 1:34 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

js. 162²

continued...

111

**Account name** Charles L Kleffner
**Account number** 0009617953-6
**Statement date** February 10, 2002
**Billing period** January 09 - February 08, 2002

Page   10

## RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 313 | Jan 14 | 03:30 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 314 | Jan 14 | 03:31 PM | MOBILE, CL | 847-561-8843 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 315 | Jan 14 | 03:38 PM | ROSELLE, IL | 847-804-6233 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 316 | Jan 14 | 03:39 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 317 | Jan 14 | 03:40 PM | ZION, IL | 847-912-1870 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 318 | Jan 14 | 03:41 PM | ZION, IL | 847-912-1870 | PP/PU | 1:27 | 0.00 | | 0.00 |
| 319 | Jan 14 | 04:02 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 320 | Jan 14 | 04:03 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 321 | Jan 14 | 04:04 PM | MOBILE, CL | 847-366-3485 | PP/PU | 1:45 | 0.00 | | 0.00 |
| 322 | Jan 14 | 04:10 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 323 | Jan 14 | 04:19 PM | MOBILE, CL | 815-693-1498 | PP/PU | 2:21 | 0.00 | | 0.00 |
| 324 | Jan 14 | 04:30 PM | MOBILE, CL | 815-693-1498 | PP/PU | 2:43 | 0.00 | | 0.00 |
| 325 | Jan 14 | 04:33 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 326 | Jan 14 | 04:34 PM | MOBILE, CL | 847-366-3485 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 327 | Jan 14 | 04:54 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 328 | Jan 14 | 04:55 PM | ELK GROVE, IL | 847-312-9538 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 329 | Jan 14 | 05:25 PM | | INCOMING | PP | 2:48 | 0.00 | | 0.00 |
| 330 | Jan 14 | 05:41 PM | MOBILE, CL | 847-561-8843 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 331 | Jan 14 | 05:53 PM | MOBILE, CL | 847-561-8843 | PP/PU | 1:46 | 0.00 | | 0.00 |
| 332 | Jan 14 | 05:58 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 333 | Jan 14 | 06:15 PM | | INCOMING | PP | 3:14 | 0.00 | | 0.00 |
| 334 | Jan 14 | 06:18 PM | | INCOMING | PP/CW | 1:00 | 0.00 | | 0.00 |
| 335 | Jan 14 | 06:22 PM | MOBILE, CL | 815-693-1498 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 336 | Jan 14 | 06:22 PM | MOBILE, CL | 815-693-1498 | PP/PU | 2:30 | 0.00 | | 0.00 |
| 337 | Jan 14 | 06:47 PM | | INCOMING | PP | 1:54 | 0.00 | | 0.00 |
| 338 | Jan 14 | 06:57 PM | | INCOMING | PP | 1:04 | 0.00 | | 0.00 |
| 339 | Jan 14 | 07:03 PM | ZION, IL | 847-912-1870 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 340 | Jan 14 | 07:03 PM | ZION, IL | 847-912-1870 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 341 | Jan 14 | 07:04 PM | ZION, IL | 847-912-1870 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 342 | Jan 14 | 07:06 PM | | INCOMING | PP | 4:07 | 0.00 | | 0.00 |
| 343 | Jan 14 | 07:10 PM | ZION, IL | 847-912-1870 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 344 | Jan 14 | 07:17 PM | ZION, IL | 847-912-1870 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 345 | Jan 14 | 07:38 PM | ANTIOCH, IL | 847-395-6565 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 346 | Jan 14 | 07:45 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:24 | 0.00 | | 0.00 |
| 347 | Jan 14 | 07:47 PM | MOBILE, CL | 815-693-1498 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 348 | Jan 14 | 07:51 PM | MOBILE, CL | 815-693-1498 | PP/PU | 2:28 | 0.00 | | 0.00 |
| 349 | Jan 14 | 07:54 PM | MOBILE, CL | 815-693-1498 | PP/PU | 3:56 | 0.00 | | 0.00 |
| 350 | Jan 14 | 08:12 PM | ANTIOCH, IL | 847-395-6565 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 351 | Jan 14 | 08:33 PM | LAKE VILLA, IL | 847-356-0408 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 352 | Jan 14 | 08:44 PM | LAKE VILLA, IL | 847-356-0408 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 353 | Jan 14 | 08:45 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:53 | 0.00 | | 0.00 |
| 354 | Jan 14 | 08:45 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 3:46 | 0.00 | | 0.00 |
| 355 | Jan 14 | 08:50 PM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 356 | Jan 14 | 08:57 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 357 | Jan 14 | 09:22 PM | LAKE VILLA, IL | 847-356-0408 | OP/PU | 1:06 | 0.00 | | 0.00 |
| 358 | Jan 14 | 09:22 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 359 | Jan 14 | 09:23 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 360 | Jan 14 | 09:43 PM | LAKE VILLA, IL | 847-356-0408 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 361 | Jan 14 | 09:43 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 362 | Jan 14 | 09:52 PM | WHEELING, IL | Voice Mail | OP/PU | 7:20 | 0.00 | | 0.00 |
| 363 | Jan 14 | 09:52 PM | LAKE VILLA, IL | 847-265-7439 | OP/PU | | 0.00 | | 0.00 |

Footnote   Features                Networks                 Services                    Time Period
CW-Call Waiting         NN-National Network      AL-Alternate Line           PP-Peak Period
CF-Call Forwarding      CN-Canadian Network      PU-Plan/Promotional Usage   OP-Off Peak Period
3W-Three Way Call       WW-Nextel Worldwide      PF-Partial Free             MP-Multiple Period
DS-Dialup Service                                PC-Partial Call

165(p)

continued...

112

**Account name** Charles L Kleffner
**Account number** 0009617953-6
**Statement date** February 10, 2002
**Billing period** January 09 - February 08, 2002

Page  14

## RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|--------|------|------|---------|---------------|--------------|---------|-------|---------------|-------------------------------|
| 517 | Jan 17 | 01:17 PM | MOBILE,CL | 815-693-1498 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 518 | Jan 17 | 01:28 PM | | INCOMING | PP | 1:12 | 0.00 | | 0.00 |
| 519 | Jan 17 | 01:30 PM | ROUND LAKE,IL | 847-740-3743 | PP/PU | 4:19 | 0.00 | | 0.00 |
| 520 | Jan 17 | 01:35 PM | WHEELING,IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 521 | Jan 17 | 01:36 PM | MOBILE,CL | 815-693-1498 | PP/PU | 1:53 | 0.00 | | 0.00 |
| 522 | Jan 17 | 01:44 PM | MOBILE,CL | 815-693-1498 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 523 | Jan 17 | 01:44 PM | MOBILE.CL | 815-693-1498 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 524 | Jan 17 | 02:34 PM | WHEELING,IL | Voice Mail | PP/PU | 1:21 | 0.00 | | 0.00 |
| 525 | Jan 17 | 02:50 PM | MOBILE,CL | 815-693-1498 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 526 | Jan 17 | 03:21 PM | WHEELING,IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 527 | Jan 17 | 03:39 PM | ROUND LAKE,IL | 847-740-3743 | PP/PU | 8:48 | 0.00 | | 0.00 |
| 528 | Jan 17 | 03:48 PM | ZION,IL | 847-912-1870 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 529 | Jan 17 | 03:54 PM | | INCOMING | PP | 2:18 | 0.00 | | 0.00 |
| 530 | Jan 17 | 04:18 PM | | INCOMING | PP | 1:06 | 0.00 | | 0.00 |
| 531 | Jan 17 | 04:24 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 532 | Jan 17 | 04:24 PM | MOBILE,CL | 815-693-1498 | PP/PU | 2:40 | 0.00 | | 0.00 |
| 533 | Jan 17 | 04:30 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 534 | Jan 17 | 04:31 PM | ROUND LAKE,IL | 847-740-4091 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 535 | Jan 17 | 04:32 PM | ROUND LAKE,IL | 847-740-4091 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 536 | Jan 17 | 04:32 PM | ROUND LAKE,IL | 847-740-4091 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 537 | Jan 17 | 04:33 PM | WHEELING,IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 538 | Jan 17 | 04:34 PM | ROUND LAKE,IL | 847-740-4091 | PP/PU | 3:26 | 0.00 | | 0.00 |
| 539 | Jan 17 | 06:03 PM | LAKE VILLA,IL | 847-265-9763 | PP/PU | 1:13 | 0.00 | | 0.00 |
| 540 | Jan 17 | 06:05 PM | ANTIOCH,IL | 847-395-2484 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 541 | Jan 17 | 06:55 PM | | INCOMING | PP | 1:50 | 0.00 | | 0.00 |
| 542 | Jan 17 | 07:01 PM | | INCOMING | PP | 1:42 | 0.00 | | 0.00 |
| 543 | Jan 17 | 07:28 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 544 | Jan 17 | 07:29 PM | MOBILE,CL | 815-693-1498 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 545 | Jan 17 | 07:29 PM | | INCOMING | PP | 4:47 | 0.00 | | 0.00 |
| 546 | Jan 17 | 07:34 PM | LAKE VILLA,IL | 847-356-0305 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 547 | Jan 17 | 07:35 PM | | INCOMING | PP/CW | 2:13 | 0.00 | | 0.00 |
| 548 | Jan 17 | 07:55 PM | | INCOMING | PP | 1:41 | 0.00 | | 0.00 |
| 549 | Jan 17 | 07:56 PM | CHICAGO,IL | 312-375-2148 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 550 | Jan 17 | 07:57 PM | CHICAGO,IL | 773-438-7499 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 551 | Jan 17 | 07:58 PM | | INCOMING | PP | 1:08 | 0.00 | | 0.00 |
| 552 | Jan 17 | 08:54 PM | LAKE VILLA,IL | 847-265-7439 | OP/PU | 1:23 | 0.00 | | 0.00 |
| 553 | Jan 17 | 09:04 PM | | INCOMING | OP | 1:08 | 0.00 | | 0.00 |
| 554 | Jan 17 | 09:22 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 555 | Jan 17 | 09:48 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 556 | Jan 17 | 10:18 PM | WHEELING,IL | Voice Mail | OP/PU | 1:22 | 0.00 | | 0.00 |
| 557 | Jan 17 | 10:24 PM | NORTHBROOK,IL | 847-791-4447 | OP/PU | 2:56 | 0.00 | | 0.00 |
| 558 | Jan 17 | 10:48 PM | WHEELING,IL | Voice Mail | OP/PU | 1:07 | 0.00 | | 0.00 |
| 559 | Jan 17 | 10:50 PM | WHEELING,IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 560 | Jan 17 | 10:58 PM | CHICAGO,IL | 773-438-7499 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 561 | Jan 17 | 10:59 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 562 | Jan 17 | 11:58 PM | CHICAGO,IL | 312-375-2148 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 563 | Jan 17 | 11:59 PM | CHICAGO,IL | 312-375-2148 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 564 | Jan 17 | 11:59 PM | CHICAGO,IL | 312-375-2148 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 565 | Jan 18 | 12:00 AM | WHEELING,IL | Voice Mail | OP/PU | 1:26 | 0.00 | | 0.00 |
| 566 | Jan 18 | 12:10 AM | CHICAGO,IL | 312-375-2148 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 567 | Jan 18 | 12:15 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|----------|----------|----------|----------|-------------|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

165(q)

*continued...*

113

| | |
|---|---|
| Account name | Charles L Kleffner |
| Account number | 0009617953-6 |
| Statement date | February 10, 2002 |
| Billing period | January 09 - February 08, 2002 |

Page   15

## RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 568 | Jan 18 | 01:28 AM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 569 | Jan 18 | 01:29 AM | FOX LAKE, IL | 847-973-1848 | OP/PU | 1:13 | 0.00 | | 0.00 |
| 570 | Jan 18 | 10:05 AM | WHEELING, IL | Voice Mail | PP/PU | 1:05 | 0.00 | | 0.00 |
| 571 | Jan 18 | 10:09 AM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 572 | Jan 18 | 10:44 AM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 573 | Jan 18 | 10:56 AM | | INCOMING | PP | 3:22 | 0.00 | | 0.00 |
| 574 | Jan 18 | 11:59 AM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 575 | Jan 18 | 12:52 PM | | INCOMING | PP | 6:38 | 0.00 | | 0.00 |
| 576 | Jan 18 | 01:36 PM | LAKE VILLA, IL | 847-265-9763 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 577 | Jan 18 | 01:36 PM | FOX LAKE, IL | 847-973-1848 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 578 | Jan 18 | 02:50 PM | | INCOMING | PP | 2:34 | 0.00 | | 0.00 |
| 579 | Jan 18 | 04:27 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 580 | Jan 18 | 04:30 PM | FOX LAKE, IL | 847-973-1848 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 581 | Jan 18 | 04:31 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 582 | Jan 18 | 04:32 PM | FOX LAKE, IL | 847-973-1848 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 583 | Jan 18 | 04:34 PM | FOX LAKE, IL | 847-973-1848 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 584 | Jan 18 | 04:36 PM | MOBILE, CL | 847-456-6955 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 585 | Jan 18 | 04:39 PM | NORTHBROOK, IL | 847-361-1060 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 586 | Jan 18 | 04:43 PM | LAKE VILLA, IL | 847-356-0305 | PP/PU | 2:38 | 0.00 | | 0.00 |
| 587 | Jan 18 | 04:51 PM | ROUND LAKE, IL | 847-740-9462 | PP/PU | 2:18 | 0.00 | | 0.00 |
| 588 | Jan 18 | 04:55 PM | LAKE VILLA, IL | 847-356-0305 | PP/PU | 1:03 | 0.00 | | 0.00 |
| 589 | Jan 18 | 04:56 PM | NORTHBROOK, IL | 847-858-4654 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 590 | Jan 18 | 04:57 PM | NORTHBROOK, IL | 847-858-4654 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 591 | Jan 18 | 04:58 PM | ANTIOCH, IL | 847-838-3341 | PP/PU | 1:02 | 0.00 | | 0.00 |
| 592 | Jan 18 | 05:04 PM | NORTHBROOK, IL | 847-858-4654 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 593 | Jan 18 | 05:06 PM | ROSELLE, IL | 847-436-0591 | PP/PU | 1:45 | 0.00 | | 0.00 |
| 594 | Jan 18 | 05:08 PM | | INCOMING | PP/CW | 1:00 | 0.00 | | 0.00 |
| 595 | Jan 18 | 05:09 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 596 | Jan 18 | 05:12 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 597 | Jan 18 | 05:14 PM | FOX LAKE, IL | 847-973-1848 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 598 | Jan 18 | 05:15 PM | LAKEFOREST, IL | 847-219-7876 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 599 | Jan 18 | 05:16 PM | NORTHBROOK, IL | 847-477-7707 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 600 | Jan 18 | 05:16 PM | NORTHBROOK, IL | 847-477-7707 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 601 | Jan 18 | 05:20 PM | NORTHBROOK, IL | 847-477-7707 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 602 | Jan 18 | 05:20 PM | NORTHBROOK, IL | 847-858-4654 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 603 | Jan 18 | 05:55 PM | NORTHBROOK, IL | 847-477-7707 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 604 | Jan 18 | 05:56 PM | NORTHBROOK, IL | 847-477-7707 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 605 | Jan 18 | 06:01 PM | GRAYS LAKE, IL | 847-223-2361 | PP/PU | 1:23 | 0.00 | | 0.00 |
| 606 | Jan 18 | 06:03 PM | ROSELLE, IL | 847-804-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 607 | Jan 18 | 06:03 PM | ANTIOCH, IL | 847-838-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 608 | Jan 18 | 06:07 PM | ROSELLE, IL | 847-804-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 609 | Jan 18 | 06:07 PM | ANTIOCH, IL | 847-838-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 610 | Jan 18 | 06:09 PM | LAKE VILLA, IL | 847-265-7439 | PP/PU | 4:00 | 0.00 | | 0.00 |
| 611 | Jan 18 | 06:14 PM | GRAYS LAKE, IL | 847-223-2361 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 612 | Jan 18 | 06:32 PM | FOX LAKE, IL | 847-973-1848 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 613 | Jan 18 | 06:33 PM | MOBILE, CL | 847-456-6955 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 614 | Jan 18 | 06:34 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 615 | Jan 18 | 06:37 PM | MOBILE, CL | 847-456-6955 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 616 | Jan 18 | 06:42 PM | ROSELLE, IL | 847-804-6133 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 617 | Jan 18 | 06:42 PM | FOX LAKE, IL | 847-973-1848 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 618 | Jan 18 | 06:43 PM | DUNDEE, IL | 847-551-0755 | PP/PU | 1:00 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

**165(r)**

continued...

114

| | | | |
|---|---|---|---|
| Account name | Charles L Kleffner | | Page   18 |
| Account number | 0009617953-6 | | |
| Statement date | February 10, 2002 | | |
| Billing period | January 09 - February 08, 2002 | | |

RAYMOND (847) 561-5033 continued...

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 721 | Jan 20 | 03:57 PM | ROUND LAKE, IL | 847-740-3737 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 722 | Jan 20 | 04:06 PM | ROUND LAKE, IL | 847-740-3737 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 723 | Jan 20 | 04:48 PM | ANTIOCH, IL | 847-838-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 724 | Jan 20 | 04:49 PM | ROSELLE, IL | 847-804-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 725 | Jan 20 | 04:56 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 726 | Jan 20 | 04:57 PM | LAKE VILLA, IL | 847-265-7439 | OP/PU | 38:35 | 0.00 | | 0.00 |
| 727 | Jan 20 | 05:10 PM | | INCOMING | OP/CW | 1:00 | 0.00 | | 0.00 |
| 728 | Jan 20 | 05:28 PM | | INCOMING | OP/CW | 1:00 | 0.00 | | 0.00 |
| 729 | Jan 20 | 05:36 PM | | INCOMING | OP | 21:17 | 0.00 | | 0.00 |
| 730 | Jan 20 | 05:57 PM | FOX LAKE, IL | 847-973-0630 | OP/PU | 7:37 | 0.00 | | 0.00 |
| 731 | Jan 20 | 06:05 PM | ELK GROVE, IL | 847-312-9538 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 732 | Jan 20 | 06:06 PM | ROUND LAKE, IL | 847-740-8129 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 733 | Jan 20 | 06:06 PM | ROUND LAKE, IL | 847-740-8129 | OP/PU | 20:06 | 0.00 | | 0.00 |
| 734 | Jan 20 | 06:13 PM | | INCOMING | OP/CW | 13:49 | 0.00 | | 0.00 |
| 735 | Jan 20 | 06:27 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 736 | Jan 20 | 06:28 PM | NORTHBROOK, IL | 847-361-1060 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 737 | Jan 20 | 06:29 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 738 | Jan 20 | 06:30 PM | NORTHBROOK, IL | 847-361-1060 | OP/PU | 2:46 | 0.00 | | 0.00 |
| 739 | Jan 20 | 06:37 PM | NORTHBROOK, IL | 847-791-4368 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 740 | Jan 20 | 06:38 PM | WAUKEGAN, IL | 847-445-3775 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 741 | Jan 20 | 06:39 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 2:53 | 0.00 | | 0.00 |
| 742 | Jan 20 | 06:40 PM | | INCOMING | OP/CW | 1:00 | 0.00 | | 0.00 |
| 743 | Jan 20 | 06:42 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 744 | Jan 20 | 06:44 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 745 | Jan 20 | 06:47 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 746 | Jan 20 | 06:54 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 747 | Jan 20 | 07:18 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 748 | Jan 20 | 09:36 PM | WHEELING, IL | Voice Mail | OP/PU | 2:01 | 0.00 | | 0.00 |
| 749 | Jan 20 | 10:29 PM | WAUKEGAN, IL | 847-445-7176 | OP/PU | 5:12 | 0.00 | | 0.00 |
| 750 | Jan 20 | 10:35 PM | | INCOMING | OP | 3:24 | 0.00 | | 0.00 |
| 751 | Jan 21 | 12:55 AM | MOBILE, CL | 815-693-1498 | OP/PU | 2:40 | 0.00 | | 0.00 |
| 752 | Jan 21 | 02:00 AM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 753 | Jan 21 | 02:01 AM | WAUKEGAN, IL | 847-445-7757 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 754 | Jan 21 | 02:01 AM | WAUKEGAN, IL | 847-445-7757 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 755 | Jan 21 | 02:49 AM | | INCOMING | OP | 3:30 | 0.00 | | 0.00 |
| 756 | Jan 21 | 02:54 AM | WAUKEGAN, IL | 847-445-7757 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 757 | Jan 21 | 02:56 AM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 758 | Jan 21 | 03:01 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 759 | Jan 21 | 03:04 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 760 | Jan 21 | 03:28 AM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 761 | Jan 21 | 03:38 AM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 762 | Jan 21 | 03:39 AM | MOBILE, CL | 815-693-1498 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 763 | Jan 21 | 04:17 AM | DIR ASST, CL | 411 | OP/PU | 1:00 | 0.00 | 1.19 | 1.19 |
| 764 | Jan 21 | 04:19 AM | WAUKEGAN, IL | 847-360-5750 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 765 | Jan 21 | 04:20 AM | | INCOMING | OP/CW | 1:00 | 0.00 | | 0.00 |
| 766 | Jan 21 | 04:24 AM | DIR ASST, CL | 411 | OP/PU | 1:25 | 0.00 | 1.19 | 1.19 |
| 767 | Jan 21 | 04:26 AM | ANTIOCH, IL | 847-395-3838 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 768 | Jan 21 | 04:26 AM | ANTIOCH, IL | 847-395-3535 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 769 | Jan 21 | 04:29 AM | ANTIOCH, IL | 847-395-8585 | OP/PU | 2:03 | 0.00 | | 0.00 |
| 770 | Jan 21 | 05:24 AM | ANTIOCH, IL | 847-838-6133 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 771 | Jan 21 | 07:29 AM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

165(s)

continued...

| | |
|---|---|
| Account name | Charles L Kleffner |
| Account number | 0009617953-6 |
| Statement date | February 10, 2002 |
| Billing period | January 09 - February 08, 2002 |

Page  23

RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 976 | Jan 24 | 07:46 AM | WHEELING, IL | Voice Mail | PP/PU | 1:31 | 0.00 | | 0.00 |
| 977 | Jan 24 | 10:50 AM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 978 | Jan 24 | 10:51 AM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 979 | Jan 24 | 10:51 AM | LAKE VILLA, IL | 847-356-7091 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 980 | Jan 24 | 01:22 PM | WHEELING, IL | Voice Mail | PP/PU | 1:38 | 0.00 | | 0.00 |
| 981 | Jan 24 | 01:24 PM | LAKE VILLA, IL. | 847-356-7091 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 982 | Jan 24 | 01:25 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 983 | Jan 24 | 01:25 PM | LAKE VILLA, IL | 847-356-7091 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 984 | Jan 24 | 01:29 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 985 | Jan 24 | 01:33 PM | NORTHBROOK, IL | 947-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 986 | Jan 24 | 02:39 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 987 | Jan 24 | 02:40 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 988 | Jan 24 | 02:40 PM | LAKE VILLA, IL | 847-356-7091 | PP/PU | 1:37 | 0.00 | | 0.00 |
| 989 | Jan 24 | 02:42 PM | NORTHBROOK, IL | 847-361-1060 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 990 | Jan 24 | 02:43 PM | ZION, IL | 847-912-1870 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 991 | Jan 24 | 02:44 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 992 | Jan 24 | 02:44 PM | | INCOMING | PP/CW | 1:00 | 0.00 | | 0.00 |
| 993 | Jan 24 | 02:45 PM | WHEELING, IL | Voice Mail | PP/PU | 1:11 | 0.00 | | 0.00 |
| 994 | Jan 24 | 02:46 PM | ELK GROVE, IL | 847-312-9538 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 995 | Jan 24 | 02:49 PM | CHICAGO, IL | 773-438-7499 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 996 | Jan 24 | 02:49 PM | | INCOMING | PP/CW | 2:07 | 0.00 | | 0.00 |
| 997 | Jan 24 | 02:51 PM | WHEELING, IL | Voice Mail | PP/PU | 1:09 | 0.00 | | 0.00 |
| 998 | Jan 24 | 02:53 PM | CHICAGO, IL | 773-438-7499 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 999 | Jan 24 | 02:54 PM | | INCOMING | PP | 3:08 | 0.00 | | 0.00 |
| 1000 | Jan 24 | 03:08 PM | WAUKEGAN, IL | 847-445-3775 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1001 | Jan 24 | 03:13 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1002 | Jan 24 | 03:22 PM | LAKE VILLA, IL | 847-356-7091 | PP/PU | 1:59 | 0.00 | | 0.00 |
| 1003 | Jan 24 | 03:56 PM | | INCOMING | PP | 2:27 | 0.00 | | 0.00 |
| 1004 | Jan 24 | 04:01 PM | WAUKEGAN, IL | 847-445-3775 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1005 | Jan 24 | 04:02 PM | MOBILE, CL | 847-546-4819 | PP/PU | 5:34 | 0.00 | | 0.00 |
| 1006 | Jan 24 | 04:11 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1007 | Jan 24 | 04:13 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1008 | Jan 24 | 04:14 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1009 | Jan 24 | 04:15 PM | WAUKEGAN, IL | 847-445-3775 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1010 | Jan 24 | 04:58 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1011 | Jan 24 | 04:59 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1012 | Jan 24 | 04:59 PM | LAKE VILLA, IL | 847-356-7091 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1013 | Jan 24 | 05:00 PM | LAKE VILLA, IL | 847-265-7439 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1014 | Jan 24 | 05:04 PM | MOBILE, CL | 847-546-4819 | PP/PU | 3:31 | 0.00 | | 0.00 |
| 1015 | Jan 24 | 05:13 PM | | INCOMING | PP | 6:29 | 0.00 | | 0.00 |
| 1016 | Jan 24 | 05:28 PM | WHEELING, IL | Voice Mail | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1017 | Jan 24 | 05:31 PM | ROUND LAKE, IL | 847-740-3743 | PP/PU | 1:17 | 0.00 | | 0.00 |
| 1018 | Jan 24 | 05:44 PM | | INCOMING | PP | 1:15 | 0.00 | | 0.00 |
| 1019 | Jan 24 | 05:50 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1020 | Jan 24 | 06:03 PM | LAKE VILLA, IL | 847-356-0305 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1021 | Jan 24 | 06:04 PM | LAKE VILLA, IL | 847-265-7439 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1022 | Jan 24 | 06:16 PM | NORTHBROOK, IL | 847-361-1060 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1023 | Jan 24 | 06:16 PM | ZION, IL | 847-912-1870 | PP/PU | 6:59 | 0.00 | | 0.00 |
| 1024 | Jan 24 | 06:23 PM | | INCOMING | PP/CW | 1:00 | 0.00 | | 0.00 |
| 1025 | Jan 24 | 06:25 PM | | INCOMING | PP | 1:10 | 0.00 | | 0.00 |
| 1026 | Jan 24 | 06:37 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

*continued...*

| | |
|---|---|
| **Account name** | Charles L Kleffner |
| **Account number** | 0009617953-6 |
| **Statement date** | February 10, 2002 |
| **Billing period** | January 09 - February 08, 2002 |

Page  24

RAYMOND (847) 561-5033 *continued...*

| Item # | Date | Time | Call To | Number Called | See Footnote | Min:Sec | Usage | Long Distance | Total Usage and Long Distance |
|---|---|---|---|---|---|---|---|---|---|
| 1027 | Jan 24 | 06:41 PM | | INCOMING | PP | 8:59 | 0.00 | | 0.00 |
| 1028 | Jan 24 | 07:34 PM | | INCOMING | PP | 1:31 | 0.00 | | 0.00 |
| 1029 | Jan 24 | 07:42 PM | NORTHBROOK, IL | 847-791-4447 | PP/PU | 1:00 | 0.00 | | 0.00 |
| 1030 | Jan 24 | 07:52 PM | | INCOMING | PP | 1:00 | 0.00 | | 0.00 |
| 1031 | Jan 24 | 08:05 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1032 | Jan 24 | 08:07 PM | LAKE VILLA, IL | 847-265-7439 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1033 | Jan 24 | 08:13 PM | | INCOMING | OP | 3:42 | 0.00 | | 0.00 |
| 1034 | Jan 24 | 08:14 PM | | INCOMING | OP/CW | 3:22 | 0.00 | | 0.00 |
| 1035 | Jan 24 | 08:18 PM | | INCOMING | OP | 22:46 | 0.00 | | 0.00 |
| 1036 | Jan 24 | 08:41 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1037 | Jan 24 | 08:42 PM | ELK GROVE, IL | 847-312-9538 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1038 | Jan 24 | 08:43 PM | LAKE VILLA, IL | 847-356-7091 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1039 | Jan 24 | 08:53 PM | | INCOMING | OP | 1:31 | 0.00 | | 0.00 |
| 1040 | Jan 24 | 08:58 PM | | INCOMING | OP | 2:46 | 0.00 | | 0.00 |
| 1041 | Jan 24 | 09:08 PM | LAKE VILLA, IL | 847-356-6520 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1042 | Jan 24 | 09:14 PM | | INCOMING | OP | 3:06 | 0.00 | | 0.00 |
| 1043 | Jan 24 | 09:18 PM | LAKE VILLA, IL | 847-356-6520 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1044 | Jan 24 | 09:19 PM | NORTHBROOK, IL | 847-338-6667 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1045 | Jan 24 | 09:21 PM | | INCOMING | OP | 1:00 | 0.00 | | 0.00 |
| 1046 | Jan 24 | 09:27 PM | ROUND LAKE, IL | 847-740-7494 | OP/PU | 25:05 | 0.00 | | 0.00 |
| 1047 | Jan 24 | 10:01 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:03 | 0.00 | | 0.00 |
| 1048 | Jan 24 | 10:16 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1049 | Jan 24 | 10:18 PM | ROSELLE, IL | 847-436-0591 | OP/PU | 1:35 | 0.00 | | 0.00 |
| 1050 | Jan 24 | 10:20 PM | ROSELLE, IL | 847-436-0591 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1051 | Jan 24 | 10:21 PM | ROSELLE, IL | 847-436-0591 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1052 | Jan 24 | 10:21 PM | ROSELLE, IL | 847-436-0591 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1053 | Jan 24 | 10:33 PM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1054 | Jan 24 | 10:34 PM | ROSELLE, IL | 847-436-0591 | OP/PU | 1:53 | 0.00 | | 0.00 |
| 1055 | Jan 24 | 10:36 PM | ROSELLE, IL | 847-436-0591 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1056 | Jan 24 | 10:38 PM | | INCOMING | OP | 4:38 | 0.00 | | 0.00 |
| 1057 | Jan 24 | 10:49 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1058 | Jan 24 | 10:57 PM | WHEELING, IL | Voice Mail | OP/PU | 1:37 | 0.00 | | 0.00 |
| 1059 | Jan 24 | 10:57 PM | | INCOMING | OP/CW | 10:32 | 0.00 | | 0.00 |
| 1060 | Jan 24 | 11:08 PM | | INCOMING | OP | 6:05 | 0.00 | | 0.00 |
| 1061 | Jan 24 | 11:26 PM | NORTHBROOK, IL | 847-791-4447 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1062 | Jan 24 | 11:53 PM | | INCOMING | OP | 1:32 | 0.00 | | 0.00 |
| 1063 | Jan 25 | 12:04 AM | ZION, IL | 847-912-1870 | OP/PU | 4:30 | 0.00 | | 0.00 |
| 1064 | Jan 25 | 12:09 AM | ZION, IL | 847-912-1870 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1065 | Jan 25 | 12:12 AM | NORTHBROOK, IL | 847-361-1060 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1066 | Jan 25 | 12:24 AM | MOBILE, CL | 847-546-8702 | OP/PU | 1:27 | 0.00 | | 0.00 |
| 1067 | Jan 25 | 12:26 AM | NORTHBROOK, IL | 847-372-6119 | OP/PU | 23:49 | 0.00 | | 0.00 |
| 1068 | Jan 25 | 12:50 AM | NORTHBROOK, IL | 847-372-6119 | OP/PU | 7:05 | 0.00 | | 0.00 |
| 1069 | Jan 25 | 01:03 AM | WHEELING, IL | Voice Mail | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1070 | Jan 25 | 01:03 AM | WHEELING, IL | Voice Mail | OP/PU | 1:07 | 0.00 | | 0.00 |
| 1071 | Jan 25 | 01:04 AM | ELK GROVE, IL | 847-312-9538 | OP/PU | 10:23 | 0.00 | | 0.00 |
| 1072 | Jan 25 | 01:10 AM | | INCOMING | OP/CW | 1:00 | 0.00 | | 0.00 |
| 1073 | Jan 25 | 01:18 AM | ELK GROVE, IL | 847-312-9538 | OP/PU | 9:50 | 0.00 | | 0.00 |
| 1074 | Jan 25 | 01:21 AM | | INCOMING | OP/CW | 1:00 | 0.00 | | 0.00 |
| 1075 | Jan 25 | 01:28 AM | ELK GROVE, IL | 847-312-9538 | OP/PU | 1:23 | 0.00 | | 0.00 |
| 1076 | Jan 25 | 02:00 AM | NORTHBROOK, IL | 847-339-5058 | OP/PU | 1:00 | 0.00 | | 0.00 |
| 1077 | Jan 25 | 02:04 AM | ROUND LAKE, IL | 847-740-8760 | OP/PU | 1:46 | 0.00 | | 0.00 |

| Footnote | Features | Networks | Services | Time Period |
|---|---|---|---|---|
| | CW-Call Waiting | NN-National Network | AL-Alternate Line | PP-Peak Period |
| | CF-Call Forwarding | CN-Canadian Network | PU-Plan/Promotional Usage | OP-Off Peak Period |
| | 3W-Three Way Call | WW-Nextel Worldwide | PF-Partial Free | MP-Multiple Period |
| | DS-Dialup Service | | PC-Partial Call | |

165(u)

continued...

STATE OF ILLINOIS      )
                       )SS
COUNTY OF              )

## AFFIDAVIT

I Marcy McIntosh , being first duly sworn under oath, depose and state that the following information within this affidavit is true and correct in substance and in facts:

I met Ray Serio in Sept. of 2001 at a bar called Whiplash that his family ran. My fiance (Jim Naty and I were patrons at Whiplash. In the following months we became friends with Ray Serio and his family.

In February of 2002, (after the death of Rick Neubauer) my fiance ~~and~~ Jim and I went in partners with Ray's family in regards to Whiplash.

Denise Schubat was employed at Whiplash as our bartender, Working evening (6:00pm to close). At no time had she ever expressed any fear of Ray Serio or fear of closing the bar by herself or being alone there.

On April 4, 2002, my fiance and I were working the bar. We were the

(Continued)

_____
**Affiant Signature**   Marcy McIntosh

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _16th_ DAY OF _November_ 20_05_.

_____
**Notary Public**

"OFFICIAL SEAL"
Jacqueline S. Shoblom
Notary Public, State of Illinois
My Commission Exp. 05/24/2008

18

STATE OF ILLINOIS    )
                     )SS
COUNTY OF            )

## AFFIDAVIT

I __Marcy McIntosh__, being first duly sworn under oath, depose and state that the following information within this affidavit is true and correct in substance and in facts:

only ones in the bar, when Ray Serio came in saying that "Lake County" had just released him. I asked Ray they had him in custody 'cause I thought he had nothing to do with it (the murder). Ray then told me "Nothing to do with it, I killed him - he was a punk and deserved to die." While hearing this Jim got up and walked to the other side of the bar - he didn't want to get involved.

I proceeded ask Ray what he was talking about. Ray repeated himself stating he de (Rick) deserved to die and that he did it for Niesse (Denise Schub Ray also told me that Denise was standing right where I was when

_pg 2_

_Marcy McIntosh_
Affiant Signature

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _16th_ DAY OF _November_ 20_05_.

_Jacqueline S. Shoblom_
Notary Public

"OFFICIAL SEAL"
Jacqueline S. Shoblom
Notary Public, State of Illinois
My Commission Exp. 05/24/2008

119

STATE OF ILLINOIS )
)SS
COUNTY OF )

## AFFIDAVIT

I Marcy Mc Intosh , being first duly sworn under oath, depose and state that the following information within this affidavit is true and correct in substance and in facts:

he told her wait right there, while he went outside & killed Rick.

In his next breath, Ray asked if he could use my van to go to his (Chuc brother's house & get his car. I told him no.

Ray left the bar & later called me on the bar phone. He asked me not to be mad but that he had taken my van & my cell phone and that he would be back before Jim found out. He never showed up that night but picked me up the next morning. (4/5

Ray & Amanda Barbar picked me up at my house (25302 W Hawthorne Antioch IL 60002) in my van and took me ~~~~ to work in Waukegan (Huber Glass) and drop

_(signature)_ Marcy McIntosh
Affiant Signature

pg 3

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 16th DAY OF November 2005.

_(signature)_
Notary Public

"OFFICIAL SEAL"
Jacqueline S. Shoblom
Notary Public, State of Illinois
My Commission Exp. 05/24/2008

20

STATE OF ILLINOIS          )
                           )SS
COUNTY OF                  )

## AFFIDAVIT

I Marcy McIntosh, being first duly sworn under oath, depose and state that the following information within this affidavit is true and correct in substance and in facts:

me off. Ray and Amanda then returned
at about 3:00pm to pick me up.
We then went to the Days Inn Airport
Hotel. Where I got them a room under
my name. & put it on my credit card
This is the hotel that Ray was
arrested in.
     At no time was Ronald Ruhls
name ever mentioned. Ray clearly
stated that "I (Ray) killed him (Rick)

     Ray Serio had a Laptop computer
with naked photos of Denise Schubot
and other bartenders & patrons on it.

_____

_____

**Affiant Signature**

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 16th DAY OF November 2005.

_____
Notary Public

"OFFICIAL SEAL"
Jacqueline S. Shoblom
Notary Public, State of Illinois
My Commission Exp. 05/24/2008

121

## VERIFICATION OF CERTIFICATION

I, Marcy McIntosh, the undersigned, certify and state that:

1.) I am the witness in the above entitled legal matter.

2.) That I have read and fully comprehend the foregoing application and have knowledge of its contents.

3.) Under penalties as provided by law pursuant to section 1-109 of the code of civil procedure, I certify that the statements set forth in the foregoing affidavite are true and correct except as to the therein stated to be on information and belief, and as to such matters I certify that I believe the same to be true.

/S/ Marcy McIntosh

11-16-05

"OFFICIAL SEAL"
Jacqueline S. Shoblom
Notary Public, State of Illinois
My Commission Exp. 05/24/2008

22

122

EDWARD V. EDENS
1212 S. NAPER BLVD.
PMB 158 - SUITE 119
NAPERVILLE, IL  60540
(630) 983-0615
FAX (630) 983-1670

## FAX TRANSMITTAL SHEET

DATE:          JANUARY 29, 2003

TO:            Attorney Brad

FAX NO.        847-566-7540

FROM:          Peggy

# OF PAGES INCLUDING COVER SHEET:    4

REGARDING:

Ronald Ruhl

Please call with any questions.  Mr. Edens has the entire
case with him, indicating that you have these cases in your
office library.

123

Memo

Dear Judge Brown

Attached please find the significant portions of the case of People v. [illegible] 645 N.E. [illegible] and [illegible] House, 162 Ill.2d 317, 643 N.E.2d 236 and People v. House, 141 Ill.2d 323, 566 N.E.2d 259. These cases are extremely long and faxing them in their entirety was not practical.

It is my contention that the threshold issue that the statement of Raymond [illegible] was against penal interest is clearly supported by the evidence adduced at the hearing. If the court holds in this fashion then [illegible] be it may be appropriate to [illegible] additional [illegible] here to demonstrate the indicia of truthfulness as referred to [illegible]. It would be my suggestion that that evidence will be adduced at trial and your ruling in the states motion should be held until such time as we would be calling this witness. To do otherwise seems an extreme misuse of the court's time. I will be present in this court later in the day today if the court believes as my calendar allows.

Thank you for your consideration

[signature]

TRANSMISSION VERIFICATION REPORT

124

TIME : 01/30/2003 01:13

| | |
|---|---|
| DATE,TIME | 01/30 01:10 |
| FAX NO./NAME | 18475667540 |
| DURATION | 00:02:50 |
| PAGE(S) | 03 |
| RESULT | OK |
| MODE | STANDARD |

Ex. M  125

STATE OF ILLINOIS )
                         )SS
COUNTY OF          )

## AFFIDAVIT

I Jim Natywa , being first duly sworn under oath, depose and state that the following information
within this affidavit is true and correct in substance and in facts:

On april 4th 2002 I was working at Whiplash Tavern
with my fiancee Marcy McIntoch, when Ray Serin entered
the bar. He began to tell Marcy & I that he was just
released from Lake Co. on questioning of the death of
Rick Newbauer. Then Marcy ask why Lake Co. was
questioning him. Ray said "I killed him". Rick was
a punk & deserved to die. I turned around and
walked to the other end of the bar. I didn't
want to hear anymore.

Ray Serio had a laptop computer with naked
photo's of Denise Schubat and other Female bartenders
and patrons which i saw.

Jim Natywa
Affiant Signature

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 16th DAY OF November 2005.

Jacqueline S. Shoblom
Notary Public

"OFFICIAL SEAL"
Jacqueline S. Shoblom
Notary Public, State of Illinois
My Commission Exp. 05/24/2008

126

## VERIFICATION OF CERTIFICATION

I, _Jim Natyua_ , the undersigned, certify and state that:

1.) I am the witness in the above entitled legal matter.

2.) That I have read and fully comprehend the foregoing application and have knowledge of its contents.

3.) Under penalties as provided by law pursuant to section 1-109 of the code of civil procedure, I certify that the statements set forth in the foregoing affidavite are true and correct except as to the therein stated to be on information and belief, and as to such matters I certify that I believe the same to be true.

11-16-07

> OFFICIAL SEAL"
> Jacqueline S. Shoblom
> Notary Public, State of Illinois
> My Commission Exp. 05/24/2008

/S/ Jim Natyua

24

Ex. N   127

**STATE OF ILLINOIS** )
)SS
**COUNTY OF** LAKE )

## AFFIDAVIT

I Jennifer Slobbom being first duly sworn under oath, depose and state that the following information within this affidavit is true and correct in substance and in facts:

I Jennifer Slobbom have known Denises Soldubat for about 13 years. We were very good friends. We went shopping, vacations, hang out and talked almost daily. I also was friend with Rick Nevoubr. I was with denise often when she would talk with Rick on the phone. He was very verbaly abusive, and there were Bruises on denise that were suspicious. their relationship was unpredictable very up and down.

On the night of January sixth 2002 I recieved a phone call from Sandra Morton. She informed me of Rick's death and said she would be right over so we could go to Denises house.

NOTARY PUBLIC
OFFICIAL SEAL
STATE OF ILLINOIS
Madelyn Friedberg
My Commission Expires
July 10, 2009

Affiant Signature

**SUBSCRIBED AND SWORN TO BEFORE ME**
**THIS** 10th **DAY OF** Nov 2005

**Notary Public**

82

**STATE OF ILLINOIS**          )
                               )SS
**COUNTY OF**                  )

128

## AFFIDAVIT

I Jennifer Shablon being first duly sworn under oath, depose and state that the following information within this affidavit is true and correct in substance and in facts:

Sandra and I showed up at Denise's home to find she (Denise) was not there. Her mother instructed us to go to Whiplash and tell them she would not be at work that night. Sandra and I got there, knew one was there. We got out and looked in the window of the back door to see if we could see anything, but it was dark. Bar was closed. Soon Ray pulled up. We walked in with him and told him about Denise and Rick. Ray's personality was weird.

The evening of January Seventh 2005 had a party at my home. Denise was there she seemed off her usual and vomiting a lot. Ray showed up too. Denise did not seem afraid of him at all or I would not have let him in.

Affiant Signature

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 16 DAY OF Nov 20 05

_____
Notary Public

Madelyn Freedberg
My Commission Expires
July 10, 2008

NOTARY PUBLIC
OFFICIAL SEAL
STATE OF ILLINOIS

83

129

**STATE OF ILLINOIS** )
)SS
**COUNTY OF** )

## AFFIDAVIT

I Jennifer Shoblom being first duly sworn under oath, depose and state that the following information within this affidavit is true and correct in substance and in facts:

On the night of Rick's wake, I worked at Kempf's Resort. After attending Rick's wake and working, I had another gather at my home. Which denise and her friend Jaimie Hoson had showed up. Cita Ray also was there.

I was asked to show up as a witness at Ron Ruhl's trial. When asked by Ed Edens how I knew Ray, I answer I really Don't. Ed Edens then said what are you doing here.



Madelyn Freedberg
My Commission Expires
July 10, 2009

**SUBSCRIBED AND SWORN TO BEFORE ME**
**THIS** 16th **DAY OF** Nov 2005

**Affiant Signature**

**Notary Public**

84

## VERIFICATION OF CERTIFICATION

130

I, _Jennifer Shoblom_, the undersigned, certify and state that:

1.) I am the witness in the above entitled legal matter.

2.) That I have read and fully comprehend the foregoing application and have knowledge of its contents.

3.) Under penalties as provided by law pursuant to section 1-109 of the code of civil procedure, I certify that the statements set forth in the foregoing affidavite are true and correct except as to the therein stated to be on information and belief, and as to such matters I certify that I believe the same to be true.



11-16-05
Notary

NOTARY PUBLIC
OFFICIAL SEAL
STATE OF ILLINOIS

Madelyn Freedberg
My Commission Expires
July 10, 2009

130 A

130A

**WEEKLY TIME REPORT** FOR WEEK ENDING 2-16

NAME Denise                                     NO.

DEPARTMENT Bar                    TOTAL REGULAR TIME FOR WEEK

                                  TOTAL OVERTIME FOR WEEK

IN ORDER THAT WE MAY COMPLY WITH THE WAGE-HOUR LAW, EACH EMPLOYEE IS REQUIRED TO FILL IN
THE TIME WORKED EACH DAY, AND IF AWAY IN THE WORKING HOURS, SHOULD BE MAIL THE USE OF THIS TIME, SHOULD BE MAIL IN THE BACK OF HER CARD

| | | MONDAY | | TUESDAY | | WEDNESDAY | | THURSDAY | | FRIDAY | | SATURDAY | | SUNDAY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. |
| MORNING | IN | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | |
| AFTERNOON | IN | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | |
| EVENING | IN | | | | | | | | | | | | | | |
| | OUT | | | 10 30 | 6 30 | | | | | | | | | | |
| | | | | 11 30 | 7 00 | | | | | | | | | | |
| TIME WORKED EACH DAY | | | | 5 | 12 | 7 | HOURS | | | | | | | | |

SOCIAL SECURITY ACCOUNT NUMBER

FORM NO. 2017                                62.50 P'D BY

MADE IN U.S.A.

130 B

WEEKLY TIME REPORT FOR WEEK ENDING 3-2-02    NO.

NAME Denise Schubert

TOTAL REGULAR TIME FOR WEEK

TOTAL OVERTIME FOR WEEK

DEPARTMENT

IN ORDER THAT WE MAY COMPLY WITH THE WAGE-HOUR LAW, EACH EMPLOYEE IS REQUIRED TO FILL IN THE TIME WORKED EACH DAY AS SHOWN. AT THE END OF THE WEEK, IF CALLED AWAY DURING WORKING HOURS, INDICATION OF THIS TIME SHOULD BE MADE ON THE BACK OF THIS CARD.



| | | MONDAY | | TUESDAY | | WEDNESDAY | | THURSDAY | | FRIDAY | | SATURDAY | | SUNDAY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. |
| MORNING | IN | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | |
| AFTERNOON | IN | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | |
| EVENING | IN | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | |
| TIME WORKED EACH DAY | | | | | | | | | | | | | | | |

SIGNED _____  Ihrs    8hrs    CK'D BY _____

SOCIAL SECURITY ACCOUNT NUMBER

WHITE FORM NO. 3077    MADE IN U.S.A.

Renewed
subscriptions
page 3-2-08

149 B

130 c

130 c

WEEKLY TIME REPORT FOR WEEK ENDING 2/23/002

NAME Denise Schubat

| | | MONDAY | | TUESDAY | | WEDNESDAY | | THURSDAY | | FRIDAY | | SATURDAY | | SUNDAY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. |
| MORNING | IN | | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | | |
| AFTERNOON | IN | | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | | |
| EVENING | IN | | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | | |
| TIME WORKED EACH DAY | | 7 | | 5 | 1/2 | | | | | | | | | | |

SIGNED Denise Schubat

149 c.

1300

130p

WEEKLY TIME REPORT  FOR WEEK ENDING  3/16/02                     NO.

NAME  [illegible]                                    TOTAL REGULAR TIME FOR WEEK

DEPARTMENT                                           TOTAL OVERTIME

| | | MONDAY | | TUESDAY | | WEDNESDAY | | THURSDAY | | FRIDAY | | SATURDAY | | SUNDAY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. |
| MORNING | IN | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | |
| AFTERNOON | IN | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | |
| EVENING | IN | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | |
| TIME WORKED EACH DAY | | | | | | | | | | | | | | | |

SOCIAL SECURITY ACCOUNT NUMBER

FORM NO. 3017                                                    MADE IN U.S.A.

130 E

130 E

| WEEKLY TIME REPORT FOR WEEK ENDING 3-23-02 | | | | | | | | | | | | | | NO. | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NAME Denise Schubat | | | | | | | | TOTAL REGULAR TIME FOR WEEK— | | | | | | | |
| DEPARTMENT | | | | | | | | TOTAL Overtime FOR WEEK— | | | | | | | |
| IN ORDER THAT WE MAY COMPLY WITH THE WAGE-HOUR LAW, EACH EMPLOYEE IS REQUIRED TO FILL IN THE TIME WORKED EACH DAY, AND TURN IN THE RECORD AT THE END OF THE WEEK. IF CALLED AWAY DURING WORKING HOURS, NOTATION OF THIS TIME SHOULD BE MADE ON THE BACK OF THIS CARD. | | | | | | | | | | | | | | | |
| | | MONDAY | | TUESDAY | | WEDNESDAY | | THURSDAY | | FRIDAY | | SATURDAY | | SUNDAY | |
| | | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. |
| MORNING | IN | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | |
| AFTERNOON | IN | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | |
| EVENING | IN | | | | 6:00 | | 10:00 | | | | | | | | |
| | OUT | | | | 12:30 | | | | | | | | | | |
| TIME WORKED EACH DAY→ | | | | | | 6 1/2 | | | | 8 | | | | | |

SOCIAL SECURITY ACCOUNT NUMBER _____

FORM NO. 3017                                    MADE IN U.S.A.

SIGNED _____                    CK'D BY: _____

Exhibit 130.F

130F

Time Cards of Schubert from Whiplash bar



WEEKLY TIME REPORT FOR WEEK ENDING 3/29/08          NO.

NAME Dense

TOTAL REGULAR TIME FOR WEEK

DEPARTMENT

TOTAL OVERTIME FOR WEEK

IN ORDER THAT WE MAY COMPLY WITH THE WAGE-HOUR LAW, EACH EMPLOYEE IS REQUIRED TO FILL IN THE TIME WORKED EACH DAY AND TURN IN THIS SLIP, SIGNED, AT THE END OF THE WEEK. IF CALLED AWAY DURING WORKING HOURS, NOTATION OF THIS TIME SHOULD BE MADE ON THE BACK OF THIS CARD.

| | | MONDAY | | TUESDAY | | WEDNESDAY | | THURSDAY | | FRIDAY | | SATURDAY | | SUNDAY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. | HR. | MIN. |
| MORNING | IN | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | |
| AFTERNOON | IN | | | | | | | | | | | | | | |
| | OUT | | | | | | | | | | | | | | |
| EVENING | IN | | | | | | | | | | | | | | |
| | OUT | | | | | | | 12 00 | | | | | | | | |
| TIME WORKED EACH DAY | | | | | | | | | | | | | | | |

SOCIAL SECURITY ACCOUNT NUMBER

FORM NO. 8017                                                    MADE IN U.S.A.



149 F

STATE OF ILLINOIS )
)SS
COUNTY OF )

Ex.O 131

### AFFIDAVIT

I, Scott Owes, being first duly sworn under oath, depose and state that the following information within this affidavit is true and correct in substance and in facts:

One day after Richard Newbauer's death, Monday January 7 2002, Denise Shubat showed up at a small gathering at Jennifer Shobloms home. Denise & Ray Serio were at the gathering at the same time. I could not say they arrived together but saw them both within a five minute period of time. About One AM

I have known Denise Schubat for about 12 years. In the time she was involved with Richard Newbauer they never seemed stable, and she had complained of him being physical from time to time. When Denise started working at Whiplash, her and I stopped talking. Since this Incident I have not, nor wish to have any contact with her.

Describing Denise Schubat as a person, I would say she is a Dishonest person that uses her femininity to get what she wants from whoever she wants it.

_Affiant Signature_

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _16th_ DAY OF _November_ 2005.

_Notary Public_

"OFFICIAL SEAL"
Jacqueline S. Shoblom
Notary Public, State of Illinois
My Commission Exp. 05/24/2008

86

## VERIFICATION OF CERTIFICATION

152

I, _Scott Owens_ , the undersigned, certify and state that:

1.) I am the witness in the above entitled legal matter.

2.) That I have read and fully comprehend the foregoing application and have knowledge of its contents.

3.) Under penalties as provided by law pursuant to section 1-109 of the code of civil procedure, I certify that the statements set forth in the foregoing affidavite are true and correct except as to the therein stated to be on information and belief, and as to such matters I certify that I believe the same to be true.

11-16-05

/s/

"OFFICIAL SEAL"
Jacqueline S. Shoblom
Notary Public, State of Illinois
My Commission Exp. 05/24/2008

REPORT : P01

LAKE COUNTY CIRCUIT CLERK
COURT CALENDAR WORKSHEET FOR COURT CLERK
01/14/2002
COURTROOM 120

DATE: 01/11/2002
PAGE: 23

CASE NUMBER        TITLE                                    FILED          STATUS

01CF00004223       PEOPLE VS NEUBAUER
ASSIGNED JUDGE     SCHOSTOK, MARY S.
CHARGE/DISP/SENTENCE COUNT  1                  MANU/DEL 01-15 GR COCAINE/MMLG CLASS: 1 720 ILCS 570/401(C)(2)
                                              POSS ANT CON SUB EXCEPT(A)/(D) CLASS: 4 720 ILCS 570/402(C)

                                                                12/18/2001        ACTIVE
                                                             ARRESTING AGENCY LAKE COUNTY SHERIFF
                                                             AC    DOMESTIC BATTERY/BODILY HARM
                                                                   DOMESTIC BTRY/PHYSICAL CONTACT
                                                                   KNOWINGLY DAMAGE PROP<$300

OTHER CASES        98CM0007131       NEUBAUER, RICHARD A.

PARTY/ATTY
LAST CT APPRS      12/18/2001
ATTENDEES          NEUBAUER, RICHARD A.
                   WALDECK, JOSEPH R.
                   DAY, FREDERICK C.
                   HANSEN, JENNIFER,
                   NEUBAUER, RICHARD A.                     DEF    BRODSKY, DAVID P.
                      DEF PRESENT IN CUSTODY
                   LAKE COUNTY SHERIFF
                                                            PRESIDING JUDGE
EVENTS             APPOINT PUBLIC DEFENDER                  STATE'S ATTORNEY       YES PRESENT
                   BOND HEARING                             PUBLIC DEFENDER
                   GERSTEIN HEARING                         PARTY                  YES PRESENT
                   BOND SET
                       10% OF $7,500.00 ALONG WITH 98CM7131,01CF4223 – DEF TO BE
                       RELEASED TO PRETRIAL SERVICES – DEF ORDERED NOT TO CONSUME ANY
                       ALCOHOL OR DRUGS – DEF ORDERED TO SUBMIT TO RANDOM TESTING –
                       SAID TESTING TO BE PAID FOR BY THE DEF – DEF ORDERED TO ABIDE
                       BY A (24) HOUR CURFEW WITH THE EXCEPTION OF WORK – DEF
                       ORDERED TO HAVE NO NEGATIVE CONTACT WITH THE VICTIM
                   SET PRELIMINARY HEARING DATE
                       FILE DEMAND FOR SPEEDY TRIAL
                   REMAND

CUR CT APPRS       01/14/2002    01:30P
EVENTS             PRELIMINARY HEARING                                             YES PRESENT
                                                                                   YES PRESENT
                                                                                   YES PRESENT
                                                                   SET

TOTAL DUE

91



11/03/1998

99F 00000224
SUPRT CLOSED

172

134

CASE (DISPOSITION) SHEET    04/27/1999    PAGE

SCHUBAT VS NEUBAUER
SANTI, EMILIO B.

SCHUBAT, DENISE

NEUBAUER, RICHARD A.

| | | PETITIONER | PARTIES |
| | | RESPONDENT | |

| | | COURT APPEARANCES | |
06/24/1999            C107        01:30P
PRESENT    SANTI, EMILIO B.                    PRESIDING JUDGE

EVENTS    STATUS OF SERVICE

PRESENT    SANTI, EMILIO B.        C107        06:00A        STRICKEN ABSENT
           NEUBAUER, RICHARD A                               PRESIDING JUDGE
                                                             RESPONDENT

EVENTS    STATUS OF SERVICE                    YES PRESENT
          SET SUPPORT PAYMENTS                 YES PRESENT

| DATE | CATEGORY | PAPERS FILED TYPE | ACTION |
|------|----------|-------------------|--------|
| 04/27/1998 | PETITION | | FILED |
| 04/27/1999 | SUMMONS | SUPPORT | ISSUED |
| 06/14/1999 | SUMMONS | | RETURNED |
| 07/06/1999 | ALIAS SUMMONS | | ISSUED |
| 07/27/1999 | ALIAS SUMMONS | | RETURNED |
| 08/26/1999 | NOTICE | FOR WITHHOLDING SUPPORT | FILED |
| 08/28/1999 | ORDER | | FILED |
| 08/15/1999 | PROOF OF SERVICE | | FILED |
| 08/18/1999 | NOTICE | FOR WITHHOLDING | FILED |

EX. C

Case 1:08-cv-04883 Document 6-4 Filed 09/02/2008 Page 38 of 139

# LA COUNTY SHERIFF'S DEPARTMENT

## SUPPLEMENTARY REPORT

| PAGE 1 OF 1 | | 1. COMPLAINT # 99-12679 |
|---|---|---|

| DATE BY | TIME | DATE OR COMPLAINANT/REPORTING PERSON |
|---|---|---|
| 10/08/99 | 3:00 PM | Schubet, Denise K. |

Criminal Damage to Property

The following supplemental reflects additional information to the above captioned incident originally reported to Deputy KUSSMANN on Thursday:

On 09/07/99, this R/I spoke with the complainant, Denise K. Schubet, who reported that she had gone to the residence at 24079 W. Grand Avenue, the NEUBAUER (sp.) residence, to pick up her daughter Ashley, 19-months old, who was left in the care of Nancy NEUBAUER (sp.). As she began leaving backing out of the driveway with her vehicle, Richard A. NEUBAUER (sp.), the listed offender and Ashley's father, began yelling at her for no apparent reason and Nancy Neubauer had reportedly ___ gone inside the residence and was not present at this time.

Mr. Neubauer, who had just arrived, did begin without provocation yelling at the complainant. In an effort to avoid any further confrontation, the complainant backed up to leave. At this time, Mr. Neubauer approached the complainant and placed a lit cigarette on her left forearm.

As the complainant continued reversing to leave the area, Mr. Neubauer went to his vehicle, retrieved a set of keys, ran up towards the vehicle that the complainant was driving and scratched the paint on the rear passenger side of the complainant's vehicle.

Photos of the vehicle the complainant was driving, as well as Ms. Schubet's injuries, were taken by Deputy ANDERSON, and the complainant expressed her desire to follow through on this matter via criminal prosecution.

On 10/08/99, Ms. Schubet provided with an estimate of costs to repair the damage to the vehicle she was driving, namely, a 1996 Chevy ___ blue in color, Illinois license #C 503 675. The estimate is from Bodycraft, Inc., 40 W. Route 173, Antioch, dated 09/30/99. Cost to repair the damage is $237.68.

End of report.
/pkn

| REPORTING OFFICER: Det. Kevin Hibiki | 501 | APPROVING SUPERVISOR | DATE 10/8/99 | TIME 1500 |
|---|---|---|---|---|

Records

136

LAKE COUNTY SHERIFF'S DEPARTMENT
SUPPLEMENTARY REPORT

| PAGE | OF | PAGES | | | COMPLAINT # |
|------|----|----|----|----|----|

99 - 10267

CRIMINAL DAMAGE TO VEHICLE

ON ABOVE DATE AND TIME I MET WITH A.S.A.
Amy False, SHE REVIEWED THE ABOVE REPORT. SHE _____
CHARGES FOR MISDEMEANOR CRIMINAL DAMAGE TO _____
AGAINST _____ SCENE. I OBTAINED
WARRANT # 99CA531 _____

AFTER OBTAINING THE WARRANT I TURNED
ST. OVER TO THE LAKE COUNTY SHERIFFS OFFICE
WARRANTS DIVISION. OFF. _____ ENTERED INTO
LEADS.

136



THE COMP REPORTED THAT AT APPROX 9:45 A.M. THIS DATE SHE WENT TO PICK UP HER DAUGHTER AT 24076 W. GRAND AVE LAKE VILLA, WHERE SHE (COMP) HAD LEFT HER DAUGHTER WITH THE GRANDMOTHER LAST NIGHT. SHE (COMP) SHOWED UP AT THE HOUSE. (THE OFFENDER (ALSO SHOWED UP) OF THE COMP DAUGHTER) THE OFFENDER IS THE FATHER THE COMP, SHE GOT INTO HER VEHICLE, AND THE OFFENDER APPROACHED THE COMP AND PUT A CIGARETTE (LIT) ON HER LEFT FOREARM, LEAVING A SMALL BURN ON THE COMP'S ARM. THE COMP TRIED TO PULL AWAY AND THE OFFENDER THE PASSENGER SIDE Det REAR QUARTER PANEL WITH A KEY. COMP THEN WAS ABLE TO GET OUT OF THE DRIVEWAY AND AWAY FROM THE OFFENDER.

REPORTING OFFICER (R/O) WENT TO THE RESIDENCE AT 24076 W. GRAND THE OFFENDER WAS NOT THERE HE WAS IN COURT (CZION) ON A CIVIL MATTER. R/O COULD (107) BUT DEPUTY SHOWN THE COURT OFFICER SAID THAT THE OFFENDER HAS HAD ALREADY BE CALLED, AND (OFFENDER) AND LEFT THE COURTHOUSE.

A COPY OF THIS REPORT WILL BE SENT TO D.F. MAKE WILL...

DET ALSO...
AS A ET ACTIVITY PHOTO'S OF THE COMP'S ARM AND PHOTO'S OF THE DAMAGES VEHICLE. THE VEHICLE THAT WAS DAMAGED IS A CHEVROLET BLAZER, BLUE COLOR, LICENSE PLATE ILLINOIS 2758...VIN 16 NESI8W PRONT

MISD. WARRANT                    **I N F O R M A T I O N** 99 ___ 7131

Now come the People of the State of Illinois, by MICHAEL J. WALLER,

STATE'S ATTORNEY OF LAKE COUNTY, ILLINOIS, and do hereby charge upon

information and belief that on or about ___AUGUST 26, 1999___,

19 ___, in Lake County, Illinois, ___RICHARD A. NEUBAUER, DOB: 12/27/74___,

hereinafter called the defendant(s), committed the offense(s) of:
  CT. 1, **DOMESTIC BATTERY, 720 ILCS 5/12-3.2(a)(1), CLASS A**
  ~~CT. 2, DOMESTIC BATTERY, 720 ILCS 5/12-3.2(a)(2), CLASS A~~
  CT. 3, **CRIMINAL DAMAGE TO PROPERTY, 720 ILCS 5/21-1(1)(a), CLASS A**

in violation of Section _____, Chapter _____, of the Illinois

Revised Statutes, in that the said defendant(s)

CT. 1, in that the said defendant knowingly and without legal justification
caused bodily harm to Denise K. Schubat, a family member or household member
of the defendant, in that the defendant touched Denise Schubat about the arm
with a lighted cigarette.
CT. 2, in that the said defendant without legal justification, knowingly made
contact of a provoking or an insulting nature with Denise Schubat, a family
member or household member of the defendant, in that the defendant touched
Denise Schubat about the body with a lighted cigarette.
CT. 3, in that the said defendant knowingly damaged property of Denise
Schubat, being a 1994 Chevrolet Blazer, without Denise Schubat's consent, the
damage being less than $300.00.

MAKI/LCSO
FOY/RLD

Contrary to the form of the statutes in such case made and provided and
against the peace and dignity of the People of the State of Illinois.

MICHAEL J. WALLER
STATE'S ATTORNEY OF LAKE COUNTY

By: _____
ASSISTANT STATE'S ATTORNEY

Subscribed and sworn to before me on ___10-13-___, 19 99.

OFFICIAL SEAL
REBECCA L. DELFIN
Notary Public, State of Illinois
My Commission Expires 11/18/02

_____
NOTARY PUBLIC

Ex Parte Hearing Held and Probable Cause Found.
Warrant Issued - Bond set in the amount of: $ 30,000.00

**1. COMPLAINT #** 01-17795

AGE 2 OF 2 PAGES

| | | DAY | DATE OF THIS REPORT | TIME | | NAME OF COMPLAINANT-REPORTING PERSON |
|---|---|---|---|---|---|---|
| ☒ FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT | ☐ FORM USED TO REPORT FOLLOWUP INFORMATION OR SUPPLEMENTAL INFORMATION | MO | 01701 | 508 | AM | R. CCSO. OG. Rookie 22 |

☐ END OF REPORT CONTINUED  ☒ OFFENSE  ☒ ARREST  ☐ FOLLOWUP OR SUPPLEMENTARY

CORRECT OFFENSE OR INCIDENT CLASSIFICATION: Poss of controlled substance  CHANGED ☐ YES

I Responded to a vehicle accident in which
MR. NEUBAUER who was wanted on a
Lake-county warrant # 97CM2131.

I took MR. NEUBAUER into custody and
checked him for weapons, after only finding
a cell-phone and keys I placed him
in my marked squad car.

After I completed the accident Report I
Transported MR. NEUBAUER to the Lake
County jail.

Upon arrival to the jail, corrections
officer Steuine collected NEUBAUERS
property for booking, during the process
it was discovered that NEUBAUER had
inside one of his cargo pants pockets
five bags and a plastic container, both
containing white substance later field tested
positive for cocaine.

I asked NEUBAUER if he had any more
contraband on him, and he pulled out
another bag of cocaine from within
his shoe.

I made contact with states attorney Glavin
who approved charges of possession and
intent to deliver of a controlled substance.
End of Report.

| 13. CONT. ON CONT. FORM ☐ | 14. ARREST MADE YES ☒ NO ☐ | 15. REPORTING OFFICER WILL FOLLOW UP YES ☐ NO ☒ | 16. WARRANT OBTAINED YES ☐ NO ☒ DENIED ☐ |
|---|---|---|---|

Ex.P 140

STATE OF ILLINOIS )
) SS
COUNTY OF LAKE )

FILED
AUG 2 9 2002

IN THE CIRCUIT COURT OF THE NINETEENTH
JUDICIAL CIRCUIT, LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )
)
vs. )
)
)
RAYMOND SERIO )

GEN. NO.    02 CF 2182

## MOTION TO WITHDRAW AS ATTORNEY OF RECORD

Comes now Lake County Public Defender, David Brodsky, by Assistant Public Defender John Bailey and Special Public Defender Michael Simmons, and asks this Honorable Court for leave to withdraw as counsel of record in this cause and as grounds for said request alleges and states:

1.    That your petitioner, the undersigned attorney, was appointed by this Court to represent the Defendant, Raymond Serio, who is charged with first degree murder.

2.    That an Assistant Public Defender who shares the same office, secretary, and investigator as the undersigned represented Amanda Barbaro in 02 CF 1272. Ms. Barbaro is included on the State's list of witnesses. The discovery contains Ms. Barbaro's signed statement implicating the Defendant in the instant case. The Public Defender's Office was appointed to represent Ms. Barbaro on April 10, 2002 and continued to represent her until June 28, 2002. During the course of this representation, the Public Defender's Office became aware of information it might not have otherwise obtained regarding this potential witness, including information

directly related to her involvement in Defendant Serio's case.

3. ~~That the same Assistant Public Defender as the undersigned represented William Niemi in 01 CF 46 and 01 CF 1370. Mr. Niemi is included on the State's list of witnesses. The discovery~~ contains a police report indicating that Mr. Niemi allegedly overheard the Defendant ~~making admissions in the instant case~~. The Public Defender's Office represented Mr. Niemi from January 12, 2001 through October 1, 2001 on 01 CF 46 and from April 29, 2001 to May 9, 2002 on 01 CF 1370. During the course of this representation, the Public Defender's Office became aware of information it might not have otherwise obtained regarding this potential witness.

4. The Public Defender's Office represented Richard Neubauer, the alleged victim in the case, in 01 CF 4223 from December 18, 2001 until January 14, 2002.

5. That the interests of the parties are in direct actual conflict. The Public Defender cannot represent both of the parties without the appearance of impropriety.

WHEREFORE, the Defendant prays that this Honorable Court grant the following relief:

1. Grant the undersigned leave to withdraw as the attorney for the Defendant.

2. Appoint competent conflict counsel for the Defendant.

Respectfully submitted,

John Bailey, Assistant Public Defender

LAKE COUNTY PUBLIC DEFENDER'S OFFICE
15 S. County Street
Waukegan, Illinois 60085
(847) 377-3360

92

Case 1:01-cv-04981 Document 632 Filed 09/02/2008 Page 62 of 120

## Left Ticket

No. TRAFFIC COMPLAINT AND ARREST TIC.

#2001-25631

STATE OF ILLINOIS
COUNTY OF LAKE
CITY OR VILLAGE OF WAUKEGAN, ILL.

SS

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT,
LAKE COUNTY, ILLINOIS

No. E 143052

COMPLAINT

The undersigned says that

On SATURDAY the 28TH day of _____, 20 01, at 4:22 P. M.

Name WILLIAM I. NIEMI

Address 43 N. ELMWOOD

City WAUKEGAN State IL Zip 60085

Phone No. (847) 623-7962 Birthdate 11/30/57

Social Security No. 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

did in the City or Village of WAUKEGAN, ILLINOIS

Lake County, State of Illinois unlawfully commit the
following offenses

UNLAWFUL POSSESSION OF A CONTROLLED
SUBSTANCE

(Described) NIEMI KNOWINGLY POSSESSED A
WHITE ROCK LIKE SUBSTANCE BELIEVED
TO BE COCAINE

In violation of Section 570/402(c) Chapter 720 ILCS

of the X Illinois Revised Statutes
_____ Ordinance of the City or Village
of _____

Dated this 28TH day of APRIL, 20 01.

Signature and Identification of Officer or other
Complainant

YOU ARE DIRECTED TO REPORT TO

PROBABLE CAUSE HEARING WAUKEGAN, ILLINOIS

ON THE _____

STREET _____ CITY WAUKEGAN, ILLINOIS

DAY OF _____ AT _____ M

NOTICE THE COURT WILL ISSUE A WARRANT FOR THE ARREST OF ANY DEFENDANT

## Right Ticket

No. TRAFFIC COMPLAINT AND ARREST TIC.

#2001-25631

STATE OF ILLINOIS
COUNTY OF LAKE
CITY OR VILLAGE OF WAUKEGAN, IL.

SS

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT,
LAKE COUNTY, ILLINOIS

No. E 143053

COMPLAINT

The undersigned says that

On SATURDAY the 28TH day of _____, 20 01, at 4:22 P. M.

Name WILLIAM I. NIEMI

Address 43 N. ELMWOOD

City WAUKEGAN State IL Zip _____

Phone No. (847) 623-7962 Birthdate _____

Social Security No. 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

did in the City or Village of WAUKEGAN, ILLINOIS

Lake County, State of Illinois unlawfully commit the
following offenses

UNLAWFUL POSSESSION OF DRUG
PARAPHERNALIA

(Described) NIEMI KNOWINGLY POSSESSED AN ITEM
OF DRUG PARAPHERNALIA WITH THE INTENT TO USE
IT IN TRAFFICING OR OTHERWISE INTRODUCING A
CONTROLLED SUBSTANCE INTO THE HUMAN BODY,

In violation of Section 600/3.5 Chapter 720 ILCS

of the X Illinois Revised Statutes
_____ Ordinance of the City or Village
of _____

Dated this 28TH day of APRIL, 20 01.

Signature and Identification of Officer or other
Complainant

YOU ARE DIRECTED TO REPORT TO

PROBABLE CAUSE HEARING WAUKEGAN, ILLINOIS

ON THE _____

STREET _____ CITY WAUKEGAN, ILLINOIS

DAY OF _____ AT _____ M

NOTICE THE COURT WILL ISSUE A WARRANT FOR THE ARREST OF ANY DEFENDANT

Ex. Q 143

STATE OF ILLINOIS       )
                        ) SS
COUNTY OF _____ )


## AFFIDAVIT

I, Ronald Buhl _____ being first duly sworn under oath depose and state
that the foregoing is true and correct and made upon my personal knowledge and I
am competent to testify thereto.

1) I am incarcerated on the above judgment and Convicted in the Illinois
department of Corrections

2) Before I hired Edward Edens to defend me in this case, I had
asked him if he has handled cases as the one I was being Charged with,
He told me he had tried twenty (20) murder cases and won 19 of them
and was the other one on appeal and for me not to worry about anything
as he could handle everything. This conversation took place in the
non-contact visiting room of lake County jail and his alleged experience
and record is why I retained him to defend me.

3) I tendered money through my finance to my trial Counsel, Edward
Edens to conduct an investigation into this matter, Specifically to
have performed a drive-time test from Whiplash Bar to the Renaissance
Faire with a return to Denise Schubuts home. Edens told me
that the investigator had done this drive time and video taped it —
( Continued on page 2 )

_____
                    **AFFIANT**

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY _____, 20____


_____
NOTARY PUBLIC

3

After the State put on the detective saying the drive time could not have been done by Schubat, I asked Edens where the video tape and investigator was, at that time he informed me he didn't have either.

4) I tendered to my attorney the names of individuals who had been present when Ray Serio had admitted killing Richard Neubauer, I tendered to my attorney the names of witnesses who would testify to the relationship between Serio, the killer and Schubat, his accomplice.

I tendered to my attorney names of friends and family to testify as to my Character and 15 years of employment. With the exception of one witness (Mc Intosh) none of those witnesses where ever interviewed or even contacted by my attorney prior to trial or testified.

5) At no time did my attorney discuss with me my right to testify, I informed him on several occasions that I wanted to testify, After the States rested their case I again informed Edens I wanted to testify on my own behalf, He told me in a very direct voice that I could not testify unless I wanted to spend the rest of my life in prison and when the Court asks me if I want to testify, That I am to tell them No or else there is nothing further he could do for me.

6) Due to my access of a notary public at Stateville Corrections I am forced to submit only the attached Affidavit of Affirmation.

I, Ronald Riehl _____, affiant, do hereby declare and affirm
pursuant to 28 USC 1746, 18 USC 1621, or 735 ILCS 5/109, under penalty of perjury,
that everything contained herein is true and accurate to the best of my knowledge
and belief. I further declare and affirm that the contents of the forgoing
documents are known to me and are accurate to the best of my knowledge and belief.
Finally, I do declare and affirm that the matter at hand is not taken either
frivolously or maliciously and that I believe the forgoing matter is taken in
good faith.

Signed on this 19th day of November, 2005,

_____
Affiant

STATE OF ILLINOIS    )
                     )  SS:
COUNTY OF WILL       )

# A F F I D A V I T

I, **RONALD RUHL**, do hereby swear upon oath, depose and states
that your affiant has read the aforegoing affidavit that he has
subscribed; that your affiant know the contents therein to be true
in substance and in facts.

In support thereof, it is stated:

1. I'm presently incarcerated at the Stateville Correctional
   Center situated in Joliet, Illinois serving an sentence
   imposed by the Circuit Court of Lake County, Illinois.

2. I'm in the process of filing a **pro se** Petition for Leave
   to File a Successive Post-Conviction Petition, and in
   doing so, it is imperative that I mention my vigorous
   attempt to have attorney Brandstrader to file an ineffec-
   tive assistance of appellate counsel/post-trial counsel
   claim against Attorney Jed Stone for failing to properly
   support a meritorious claim with documents.  After the
   appellate Court affirmed my conviction and sentence, I
   retained Attorney Brandstrader to file a Petition for
   Rehearing and represent me throughout the appellate pro-
   cess.  Prior to the preparation of his Petition for Re-
   hearing, I forwarded to him a rough draft of the petition
   requesting that he raise certain viable issues. [See Ex-
   (Exh. U within Habea) hibit 6], which clearly show that I brought this to his
   immediate attention.

3. In addition, Attorney Brandstrader filed my initial post-
   conviction petition "on the final date for filing" **with-
   out** allowing me to review the petition.

4. That all the contentions being raised in the foregoing
   Petition for Leave to File Successive Petition for Post-
   Conviction Relief, Memorandum In Support and Exhibits
   is true and correct.

_____
Ronald Ruhl, affiant

**SUBSCRIBED** and **SWORN** to before me

on this 31st day of July, 2008.

_Phyllis Baker_

OFFICIAL SEAL
PHYLLIS BAKER
Notary Public - State of Illinois
My Commission Expires Feb 07, 2011

211

147

STATE OF ILLINOIS
                    SS
COUNTY OF LAKE

### IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT
### LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS
                    Plaintiff

                    Vs                              No. 02 CF 2183

RONALD RUHL
                    Defendant

### MOTION TO DISMISS

Now comes the defendant Ronald Ruhl, by and through his attorney Edward Edens and requests that this Honorable Court dismiss the pending charges of murder against him.

In support thereof defendant alleges the following:

1.    That he is the defendant in the above captioned case.

2.    That he is in receipt of a substantial amount of states discovery on this cause.

3.    That the evidence alleged in states discovery indicates that the victim died of gun shot to the head causing immediate death.

4.    That the evidence alleged in state's discovery indicates that these shots were fired while the victim and alleged offender were outside of Illinois to wits: Wisconsin

5.    That the crime must have been committed within the state to confer jurisdiction to the State, See People v. Holt, 91 Ill 2d 480,64 Ill. Dec 500,440 N.E.2d 102 (1982) and People v Moreland 292 Ill. App.3d 616,619,686,N.E.2d 597,226 Ill Dec. 814

Further defendant sayeth not.

148

Exhibit, D

COPY

STATE OF ILLINOIS )
                 ) SS
COUNTY OF LAKE   )

IN THE CIRCUIT COURT OF THE NINETEENTH
JUDICIAL CIRCUIT, LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )
                                )
              VS                )         GEN. NO. 02 CF 2183
                                )
RONALD RUHL                     )

## STIPULATION

IT IS HEREBY AGREED AND STIPULATED BETWEEN THE PARTIES:

1. Dr. Maureen Levin is the Medical Examiner for Kenosha County, Wisconsin. On or about January 7, 2002, she performed an autopsy on the victim in this case, Richard Neubauer. Dr. Levin is an experienced forensic pathologist.

2. Dr. Nancy Jones is an experienced forensic pathologist who works for both the Cook and Lake County Coroner's Offices. She reviewed the autopsy findings of Dr. Levin as well as the photographs from the autopsy.

3. Both doctors observed three (3) gunshot wounds to the head of the victim. One was located on the left side of his head just behind the victim's left eye. The bullet from this wound penetrated the brain and was recovered. There were two entrance wounds on the right side of the victim's head. One of these wounds was on the right side of his head behind the right eye. This bullet also penetrated the brain and was removed. The last wound entered the right posterior side of the victim's neck and was removed.

149

4.  Both doctors agree that each gunshot to the brain would have inevitably been fatal without

immediate medical attention due in part to swelling of the brain.  The doctors also agree that

these two wounds would have most likely been fatal even with immediate medical treatment.

The wound to the neck would probably not have been fatal with immediate medical treatment.

This wound would possibly have been fatal without immediate medical attention due to possible

asphyxiation.

DM 233/ DM 236/ KU 152
    Both doctors found that the victim was still alive when the two gunshot wounds to the right side

of the head were inflicted.  This finding assumes that the wound to the left side of the head was

inflicted first.

6.  Both doctors agree that these three (3) gunshot wounds caused the death of the victim.

7.  Victim died within a range of seconds to minutes after last two gunshot wounds.

8.  We stipulate and agree that the first shot was fired in Lake County, Illinois which is the wound

to the left side of the head.  The subsequent wounds were inflicted in Kenosha, Wisconsin.


SO STIPULATED


Edward Eden                                      George Strickland
Attorney for Defendant                          Assistant State's Attorney

150

1    A    The direction the bullet took in the

2    brain, we cannot say anything whatsoever about the

3    person's position or the gun's position, because

4    once a bullet impacts with a hard surface like a

5    bone, which is what the skull is made of, it can go

6    in any direction.

7    Q    All right.  Now, that would be true, would

8    it not, if the bullet was a smaller caliber bullet,

9    like a .22, .25, .32?

10    A    No, it doesn't matter.

11    Q    I mean, if somebody is shooting a .44 or a

12    .45 directly up against your skull, it's not going

13    to retract that much; it's going to go straight

14    through, correct?

15    A    Not necessarily, no.

16    Q    We can say to a reasonable degree of

17    medical certainty that this first bullet, when it

18    hit the individual's head and caused the injury to

19    him, that he was clearly unconscious, correct?

20    A    Yes.

21    Q    But alive?

22    A    Yes.

23    Q    And he remained alive for a period of time

24    until the second and third shots were fired and

236

32

1    beyond, correct?

2        A    I think it would be difficult for me to

3    speculate which shot was first; what the period of

4    time is between the shots.

5        Q    Well, are you saying that you can't say

6    that the shot to the left eye by that left eyebrow

7    was first?

8        A    They are all showing reaction and showing

9    that he is alive, so, no, there is no way that I can

10    say that.

11        Q    So it is possible that all three of these

12    shots were fired in a reasonable time frame to each

13    other?

14        A    Anything is possible.

15        Q    And so the --

16        MR. EDENS:    Let me withdraw that question,

17    Judge, and just think for a moment.

18        Q    Shots number two and three are only number

19    two and three because you have labeled them as such?

20        A    That's correct.

21        Q    They do not denote the time frame in which

22    they were fired?

23        A    No.

24        Q    But we do know that shot number one was

152

1    fired in close proximity, and shots numbered two and

2    three, albeit not time sequentially two and three,

3    but number two and number three designated shots

4    were fired at a distance?

5         A    That's correct.

6         Q    And we do know that -- well, do we know

7    the positioning of the body at the time the second

8    and third shots were fired?  Was the individual

9    seated upright or was he laying forward, down, do we

10   know?

11        A    No, we don't know that.

12        Q    So we can't even tell where the guy was

13   when he was shot?

14        A    From the wounds, we can't say.

15        Q    Is there anything that would indicate to

16   you what that was or what position he was in when he

17   was shot?

18        A    No.

19        Q    Now, you were asked a question as to

20   whether or not you had gone to the crime scene?

21        A    That's correct.

22        Q    You had been at the crime scene, correct?

23        A    I was at the scene of where the body was

24   found.

238

183

1    Q    Okay.  And you are clear that that was

2    where the body was found, but you don't know

3    necessarily that that was where the individual was

4    shot.

5    A    No, I don't know that.

6    Q    And you could not tell that from what you

7    were seeing, correct?

8    A    No.

9    Q    And you had occasion to see where the

10   blood was located within the vehicle, correct?

11   A    I had some occasion, yes.

12   Q    Okay.  But that's not your thing.  You are

13   the pathologist.  You are in forensic pathology.

14   You deal with the body, correct?

15   A    That's correct.

16   Q    You are not a blood spatter expert?

17   A    I am seeking certification in that, but I

18   am not comfortable with those questions in court at

19   this point.

20   Q    Very good.  But to a reasonable degree of

21   medical certainty, the individual did not die --

22   this isn't a bullet to the head with instantaneous

23   death; this is a bullet with death lingering at some

24   point thereafter, right?

239

154

1        A       That's quite possible.

2        Q       Thank you.

3        A       You are welcome.

4                        REDIRECT EXAMINATION

5   BY MR. STRICKLAND:

6        Q       Just briefly, Doctor, is it true that

7   sometimes after a person is shot in the brain area,

8   the body has spasms?

9        A       That's possible, yes.

10               MR. STRICKLAND:  I have no other

11  questions.  Thank you, Doctor.

12               THE COURT:  You may step down.  Thank you.

13                       (Witness excused.)

14               THE COURT:  Next witness, please,

15  Mr. Strickland.

16                       EVERETT JUSTICE,

17  having been first duly sworn, was examined and

18  testified as follows:

19                       DIRECT EXAMINATION

20  BY MR. STRICKLAND:

21       Q       Sir, please state your name and spell your

22  last name for the record.

23       A       Edward Justice, J-u-s-t-i-c-e.

24       Q       What is your occupation?

STATE OF ILLINOIS )
) SS
COUNTY OF LAKE )

IN THE CIRCUIT COURT OF THE NINETEENTH
JUDICIAL CIRCUIT, LAKE COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS )
)
)
VS. ) GEN NO. 02 CF 2183
)
RONALD E. RUHL )

## ORDER

This matter comes before the court on Ronald Ruhl's "Petition for Post Conviction

Relief," under 725 ILCS 5/122-1 *et seq.* The court has reviewed the court file, all relevant

documents in that file, the documents filed by the petitioner in support of his arguments, as well

as the trial transcripts, and thus being fully advised in the premises, FINDS AS FOLLOWS:

### Procedural History

1.     A jury convicted Ruhl ("Petitioner") of first-degree murder for the death of Richard

Neubauer. The court sentenced him to 50 years imprisonment.

2.     Petitioner appealed, and the Appellate Court for the Second District affirmed his

conviction in a Rule 23 Order filed December 15, 2004. *Ruhl*, No. 2-03-0920 (unpublished order

under Sup. Ct. R. 23).

3.     On November 22, 2005, Petitioner, with the aid of private counsel, filed his "Petition

for Post Conviction Relief."

### Petitioner's Arguments

4.     Petitioner argues he is entitled to post-conviction relief based on ineffective

assistance of counsel. Specifically, he alleges his trial counsel:

a.  acted baffled at the complexity of a murder case;

b.  gave incriminating statements to police;

c.  lied about his experience as an attorney;

d.  failed to investigate the case thoroughly, including failing to interview witnesses, corroborate the testimony of one witness and inform Petitioner of the progress he was making;

e.  improperly stipulated to the venue of the court;

f.  made "inconsistent, vulgar and nonsense-like" arguments in his opening and closing statements;

g.  failed to "exclude, or at least limit" certain testimony, and impeach Denise Schubat's testimony;

h.  failed to prepare for the State's "surprise" witness; and finally,

i.  precluded him from testifying on his own behalf.

### Discussion

*The Rules Governing Post-Conviction Proceedings*

5.      Post-conviction petitions are collateral attacks on prior judgments. *People v. Simms*, 192 Ill. 2d 348, 359, 736 N.E.2d 1092, 1105 (2000). Petitions are limited to constitutional issues that a defendant could not have raised on direct appeal. *People v. King*, 192 Ill. 2d 189, 192, 735 N.E.2d 569, 572 (2000). The court can summarily dismiss non-meritorious claims raised by a petitioner. *People v. Richardson*, 189 Ill. 2d 401, 407, 727 N.E.2d 361, 367 (2000). In the first stage of a post-conviction proceeding, a *pro se* petitioner must present the "gist" of a constitutional claim. *People v. Edwards*, 197 Ill. 2d 239, 244, 757 N.E.2d 442, 445 (2001). If the petitioner meets that standard, the court may appoint counsel for the petitioner and allow the

2

State to file a responsive pleading. *Edwards*, 197 Ill. 2d at 245-46. At the second stage, the court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *Id.* at 246. If the petitioner makes such a showing, the petition moves to the third stage of the proceedings, in which the petitioner is entitled to an evidentiary hearing. *Id.*

6.     Where, as here, the post-conviction petition is filed with the aid of counsel and not *pro se*, the Second District has written that the court should still analyze the petition under the "gist standard" in the proceeding's first stage. *People v. Dominguez*, 356 Ill. App. 3d 872, 824 N.E.2d 1232 (2d Dist. 2005) (judgment vacated by 216 Ill. 2d 703 for reconsideration in light of *People v. Blair*, 215 Ill. 2d 427, 831 N.E.2d 604 (2005)). The Second District has noted that analysis under the statutory framework requires a court to analyze whether the petitioner has articulated the gist of a constitutional claim in light of the record. *Dominguez*, 356 Ill. App. 3d at 882. Where the record rebuts the petitioner's claims, a court can dismiss the petition in the first stage of proceedings as frivolous and patently without merit. *Id.*; *see also* 725 ILCS 5/122-2.1(a)(2).

### *The Legal Standard for Ineffective Assistance of Counsel Claims*

7.     To prevail on an ineffective assistance of counsel claim, petitioners must first show that their "counsel's representation fell below an objective standard of reasonableness," and, additionally, that their counsel's performance was so prejudicial that it deprived them of "a trial whose result is reliable." *People v. Albanese*, 104 Ill. 2d 504, 525, 473 N.E.2d 1246, 1255 (1984) (adopting the U.S. Supreme Court's approach in *Strickland v. Washington*, 466 U.S. 668 (1984)).

8.     Regarding objective reasonableness, courts have acknowledged the difficulties inherent in determining whether attorneys have acted reasonably at the time they made their

3



decisions. *Strickland*, 466 U.S. at 689. Because of such difficulties, a strong presumption exists that a "counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* The Illinois Supreme Court has noted that "effective assistance of counsel refers to competent, not perfect, representation," and that "counsel's strategic choices are virtually unchallengeable." *People v. Palmer*, 162 Ill. 2d 465, 476, 643 N.E.2d 797, 802 (1994).

9.     Even where counsel acted objectively unreasonably, ineffective assistance claims will not prevail if a court finds that the petitioner suffered no prejudice based on the errors he asserts. *People v. Palmer*, 162 Ill. 2d 465, 475-76 (1994); *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). A petitioner must show a reasonable probability that, but for counsel's conduct, the results of his case would have been different. *People v. Patterson*, 192 Ill. 2d 93, 122, 735 N.E.2d 616, 633 (2000).

*The Petitioner's Ineffective Assistance of Counsel Claims*

10.     Petitioner appealed his case with the aid of an attorney different from his trial counsel. As such, each of the issues Petitioner now raises could have been raised on appeal. In fact, Petitioner make one ineffective assistance of counsel allegation when he appealed his case. On appeal, and again in his petition, Petitioner claimed that his attorney was ineffective for failing to call one witness, Jim Natywa, who could have corroborated the testimony of another witness, Marcy McIntosh, so that the court might have found the hearsay statement of a co-defendant, Raymond Serio, admissible as a statement against penal interest. McIntosh sought to testify that Serio told her that he killed Neubauer.

11.     The appellate court rejected Petitioner's argument, however, noting first that he failed to support his contention with an affidavit from Natywa. In addition, the court agreed with the

trial court's determination that other criteria, which courts use to weigh the trustworthiness of a hearsay statement, were also lacking. Serio's statement was, therefore, unlikely to be admitted in any case.

12.     Petitioner now presents the court with an affidavit from Natywa. The affidavit, even if it does corroborate McIntosh's testimony, is barred both by *res judicata*, since this issue was addressed on appeal, and waiver, since Petitioner failed to present the affidavit on appeal. "Rulings on issues that were previously raised at trial or on direct appeal are *res judicata*, and issues that could have been raised, but were not, are waived. *People v. Miller*, 203 Ill. 2d 433, 437, 786 N.E.2d 989, 992 (2002).

13.     But even if the court had admitted Serio's statement that he killed Neubauer under the "against penal interest" exception for hearsay, that admission would have been extremely unlikely to change the outcome of Petitioner's trial, since the prosecution's theory was that Serio and Petitioner killed Neubauer in concert with one another. For that reason, Petitioner cannot show a reasonable probability that his case would have been decided differently even had Natywa been called, and Serio's statement admitted.

14.     Petitioner next alleges numerous ways in which his trial counsel failed to adequately investigate his case in preparation for trial. The U.S. Supreme Court has written "a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Of course, under *Strickland*, a Petitioner must also show that any failure to investigate was prejudicial to the Petitioner's case.

15.     Petitioner does not meet either burden here. Petitioner claims his counsel's decisions precluded him from impeaching Denise Schubat and Officer Lamanna, two of the State's



witnesses. However, as the appellate court noted and this court can confirm, "we do not consider the evidence of defendant's guilt to be close." Rule 23 Order at 24. Even if additional investigation might have facilitated a more thorough cross-examination of these witnesses, such additions would not establish a reasonable probability that the results of the trial would have been different.

16.     Petitioner also complains of his counsel's failure to argue the venue of court. This cannot have prejudiced the outcome of Petitioner's trial, however, and does not weigh heavily in favor of ineffective assistance of counsel, since it is a strategic decision. He further alleges his counsel gave incriminating statements to the police and appends a Sheriff's supplementary report. The report, though, clearly indicates that Petitioner himself provided the reporting detective with information suggesting he knew about Neubauer's murder. Counsel's comment— as reported by the detective in his report—may appear inapt, but it does not rise to ineffective assistance of counsel.

17.     Petitioner claims that his trial counsel acted baffled at the complexity of a murder case and made "inconsistent, vulgar and nonsense-like" arguments in his opening statement and closing argument. Counsel's performance was certainly less than perfect; however, perfection is not the standard by which ineffective assistance claims are weighed. This court presided over the case at trial and found counsel's performance to be within the constitutional bounds articulated by both the Illinois and U.S. Supreme Courts. A review of the petition and the full trial record does not change that determination.

18.     Next, Petitioner alleges that his counsel lied to him that he had extensive experience trying murder cases. He supports this contention with part of the record, in which his counsel stated to the court that he mostly does "murders and major drug cases," and the assertion that his

counsel's name does not appear in many cases reported by the circuit or appellate courts. *See* Petitioner's Exh. B. While an attorney commits ethical violations by misrepresenting his experience to a client and court, such misrepresentations do not, per se, constitute ineffective assistance of counsel. *See People v. Lear*, 175 Ill. 2d 262, 274, 677 N.E.2d 895, 900 (1997) ("Having a counsel with limited resources and limited experience is not a circumstance which this court has held to constitute per se ineffective assistance of counsel"). In light of the trial presided over by this court, Petitioner cannot establish that his counsel's claims, even if exaggerated, prejudiced him so as to make the trial's result unreliable.

19.     Petitioner next attacks the evidence presented at trial regarding a telephone call made by Schubat to Neubauer subsequent to Neubauer's death. He claims that phone records do not substantiate that the call was actually made. Detectives testified, however, that they heard Schubat's voice on a voice mail message left on Neubauer's phone, and that the time stamp for that message was approximately 2:43 AM.

20.     Petitioner also claims that his counsel was ineffective for not objecting to hearsay testimony by Derrick Banks regarding Raymond Serio's request that Banks supply Serio a weapon. Petitioner alleges that this violates *Crawford v. Washington*, 541 U.S. 36 (2004). However, the transcript appended to the petition shows that counsel did object to Banks' testimony, and that the objection was overruled as a statement of a co-conspirator. Moreover, the trial occurred prior to the Supreme Court's ruling in *Crawford*, and the rule in *Crawford* has been held not to apply retroactively. *See Bintz v. Bertrand*, 403 F.3d 859, 867 (7th Cir. 2005).

21.     Finally, Petitioner claims his counsel prevented him from testifying on his own behalf. The record clearly rebuts this claim, showing that the court informed Petitioner he could testify and obtaining his express waiver in open court. *See* Trial Transcript at 1053.

7

162

## Conclusion

Based on the preceding paragraphs and in light of the record, the court finds that the Petitioner's arguments are frivolous and patently without merit. Accordingly, the petition for post-conviction relief is dismissed.

ENTERED: _____

Judge James K. Booras

Dated this _____10th of Feb._____, 2006, at Waukegan, Illinois.

1    Ms. Schubat, for several months, kept quiet about

2    what had happened in this case and had indicated in

3    prior testimony in the reports that she was very

4    frightened of the defendant.

5            One thing I forgot to mention, actually,

6    the last time we litigated this, is there is a

7    videotaped statement of the defendant where you can

8    see the devil horns in the statement on him.  So, I

9    mean, it would come in even if for no other reason

10    than this videotaped statement.

11            His appearance is different now than it

12    was back then also.  It goes to identification.

13            But for those reasons, Judge, and for the

14    reasons the Court previously ruled, I would ask you

15    to deny that motion.

16            THE COURT:  I will deny the motion.

17    Again, the State may not choose to stipulate to the

18    identification by the police officer and may want to

19    introduce the testimony to create more impact that

20    this police officer does remember the stop.

21            Secondly, I am not over-convinced about

22    Ms. Schubat being afraid of the defendant in view of

23    the remainder of the testimony, but that's one of

24    the theories that the State is seeking to introduce

6

164

1    the tattoos for, whether they are horns or something

2    else.  And I don't -- frankly, unless they are

3    prejudicial to the defendant and the probative value

4    would exceed the prejudicial effect -- would not

5    exceed the prejudicial effect, then I should keep it

6    out.  I don't consider the prejudicial effect to be

7    that grave in view of the fact that, again, I viewed

8    the videotape.  The defendant appeared that way and

9    appeared in public that way.  Everybody knew him

10    that way, with those tattoos and those horns, and

11    there is no way I can bar the State from introducing

12    the defendant's statement, videotaped statement, to

13    which the defendant consented to.

14            There is no way I can obliterate, even if

15    I had found otherwise, the image from the videotape.

16    I do not see such a big prejudicial effect on the

17    defendant if the testimony about the tattoos comes

18    in.  I think there is a lot to be proved by the

19    introduction, and the probative value definitely

20    exceeds the prejudicial effect.

21            MR. STRICKLAND:  Judge, I have no

22    objection to No. 2, regarding any prior murder

23    allegedly attributed to the defendant.  I have

24    instructed Ms. Schubat regarding that already.

7

ED02 MQ                    MINUTES QUERY                02/25/2003   165

CASE# 02CF00002183 FILED 06/19/2002   STATUS AC STATUS DATE 07/25/2002   A
TITLE PEOPLE VS RUHL                          ARREST AGENCY LKCS BRANCH CE

        JURY IMPANELLING                      YES PRESENT
        CAUSE ADJOURNED                       YES PRESENT
           UNTIL 1 30 P.M. THIS DATE
        REMAND                                YES PRESENT

DATE: 01/30/2003 TIME: 01:50P ROOM: C201  CALNDR: CRM NOTE: RULING

     PRESENT:
        BOORAS, JAMES K.               PRESIDING JUDGE
        LIGENZA, MARIANNE              COURT REPORTER
        STRICKLAND, GEORGE             STATE'S ATTORNEY
        AUBEL, BRADLEY F.              ATY ON BEHALF OF

     EVENTS:
        DEFENDANT'S PRESENCE WAIVED        YES ABSENT
        STATUS                             YES ABSENT
           HELD.
        RULING                             YES ABSENT
           COURT GRANTS DEF'S PREVIOUSLY FILED MOTION IN LIMINE - WITNESS'
           STATEMENT IS BARRED - DEF REMAINS IN CUSTODY OF THE LAKE COUNTY
           JAIL.

DATE: 01/30/2003 TIME: 09:00A ROOM: C201  CALNDR: CRM NOTE: RULING ON MOTC LIMI

     PRESENT:
        BOORAS, JAMES K.               PRESIDING JUDGE
        LIGENZA, MARIANNE              COURT REPORTER
        STRICKLAND, GEORGE             STATE'S ATTORNEY
        AUBEL, BRADLEY F.              ATY ON BEHALF OF

     EVENTS:
        DEFENDANT'S PRESENCE WAIVED        YES ABSENT
        STATUS                             YES ABSENT
           BOTH COUNSEL SUBMIT CASE LAW TO THE COURT.
        RULING                         CONTINUED ABSENT
           CAUSE HELD ON THE CALL THIS DATE - DEF REMAINS IN CUSTODY OF
           THE LAKE COUNTY JAIL.

DATE: 01/29/2003 TIME: 01:30P ROOM: C201  CALNDR: CRM NOTE: HRG ASA MOTC LIMINE

     PRESENT:
        BOORAS, JAMES K.               PRESIDING JUDGE
        LIGENZA, MARIANNE              COURT REPORTER
        STRICKLAND, GEORGE             STATE'S ATTORNEY
        EDENS, EDWARD V.               ATY-DEFENDANT
        RUHL, RONALD                   DEFENDANT

     EVENTS:

7

ED02 MQ                          MINUTES QUERY                    02/25/2003

CASE# 02CF00002183 FILED 06/19/2002  STATUS AC STATUS DATE 07/25/2002   A
TITLE PEOPLE VS RUHL                          ARREST AGENCY LKCS BRANCH CE

                DEF GIVEN LEAVE TO FILE MOTION IN LIMINE.
            MOTION IN LIMINE                      DENIED
                PARAGRAPH #6 IS MOOT AND ANY PRIOR CONVICTIONS ARE ALLOWED TO BE
                INTRODUCED.
            MOTION FILED                          YES PRESENT
                STATE GIVEN LEAVE TO FILE MOTION IN LIMINE.
            MOTION IN LIMINE                      GRANTED
                SAID MOTION IS GRANTED WITH NO OBJECTIONS FROM THE DEF AS TO
                #1 THROUGH #8, AND #11, GRANTED OVER DEF'S OBJECTIONS AS TO
                #9 AND #10 SUBJECT TO ANY MOTION TO RECONSIDER BY THE DEFENSE,
                #12 AND #13 WERE PREVIOUSLY RULED ON IN DEF'S MOTION IN LIMINE
                FILED THIS DATE, AND GRANTED AS TO #14 BUT DEF IS ALLOWED TO GO
                INTO HER PHYSICAL APPEARANCE.
            MOTION OF DEFENSE                      GRANTED
                FOR STREET CLOTHES.
            ENTER AGREED ORDER                    YES PRESENT
            REMAND                                YES PRESENT


DATE: 12/16/2002 TIME: 09:00A ROOM: C201  CALNDR: TLC NOTE: TRIAL

        PRESENT:
            BOORAS, JAMES K.              PRESIDING JUDGE
            LIGENZA, MARIANNE             COURT REPORTER
            LARUE, KENNETH W.             STATE'S ATTORNEY

        EVENTS:
            JURY TRIAL                            STRICKEN FROM CALL
            SET JURY TRIAL DATE                   YES ABSENT
                DEF REMAINS IN CUSTODY OF THE LAKE COUNTY JAIL.

DATE: 12/05/2002 TIME: 09:00A ROOM: C201  CALNDR: CRM NOTE: HRG ON MOTC

        PRESENT:
            BOORAS, JAMES K.              PRESIDING JUDGE
            LIGENZA, MARIANNE             COURT REPORTER
            STRICKLAND, GEORGE            STATE'S ATTORNEY
            EDENS, EDWARD V.              ATY-DEFENDANT
            RUHL, RONALD                  DEFENDANT

        EVENTS:
            DEF PRESENT IN CUSTODY                YES PRESENT
            HEARING ON MOTION                     DENIED
                DEF'S MOTIONS TO DISMISS
            STATUS                                YES PRESENT
                DEF ADVISED OF EXTENDED TERM SENTENCE
            REMAND                                YES PRESENT

DATE: 11/18/2002 TIME: 09:00A ROOM: C201  CALNDR: CRM NOTE: HRG PENDING MOTCS


                                    8

ED02 MQ        ●      MINUTES QUERY     ●      02/25/2003   167

CASE# 02CF00002183 FILED 06/19/2002   STATUS AC STATUS DATE 07/25/2002    A
TITLE PEOPLE VS RUHL               ARREST AGENCY LKCS BRANCH CE

```
        PRESENT:
                BOORAS, JAMES K.              PRESIDING JUDGE
                LIGENZA, MARIANNE             COURT REPORTER
                STRICKLAND, GEORGE            STATE'S ATTORNEY
                EDENS, EDWARD V.              ATY-DEFENDANT
                RUHL, RONALD                  DEFENDANT

        EVENTS:
                HEARING                           CONTINUED PRESENT
                DEF PRESENT IN CUSTODY            YES PRESENT
                REMAND                            YES PRESENT

DATE: 11/12/2002 TIME: 09:00A ROOM: C201  CALNDR: TLC NOTE: TRIAL (STRICKEN)

        EVENTS:
                JURY TRIAL                        STRICKEN FROM CALL

DATE: 11/07/2002 TIME: 09:00A ROOM: C201  CALNDR: CRM NOTE: PRE-TRIAL

        PRESENT:
                BOORAS, JAMES K.              PRESIDING JUDGE
                LIGENZA, MARIANNE             COURT REPORTER
                MENAS, DEBORAH J.             STATE'S ATTORNEY
                EDENS, EDWARD V.              ATY-DEFENDANT
                RUHL, RONALD                  DEFENDANT

        EVENTS:
                DEF PRESENT IN CUSTODY            YES PRESENT
                STATUS                            YES PRESENT
                  COURT ORDERS THAT THE ATTORNEY OF RECORD, EDWARD EDENS ATD, BE
                  PRESENT AT 9:00 A.M. FOR ALL COURT DATES SET.
                MOTION FILED                      YES PRESENT
                  DEF GIVEN LEAVE TO FILE MOTION TO DISMISS.
                PRE-TRIAL                         YES PRESENT
                MOTION BY AGREEMENT               GRANTED
                  TO CONTINUE THE TRIAL.
                TRIAL CONTINUANCE GRANTED         YES PRESENT
                HEARING DATE SET                  YES PRESENT
                SET JURY TRIAL DATE               YES PRESENT
                REMAND                            YES PRESENT

DATE: 11/06/2002 TIME: 09:00A ROOM: C201  CALNDR: CRM NOTE: PRE-TRIAL

        PRESENT:
                BOORAS, JAMES K.              PRESIDING JUDGE
                LIGENZA, MARIANNE             COURT REPORTER
                STRICKLAND, GEORGE            STATE'S ATTORNEY
```

ED02 MQ                         MINUTES QUERY                      02/25/2003

                                                                    168

CASE# 02CF00002183 FILED 06/19/2002  STATUS AC STATUS DATE 07/25/2002   A
TITLE PEOPLE VS RUHL                           ARREST AGENCY LKCS BRANCH CE


          EVENTS:
                PRE-TRIAL                          CONTINUED ABSENT
                STATUS                             YES ABSENT
                   STATE TO NOTIFY THE ATTORNEY OF RECORD TO BE PRESENT ON
                   NOVEMBER 7, 2002 - DEF REMAINS IN CUSTODY OF THE LAKE COUNTY
                   JAIL.

DATE: 10/30/2002 TIME: 09:00A ROOM: C201  CALNDR: CRM NOTE: PRE-TRIAL


          PRESENT:
                BOORAS, JAMES K.                   PRESIDING JUDGE
                LIGENZA, MARIANNE                  COURT REPORTER
                MENAS, DEBORAH J.                  STATE'S ATTORNEY

          EVENTS:
                PRE-TRIAL                          CONTINUED ABSENT

DATE: 09/05/2002 TIME: 09:00A ROOM: C201  CALNDR: CRM NOTE: PRE-TRIAL


          PRESENT:
                BOORAS, JAMES K.                   PRESIDING JUDGE
                LIGENZA, MARIANNE                  COURT REPORTER
                STRICKLAND, GEORGE                 STATE'S ATTORNEY
                EDENS, EDWARD V.                   ATY-DEFENDANT
                RUHL, RONALD                       DEFENDANT
                MENAS, DEBRA                       STATE'S ATTORNEY

          EVENTS:
                PRE-TRIAL                          STRICKEN PRESENT
                TRIAL CONTINUANCE GRANTED          YES PRESENT
                  BY AGREEMENT OF THE PARTIES
                SET JURY TRIAL DATE                YES PRESENT
                REMAND                             YES PRESENT

DATE: 09/03/2002 TIME: 09:00A ROOM: C201  CALNDR: TLC NOTE: STRICKEN


          EVENTS:
                JURY TRIAL                         STRICKEN FROM CALL

DATE: 08/21/2002 TIME: 09:00A ROOM: C201  CALNDR: CRM NOTE: PRE-TRIAL


          PRESENT:
                ROSSETTI, VICTORIA A.              PRESIDING JUDGE
                LIGENZA, MARIANNE                  COURT REPORTER
                STRICKLAND, GEORGE                 STATE'S ATTORNEY
                RUHL, RONALD                       DEFENDANT
                MENAS, DEBRA                       STATE'S ATTORNEY

This Order Is Not Precedential And Is Not To Be Cited

No. 2--03--0920

**FILED**

DEC 1 5 2004

ROBERT J. MANGAN, CLERK
APPELLATE COURT 2nd DISTRICT

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 02--CF--2183 |
| | ) | |
| RONALD E. RUHL, | ) | Honorable |
| | ) | James K. Booras, |
| Defendants-Appellants. | ) | Judge, Presiding. |

---

**RULE 23 ORDER**

Defendant, Ronald E. Ruhl, seeks reversal of his conviction of first-degree murder (720 ILCS 5/9--1(a) (West 2002)) and his sentence of 50 years' imprisonment contending: (1) that he was deprived of a fair trial when the trial court barred a defense witness from testifying to an out-of-court statement; (2) that he was deprived of a fair trial when the State disclosed an additional witness during trial; (3) that his extended-term sentence of 50 years' imprisonment violated the rule annunciated in Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000) and the Illinois Code of Criminal Procedure; and (4) that his right to the presumption of innocence was violated when the trial court ordered the selection of an anonymous jury. For the reasons that follow, we reject each of defendant's contentions and affirm defendant's conviction and sentence.

I. FACTS

Defendant and Raymond Serio were charged with two counts of first-degree murder as a result of their roles in the January 6, 2002, murder of Richard Neubauer. In count I the State alleged that defendant and Serio shot Richard Neubauer with a gun thereby causing Neubauer's death (720 ILCS 5/9(a)(1) (West 2000)). In count II the State alleged that defendant and Serio shot Neubauer in the body with a gun knowing such act created a strong probability of great bodily harm to Neubauer, thereby causing the death of Neubauer (720 ILCS 5/9(a)(2) (West 2000)). Defendant and Serio were tried separately.

The State presented a theory of the case during opening statement that defendant shot Neubauer at Serio's behest while Neubauer waited for his girlfriend, Denise Schubat, in the parking lot of Serio's bar. The assistant state's attorney told the jury that the evidence would show that Serio had Neubauer killed so that he could pursue a relationship with Schubat. The State related further that Neubauer's body was found the following morning within the vehicle he had been driving just over the Wisconsin border at the entrance to the Bristol Renaissance Faire in Kenosha County, Wisconsin. Neubauer had been shot a total of three times. The assistant state's attorney said that the evidence would indicate that Schubat had nothing to do with Neubauer's murder and that she did not tell the police what she knew about the crime for several months thereafter because Serio had threatened her and her daughter.

In contrast, in defendant's opening statement defense counsel stated that defendant did not participate in Neubauer's murder and had no knowledge of the crime. Defense counsel presented the theory that Schubat solicited Serio to kill Neubauer, that Serio did so, and that Schubat helped Serio get rid of the body by driving the vehicle containing Neubauer's body to the Bristol Renaissance Faire

-2-



while Serio followed in Schubat's vehicle so that they could leave the body and the vehicle at that location. Defense counsel stated that Schubat implicated defendant in the murder only after the police investigation showed that two people participated in Nuebauer's murder and the removal of his body, and that the police suspected Serio and Schubat. Defense counsel suggested that Schubat claimed defendant was involved because he was Serio's friend and spent a lot of time with Serio.

Evidence presented by the State at defendant's trial established that Richard Neubauer's body was discovered on the morning of January 6, 2002, in a car at the entrance to the Bristol Renaissance Faire. The medical examiner concluded that Neubauer died as a result of three gunshot wounds, two in the head and one in the neck.

At trial Denise Schubat testified that she bore Neubauer's daughter, Ashley, in March 1998. After Ashley's birth, she and Neubauer lived together for about 18 months. Thereafter, Schubat and Ashley returned to Schubat's mother's home in Lake Villa. Schubat said that after they stopped living together she and Neubauer remained romantically involved and Neubauer paid child support. In the early part of 2001, Schubat and Neubauer drifted apart but Neubauer continued to visit Ashley and they had no disagreements over the custody of Ashley.

In August 2001 Schubat began working as a night-shift bartender at a bar in Antioch called Whip Lash. She was hired by Serio and his brother who were co-owners of Whip Lash at the time. Schubat identified a photograph of Serio showing that he was shaved bald, had devil horns tattooed on his head, and a scorpion tattooed on his neck. Schubat said that Serio worked the night shift with her from 6 p.m. to closing. According to Schubat, Serio was "very flirtatious and grabby" toward her and always attempted to get her to go out with him after Whip Lash closed for the night.

Schubat testified that she met defendant at a bar called Kemps approximately one year before she started bartending at Whip Lash. Schubat described defendant as an acquaintance. Defendant was known as "Pokeman." Schubat testified that defendant and Serio were friends and that she saw them together all the time. Generally, defendant would drive Serio to and from work. Defendant also did some remodeling work at Whip Lash and ran errands for Serio. According to Schubat, defendant owed Serio a relatively substantial amount of money. Serio carried a direct-connect Nextel cellular telephone that had a two-way radio feature. Schubat saw and heard Serio communicate with defendant via their Nextel telephones every night.

Schubat described an incident near the end of October 2001 when Serio asked her to give him a ride to a hotel where he was staying. Schubat said that she went to Serio's hotel room where he provided her with cocaine and she had sexual relations with him. The following day at Whip Lash Serio approached Schubat and asked her to spend the night with him again. Schubat told Serio that the previous night was a mistake, that she was disgusted with herself, and that it was not going to happen again. Serio was not happy. Schubat continued to work at Whip Lash and Serio continued to pursue her.

Around Thanksgiving 2001, Schubat learned that Neubauer had broken his jaw. She felt bad so she began to see him again and their relationship began to grow back into what it once was, including a romantic relationship. Schubat testified that during this period of time, Neubauer would often pick her up at Whip Lash when she was through working. Schubat said that Neubauer would arrive in the Whip Lash parking lot around 2:15 a.m. or 2:30 a.m. so that she had enough time to clean up the bar after closing. While Schubat cleaned up the bar, Serio would sit at the bar and count the cash register drawer. Schubat would leave Whip Lash when she saw Neubauer's headlights in the

parking lot. During this period of time Serio continued to ask Schubat to leave with him after work and Schubat told Serio that she was going home to Neubauer and their daughter.

Schubat testified further that approximately one week before Neubauer was killed she was in the kitchen at Whip Lash with Serio and defendant when Serio told defendant that they were going to kill Neubauer. According to Schubat, in response defendant said, "[w]ell okay, only if Schubat doesn't get mad at me." Schubat said that Serio and defendant were laughing about it, that she thought Serio was kidding, and, consequently, she did not take their comments seriously. Schubat also testified that, around that period of time she noticed an old western movie-type handgun with a tan-colored handle in one of the drawers behind the bar.

Schubat said that on January 4, 2002, Serio approached her at Whip Lash and once again asked her to leave with him after work. Schubat told Serio no, and that Neubauer was coming to pick her up after work because they had plans. Serio became upset. Later that night, Serio told Schubat that he was going to kill Neubauer. Schubat did not take Serio seriously because he was laughing and joking about it.

On Saturday January 5, 2002, Schubat arrived at Whip Lash at 6 p.m. Serio asked Schubat all kinds of questions about what she and Neubauer did the previous night. Schubat told Serio that they went to a friend's house, that she got home late, and that it was not any of Serio's concern. According to Schubat, Serio made a comment about getting rid of Neubauer so that she could be with him. Schubat told Serio that he was crazy, that they were never going to be together, and that she did not know where he got that idea.

Schubat explained that she had spoken to Neubauer earlier that Saturday night and they made plans to go to a party in the city. Neubauer was going to go to the party and then drive out and pick

-5-

Schubat up after work so that he could return to the party with Schubat. For several days preceding Saturday January 5, 2002, Neubauer had been driving his mother's green four-door car.

At about 10 p.m. on January 5, 2002, defendant came into Whip Lash and went into the kitchen with Serio. Schubat went into the kitchen to ask Serio a question and defendant and Serio "shut up right away." At some point that night, Schubat went into the drawer behind the bar to get an aspirin and noticed that the gun was gone. When the bar closed at 2 a.m. on Sunday January 6, 2002, Schubat went about her business cleaning up the bar. She and Serio were the only persons present inside Whip Lash. While cleaning up behind the bar, Schubat heard Serio on his Nextel phone asking if the green four-door was still in the parking lot. Schubat heard defendant say "yes" in response over Serio's Nextel phone. According to Schubat, Serio asked defendant to go up to the window and shoot him. Schubat tried to l~        ., and Serio pushed her behind the bar and told her that she was not going anywhere. Schubat said that at that point she began to get worried. Next, Schubat heard Serio tell defendant over the Nextel phone to go to the window, knock, and pull the trigger. After a pause, Schubat heard defendant say, "are you sure?" With that Serio screamed into the phone, "I want to hear a gunshot." The next thing Schubat heard was a gunshot. Schubat pushed Serio out of her way, jumped over the bar, and ran to the front door. Through the window on the front door Schubat saw Neubauer sitting in the car hunched over with his jaw quivering. Schubat fell to the ground, Serio picked her up and sat her on the pool table. Serio shook her and told her to calm down and that she could not be mad at him because he did not do it. Serio moved Schubat to a bar stool and while sitting there she heard pounding on the door and then glass breaking. Serio went to the door and let defendant into the bar. Defendant paced back and forth holding his head. Schubat said that the gun from the drawer behind the bar was now on the bar in a blue towel. Defendant told Serio that they had to hurry up and get rid of the body. Serio told Schubat to go home and to make

sure no one knew that Neubauer was at Whip Lash that night if she wanted her daughter to be safe. Serio told Schubat not to approach Neubauer and not to touch the car. Schubat noticed Serio watching her from the threshold of the bar as Schubat walked to her car and drove away.

Schubat said that, at Serio's behest, she drove straight home and called Neubauer's cellular telephone at approximately 2:43 a.m. Schubat left a message to the effect that Neubauer must have stayed in the city, that she was home, and that she would talk to him later. The next morning Neubauer's mother called Schubat and inquired as to Neubauer's whereabouts. Schubat told her that she had not heard from Neubauer. The following evening Neubauer's mother called Schubat and told her to come over to her house. Upon arriving at Neubauer's mother's house, Schubat was told by two detectives that Neubauer was found dead in Wisconsin. When the Detectives asked Schubat what she knew about Neubauer's death, Schubat said nothing because she was afraid that Serio or defendant would do something to Ashley. Schubat admitted that between Neubauer's death and April 2002, she lied to the police several times about Neubauer's death. Schubat said that she eventually told the police the truth.

Officer Keith Lamanna of the Waukegan Police Department testified that he stopped a vehicle registered to Raymond Serio at 5:17 a.m. on January 6, 2002, on Washington Street just east of Lewis Avenue in Waukegan. According to Officer Lamanna, the vehicle was occupied by two persons. Officer Lamanna identified the driver as a heavy set, bald, white male, with tattoos of horns on the top of his head. Officer Lamanna identified a picture of Serio as the driver of the vehicle he stopped. Officer Lamanna also made an in-court identification of defendant as the passenger in the vehicle driven by Serio. Additionally, Officer Lamanna identified defendant as the passenger from a photo array he was shown prior to trial. At the scene of the traffic stop, Officer Lamanna asked Serio and defendant where they had been, and one or both of them said that they came "from the

-7-

north, Round Lake." Officer Lamanna testified that he became suspicious because Round Lake is due west of the intersection of Washington and Lewis. When asked where they were going, one or both of the men told Officer Lamanna that they were looking for a restaurant. Serio consented to a search of his vehicle and Officer Lamanna recovered an open bottle of liquor. Officer Lamanna poured out the liquor and released the men without making an arrest or issuing any citations. Officer Lamanna indicated that he made no written report regarding the traffic stop.

Detective Timothy Jonites of the Lake County Sheriff's Department testified that he traveled the route between Whip Lash and the Bristol Renaissance Faire, and from that location to the home of Schubat. Detective Jonites said that he left Whip Lash at 2:20 a.m. According to Detective Jonites, the distance between Whip Lash and the entrance to the Bristol Renaissance Faire is 15.3 miles. Upon arrival at the entrance to the Bristol Renaissance Faire, Detective Jonites immediately turned around and proceeded to the home of Schubat. According to Detective Jonites, the total distance of the trip was 26.3 miles and he traveled the total distance in 39 minutes arriving at Schubat's home at 2:59 a.m. Detective Jonites indicated that he exceeded the posted speed limits by 5 m.p.h. and proceeded on the fastest and easiest route.

During defendants case, defendant called Sandra Morton who testified that she has known Schubat for approximately 4 1/2 years and considers Schubat her friend. Morton said that she and Schubat worked together at Kemp's bar at one point before Schubat left to work at Whip Lash. Morton indicated that Schubat would bring Ashley to her house to play and that she used to babysit Ashley. Morton, Schubat, and a group of friends vacationed in Key West Florida in May 2001. In the 4 1/2 years that Morton has known Schubat, Morton never met Neubauer. According to Morton, Schubat complained about Neubauer a lot and never said anything positive about him. Schubat told Morton that Neubauer was a poor father, never gave her money, was upset with Schubat's lifestyle,

No. 2--03--0920

and was threatening to take Ashley. Morton testified further that she has known defendant for six years and admitted that he is a very good friend. Morton also admitted that she was unaware that Schubat had started seeing Neubauer again for the last six weeks of Neubauer's life.

After hearing closing arguments and receiving instructions, the jury deliberated and then found defendant guilty of first-degree murder and of personally discharging a firearm. Defendant's post-trial motion for new trial or for judgment notwithstanding the verdict was denied and the trial court sentenced defendant to 50 years' imprisonment. No motion to reconsider sentence was filed. Thereafter, defendant filed a timely notice of appeal.

II. ANALYSIS

A. Admissibility of Purported Hearsay Statement Against Penal Interest

Before trial the State filed a motion in limine to bar, among other evidence, the testimony of Marcy McIntosh on the ground that it constituted inadmissible hearsay. At the hearing on the State's motion, McIntosh testified that she met Raymond Serio in November 2001, when she was a customer at Whip Lash. McIntosh explained that her fiancé, Jim "Snake" Natywa, is from the same south-side neighborhood as Serio so she and Natywa drank on the house at Whip Lash. McIntosh became a bartender at Whiplash and worked as such from January 2002 until April 2002. At some point, McIntosh and Natywa bought Serio's interest in Whip Lash. According to McIntosh, the day before Serio was arrested, Serio came into Whip Lash at a time when she and Natywa were the only persons in the bar. McIntosh said that the police had just released Serio after questioning him in connection with the Neubauer murder. When Serio came into the bar McIntosh asked him why the police were

questioning him when he had nothing to do with it? According to McIntosh, Serio responded, "What do you mean I had nothing to do with it? I did it." At that point, Natywa got up and walked away. Serio proceeded to tell McIntosh that he shot Neubauer once in the parking lot and that did not kill him so he shot him "more times." Serio did not say how many more times he shot Neubauer. Serio also told McIntosh that Neubauer was a punk, that he did not deserve to live, and that Schubat and Ashley were better off without him. McIntosh testified further that Serio told her that, on the night of the murder, Schubat was standing right where McIntosh was standing. Serio did not say that Schubat had anything to do with the murder of Neubauer.

McIntosh admitted that she never did social things with Serio such as go out to dinner, and that she did not confide in Serio or ask his advise. McIntosh also related that Serio would occasionally "borrow" her van while she was working at Whip Lash. McIntosh explained that Serio would take her van and cellular telephone against her will. McIntosh did not want Serio to use her van because Natywa would get mad but Serio would take it and tell her that he would return the van before closing and Natywa would never know. McIntosh said that she did not inform the police about what Serio told her because she did not want to get involved due to what she knew about Serio and his connections. McIntosh claimed that she came forward when she found out that defendant was accused of the murder because Serio said nothing about defendant's involvement.

After hearing the evidence, the trial court took the motion under advisement. On the date set for a ruling on the motion defendant's trial counsel, Mr. Edens, had a schedule conflict and had substitute counsel appear in his stead. In a letter submitted to the trial court along with case law, Mr. Edens asserted that if the trial court found that Serio's hearsay statement was against his penal interest it should hold a second hearing to determine whether there were sufficient indicia of trustworthiness surrounding the hearsay statement. The trial court stated that it had already held a hearing regarding

-10-

indicia of trustworthiness. The trial court then found that the hearsay statement was against Serio's penal interest, that McIntosh and Serio were not close acquaintances, that McIntosh's testimony was not corroborated; and that there would be no adequate opportunity to cross-examine Serio regarding his purported statement because Serio would undoubtedly exercise his fifth amendment right not to incriminate himself. The trial court then granted the State's motion holding that, in its discretion the hearsay statement of Serio did not meet the <u>Chambers v. Mississippi</u> threshold and was, therefore, inadmissible.

Defendant contends that the trial court deprived him of a fair trial when it excluded McIntosh's testimony as to the unsworn extrajudicial declaration of guilt allegedly made by Serio. In response, the State argues that the trial court did not abuse its discretion in excluding McIntosh's testimony.

There is an exception to the hearsay rule for declaration's against interest. <u>People v. Tenney</u>, 205 Ill. 2d 411, 433 (2002). However, an unsworn, out-of-court declaration that the declarant committed the crime, and not the defendant on trial, is inadmissible, even though the declaration is against the declarant's penal interest. <u>Tenney</u>, 205 Ill. 2d at 433. Such declarations may, however, be admitted where justice requires. <u>Tenney</u>, 205 Ill. 2d at 433. In <u>Tenney</u> our supreme court quoted an earlier decision explaining the justification for the rule:

> ' "The practicality of this rule is obvious. General admission of such statements could seriously handicap the administration of justice in tempting everyone accused of a crime to introduce perjured testimony that a third party, then deceased or beyond the jurisdiction of the court, had declared that he, and not the accused, had committed the crime. The rule is sound and should not be departed from except in cases where it is obvious that justice demands a departure. But it would be absurd, and shocking to all sense of justice, to

indiscriminately apply such a rule to prevent one accused of a crime from showing that another person was the real culprit merely because that other person was deceased, insane or outside the jurisdiction of the court." ' Tenney, 205 Ill. 2d at 433-34, quoting People v. Lettrich, 413 Ill. 172, 178 (1952).

As the Supreme Court explained in Chambers v. Mississippi, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." Chambers, 410 U.S. at 302, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049. The question to be considered in judging the admissibility of declarations of this character "is whether the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." People v. Bowel, 111 Ill. 2d 58, 67 (1986), quoting Chambers, 410 U.S. 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. 1048-49. Chambers established four factors to help determine whether there are sufficient indicia of trustworthiness: (1) whether the declaration was made spontaneously to a close acquaintance shortly after the crime occurred; (2) whether the declaration was corroborated by other evidence; (3) whether the declaration was self-incriminating and against the declarant's penal interest; and (4) whether there was adequate opportunity for the State to cross-examine the declarant. Chambers, 410 U.S. 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. 1048-49. Other indicia of trustworthiness may also be considered. People v. Swaggirt, 282 Ill. App. 3d 692, 700 (1996). The four Chambers factors are merely guidelines to admissibility rather than hard and fast requirements; the presence of all four factors is not a condition of admissibility. Tenney, 205 Ill. 2d at 435. Just as all four factors are not required to be present to find a statement trustworthy, the existence of one or more of the factors does not make a statement trustworthy. Swaggirt, 282 Ill. App. 3d at 700. The admission of evidence is within the sound discretion of the trial court, and its

-12-

ruling should not be reversed absent a clear showing of abuse of that discretion. Tenney, 205 Ill. 2d at 433.

The only arguments defendant makes regarding the trial court's indicia of trustworthiness assessment are that the trial court's determination that McIntosh was not a close acquaintance of Serio was contrary to the facts established at the hearing and that the trial court unfairly denied him the opportunity to present testimony to corroborate the statement. We address each argument in turn.

First, defendant claims that McIntosh's testimony that she had known Serio for about a year and a half; that she was at first a customer of Serio's, then Serio's employee for four months, and then purchased Serio's interest in the Whip Lash bar; and that she had loaned Serio her van and her cellular telephone shows that she and Serio were indeed close acquaintances. We disagree. McIntosh testified at the hearing on the State's motion in limine which was held on January 29, 2003. At that time she indicated that she had known Serio for about 18 months. However, in April 2002, the time of Serio's purported statement, she had known Serio less than six months. Also, what defendant describes as a loan of property was unequivocally described by McIntosh as Serio taking her van and cellular telephone against her will. Moreover, McIntosh did not describe Serio as a friend, indicated that she did not associate with Serio on a personal level, did not confide in him, would not take advice from him, and was afraid of him due to his connections and based on what she knew about him. Based on these facts, we conclude that the trial court did not abuse its discretion in finding that McIntosh was not a close acquaintance of Serio.

Second, defendant claims that the trial court barred him from presenting evidence to corroborate Serio's statement. Defendant argues that he could have called Natywa who was present when Serio first said that he did it which would have corroborated what McIntosh heard. We fail to

-13-

see how the trial court prevented defendant from presenting this evidence where it held a full hearing on the State's motion in limine seeking to exclude McIntosh's testimony. On January 22, 2003, the State filed its motion in limine and tendered it to the defense. On the same date the trial court scheduled a hearing on the motion for January 29, 2003. At that hearing on January 29, 2003, defendant was afforded an opportunity to present whatever evidence on the issue that he wished. When the trial court rendered its ruling on the State's motion on January 30, 2003 it indicated that it disagreed with defense counsel's contention that there should be another separate hearing on the indicia of trustworthiness of the statement after the determination that the statement was against the declarant's penal interest. We reject defendant's suggestion on appeal that *People v. Cruz*, 162 Ill. 2d 314 (1994), requires that the reliability determination be made after two separate hearings are held as that case contains no such holding.

Defendant also argues that his trial counsel was ineffective in failing to present the corroborating testimony of Natywa. We disagree. Generally, a defendant alleging the ineffective assistance of counsel must meet the two-prong test announced in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Under that test, a defendant must show that his counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Stickland, 466 U.S. at 688, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068. The failure to satisfy either the deficiency prong or the prejudice prong of the Strickland test precludes a finding of ineffective assistance of counsel. Strickland, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Decisions concerning whether to call a certain witness are matters reserved to the discretion of trial counsel such that they enjoy a strong presumption of sound trial strategy rather than

-14-

No. 2--03--0920

incompetence. People v. Enis, 194 Ill. 2d 361, 378 (2000). This presumption generally immunizes

trial counsel from claims of ineffective assistance of counsel except where their representation is so

unsound that no meaningful adversarial testing was conducted. Enis, at 378. Defendant speculates

in his brief that "there was no sound strategic reason not to call [Natywa]." However, after raising

in his post-trial motion the issue of trial counsel's failure to call Natywa, defendant failed to provide

an affidavit of Natywa setting forth what, if anything, he could have testified to at the hearing on the

State's motion. A claim that trial counsel failed to investigate and call a witness must be supported

by an affidavit from the proposed witness. People v. Enis, 194 Ill. 2d at 380; People v. Ashford, 121

Ill. 2d 56, 77 (1988). We cannot speculate as to Natywa's existence, availability, or to the content

of his testimony and, therefore, defendant has not shown that trial counsel's failure to call this witness

fell below an objective standard of reasonableness.

Having determined that the trial court did not abuse its discretion in determining that Serio's

hearsay statement was not made to a close acquaintance, together with the unchallenged conclusions

of the trial court that the statement was uncorroborated and not subject to cross-examination by the

State, three of the four Chambers factors weigh in favor of a conclusion that the statement was not

made under circumstances that provide considerable assurance of its reliability by objective indicia

of trustworthiness. Consequently, we cannot say that the trial court abused its discretion in so finding

and excluding McIntosh's testimony as to Serio's hearsay statement.

### B. Disclosure of an Additional Prosecution Witness During Trial

Defendant's second contention is that the State deprived him of a fair trial when it revealed

Officer Lamanna as a State witness on the second day of trial. Defendant maintains that the untimely

-15-

disclosure of this witness constituted a discovery violation, that he was prejudiced by the trial court permitting the witness to testify at trial, and that he is therefore entitled to a new trial. The State argues that the trial court did not abuse its discretion in allowing Officer Lamanna to testify.

On the second day of trial, after the jury had been selected and the parties delivered their opening statements, defense counsel informed the court that he was just notified that the State located a witness that the State had been trying to locate for over a year. Next, the following colloquy ensued between the trial court and the parties:

"THE COURT: All right. Mr. Strickland [assistant state's attorney] is now present. You had a motion, Mr. Edens [defense counsel], please.

MR. EDENS: Yes, Judge. I was informed as I was entering into the courtroom that an individual who allegedly pulled over a vehicle driven by my client and the co-defendant, alleged offender, had been located and that that person was located recently.

THE COURT: Who is that person, a civilian, a police officer?

MR. STRICKLAND: It's a police officer, Judge.

THE COURT: All right so you knew about him.

MR. EDENS: I did not, Judge, and I have not seen any reports. I was informed –
in the statement of the co-defendant, there was some reference made to a possible traffic stop, but we didn't have any further information beyond that. And beyond that, at the time that I made my opening statement in this case, I was not aware, and based upon the information that I gave in my opening statement, my case would have changed radically from what it was, or at least it could have been potentially different than what it was.

MR. STRICKLAND: Well, that's impossible, Judge. A couple things. First of all, Mr. Edens has been well aware for a long time in this case, and that's 224 of our discovery,

-16-

[of] our intent to find out, and by the way, we mentioned in jury selection yesterday that we have been attempting to ascertain which officer –

THE COURT: Page 224 of the discovery you are showing me.

MR. STRICKLAND: Right, which officer made a traffic stop on both defendants that night. As you recall yesterday, when the 911 communications director was excused, I had indicated in front of Mr. Edens -- and by the way, I have spoken to Mr. Edens off the record numerous times in this case. We have been trying to find out who made the traffic stop on these two late at night. This is our attempt to find out about the traffic stop.

Not only that, but this traffic stop is referred to extensively in Mr. Serio's statements where he talks about both of them being pulled over, so this is not a surprise.

THE COURT: And Mr. Edens has that.

MR. STRICKLAND: He has that also. He has known from day one that there was a traffic stop, and he has also known from – maybe not day one, but certainly for months, that we have been trying to find out who the officer was who made that traffic stop. We finally found that out last night, and we have not been in possession of this information and held it back, so it's not a violation of discovery.

We continue investigating these cases until the verdict comes in, and as issues come up, we will continue to follow up with them. And the Court is well aware that discovery applies. It's not as if we had this information, sat on it, let Mr. Edens make an opening and then give it and say: Oh, by the way, we have been holding onto this to sandbag you. That's simply not the case.

178

No. 2--03--0920

THE COURT: No. I cannot find that you acted in bad faith. I cannot find that there is a violation of discovery. If there is a motion for a continuance, I haven't heard it. Any other motions that Mr. Edens may have, I don't know what your motion is today.

MR. EDENS: I just allowed Mr. Strickland or asked Mr. Strickland to make his record as far as what had occurred. I do not know who this individual is. I have not had an opportunity to talk to them. And clearly, as your honor was aware from the time when we were doing jury selection yesterday, it was confirmed by Mr. Strickland that, in fact, they did not know who this officer was; they were not in possession of that evidence, and the only evidence that we did have or the only knowledge we did have that there was potentially this person out there was the statement of the co-defendant, which is not going to be admitted in this case, so we had no idea that this potentially was going to come up.

It may well have changed my opening statement, and I believe my client has been prejudiced by that, if this officer were allowed to testify. I don't believe that at this late date, the officer should be allowed to testify.

Clearly, I would be in a position of making a different opening statement had I been aware.

THE COURT: Other than the fact that there was a traffic stop, I don't know what the testimony will be. Nobody has informed me.

MR. STRICKLAND: First of all, it's Officer Lamanna, who we will make available for Mr. Edens to talk to before he testifies. He will testify that he made a traffic stop on Mr. Serio's car. He will identify Mr. Serio by photograph. He will indicate that there was another male in the car, that, I believe, he cannot identify.

-18-

No. 2--03--0920

MR. LA RUE [Assistant State's Attorney]:  I am not sure at this point.

MR. STRICKLAND:  At this point, we are unsure if he can even identify that other male, and he didn't do a report.  He didn't make an arrest.  He let them go.  Basically, that's it.

THE COURT:  You mean on the same night?

MR. STRICKLAND:  This is the same night.

MR. EDENS:  Two hours or two and a half hours later.

MR. STRICKLAND:  This is about two and a half hours later.

MR. EDENS:  That the two individuals were in a car together.  That is clearly potentially explosive information.

THE COURT:  How can it be explosive if it's not near or at the scene of the crime?

MR. EDENS:  It puts the two of them together some two hours, two and a half hours after the crime was committed.

MR. STRICKLAND:  That's why you shouldn't make real detailed opening statements, especially when he knows we have been trying to run this down.  So why he argued that, I don't know, but that was his decision.

THE COURT:  I don't find that this is a surprise to Mr. Edens.  I find that he exercised a tactical step in assuming that the State would not find this officer.  I must find that you knew all about this officer, you knew all about the traffic stop.

MR. EDENS:  I was well aware of the possible traffic stop.

THE COURT:  Based upon what was presented by the State here today.  If you have something to the contrary –

-19-

179

No. 2--03--0920

MR. EDENS: No. Clearly, Judge, I had knowledge that this potentially was out there. I am saying that it's not even as though this happened during jury selection time. This is after opening statements and after we placed on two witnesses that this now comes up. I don't believe that the officer should be allowed to testify. We object.

THE COURT: I will go so far as to allow you to interview the officer. I cannot bar the officer from testifying. You knew his testimony existed; you knew he existed; you knew from a long time ago that he existed through statements; through statements of the co-defendant; through a report, page 224, I think it was.

MR. STRICKLAND: Page 224.

THE COURT: Yes, page 224 from the discovery.

MR. STRICKLAND: Through 229.

THE COURT: The fact that you took a chance in making your detailed opening statement, that's your strategy, Mr. Edens.

MR. EDENS: I understand that.

THE COURT: You cannot come back and complain at this time.

MR. EDENS: Judge, my strategy would have been different had I been aware of the existence. What I am going to suggest then –

THE COURT: You were aware of the existence of the officer. You were not aware of whether or not the State had located the officer.

MR. EDENS: That's correct, Judge.

-20-

No. 2--03--0920

THE COURT: And frankly, police officers – you shouldn't take chances with police officers, because police officers are easy to locate. They are not like civilian witnesses that take off and they are gone.

MR. EDENS: I would have assumed that they would have found him if they were diligently looking for him.

MR. STRICKLAND: He assumed wrong.

THE COURT: All right. I so find there is no violation of discovery; there is no prejudice to the defendant, the fact that the State is going to call a witness whom the defense knew all about. And frankly, I don't know what the testimony would be; where it would place the defendant together with – maybe with this co-defendant, because I don't know that yet."

Thereafter, it was agreed that, in the event Officer Lamanna indicated to the assistant state's attorney that he believes that he could identify the passenger in the car that he stopped on the morning in question, that he would be shown a photographic line up before he testified to determine if he would identify defendant as the passenger.

Supreme Court Rule 412(a)(i) (134 Ill. 2d R. 412(a)(i)) requires the State, upon written motion of defense counsel, to disclose to defendant the names and last known addresses of persons whom it intends to call as witnesses. People v. Enis, 163 Ill. 2d 367, 404 (1994). While the State has a duty to disclose at the earliest opportunity, it is within the discretion of the trial court to allow a previously unlisted witness to testify at trial, and the trial court's decision will not be disturbed absent an abuse of discretion. People v. Zarebski, 186 Ill. App. 3d 285, 290 (1989); People v. Ziehm, 120 Ill. App. 3d 777, 785 (1983)  A reviewing court will find an abuse of discretion when the

-21-

180

No. 2--03--0920

defendant meets his burden of establishing that he was surprised or prejudiced by the testimony. Zarebski, 186 Ill. App. 3d at 290.

First, we must determine if the State violated Rule 412(a)(i). In the trial court the State claimed that it had been trying to identify the Waukegan police officer who effectuated the traffic stop on Serio's vehicle and did not find out that officer's name until late at night after the first day of trial. The State denied withholding the witnesses's name from the defense and argued that there was no discovery violation. The trial court accepted this explanation and found no discovery violation. We disagree.

Defendant was charged by indictment on January 6, 2002. Defendant filed a motion for discovery requesting, among other things, a list of witnesses that the State intended to call at trial. The State made various disclosures pursuant to Rule 412 of the names of the witnesses it intended to call at trial beginning with an initial disclosure on August 6, 2002. The State made various supplemental disclosures of additional witnesses between August and the beginning of trial on February 3, 2003, when the State filed a list of trial witnesses. None of these disclosures included the name of Officer Lamanna as a possible prosecution witness.

"The State shall perform its obligations under [Rule 412] as soon as practicable following the filing of a motion by defense counsel." 134 Ill. 2d R. 412(d). Compliance with Rule 412 is mandatory for the purpose of avoiding surprise, unfairness, and inadequate preparation to the defendant and is excused only if the State is unaware of the existence of the information prior to trial and cannot become aware of it in the exercise of due diligence. People v. Chriswell, 133 Ill. App. 3d 458, 468 (1985). The trial court accepted the assistant state's attorney's assertion that the State had been trying to identify the officer but had no success until after the trial had begun. This may be true,

-22-

No. 2--03--0920

but there is no evidence in the record to support the State's assertion, or from which the trial court could have reasonably concluded that the State exercised due diligence in identifying this witness. Other than a passing reference during voir dire as to the State's inquiry to a 911 communications center on an unknown date, there was no representation made by the State as to what efforts had been made to identify the witness during the 13-month period between the January 6, 2002, murder and defendant's February 2003 trial. Even though the trial court made the comment that unlike civilian witnesses "police officers are easy to locate" it failed to require the State to explain what efforts it had made to identify this easily located witness prior to trial. "The State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged." 134 Ill. 2d R. 412(f). Because the State failed to provide an explanation as to why it was unable to determine the officer's name from scheduling records of the Waukegan Police Department, radio logs, or by some other means before the second day of trial, we believe that the State did not show that it complied with its duty to disclose Officer Lamanna's name to the defendant at its earliest opportunity. Having determined that the State violated Rule 412, we turn to the question of whether defendant was prejudiced by the trial court's failure to bar the witness from testifying. A new trial should be granted if the defendant is prejudiced by the discovery violation and the trial court fails to eliminate the prejudice. People v. Weaver, 92 Ill. 2d 545, 559 (1992). The burden of showing surprise or prejudice is upon the defendant. People v. Robinson, 157 Ill. 2d 68, 78 (1993). In order to determine if defendant was unduly prejudiced, and therefore is entitled to a new trial as a result of a discovery violation by the State, we will consider (1) the closeness of the evidence, (2) the strength of the undisclosed evidence, (3) the likelihood that prior notice could have

-23-

No. 2--03--0920

helped the defense discredit the evidence, and (4) ~~the willfulness of the State in failing to disclose the~~ ~~new evidence.~~ Robinson, 157 Ill. 2d at 81; Weaver, 92 Ill. 2d at 560. After weighing these four factors, we conclude that the State's failure to timely disclose Officer Lamanna was not prejudicial to defendant's case and, therefore, does not constitute reversible error necessitating a new trial.

~~First, we do not agree with the evidence of defendant's guilt was not close.~~ Defendant argues that the State's entire case hinged on the believability of Schubat's testimony and that Officer Lamana's testimony was the only evidence corroborating her testimony. We disagree. Schubat's testimony that she left the Whip Lash bar and went straight home shortly after Neubauer was shot and left a message on Nuebauer's cellular telephone was corroborated by telephone records establishing that a telephone call was placed from the land-line at Schubat's home to Neubauer's cellular telephone at 2:43 a.m. The testimony of Detective Jonites established that Schubat could not have placed that call had she accompanied Serio to abandon Neubauer's body at the Bristol Renaissance Faire because if she had, the earliest she could have returned to her home was 2:59 a.m., and that assumes that she and Serio left Whip Lash right at 2:20 a.m. and spent no time at the entrance to the Bristol Renaissance Faire.

~~[redacted text]~~

Second, we do not find the undisclosed testimony to be particularly damaging. Defense counsel admitted that he knew about the traffic stop from a statement given to the police by co-defendant Serio which was disclosed in discovery. Nevertheless, in apparent reliance upon the fact that the State had not tendered as a possible witness the Waukegan police officer who made that traffic stop, defendant's counsel decided to advance the theory that it was Schubat, and not defendant, who was involved in the murder and who helped Serio take the victim's body north to the entrance

-24-

No. 2--03--0920

to Bristol Renaissance Faire. Even though defense counsel was entitled to rely on the fact that the State was not going to present testimony regarding the traffic stop because no Waukegan police officer was disclosed, the fact that the State was allowed to present such testimony did not discredit the defense's theory. If the murder took place at approximately 2:20 a.m., Serio had nearly three hours to take Neubauer's vehicle containing Neubauer's body to the Bristol Renaissance Faire, then to drop off Schubat at home, and then to pick up defendant and drive to the vicinity of Washington Street and Lewis Avenue in Waukegan by 5:17 a..m., the time of the traffic stop. In fact, as noted above, the defense's theory was discredited by the telephone records and the testimony of Detective Jenites, not by Officer Lamanna's testimony.

Third, defendant has failed to establish that it is likely that an earlier disclosure of Officer Lamanna as a prosecution witness would have helped him to discredit Officer Lamanna's testimony. Defendant argues that he had no opportunity to investigate the alleged traffic stop, to verify that Officer Lamanna was indeed on duty at the time of the alleged traffic stop, to investigate and interview the officer who allegedly backed-up Officer Lamanna at the alleged traffic stop, and to challenge the photographic line-up shown to Officer Lamanna. Defendant's speculation about being able to discredit Officer Lamanna does not satisfy his burden to prove prejudice. Additionally, defense counsel's failure to request a continuance to accomplish the investigations, the absence of which defendant claims prejudiced him, " 'is persuasive evidence that the prejudice alleged was in fact trivial' " Weaver, 92 Ill. 2d 545, 559 (1982), quoting People v. Foster, 76 Ill. 2d 365, 384 (1979).

The fourth factor to consider is the willfulness of the State in failing to disclose the new evidence. There is nothing to suggest that Officer Lamanna's name was intentionally withheld until the second day of trial. Our conclusion that the State violated Rule 412(a)(i) is the result of the

-25-

No. 2--03--0920

State's failure to demonstrate its due diligence in discovering and disclosing Officer Lamanna to the defense at the earliest opportunity. Even if the State failed to exercise due diligence, noncompliance with Rule 412 does not require reversal absent a showing of prejudice. *Zehm*, 120 Ill. App. 3d at 786.

The real thrust of defendant's prejudice argument does not fit neatly into the four factors discussed above. That is, defendant argues that he was prejudiced by the State's failure to disclose Officer Lamanna in a timely fashion because he would not have advanced that theory of defense had he known that it would be undercut by Lamanna's testimony that defendant was with Serio 2 1/2 hours after the murder. As we have concluded above, however, Officer Lamanna's testimony did not undercut the defense's theory.

Defendant also suggests that the States failure to timely disclose Officer Lamanna as a prosecution witness was a violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). The State has a constitutional obligation to disclose evidence that is both favorable to the accused and material to either guilt or punishment. <u>Brady</u>, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97; <u>People v. Burt</u>, 205 Ill. 2d 28, 47 (2001). <u>Brady</u> is codified in our supreme court's Rule 412(c). 134 Ill. 2d R. 412(c). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. <u>Burt</u>, 205 Ill. 2d at 47. In order to succeed in a <u>Brady</u> claim, the defendant must show that: (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching; (2) the evidence was either willfully or inadvertently suppressed by the State; and (3) prejudice ensued to the defendant. <u>Burt</u>, 205 Ill. 2d at 47. Because defendant's <u>Brady</u> claim does not satisfy the first or third element, we reject it. Officer Lamanna's testimony which put defendant in Serio's vehicle

-26-

No. 2--03--0920

with Serio almost 3 hours after the murder did not exculpate defendant. Additionally, as we have concluded above, defendant has failed to show that he suffered prejudice as a result of the State's

### C. Enhanced Sentence

The basic sentencing range for first-degree murder in this State is a term of imprisonment of not less than 20 years and not more than 60 years. 730 ILCS 5/5--8--1(a)(1)(a) (West 2002). However, section 5--8--1(a)(1)(d) of the Unified Code of Corrections (sometimes referred to as the "15, 20, 25 to life statute") mandates three enhanced sentencing ranges for first degree murder when a firearm is utilized by the person in committing the offense. The applicable enhanced ranges depend upon the extent to which the firearm is involved:

"(d)(i) if the person committed the offense while armed with a firearm, 15 years shall be added to the term of imprisonment imposed by the court;

(ii) if, during the commission of the offense, the person personally discharged a firearm, 20 years shall be added to the term of imprisonment imposed by the court;

(iii) if, during the commission of the offense, the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5--8--1(a)(1)(d) (West 2002).

-27-

No. 2--03--0920

In this case, the 15, 20, 25 to life statute was first mentioned when, at a pretrial hearing, the State requested that the trial court admonish defendant of the possibility of sentencing under the statute. The State asserted that if defendant were convicted of actually firing the shot, the minimum sentence that he could receive would be 45 years, that is, the basic 20-year statutory minimum for first degree murder plus the 25-year enhancement required by the statute. The trial court so advised defendant. On the day that trial began, the assistant state's attorney informed the court that he would be submitting a special verdict under the Apprendi case regarding the 15, 20, 25 to life statute. The submitted instruction that was given to the jury read:

> "If you find the defendant guilty of First Degree Murder, you shall then consider a special verdict form which accuses the defendant of personally shooting Mr. Neubauer. If you find that defendant personally shot Mr. Neubauer on at least one occasion and that that shot contributed to the death of Mr. Neubauer, you should find the defendant guilty of that count."

The special verdict form, which the jury ultimately signed, read, "We the jury, find the defendant, RONALD RUHL, Guilty of First Degree Murder (personally discharged firearm)."

After rejecting the contentions defendant raised in his post-trial motion, including his contentions under Apprendi that defendant did not receive proper notice that the State was seeking an enhanced sentence and that the instruction was faulty because it did not require the jury to find beyond a reasonable doubt that defendant personally shot the victim, the matter proceeded to sentencing. The assistant state's attorney began his argument by stating:

> "Your Honor, as we would point to the Illinois Revised or Compiled Statutes, specifically Chapter 730 ILCS 5/5--8--1(a)(1)(c)[sic](iii), regarding the mandatory sentence

-28-

No. 2--03--0920

      in this case which is that in addition to the minimum sentence of 20 years for murder, that

      there be an additional 25 years sentence on top of that for the fact that the personal discharge

      of a gun in this case caused the death of Richard Neubauer."

The State recommended a sentence of "at least 50 years in the Department of Corrections." Defense

counsel argued that, due to the Apprendi violations, the applicable sentencing range was 20 to 60

years and that the State was not entitled to the 15, 20, 25 to life enhancement. Defense counsel made

no specific recommendation other than a term of years between 20 and 60 and concluded his remarks

by staying, "I will tell you this with all respect to the Court, whatever sentence you impose upon

[defendant], you are sentencing an innocent man."

      After reciting its findings regarding the factors in mitigation and aggravation, the trial court

said, "[t]here is a range from 20 to 60 that the legislature has decided is an appropriate range for one

who commits the ultimate offense, murder." The trial court then imposed sentence:

      "I do not find the State's recommendation to be an unreasonable recommendation.

      Perhaps this defendant deserves more, but using leniency and mercy because it's something

      fundamental to this court, it is not because it is something this defendant deserves, and in view

      of the fact that the recommendation is within the proper basic range as the legislature has

      recommended, not involving the 15/20/25 life statute, I will sentence the Defendant to 50

      years in the Illinois Department of Corrections.

      This is a 100 percent sentence."

Thereafter, the following dialogue ensued:

      "MR. STRICKLAND: That 50 years includes the 15/25 life I assume; is that correct,

Judge?

-29-

184

No. 2--03--0920

THE COURT: It is a reasonable sentence even if it doesn't include it, Mr. --

MR. STRICKLAND: No, Judge. I think this court has to state on the record for the record exactly if it is structuring it that way. I am not quibbling with your sentence.

THE COURT: I said it for the edification of Mr. Stone who indicated that I should be choosing a number within the range. It does include it, yes.

MR. STONE: I don't know what just happened, Judge. I mean I understand your sentence of 50 years. I am completely befuddled by Mr. Strickland's suggestion.

Are we now saying that he is sentenced to 25 years plus 25 years under the sentencing enhancement for a total of 50?

THE COURT: He is sentenced to 50 years in the Illinois Department of Corrections.

MR. STONE: But Mr. Strickland asked you to structure the sentence by the statute.

THE COURT: I am not structuring my –

MR. STONE: Okay, so the sentence does not include the sentencing enhancement of 15/20/25 life?

MR. STRICKLAND: Judge, it has to.

THE COURT: I took it into consideration, Mr. Stone.

MR. STRICKLAND: It does. The structure – the sentence what I am saying has to include that.

THE COURT: Whether I name it one way or another, Mr. Strickland, my sentence is 50 years. As I said, it is included in the range, in the proper range. My basic consideration was the proper range of 50 years. It includes the enhancement. I took the enhancement into consideration when I imposed the sentence.

-30-

No. 2--03--0920

MR. STRICKLAND:  Thank you, Judge.

MR. STONE:  So, you have added 25 years to the term of imprisonment imposed for a total of 50?

THE COURT:  My sentence would have been 50, whether that statute exists or not exists.

MR. STONE:  That's why I am –

THE COURT:  It is 50.  The proper sentence is 50, Mr. Stone.

MR. STONE:  I think I understand you.  I didn't understand Mr. Strickland.

MR. STRICKLAND:  I was merely asking –

THE COURT:  Then you can talk to Mr. Strickland.

MR. STRICKLAND:  I am attempting to clarify.  That's all.

MR. STONE:  Mr. Strickland and I will convene in the hallway, Judge."

Defendant maintains that he received an enhanced term of imprisonment under section 5--8--1(a)(1)(d)(iii) premised upon the jury's verdict that he personally shot Neubauer thereby contributing to Neubauer's death.  Based on two purported violations of Apprendi and section 111-3(c--5) of the Code of Criminal Procedure (725 ILCS 5/111--3(c--5) (West 2002)), defendant contends that the jury's verdict as to the enhancing factor is void and, therefore, his sentence must be reduced to 25 years.  First, defendant argues that the State did not allege the enhancing factor in the indictment or otherwise provide written notification of the enhancing factor.  Second, defendant argues that the instruction given to the jury relating to the enhancing factor did not inform the jury that they had to find the enhancing factor was proven beyond a reasonable doubt.

-31-

No. 2--03--0920

In contrast, the State maintains that the trial court did not enhance defendant's sentence under section 5--8--1(a)(1)(d)(iii) but, rather, sentenced defendant to a term of imprisonment within the basic statutory range for first degree murder. The State also argues that, regardless of whether the sentence was enhanced, it was within the basic statutory range of 20 to 60 years, the trial court did not exceed its authority, and the sentence can only be characterized as voidable and not void. The State, therefore, concludes that any error is waived.

We will begin by addressing the State's waiver argument. In this case the <u>Apprendi</u> issues were raised in defendant's post-trial motion but were not raised in a post-sentencing motion. In fact, defendant filed no such motion. In order to preserve for appeal contentions of error in sentencing, such contentions must be raised in a section 5--8--1(c) (730 ILCS 5/5--8--1(c) (West 2002)) post-sentencing motion. <u>People v. Reed</u>, 177 Ill. 2d 389, 392-95 (1997). In <u>Reed</u>, our supreme court held that defendants waived their contentions of sentencing error by failing to raise those issues in a post-sentencing motion, and did not consider whether the sentencing errors amounted to plain error because defendants made no such argument. <u>Reed</u>, 177 Ill. 2d 395. In this case, defendant's contentions of sentencing error are similarly forfeited and defendant makes no argument that we should review his sentence for plain error. Accordingly, we affirm defendant's sentence.

Even if we were to review defendant's <u>Apprendi</u> arguments under a plain error analysis (<u>People v. Crespo</u>, 203 Ill. 2d 335, 347 (2003), citing <u>United States v. Cotton</u>, 535 U.S. 625, 152 L. Ed. 2d 860, 122 S. Ct. 1781 (2002) (applying plain error test because defendant did not object at time of trial), we would conclude that they lack merit. Under a plain error analysis, a defendant's conviction and sentence will stand unless the defendant shows the error was prejudicial. <u>Crespo</u>, 203 Ill. 2d at 347-48. In <u>Crespo</u>, our supreme court adopted the reasoning of the Supreme Court in

-32-

File Date:    9 - 2 - 2 0 0 8

Case No:    08 cv 4980

ATTACHMENT # _____

EXHIBIT    exhibits part3

TAB (DESCRIPTION) _____

No. 2--03--0920

Cotton, holding that an appellate court may correct an error not raised at trial, only if there was an

(1) error, (2) that is plain, (3) that affects substantial rights, and (4) the error seriously affected the

fairness, integrity, or public reputation of the judicial proceedings. Crespo, 203 Ill. 2d at 348. Here,

at a minimum, defendant cannot establish the first and fourth prongs.

With regard to the first Crespo prong, after reviewing the record we cannot conclude that

there was an error in sentencing defendant. We do not believe that the trial court enhanced

defendant's sentence under the 15, 20, 25 to life statute.  At the beginning of the trial court's

pronouncement of sentence the court indicated that "in view of the fact that the recommendation is

within the proper basic range as the legislature has recommended, not involving the 15/20/25 life

statute, I will sentence the Defendant to 50 years in the Illinois Department of Corrections." Then,

when pressed by the parties, the trial court vacillated on the issue of whether the sentence included

an enhancement pursuant to the 15, 20, 25 to life statute. Nevertheless, at the end of the discussion

the trial court stated in the most positive manner that, "[m]y sentence would have been 50, whether

that statute exists or not exists" indicating that it believed that 50 years was an appropriate sentence

irrespective of whether defendant was eligible for an enhanced sentence under the 15, 20, 25 to life

provision.

With respect to the fourth Crespo prong, even if there was an Apprendi violation in the

imposition of defendant's sentence, the error did not seriously affect the fairness of the proceeding

because the trial court could have imposed a 50-year sentence based solely on the jury's verdict that

defendant is guilty of first-degree murder (730 ILCS 5/5--8--1(a)(1)(a) (West 2002)).  As a result,

the trial court's error did not result in a miscarriage of justice that warrants vacature of defendant's

sentence.  See United States v. Martinez, 289 F. 3d 1023, 1027 (7th Cir. 2002).

No. 2--03--0920

### D. Anonymous Jury

Defendant's last contention on appeal is that the trial court's use of anonymous jury selection prejudiced him because it raised the specter that he is a dangerous person from whom the jurors need protection. In addition, defendant contends that he was prejudiced by the trial court's comments to the prospective jurors regarding the use of their juror numbers rather than their names. Initially, the State argues that defendant has waived these arguments by failing to object to the use of juror numbers in selecting the jury and to the trial court's explanation. We agree with the State.

After the assistant state's attorney and defense counsel referred to six prospective jurors by their names, the following dialogue occurred:

"THE COURT: Okay, all right. Can you not use the names of the jurors?

MR. STRICKLAND: Oh, when we question them?

THE COURT: Yes. I will advise the jurors.

MR. EDENS: If you tell them we mean no disrespect.

THE COURT: Thank you.

* * *

THE COURT: * * *

You have noticed that I am addressing you and the attorneys will be addressing you by a number. There are some reasons for it; to avoid some apprehensions, some basic apprehensions that jurors have. So long as you know that we mean no disrespect to you by calling you by number. I know it's the most impolite way of questioning someone, but since this is the latest notion, we will follow it."

-34-

No. 2--03--0920

Clearly, there was no objection to the procedure of using juror numbers rather than names and, in fact, defense counsel requested only that the trial court inform the prospective jurors that no disrespect was intended. Defendant was required to object during the jury selection process. People v. Robinson, 299 Ill. App. 3d 426, 436 (1998). Without a contemporaneous objection, the trial court was deprived of an opportunity to correct or prevent errors and a defendant could gain the advantage of obtaining a reversal through intentional or inadvertent failure to act. Robinson, 299 Ill. App. 3d at 427. Moreover, a defendant may not complain of error which he invited or in which he acquiesced. People v. Lowe, 153 Ill. 2d 195, 199 (1992).

Waiver aside, neither of defendant's contentions regarding the jury selection process have merit. It is true that empaneling an anonymous jury is warranted only where there is strong reason to believe the jury needs to be protected. United States v. Mansoori, 304 F.3d 635, 650 (7th Cir. 2002). This is true because " '[a]n anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant's constitutional right to a presumption of innocence.' " Mansoori, 304 F.3d at 650, quoting United States v. Ross, 33 F. 3d 1507, 1519 (11th Cir. 1994). Be that as it may, as the State points out, it is clear from the record that the prospective jurors in this case were not anonymous. The names of the individual prospective jurors were disclosed to the State and to the defense in written juror profiles. In fact, it was after the assistant state's attorney and defense counsel referred to six different prospective jurors by their names that the trial court asked that counsel address the prospective jurors by their juror numbers. In our recent decision in People v. Collins, 351 Ill. App. 3d 175 (2004), this court responded to the appellate contention that the Lake County practice of referring to jurors by number rather than name constituted error:

187

No. 2--03--0920

"[T]he State points out, the jury was not truly anonymous, since the parties were given forms that listed each juror's name and town of residence. We agree with the State that these facts do negate the inference that defendant is a dangerous person. However, they do so only if the jury is aware of them. Hence, it would be good practice for trial courts to insure that juries are made aware of these facts in this and all trials." Collins, 351 Ill. App. 3d at 183.

In this case, the entire venire was made aware that the defense knew their names when they heard counsel refer to six prospective jurors by name before the trial court instructed counsel to refer to the jurors by juror number. The prospective jurors knew that they were not anonymous and, therefore, the specter that defendant was a dangerous person from whom they needed protection not arise. We note that, unlike Collins where we knew that the parties were given forms listing each juror's town of residence in addition to his or her name, there is no indication in this record that the juror profile forms given to the parties contained the prospective jurors' towns of residence.[1] We nevertheless believe that prospective jurors' knowledge that the defense knew their names was sufficient to dispel any inference that defendant is a dangerous person from whom they need protection.

---

[1]In People v. Robinson, 250 Ill. App. 3d 824, 831 (1993), we held that the requirement of section 115--4(c) of the Code of Criminal Procedure (725 ILCS 5/115--4(c)) (West 1992)) and Supreme Court Rule 434(b) (134 Ill. 2d R. 434(b)) that prospective jurors' addresses, if known, be provided to the parties upon request is permissive, not mandatory.

-36-

No. 2--03--0920

With respect to defendant's contention that the trial court's comments to the prospective jurors prejudiced him, defendant asserts that the comments "[o]nly highlighted that they have something to fear from [defendant]." We disagree. The trial court's explanation for using juror numbers rather than names was that "[t]here are some reasons for it; to avoid some apprehensions, some basic apprehensions that jurors have." These ambiguous comments do not imply that defendant is a dangerous person particularly where the prospective jurors were aware that the parties had knowledge of their names and where the trial court explained that the procedure was the "latest notion" and that they would follow it, thereby implying that it was the practice at all trials.

### III. CONCLUSION

For the foregoing reasons we affirm defendant's conviction and sentence.

Affirmed.

KAPALA, J., with GROMETER and GILLERAN JOHNSON, J.J., concurring.

FILED

OCT 3 0 2007 188

No. 2--06--0227

ROBERT J. MANGAN, CLERK
APPELLATE COURT 2nd DISTRICT

This Order Is Not Precedential
And Is Not To Be Cited

IN THE

## APPELLATE COURT OF ILLINOIS

### SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 02--CF--2183 |
| RONALD E. RUHL, | ) ) | Honorable James K. Booras, |
| Defendant-Appellant. | ) | Judge, Presiding. |

### RULE 23 ORDER

Defendant, Ronald E. Ruhl, appeals from an order of the Circuit Court of Lake County summarily dismissing his postconviction petition. Defendant argues that the trial court erred by dismissing his postconviction petition as frivolous and without merit, because his petition states the gist of a constitutional claim for ineffective assistance of counsel. We hold that the trial court erred by finding that Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), does not apply retroactively to defendant's case, but summary dismissal of defendant's postconviction petition was correct because (1) admission of the contested hearsay statements was proper and did not violate Crawford, and therefore defendant cannot demonstrate prejudice necessary to state the gist of a claim for ineffective assistance of counsel; and (2) defendant's other claims are barred by res judicata or forfeiture. We affirm.

### BACKGROUND



189

### A. Facts

On February 6, 2003, a jury convicted defendant of first degree murder (720 ILCS 5/9--1(a) (West 2002)). Defendant subsequently was sentenced to fifty years' imprisonment. Both defendant and a co-defendant, Raymond Serio, were convicted in separate jury trials for the murder of Richard Neubauer. The State argued in both cases that Serio ordered defendant to shoot Neubauer, apparently because Serio was infatuated with Neubauer's girlfriend, Denise Schubat. Defendant's trial counsel argued that Schubat solicited Serio to kill Neubauer, Serio did so, and Schubat then implicated defendant in the murder to cover up her own role.

At defendant's trial, Schubat testified that she began working as a bartender at Whip Lash, a bar owned by Serio, in August 2001. Schubat identified a photograph of Serio showing that he was shaved bald, had devil horns tattooed on his head, and a scorpion tattooed on his neck. She worked the night shift with Serio from 6 p.m. to closing.

Schubat was acquainted with defendant before August 2001, but she became much more familiar with him once she began working at Whip Lash. Defendant, who was friendly with Serio, spent a great deal of time at the bar. He did remodeling work there and ran errands for Serio. Defendant also drove Serio to and from work. When defendant was not at Whip Lash, Schubat often heard him and Serio talking on their cellular telephones, each of which had a two-way radio feature. Schubat was aware that defendant owed Serio a substantial amount of money.

Schubat and Serio had sexual relations on one occasion in October 2001, after which Schubat continued to work at Whip Lash five to six nights each week. Schubat and Neubauer were not romantically involved during this time, but they had a child together from their prior involvement. Schubat and Neubauer once again became romantically involved in late November 2001. After this

-2-

Neubauer would often pick Schubat up at Whip Lash when she finished working, typically between 2:15 and 2:30 a.m.

Schubat testified at defendant's trial that approximately one week before Neubauer was killed she was with Serio and defendant in Whip Lash's kitchen when Serio told defendant that they were going to kill Neubauer. According to Schubat, in response to Serio defendant said, "[w]ell okay, only if Schubat doesn't get mad at me." Schubat said that because Serio and defendant were laughing about it, she thought Serio was kidding and therefore did not take their comments seriously. At some point during this general period of time, Schubat saw a gun in one of the drawers behind the bar at Whip Lash. The gun reminded Schubat of "an old western movie with the barrel, and it had a tan-colored handle." Schubat asked Serio to remove the gun from Whip Lash.

On Saturday, January 5, 2002, Schubat arrived for work at 6 p.m., expecting Neubauer to pick her up after work. Schubat explained that she had spoken to Neubauer earlier that night and they made plans to go to a party in the city. For several days preceding January 5, 2002, Neubauer had been driving a green four-door car that belonged to his mother.

Around 10 p.m. that night, defendant came into Whip Lash and went into the kitchen with Serio. When Schubat walked into the kitchen to ask Serio a question, defendant and Serio "shut up right away." At some point that night, when Schubat looked for an aspirin in the drawer behind the bar, she noticed that the gun was gone.

After the bar closed at 2 a.m., Schubat, who was cleaning, heard Serio ask if the green four-door was still in the parking lot. Serio was talking on his cell phone. Through the phone, Schubat heard defendant respond "yes." According to Schubat, Serio then asked defendant to go up to the window and shoot Neubauer. Next, Schubat heard Serio tell defendant to go to the window, knock,

190

and pull the trigger. After a pause, Schubat heard defendant say, "are you sure?" Serio then screamed into the phone, "I want to hear a gunshot." The next thing Schubat heard was a gunshot. Schubat pushed Serio out of her way, jumped over the bar, and ran to the front door. Through the window on the front door Schubat saw Neubauer sitting in the car hunched over with his jaw quivering. A few moments later Serio let defendant into the bar, where defendant paced around, holding his head. Schubat saw defendant put a gun onto the bar. She recognized the gun to be the same gun she had seen before in the drawer behind the bar. Defendant told Serio that they needed to get rid of Neubauer's body as soon as possible. Serio warned Schubat that she should ensure that no one found out Neubauer had been at Whip Lash that night if she wanted her daughter to remain safe.

The next morning, when Neubauer's mother called, Schubat told her that she had not heard from Neubauer. That evening, Neubauer's mother called again and told Schubat to come to her house. When she arrived, Schubat was informed by two detectives that Neubauer's dead body had been found in Wisconsin. In response to questions about Neubauer's death, Schubat said nothing because she was afraid that Serio or defendant would hurt her daughter. Schubat admitted that she lied to the police several times about Neubauer's death before April 2002, when she finally told the police the truth.

On June 19, 2002, defendant was indicted for Neubauer's murder. At defendant's trial, Derrick Banks testified that Serio and defendant came to his home in Zion, Illinois on five or six separate occasions during late November and early December of 2001. These visits always took place late at night. Banks further testified that on one of these visits Serio asked Banks for a gun. According to Banks, defendant was present when Serio made this request.

-4-


Officer Keith Lamanna of the Waukegan Police Department testified that he stopped a vehicle registered to Serio at 5:17 a.m. on January 6, 2002, on Washington Street just east of Lewis Avenue in Waukegan. According to Officer Lamanna, the vehicle was occupied by two persons. Officer Lamanna identified the driver as a heavy set, bald, white male, with tattoos of horns on the top of his head. Officer Lamanna identified a picture of Serio as the driver of the vehicle he stopped. Officer Lamanna also made an in-court identification of defendant as the passenger in the vehicle driven by Serio. Officer Lamanna identified defendant as the passenger from a photo array he was shown prior to trial.

At the scene of the traffic stop, Officer Lamanna asked Serio and defendant where they had been, and one or both of them said that they came "from the north, Round Lake." Officer Lamanna testified that he became suspicious because Round Lake is due west of the intersection of Washington and Lewis. When asked where they were going, one or both of the men told Officer Lamanna that they were looking for a restaurant. Serio consented to a search of his vehicle and Officer Lamanna recovered an open bottle of liquor. Officer Lamanna poured out the liquor and released the men without making an arrest or issuing any citations. Officer Lamanna indicated that he made no written report regarding the traffic stop.

### B. Procedural History

On January 22, 2003, the State filed a motion in limine, seeking to bar testimony of three witnesses for the defense, including Marcy McIntosh. McIntosh knew Serio and defendant from Whip Lash, where she worked as a bartender from January until April, 2002. At the hearing on the State's motion in limine, McIntosh stated that in April, 2002, while she was working at Whip Lash, Serio told her that he was the one who shot and killed Neubauer. McIntosh further stated that her

No. 02--06--0227

191

fiancé, Jim Natywa, also heard Serio's statements. The State argued that the proposed testimony should be barred as inadmissible hearsay. Defendant's trial counsel argued that the statements should be admitted as statements against penal interest, an exception to the hearsay rule. The trial court granted the State's motion and barred McIntosh from testifying, ruling that the statements were inadmissible because although they qualified as statements against penal interest, they did not meet the requisite indicia of reliability and therefore were not trustworthy.

On February 6, 2003, the jury delivered a guilty verdict. On February 23, 2003, defendant replaced his trial counsel. Defendant filed a posttrial motion on March 3, 2003, in which he alleged that he was denied a fair trial and effective assistance of counsel. After a hearing on July 17, 2003, the trial court denied defendant's amended motion for a new trial. Defendant appealed. This court affirmed his conviction, finding that defendant was not deprived of a fair trial and could not show the requisite prejudice necessary to sustain a claim for ineffective assistance of counsel. People v. Ruhl, No. 2--03--0920 (2004) (unpublished order under Supreme Court Rule 23).

On November 22, 2005, defendant, through a third attorney, filed a petition under the Postconviction Hearing Act (Act) (725 ILCS 5/122-1 et seq. (West 2004)). On February 10, 2006, the trial court summarily dismissed defendant's postconviction petition as frivolous and without merit. Defendant timely appeals.

## ANALYSIS

On appeal, defendant argues that his trial counsel was ineffective for several reasons, among them that he failed to object to or otherwise limit admission of the hearsay statements of Schubat and Banks and that he failed to interview and present Natywa as a witness to corroborate McIntosh's proposed testimony.

No. 02--06--0227                                                                                         192

If the judge finds the petition to be frivolous or patently without merit, the court must dismiss

it at the first stage. 725 ILCS 5/122-2.1(a)(2) (West 2006). A petition will be found frivolous or

patently without merit when its allegations do not set forth the gist of a constitutional claim or are

rebutted by the record. Edwards, 197 Ill. 2d at 244. A petition may also be found frivolous or

patently without merit when it raises issues that are barred by res judicata or forfeiture.[1] Blair, 215

Ill. 2d at 445. All issues decided on direct appeal are res judicata, and all issues that could have been

raised in the original proceeding but were not, are forfeited. People v. Owens, 129 Ill. 2d 303 (1989).

### C. Ineffective Assistance of Counsel

To state the gist of a claim for ineffective assistance of counsel, the petitioner must satisfy the

test set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 80 L.

Ed. 2d 674, 104 S. Ct. 2052 (1984), which provides that defense counsel is ineffective only where

(1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's error

prejudiced the defendant. People v. Pineda, 373 Ill. App. 3d 113, 117 (2007). The defendant

establishes prejudice if he can show that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S.

at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698.

Defendant argues that his trial counsel erred when he either failed to object to or did not

attempt to limit admission of Schubat's hearsay statements as to Serio's admissions that he was the

one who killed Neubauer, and Banks' hearsay statements that Serio was looking for a gun, when

---

[1]In Blair, our supreme court distinguished between the terms "waiver" and "forfeiture," noting "that courts often use the terms 'forfeit,' 'waive,' and 'procedural default' interchangeably in criminal cases." Blair, 215 Ill. 2d at 443. The Court declared that for purposes of its opinion in that case, it would "use the term 'forfeited' to mean issues that could have been raised, but were not, and are therefore barred." Blair, 215 Ill. 2d at 443-44. For our decision in this case we shall follow that example and use forfeiture in the same way the Supreme Court did in Blair.

-8-

No. 02--06--0227

admission of these statements may have violated defendant's right to confrontation under <u>Crawford</u>. To determine if this alleged error prejudiced defendant, we must first decide (1) whether <u>Crawford</u> applies retroactively to defendant's case, and (2) whether the hearsay statements were properly admitted by the trial court.

1. <u>Crawford applies retroactively to cases pending on direct appeal</u>

In summarily dismissing defendant's postconviction petition, the trial court relied on <u>Bintz v. Bertrand</u>, 403 F.3d 858, 867 (7th Cir. 2005), finding that <u>Crawford</u> did not apply retroactively. In this appeal, defendant argues that <u>Bintz</u> does not stand for that proposition, and <u>Crawford</u> is retroactive to any matter pending on direct review at the time it was published. We agree with defendant.

Defendant filed his notice of appeal on August 14, 2003. <u>Crawford</u> was decided on March 8, 2004. <u>Crawford</u>, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354. This court affirmed defendant's judgment and sentence on December 15, 2004. <u>Ruhl</u>, No. 2--03--0920. Defendant's direct appeal was therefore pending at the time <u>Crawford</u> was decided. " '<u>Crawford</u> announced a new rule regarding the effect of the confrontation clause on the admission of hearsay statements in criminal prosecutions. [citations omitted] A new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final.' " <u>People v. Stechly</u>, 225 Ill. 2d 246, 268 (2007), quoting <u>People v. Sisavath</u>, 118 Cal. App. 4th 1396, 1400, 13 Cal. Rptr. 3d 753, 756 (2004); see also <u>People v. Purcell</u>, 364 Ill. App. 3d 283 (2006). <u>Crawford</u> therefore applies retroactively to cases that were pending on direct appeal at the time it was decided. <u>Stechly</u>, 225 Ill. 2d at 268.

Crawford thus applies retroactively to defendant's postconviction petition, contrary to the trial court's finding. Defendant neither waived nor forfeited the Crawford claim because "[i]t would be manifestly unfair to hold defendant to have waived claims by not raising them at trial when those claims are based on a rule which was only announced during the pendency of his appeal to this court." Stechly, 225 Ill. 2d at 268. Accordingly, we will address defendant's claim of ineffective assistance of counsel based on counsel's failure to object to or otherwise limit admission of contested hearsay statements in violation of defendant's Sixth Amendment right to confrontation.

### 2. Contested Hearsay Statements

Our supreme court has repeatedly stated that cases are to be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort. In re E.H., 224 Ill.2d 172, 178 (2006). Accordingly, when we evaluate the admission of out-of-court statements into evidence, "the first step is determining whether the statement passes muster as an evidentiary matter." (Emphasis in original.) In re E.H., 224 Ill.2d at 179. Constitutional objections should be addressed only if the statement is found admissible. In re E.H., 224 Ill.2d at 179-180.

Defendant claims ineffective assistance of counsel based on his trial counsel's failure to object to or attempt to limit admission of Serio's hearsay statements (through Schubat and Banks's testimony) that Serio was the one who killed Neubauer and that, a few weeks prior to Neubauer's murder on January 6, 2002, Serio was seeking a gun through a private individual, because the statements allegedly deprived defendant of his Sixth Amendment right to confrontation and because the statements do not qualify as co-conspirator statements.

Statements of a co-conspirator made in furtherance of the conspiracy are admissible against other members of the conspiracy as an exception to the rule barring admission of hearsay. People v.

-10-

Lake, 297 Ill. App. 3d 454, 461 (1998). The State need not allege a conspiracy, and the co-conspirator's statements may be admitted prior to proving up existence of the conspiracy as long as the State produces evidence adequate to demonstrate that a conspiracy exists. Lake, 297 Ill. App. 3d at 461. The trial court denied defendant's posttrial motion as to the hearsay statements because it found that the State proved the existence of a conspiracy between Serio and defendant and therefore Serio's hearsay statements were admissible under the co-conspirator exception to the hearsay rule.

To establish a prima facie showing of a conspiracy, "the State must prove by a preponderance of the evidence (independent of the coconspirator's hearsay statements) that (1) one or more persons intended to commit a crime; (2) they engaged in a common plan to accomplish the criminal goal; and (3) an act or acts were done by one or more of them in furtherance of the conspiracy." People v. Batrez, 334 Ill. App. 3d 772, 783 (2002).

Our review of the record convinces us that the trial court did not abuse its discretion in finding Serio's hearsay statements admissible under the co-conspirator exception. "In establishing a prima facie case of conspiracy, proof of the agreement, which is the essence of a conspiracy, need not be proved by direct evidence, but may be inferred from all the surrounding facts and circumstances, including the acts and declarations of the accused defendant." People v. Ervin, 297 Ill.App.3d 586, 592 (1998). Illinois courts permit broad inferences to be drawn from such evidence. Batrez, 334 Ill. App. 3d at 783-84.

Independent of Serio's statements, the surrounding facts and circumstances of this case provide ample evidence from which to infer the existence of a conspiracy between Serio and defendant to kill Neubauer. Schubat testified at defendant's trial that defendant and Serio were

-11-


together or talking on the phone almost all the time in the weeks prior to the murder on January 6, 2002. Schubat also testified that an antique-looking gun was usually kept on the premises of Whip Lash. On the night of the murder, however, the gun was not there. The State presented evidence that the gun used to kill Neubauer was an antique, break open revolver.

Kristen Koets, Serio's then-fianceé, testified at defendant's trial that in December 2001, she drove Serio and defendant to the Bass Pro Shop in Gurnee Mills, Illinois. Serio and Koets went into the store together while defendant waited outside in the car. Serio had Koets buy bullets. Koets then drove Serio and defendant to a hotel, where Koets gave the bullets to defendant. Defendant accepted the bullets from her without protest or questions.

Schubat testified that around 10 p.m. on January 5, 2002, defendant entered Whip Lash, where he spent 30 to 45 minutes talking to Serio in the kitchen. Neubauer was expected to arrive at Whip Lash around 2:15 a.m. for Schubat. Shortly after Whip Lash closed on January 6, 2002, Schubat heard a gunshot. She ran to the door and saw Neubauer sitting in his car, hunched over with his jaw quivering. A few minutes later defendant walked from the kitchen into the bar area of Whip Lash. Schubat saw him place the gun, which was normally kept in the drawer and which was not in the drawer that night, onto the bar. Schubat testified that the gun appeared to be broken in half.

Neubauer's body was found in the early morning hours of January 6, 2002, in a green, four-door Ford Taurus parked in the driveway of the Bristol Renaissance Faire, in Kenosha County, Wisconsin. At approximately 5:17 a.m. on January 6, 2002, Serio and defendant were stopped by Officer Lamanna while driving together in Waukegan, Illinois. At defendant's trial, Officer Lammana testified that either Serio or defendant said they had driven to Waukegan from the north.

-12-

Considered collectively, this evidence supports the inference that Serio and defendant intended to commit a crime; that they engaged in a common plan to accomplish the criminal goal; and that they performed acts in furtherance of the conspiracy. The trial judge therefore did not abuse his discretion in finding that this evidence was sufficient to set forth a prima facie case for a conspiracy between Serio and defendant. Consequently, the trial court's admission under the co-conspirator exception of Schubat's testimony as to Serio's out-of-court statements that he killed Neubauer, and Banks's testimony that a few weeks prior to Neubauer's murder on January 6, 2002 Serio had asked him, in defendant's presence, for a gun, was not error.

We now address whether admission of those statements violated defendant's Sixth Amendment right to confrontation under Crawford. Crawford holds that the "testimonial" hearsay statements of a witness who is unavailable at trial may not be admitted against a criminal defendant unless the defendant had a prior opportunity for cross-examination. Stechly, 225 Ill. 2d at 262. Under Crawford, the testimonial statement of a witness who does not testify at trial is inadmissible unless "(1) the witness is unavailable to testify, and (2) the defendant had a prior opportunity for cross-examination." Stechly, 225 Ill. 2d at 279. The initial question in analyzing a confrontation clause claim is whether the statements at issue are "testimonial," because the confrontation clause will not bar introduction of nontestimonial statements. Stechly, 225 Ill. 2d at 279.

Schubat testified that prior to the day of the murder, she twice heard Serio tell defendant that they were going to kill Neubauer, but she thought they were joking because Serio and defendant were laughing. Schubat also testified that on the night of the murder she heard Serio ask defendant if there was a green four-door car in the parking lot a few minutes before he told defendant to go to the car window and shoot Neubauer. Schubat further testified that Serio screamed to defendant over the

phone, "I want to hear a gunshot!" Defendant's trial counsel did not object to any of these statements.

 Banks testified that Serio asked Banks to get him (Serio) a gun, and that this request was made in defendant's presence. Although defendant's trial counsel objected to this testimony, the trial judge overruled the objection on the grounds that Banks' testimony was admissible hearsay pursuant to the exception for statements of a co-conspirator.

Serio's statements were properly admitted as statements of a co-conspirator. As such, they are not subject to Crawford because statements of a co-conspirator are always nontestimonial and therefore are not protected by the confrontation clause. People v. Cook, 352 Ill. App. 3d 108, 124 (2004), citing Crawford, 541 U.S. at __, 158 L. Ed. 2d at 195-96, 124 S. Ct. at 1367. We hold that defendant's claim of alleged error based on Crawford does not state the gist of a constitutional claim sufficient to survive the first stage of review under the Act because Serio's statements were admissible pursuant to the co-conspirator exception and do not implicate Crawford. As such, trial counsel's failure to object to or attempt to limit admission of Serio's hearsay statements had no effect on the outcome of defendant's trial.

### D. Res Judicata and Forfeiture

Defendant also argues that his trial counsel was ineffective because he did not interview or present a witness--Natywa--to corroborate McIntosh's testimony, which was barred from introduction at trial as inadmissible hearsay. Defendant attached an affidavit from Natywa to his postconviction petition. In the affidavit, Natywa attested that on April 4, 2002, he heard Serio admit to killing Neubauer.

-14-

~~The trial court found that consideration of the Natywa affidavit was barred both by res judicata, because the issue had been addressed on appeal, and forfeiture, because defendant failed to attach any affidavits to his posttrial motion. Defendant acknowledges that this issue was addressed~~ on direct appeal, but argues that ~~we should make an exception to res judicata and forfeiture because his claim related to Natywa rests upon facts--the affidavit--that do not appear in the record. The State counters that there is no reason to look past res judicata and forfeiture because defendant does not allege that any of the facts upon which his claim rests are newly discovered or provide proof of defendant's actual innocence. We agree with the State.~~

On direct appeal, this court affirmed the trial court's refusal to allow Marcy McIntosh's testimony into evidence. We held that defendant's trial counsel was not ineffective for failing to call Natywa as a witness. Ruhl, No. 2--03--0920. In reaching this decision, we first noted the strong presumption in favor of trial counsel's competence when it comes to decisions concerning whether to call a certain witness. People v. Enis, 194 Ill. 2d 361, 380 (2000).

A claim that trial counsel failed to investigate and call a witness requires a supporting affidavit from the proposed witness in order to allow the reviewing court to determine whether testimony from the proposed witness would have been favorable. Enis, 194 Ill. 2d at 380. Although defendant argued on direct appeal that his trial counsel had no sound reason not to call Natywa as a witness, there was no affidavit attached to defendant's posttrial motion. This court declined to "speculate as to Natywa's existence, availability, or to the content of his testimony" and therefore held that "defendant has not shown that trial counsel's failure to call this witness fell below an objective standard of reasonableness."

Although the general rule provides that "determinations of the reviewing court on direct appeal are res judicata as to issues actually decided, and issues that could have been raised on direct appeal, but were not, are deemed waived[,]" the reviewing court may overlook these rules when facts relating to the issue of incompetency do not appear on the face of the record. People v. Eddmonds, 143 Ill. 2d 501, 528 (1991); see also Blair, 215 Ill. 2d at 450-51. This exception prevents the Act from being rendered ineffectual by mechanical application of res judicata " 'to foreclose an inquiry which probes beneath the mere fact of adjudication ....' " People v. Thomas, 38 Ill. 321, 323-24 (1967), quoting People v. Jennings, 411 Ill. 21, 26 (1952).

However, a defendant may not circumvent res judicata or forfeiture by providing additional documents in a piecemeal fashion without explaining why the information contained in those documents was unavailable when he filed his posttrial motion. People v. Wilson, 307 Ill. App. 3d 140, 149 (1999). Defendant argues on appeal that this court should look past res judicata and reconsider his argument related to Natywa because it relies upon facts that were outside of the record, namely Natywa's affidavit, which is dated November 16, 2005.

On February 23, 2003, after the jury delivered its guilty verdict, defendant replaced his original trial counsel. Defendant's new counsel filed a posttrial motion on February 23, 2003, which he amended on July 9, 2003. No affidavits were attached to either the original or the amended posttrial motion, and thus no affidavits were part of the trial record on direct review. This omission cannot be attributed to trial counsel's incompetence, however, as defendant had new counsel on his posttrial motion.

Defendant offers no reason as to why he could not have obtained an affidavit from Natywa to support his posttrial argument of ineffective assistance of counsel based on counsel's failure to

-16-

interview or present Natywa as a witness to corroborate McIntosh's proposed testimony. Defendant also provides no explanation as to why he did not attach supplementary reports from the Lake County and Kenosha County Sheriffs' departments, transcripts from trial proceedings and police interviews, and other materials related to police investigation of Neubauer's murder (all of which defendant attached to his postconviction petition) to his posttrial motion. ~~We therefore have no reason to look past res judicata to reconsider defendant's claim of ineffective assistance of counsel based on trial counsel's failure to interview or present Natywa, and we decline to do so.~~

Defendant's postconviction petition also alleges that his trial counsel was ineffective because he seemed baffled by the complexity of a murder case; gave incriminating statements about defendant to the police; lied to defendant about his experience as an attorney; was often late and on one occasion sent another attorney to court in his stead; entered into a stipulation as to venue that undermined defendant's motion to dismiss; made "inconsistent, vulgar, and nonsense-like" arguments during his opening and closing arguments; failed to interview impeachment witnesses; was unprepared for the State's "surprise" witness; failed to properly peruse telephone records to impeach the State's star witness; and deprived defendant of his right to testify.

Although defendant raised these arguments in his posttrial motion, he did not raise them on direct appeal. In this appeal, he does not address the issue of forfeiture with regard to these claims. ~~Accordingly, we agree with the State we have no reason to relax the forfeiture rule and decline to do so.~~ Although the trial judge noted that defendant could have raised these claims on direct appeal, his basis for summary dismissal was not forfeiture. Instead, the trial judge found that defendant did not state the gist of a constitutional claim for ineffective assistance of counsel based on these errors because defendant could not show a reasonable probability that his case would have been decided

Although the general rule provides that "determinations of the reviewing court on direct appeal are <u>res judicata</u> as to issues actually decided, and issues that could have been raised on direct appeal, but were not, are deemed waived[,]" the reviewing court may overlook these rules when facts relating to the issue of incompetency do not appear on the face of the record. <u>People v. Eddmonds</u>, 143 Ill. 2d 501, 528 (1991); see also <u>Blair</u>, 215 Ill. 2d at 450-51. This exception prevents the Act from being rendered ineffectual by mechanical application of <u>res judicata</u> " 'to foreclose an inquiry which probes beneath the mere fact of adjudication ....' " <u>People v. Thomas</u>, 38 Ill. 321, 323-24 (1967), quoting <u>People v. Jennings</u>, 411 Ill. 21, 26 (1952).

However, a defendant may not circumvent <u>res judicata</u> or forfeiture by providing additional documents in a piecemeal fashion without explaining why the information contained in those documents was unavailable when he filed his posttrial motion. <u>People v. Wilson</u>, 307 Ill. App. 3d 140, 149 (1999). Defendant argues on appeal that this court should look past <u>res judicata</u> and reconsider his argument related to Natywa because it relies upon facts that were outside of the record, namely Natywa's affidavit, which is dated November 16, 2005.

On February 23, 2003, after the jury delivered its guilty verdict, defendant replaced his original trial counsel. Defendant's new counsel filed a posttrial motion on February 23, 2003, which he amended on July 9, 2003. No affidavits were attached to either the original or the amended posttrial motion, and thus no affidavits were part of the trial record on direct review. This omission cannot be attributed to trial counsel's incompetence, however, as defendant had new counsel on his posttrial motion.

Defendant offers no reason as to why he could not have obtained an affidavit from Natywa to support his posttrial argument of ineffective assistance of counsel based on counsel's failure to

-16-

No. 02--06--0227

197

differently were it not for his trial counsel's alleged errors.  However, we do not reach this issue because we hold that defendant forfeited the above arguments as to his trial counsel's alleged ineffectiveness because he neither raised them on direct appeal nor provided any new allegations that may be considered "outside the record."  <u>Blair</u>, 215 Ill.2d 455.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

ZENOFF, J., with GROMETER, P.J., and GILLERAN JOHNSON, J., concurring.

## THOMAS C. BRANDSTRADER
### *ATTORNEY-AT-LAW*
312-332-5297
53 W. JACKSON BLVD. SUITE 615
CHICAGO IL 60604
FAX: 312-922-2055    CELL: 847-650-4070
TCBDEFENSE@COMCAST.NET    WWW.CHICAGOFELONY.COM

Ex. U    198

February 8, 2005

Ronald Ruhl
R12207
PO Box 112
Joliet Il. 60434

Re: Petition for Rehearing

Dear Ronald,

I enclose a copy of the petition that you forwarded to me. I note in the columns (etc.) what I can use and what I cannot use. I cannot use any reference to police reports nor Serio testimony. In a petition for rehearing, you cannot raise new issues, nor issues not raised on direct review, nor, can you raise any issue outside the record.

The petition will ask the court to rethink the ruling on the McIntosh testimony and the factors employed to find that the violation of discovery rules (Officer Lamanna) did not prejudice the defense. In the latter argument, I will employ the phone issue and the Jonites route discrepancy in an effort to convince the court that the evidence is not only not close it is barely scant and certainly not sufficient to convict beyond a reasonable doubt.

Respectfully,

Thomas C. Brandstrader

cc Sandra Collins

199

## Grounds Relied Upon For Rehearing

1.) The alleged facts provided by the state will prove to be false.

2.) The reviewing Court relied on false facts that directly weighed in the decision to confirm conviction.

3.) The failure and inaffectiveness of appeal counsel to provide reviewing Court with proper court record and facts,which directly weighed in the decision to confirm conviction.

1) The alleged facts provided by the state will prove to be false.

*Included*

(A) Rule 23 order(Pg.4)"According to Detective Jonites,the total distance of the trip was 26.3 miles and he traveled the total distance in 39 minutes arriving at Schubat's house at 2:59am. Detective Jonites indicated that he exceeded the posted speed limits by 5 m.p.h. and proceeded on the fastest and easiest route".

Feb.6,2003(pg.14-41) Detective Jonites testifies to leaving the Whiplash bar at 2:20am driving to the Bristol Renaissance Fair which took him "exactly 15 minutes"...at 15.3 miles,then proceeded to drive to Denise Schubat's home. "when I arrived there,it was again;it took me 15 minutes". Testifying to a total round trip of 26.3 miles,"I arrived at Denise Schubat's house at 2:59am". Also testifying to doing this drive"yesterday morning"(Feb.5,2003) and that Detective Jonites worked this district "for many many years" and this being the fastest and easiest route.

-2-

200

No.2-03-0920

In The Appellate Court Of Illinois,Second District

Ronald Ruhl,                        ) Appeal From The Circuit Court
Plaintiff/Appellent                 )    Of Lake County
                                    )
                                    )
    vs.                             )
                                    )        No.02-CF-2183
                                    )
Illinois Court Of Claims            )  The Honorable James K. Booras
Defendant/Appellee                  )     Judge Presiding
                                    )

*This is the template for a PLA — Not a Petition fr Rehery* [handwritten]

Petition For Rehearing

To: The Honorable Chief Justice and Associate Justices of the
    2nd District court of Appeals,Illinois.

    Appellant presents this petition for a rehearing of the above

cause and,in support,respectfully shows:

1.  The appeal in the cause was argued before this Court on

    December 15,2004.

2.  On December 15,2004,this Court rendered its decision in favor

    of Respondent and against appellant affirming the judgement

    of the Lake County Court.

3.  Appellant seeks a rehearing on the following grounds:

                              Respectfully submitted,

                              _____
                              Ronald Ruhl  #R-12207