IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD RUHL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 C 4980 |
| | ) | |
| MARCUS HARDY, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On February 6, 2003, Petitioner Ronald Ruhl ("Ruhl") was convicted at a jury trial in the
Circuit Court of Lake County of first-degree murder for the 2002 shooting of Richard Neubauer
("Neubauer"). Ruhl subsequently was sentenced to 50 years in prison. Before the court is
Ruhl's "Petition for a Writ of Habeas Corpus" pursuant to 28 U.S.C. § 2254 (Dkt. No. 32) ("Am.
Pet.").

Ruhl timely filed a petition for habeas relief on September 2, 2008. (Dkt. No. 1.) The
court stayed the petition on October 7, 2008, pending disposition of then ongoing post-
conviction proceedings in the state court. (Dkt. No. 18.) After exhausting his state court
remedies, Ruhl filed his amended petition on December 22, 2010.

In his petition, Ruhl primarily raises the following three issues: (1) that he was deprived
of a fair trial when the trial court did not allow Mary McIntosh ("McIntosh") to testify about co-
defendant Raymond Serio's ("Serio") self-incriminating statements to her; (2) that he was
deprived of a fair trial when the state disclosed an additional witness, Officer Keith Lamanna
("Lamanna"), during trial; and (3) that his trial counsel was ineffective for various reasons. For

the reasons stated herein, Ruhl's Petition for a Writ of Habeas Corpus is denied.

BACKGROUND

The following facts are taken from the Illinois Appellate Court's ruling affirming Ruhl's conviction and sentence. (Dkt. No. 42, Ex. B, *People v. Ruhl,* No. 2–03–0920 (Ill. App. Ct. Dec. 15, 2004) (unpublished order pursuant to Illinois Supreme Court Rule 23) ("Direct Appeal."). Ruhl and Serio were charged with two counts of first-degree murder for their roles in the January 6, 2002, murder of Neubauer. They were tried separately.

1.    Evidence at trial

At Ruhl's trial, the state presented evidence that while Neubauer waited for his girlfriend, Denise Schubat ("Schubat"), in the parking lot of Serio's bar, Ruhl shot and killed Neubauer at Serio's behest. The motive for the killing was Serio's interest in pursuing a romantic relationship with Schubat.

Neubauer's body was found the morning of January 6, 2002, in his car at the entrance to the Bristol Renaissance Faire, which is near the Wisconsin/Illinois border in Kenosha County, Wisconsin. The Lake County, Illinois, medical examiner concluded that Neubauer died as result of three gun shot wounds, two in the head and one in the neck.

Schubat, who in August 1998 had a daughter with Neubauer, was the key witness for the state. She testified that after the birth of their daughter, she and Neubauer lived together for about 18 months. After that, Schubat and her daughter returned to Schubat's mother's home in Lake Villa, Illinois, but Schubat continued dating Neubauer. In the early part of 2001, the couple drifted apart, but Neubauer continued to visit their daughter.

In August 2001, Serio hired Schubat to work as a night-shift bartender at his bar in Antioch, Illinois called the Whip Lash. Schubat testified that Serio worked the night shift with her, and was very "flirtatious and grabby" toward her. Schubat was acquainted with Ruhl, whom she described as a friend of Serio's. According to Schubat, Ruhl and Serio were together all the time. Ruhl would frequently drive Serio to and from work and run errands for Serio. According to Schubat, Ruhl owed Serio a substantial amount of money. Schubat testified that Serio and Ruhl used direct connect Nextel cellular telephones that had a two-way radio feature. She saw and heard Ruhl and Serio converse via these devices every night.

Schubat described an incident near the end of October 2001 in which Serio asked her to give him a ride to a hotel where he was staying. At the hotel, Schubat and Serio used cocaine and had sexual relations. The next day, Serio again invited Schubat to his hotel room, but Schubat told him that the previous night was a mistake. Schubat described Serio as unhappy with her decision and said that Serio continued to pursue her.

In November of 2001, Schubat began dating Neubauer again. Neubauer often picked Schubat up at work when she was done cleaning the bar at around 2:30 a.m. During the latter part of 2001, Serio continued to make advances toward Schubat.

Schubat testified that about one week before Neubauer was killed, she was in the kitchen at the Whip Lash with Serio and Ruhl when Serio told Ruhl that they were going to kill Neubauer. According to Schubat, Ruhl responded, "[w]ell okay, only if Schubat doesn't get mad at me." Schubat said she did not take the comments seriously because Serio and Ruhl were laughing about it. Around the same time, Schubat noticed an old western movie-type handgun with a tan-colored handle in one of the drawers behind the bar.

Schubat testified that on January 4, 2002, Serio once again asked her to leave with him after work.  Schubat again refused, saying that Neubauer was coming to pick her up.  Serio became upset, and later that night told Schubat that he was going to kill Neubauer.  Like the previous week, Schubat said she did not take Serio seriously because he was laughing and joking about it.

The next evening, on January 5, 2002, Schubat arrived at the Whip Lash at 6 p.m. Serio asked Schubat about what she and Neubauer did the previous evening.  Schubat told Serio that it was not any of Serio's concern.  According to Schubat, Serio then made a comment about getting rid of Neubauer so they could be together.  Schubat responded that they would never be together.  That evening, Schubat had plans to go to a party in Chicago with Neubauer.  Neubauer was planning to go to the party early, leave to pick up Schubat from work, and then return to the party with her.  For several days preceding January 5, 2002, Neubauer had been driving his mother's green, four-door car.

At about 10 p.m. on January 5, 2002, Ruhl came into the Whip Lash kitchen with Serio. When Schubat went into the kitchen to ask Serio a question, the two "shut up right away."  At some point during her shift, Schubat looked in the drawer behind the bar and noticed the gun was gone.  When the bar closed at 2 a.m., Schubat and Serio were alone in the bar.  According to Schubat, while she was cleaning up behind the bar, she heard Serio on his Nextel phone asking whether a green, four-door car was still in the parking lot.  Schubat heard Ruhl respond "yes" over the Nextel.  According to Schubat, she heard Serio ask Ruhl to go up to the window of the car and shoot Neubauer.  Schubat tried to leave, but Serio pushed her behind the bar and told her she was not going anywhere.

Next, Schubat heard Serio ask Ruhl to go up to window of the car, knock, and pull the trigger. After a pause, Ruhl asked over the Nextel, "Are you sure?" In response, Serio screamed over the Nextel, "I want to hear a gunshot." The next thing Schubat heard was a gunshot. Pushing Serio out of the way, Schubat ran to the front door of the bar, which had a window. Through the window, Schubat saw Neubauer hunched over in the car with his jaw quivering.

Schubat testified that she fell to the ground, and Serio picked her up and sat her on the pool table. Serio shook her and told her to calm down, adding that she could not blame him because he did not do it. At that point, Serio moved Schubat to a bar stool and she heard pounding on the door and glass breaking. Serio went to the door and let Ruhl into the bar. Ruhl paced back and forth, holding his head. Schubat said the gun she had seen in the drawer behind the bar was now on the bar and wrapped in a blue towel. Ruhl told Serio that they had to hurry up and get rid of the body. Serio told Schubat to go home and make sure that no one knew that Neubauer was at the Whip Lash that night if she wanted her daughter to be safe. Serio told Schubat not to approach Neubauer or the car as she left. Schubat saw Serio watching her from the bar as she walked to her car and drove away.

At Serio's instruction, Schubat drove straight home and called and left a message on Neubauer's phone at about 2:43 a.m. Schubat recalled saying in the message that Neubauer must have stayed in the city, that she was at home, and she would talk to him later. The next morning, Neubauer's mother called Schubat and inquired as to his whereabouts. Schubat lied and said she had not heard from him. The following evening, Neubauer's mother asked Schubat to come to her house, where two detectives told Schubat that Neubauer was found dead in Wisconsin. Schubat lied and said she knew nothing about Neubauer's death. Schubat admitted that between

the time of Neubauer's death and April 2002, she repeatedly lied to police about what she knew about his death.

Officer Keith Lamanna of the Waukegan Police Department also testified for the state. He testified that he stopped a vehicle registered to Serio at 5:17 a.m. on January 6, 2002, at Washington Street just east of Lewis Avenue in Waukegan. Lamanna identified Serio and Ruhl as the two men in the vehicle. During the traffic stop, Lamanna asked Serio and Ruhl where they had been, and one or both of them said they "came from the north, Round Lake." Lamanna was suspicious because Round Lake was due west of there. When asked where they were going, one or both of the men said they were looking for a restaurant. Serio consented to a search of his vehicle and Lamanna recovered an open bottle of liquor. Lamanna poured out the liquor and released the men without making an arrest or issuing any citations. He made no written report regarding the traffic stop. Although Ruhl's attorney was aware of the traffic stop, the state did not disclose the name of the officer who conducted the stop until the second day of trial.

Detective Timothy Jonites of the Lake County Sheriff's Department also testified for the state. Jonites testified that he traveled the route between the Whip Lash and the Bristol Renaissance Faire, and from that location to Schubat's home. Jonites left the Whip Lash at 2:20 a.m. The entrance to the Bristol Renaissance Faire was 15.3 miles from the Whip Lash. Upon arrival at the Renaissance Faire, Jonites immediately turned around and went to Schubat's home. He testified that the total distance of the trip was 26.3 miles and the trip took 39 minutes, with him arriving at Schubat's home at 2:59 a.m. Jonites indicated that he exceeded the posted speed limits by 5 m.p.h. and took the fastest route.

The defense called Sandra Morton, a friend of both Schubat and Ruhl. Morton testified that she and Schubat had worked together at a different bar before Schubat left to work at the Whip Lash. In the four and a half years that Morton had known Schubat, she never met Neubauer. Morton said that Schubat complained about Neubauer a lot and said he was a poor father, never gave her money, was upset with Schubat's lifestyle, and had threatened to take their daughter.

Before trial, the state filed a motion in limine seeking to bar the testimony of Marcy McIntosh on the grounds that it was inadmissible hearsay. At the hearing on the motion, McIntosh testified that her fiancé, Jim Natywa, was from the same south-side neighborhood as Serio, so they drank for free at the Whip Lash. McIntosh worked as a bartender at the Whip Lash from January 2002 until April 2002.

On the day before Serio was arrested for the murder of Neubauer, Serio came into Whip Lash. McIntosh and Natywa were the only people in the bar. Police had just released Serio after questioning him in connection with Neubauer's murder. When Serio came into the bar, McIntosh asked him why police were questioning him when he had nothing to do with the murder. According to McIntosh, Serio responded, "What do you mean I had nothing to do with it? I did it." At that point, Natywa got up and walked away.

Serio proceeded to tell McIntosh that he shot Neubauer once in the parking lot, and when that did not kill him, he shot him again. Serio said Neubauer was a punk and that Schubat and her child were better off without Neubauer. Serio told McIntosh that on the night of the murder, Schubat was standing right where McIntosh was standing. He did not implicate Schubat in the murder.

McIntosh admitted that she did not socialize with Serio, nor did she confide in him or ask his advice.  McIntosh said that Serio would occasionally "borrow" her van and cell phone without her permission when she was working at the Whip Lash.  McIntosh said that she did not tell police about what Serio said because she did not want to get involved because of what she knew about Serio and his connections.  However, she came forward when Ruhl was accused of the murder because Serio had said nothing about Ruhl being involved in the murder.

On the date set for the ruling on the motion in limine, Ruhl's trial lawyer had a conflict and substitute counsel appeared on his behalf.  Ruhl's trial lawyer sent a letter to the court indicating that if the court found that Serio's statements were against his penal interest, the court should hold a second hearing to determine if there were sufficient indicia of trustworthiness to allow the hearsay statements to be admitted.  The trial court, however, said it had already held a hearing on that issue, and found that although the statements were against Serio's penal interest, McIntosh and Serio were not close acquaintances, McIntosh's testimony was not corroborated, and there would be no opportunity to cross-examine Serio regarding his purported statements because he would undoubtedly exercise his Fifth Amendment right not to testify.  The trial court granted the motion, finding that McIntosh's hearsay statements were not sufficiently trustworthy to be admitted under the standard set forth in *Chambers v. Mississippi*, 410 U.S. 284 (1973).

2.  Direct Appeal

After he was convicted, Ruhl retained new counsel and filed a post-trial motion for new trial or for judgment notwithstanding the verdict.  The trial court denied the motion and sentenced defendant to 50 years in prison.  Ruhl filed a timely notice of appeal.

On direct appeal, Ruhl raised four claims: (1) he was deprived of a fair trial when the trial judge barred McIntosh from testifying as to Serio's confession; (2) the state's disclosure of Officer Lamanna's name after the trial began deprived Ruhl of a fair trial; (3) his extended sentence violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and the Illinois Code of Criminal Procedure; and (4) his constitutional right to be presumed innocent was violated when the trial court selected an anonymous jury. (Dkt. No. 42, Ex. I, at 2 ("Br. on Direct Appeal").) The state appellate court rejected each of Ruhl's contentions and affirmed his conviction and sentence. (Direct Appeal 9–36.) The state appellate court also rejected Ruhl's petition for a rehearing. (Dkt. No. 42, Ex. L.)

Ruhl, represented by counsel, then filed a petition for leave to appeal ("PLA") to the Illinois Supreme Court. In his PLA, Ruhl raised only two claims: (1) that the trial court erred in excluding McIntosh's testimony and (2) that the trial court erred in allowing Officer Lamanna to testify despite the late disclosure of his name. (Dkt. 42, Ex. M, at 3–6 ("PLA on Direct Appeal").) The Illinois Court denied his PLA on May 25, 2005. (Dkt. 42, Ex. N, *People v. Ruhl*, 833 N.E.2d 7 (Ill. 2005)).

3.   Post-Conviction Petition

On November 22, 2005, Ruhl filed a post-conviction petition in the state trial court in which he claimed his constitutional right to effective assistance of counsel was violated for various reasons. (Dkt. 42, Ex. O ("Post Conviction Pet.").)

Ruhl claimed that trial counsel was ineffective for:

(a) implying to police that Ruhl knew something about the crime, but was afraid to reveal it ("disclosure contention"); (b) failing to attend key hearings, including the hearing at which McIntosh's testimony was excluded ("attendance contention"); (c) failing to call Natywa, McIntosh's fiancé, to corroborate her testimony ("Natywa

contention"); (d) stipulating that the Illinois courts had jurisdiction even though there was some question as to whether the fatal shots were fired in Wisconsin ("jurisdictional stipulation contention"); (e) admitting key, disputed facts in his opening statement that and promising witnesses counsel could not deliver ("opening statement contention"); (f) cross-examining the state's witnesses in a manner that was "mind-numbingly pointless and ineffective" ("cross-examination contention"); (g) giving an "erratic, illogical, [and] unnecessarily vulgar" closing argument ("closing argument contention"); (h) failing to seek exclusion of testimony from a man named Derrick Banks regarding Serio's request that Banks supply him with a weapon ("Banks hearsay contention"); (I) failing to seek exclusion of Schubat's testimony regarding Serio's statements that he intended to kill Neubauer ("Schubat hearsay contention"); (j) failing to interview certain witnesses who would have impeached Schubat ("failure to interview witnesses contention"); (k) failing to investigate Neubauer's involvement in the drug trade ("drug trade contention"); (l) failing to impeach Schubat on her previous false and inconsistent statements to police ("Schubat deception contention"); (m) failing to prepare for Lamanna's testimony or interview him when the trial court gave him the opportunity to do so ("Lamanna contention"); (n) failing to investigate the phone records tendered in discovery in order to show that there was no proof Schubat made the 2:48 a.m. call to Neubauer from her landline ("voice message contention"); (o) denying Ruhl his right to testify in his own defense ("prohibiting testimony contention"); (p) lying to Ruhl and the trial judge about his previous experience ("dishonesty contention"); and (q) failing to move to reconsider the exclusion of McIntosh's testimony ("motion to reconsider contention").

(Post-Conviction Pet. 3–12.) The state trial court denied Ruhl's petition on February 10, 2006. (Dkt. No. 42, Ex. P.) The state trial court addressed the merits of each claim and did not hold them forfeited. (*Id.*)

Subsequently, Ruhl appealed the denial of post-conviction relief on many of these grounds, including:

(a) the Natywa contention; (b) jurisdictional stipulation contention; (c) opening statement contention; (d) cross-examination contention; (e) Banks hearsay contention; (f) Schubat hearsay contention; (g) failure to interview witnesses contention; (h) drug trade contention; (I) Schubat deception contention; (j) Lamanna contention; (k) voice message contention; (l) prohibiting testimony contention; (m) dishonesty contention; (n) motion to reconsider contention; and (o) attendance contention.

(Dkt. No. 42, Ex. Q.)  The appeals court affirmed on October 30, 2007.  (Dkt. No. 42, Ex. S, *People v. Ruhl*, No. 2-06-0227 (Ill. App. Ct. Oct. 30, 2007) (unpublished order pursuant to Illinois Supreme Court Rule 23) ("Post-Conviction Appeal").)

Ruhl next filed a PLA with the Illinois Supreme Court.  (Dkt. No. 42, Ex. T ("Post-Conviction PLA").)  In the post-conviction PLA, Ruhl raised the following contentions of ineffective assistance: (a) Natywa contention; (b) opening statement contention; (c) Schubat hearsay contention; (d) failure to interview witnesses contention; (e) Schubat deception contention; (f) voice message contention; and (g) Lamanna contention.  The Illinois Supreme Court denied Ruhl's PLA on March 26, 2008.  (Dkt. No 42, Ex. U, *People v. Ruhl*, 888 N.E.2d 1188 (2008).)

4.      Successive Post-Conviction Proceeding

Ruhl subsequently moved in the state trial for leave to file a successive post conviction petition on August 5, 2008.  (Dkt. No. 42, Ex. V ("Successive Post-Conviction Pet.").)  The proposed petition included these general claims:

> (1) Ruhl's post-conviction counsel abandoned certain "vital meritorious issues," including that his appellate counsel was ineffective and that Ruhl was actually innocent; (2) Ruhl's appellate counsel was ineffective on direct appeal for failing to raise certain contentions of ineffective assistance of counsel; (3) Ruhl's post-trial counsel failed to tender Natywa's affidavit in connection with Ruhl's post-trial motion; and (4) trial counsel was ineffective for various reasons discussed herein; including: (a) the dishonesty contention; (b) the disclosure contention; (c) the Natywa contention; (d) the jurisdictional stipulation contention; (e) the opening statement contention; (f) the Banks hearsay contention; (g) the failure to interview witnesses contention; (h) the drug trade contention; (I) the Schubat deception contention; (j) the Lamanna contention; (k) the voice message contention; and (1) the prohibiting testimony contention.

(*Id.*)  On November 18, 2008, the trial court denied leave to file the successive petition. (Dkt. No. 42, Ex. W.)

Ruhl appealed that ruling, arguing that the trial court erred in denying leave to file the successive petition because Ruhl met the cause-and-prejudice requirement for the filing of a successive post-conviction petition, and because the trial court was presented with evidence of his actual innocence. (Dkt. No. 42, Ex. X.) The appeals court affirmed, with one justice dissenting. (Dkt. No. 42, Ex. Z, *People v. Ruhl*, No. 2-09-0076 (Ill. App. Ct. March 24, 2010) (unpublished order pursuant to Illinois Supreme Court Rule 23) ("Successive Post-Conviction Appeal").) Ruhl filed a pro se PLA in the Illinois Supreme Court. (Dkt. No. 42, Ex. AA.) The Supreme Court denied that petition on September 29, 2010. (Dkt. No. 42, Ex. BB, *People v. Ruhl*, 938 N.E.2d 528 (2010).)

5.    Claims at Issue Before this Court

The court notes that the Amended Petition is difficult to follow. The first ground of the petition is "The state violated petitioners [sic] due process rights and rendered an unreasonable application of cause and prejudice that remains contrary to the facts presented on review regarding ineffective assistance of direct appeal-petition for rehearing/post-conviction counsel." (Am. Pet. 5.) Respondent describes this as "rambling and difficult to parse," (Dkt. No. 41 ("Resp't's Answer") at 19 n.1) and the court agrees. Read in concert with the remainder of the Amended Petition, it appears that Ruhl is alleging that his post-conviction counsel was ineffective for failing to argue the ineffectiveness of his post-trial[1] and appellate counsel. (*See* Pet. 13–15.) The crux of the issue is Ruhl's assertion that his post-trial and appellate counsel failed to present an affidavit from Natywa that would have corroborated McIntosh's testimony and shown that the trial court erred in excluding her testimony. (Pet. 16.) The court notes that

_____

[1] Ruhl replaced his counsel after trial, and was represented by new counsel in his post-trial proceedings.

claims of ineffective assistance by post-conviction counsel are not cognizable because criminal defendants do not have a Sixth Amendment right to post-conviction counsel. *See Coleman v. Thompson,* 501 U.S. 722, 752 (1991) (citing *Pennsylvania v. Finley,* 481 U.S. 551 (1987)). Reading his petition and reply liberally, Ruhl contends that his post-conviction counsel represented him on appeal on his request for a re-hearing, and argues that if the issue had been raised on appeal, he could have avoided the appeals court's finding on post-conviction review that he forfeited the Natywa contention. (Am. Pet. 15–16.) The court will address this as part of its discussion of the Natywa contention.

The Amended Petition also raises the following claims: (1) the trial court's refusal to allow McIntosh to testify about Serio's alleged confession violated his right to a fair trial (identified as Ground 3 in the Amended Petition); (2) the state deprived Ruhl of a fair trial when it presented Officer Lamanna's testimony without having previously disclosed his identity (identified as Ground 4 in the Amended Petition); and (3) trial counsel was ineffective on various grounds that will be discussed more fully below (identified as Grounds 2 and 5 in the Amended Petition).

LEGAL STANDARD

Federal habeas review is limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Julian v. Bartley*, 495 F.3d 487, 492 (7th Cir. 2007). Under the AEDPA, relief may be granted only if the state court's ruling: (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)-(2). The

state court's findings of fact are presumed to be correct unless the petitioner presents the court with clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). Additionally, federal courts may not grant habeas relief for violations of state law. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

Habeas petitioners may not present a claim in federal court until they exhaust each claim through the state court appeals process. *Malone v. Walls*, 538 F.3d 744, 753 (7th Cir. 2008). In order to exhaust a claim, the petitioner must present it through either one complete round of direct review or post-conviction review. *Id.* To be properly presented to the state courts, the federal nature of each claim must be apparent from the facts and the legal principles presented. *Chambers v. McCaughtry*, 264 F.3d 732, 737–38 (7th Cir. 2001).

Federal courts will review procedurally defaulted claims only if the petitioner can show that there is cause for the default and actual prejudice as a result of the alleged violation of federal law, or that a failure to consider the claim will result in a fundamental miscarriage of justice. *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010). Cause requires an objective factor (external to the defense) that prevented a petitioner from presenting the claim earlier; prejudice means that error "so infected the entire trial that the resulting conviction violates due process." *Id.* (internal citations omitted). With these principles in mind, the court will consider each of Ruhl's claims.

<u>ANALYSIS</u>

1.    <u>Admissibility of Hearsay Statement to McIntosh</u>

Ruhl's first claim is that his constitutional rights to due process and a fair trial were violated when the trial court excluded McIntosh's testimony that Serio confessed to murdering

Neubauer, and did not make any statements indicating that Ruhl was involved. The parties agree that this claim was properly presented and exhausted on direct review. The state appeals court rejected this claim, so in order to obtain relief Ruhl must show that the state court unreasonably applied clearly established Supreme Court precedent in so ruling. 28 U.S.C. § 2254(d)(1). The trial court found that McIntosh's testimony was unreliable and did not fall within one of Illinois' exceptions to the hearsay bar. While the correctness of this ruling as a matter of state law is not reviewable here, this court must determine whether the exclusion of McIntosh's testimony violated due process. This is because "the exclusion of powerful evidence, on dubious grounds and in a close case, prompts scrutiny even in an area largely governed by state law." *O'Brien v. Marshall*, 453 F.3d 13, 20 (1st Cir. 2006).

The U.S. Supreme Court recognized this principle in *Chambers*, 410 U.S. at 302, where it held: "[W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." In *Chambers*, the Court held that a murder defendant's due process rights were violated when he was not allowed to offer evidence that another man had confessed to the crime on three separate occasions. *Id.* at 292–93. The *Chambers* Court noted that some jurisdictions did not apply the hearsay exception for statements against penal interest in criminal trials because of the belief that such an application would lead to perjured testimony. *Id.* at 299–300. While leaving open the possibility that such a rule might serve a valid purpose in certain circumstances, the *Chambers* court held that it could not be applied to exclude what appeared to be reliable evidence of the defendant's innocence. *Id.* at 300–01.

Additionally, and particularly relevant here, the *Chambers* court identified certain factors that courts should evaluate to determine whether a hearsay statement is sufficiently trustworthy to be admitted: (1) whether the declaration was made spontaneously to a close acquaintance shortly after the crime; (2) whether the declaration was corroborated by other evidence; (3) whether the declaration was incriminating and against the declarant's penal interest; and (4) whether there was an adequate opportunity for the state to cross-examine the declarant. *Id.* Both the trial court and the state appeals court recognized and considered the *Chambers* standard, and the appeals court held that the trial court did not abuse its discretion in excluding McIntosh's testimony. (*See* Dkt. No. 42, Ex. C ("Transcript of Motion in Limine Hearings") at 154–158; Direct Appeal 9–15.) This means that in order for this court to grant Ruhl relief on this basis, this court must find that the result reached was not only incorrect, but truly unreasonable. *Dunlap v. Hett*, 436 F.3d 739, 745 (7th Cir. 2006). Even prior to the application of the stringent standards of review in the AEDPA, the Seventh Circuit noted: "*Chambers* does not call for the best possible decision, or even the one judges would render with the benefit of extra time for reflection; the Constitution is satisfied when the court considers the real interests at stake and offers a trial that reliably separates the guilty from the innocent." *Carson v. Peters*, 42 F.3d 384, 387 (7th Cir. 1994).

Here, the trial judge found that Serio's statements were against his penal interest, but that McIntosh was not a close acquaintance of Serio. The trial judge found that no corroboration of Serio's statements was shown, and that the state would have no opportunity to cross-examine Serio, given that he also was charged with murder. (Transcript of Motion in Limine Hearings 154–156.) In light of these findings, the trial judge granted the motion in limine.

In affirming, the appeals court noted that McIntosh admitted that she did not have the type of relationship with Serio in which she would confide in him or ask for his advice. At the time Serio allegedly confessed to her, McIntosh had known him for about six months. Although she testified that Serio borrowed her van and cell phone (without her permission) and that she and later purchased Serio's interest in the Whip Lash bar, the appeals court credited the trial court's finding that they were not close acquaintances. (Direct Appeal 13.) The appeals court also found that the trial court did not err in finding the statements uncorroborated, given that Natywa did not testify at the hearing, nor was an affidavit from him submitted either at trial or on appeal. (Direct Appeal 15.) Because it was uncontroverted that Serio would not have been subject to cross-examination by the state, the appeals court found that three of the four *Chambers* factors supported a finding that the hearsay statements were not sufficiently trustworthy to compel their admission.

This court cannot find that the application of *Chambers* was unreasonable. Reasonable judges might disagree over whether Serio and McIntosh were close acquaintances, given that she testified that she and Natywa drank for free at the Whip Lash because Natywa was from the same neighborhood as Serio, and that they later bought the bar from Serio. (Transcript of Motion in Limine Hearings 122–123.) The court cannot find, however, that the state court's judgment was unreasonable as to this or the other *Chambers* factors.

Ruhl's counsel did not present any corroborating testimony or evidence. Under *Chambers*, the statement itself need not be corroborated, but its details must be corroborated by some other evidence in the case. *Chambers*, 410 U.S. at 300; *see U.S. ex rel. Gooch v. McVicar*, 953 F. Supp. 1001, 1009 (N.D. Ill. 1997). Although Serio's alleged confession was corroborated

in that it comported with certain details of the crime testified to by others — that Neubauer was shot in the parking lot and that Schubat was at the bar when the shooting occurred — that is not surprising given that Serio was in fact involved with the murder. No corroborating evidence was presented to show that Serio was in fact the sole shooter of Neubauer or that he fired the shots in the parking lot. Rather, the evidence showed that Serio and Ruhl discussed killing Neubauer in the weeks leading up to the murder, that they obtained ammunition together,[2] that Ruhl shot Neubauer at Serio's direction, and that the two men were seen together hours after the murder near the location where Neubauer's body was found.

The fact that Serio and Ruhl were co-conspirators makes this case significantly different from those in which there are alternate suspects, only one of which could have committed the crime. *See United States ex. rel. Wilhoite v. Washington*, No. 96 C 2414, 1996 WL 650444, at *4 (N.D. Ill. Nov. 6, 1996). In fact, the parties stipulated that the first shot was fired in Lake County, Illinois but the subsequent wounds to Neubauer were inflicted in Kenosha, Wisconsin (Dkt. No. 6-2, at 148 ("Stipulation") at ¶ 8.) It is possible that both men shot Neubauer that night, and the fact that Serio omitted any mention of Ruhl's role in the killing does not establish that he in fact had no role. Perhaps, knowing that he was likely to be charged in the murders, Serio sought to bolster his "tough guy" image by claiming that he personally fired the shot in the parking lot.[3] Regardless, the Seventh Circuit has held the purpose of Chambers was to "relax the

---

[2]Serio's girlfriend, Kristen Koets, testified at trial that she purchased bullets at Serio's direction in late 2001, and, again at Serio's direction, gave those bullets to Ruhl. (Dkt. No. 42, Ex. E ("Trial Tr.") 515–21.)

[3]This was an image that Serio apparently cultivated. Schubat testified that Serio had devil "horns" tattooed on his forehead and a tattoo of a scorpion on his neck, (Dkt. No. 42, Ex. E. (Trial Tr. 562–63).) Further, as noted above, McIntosh testified that she did not initially come forward because she was afraid of Serio and "his connections."

stranglehold of maxims and get judges to think functionally" about the circumstances in which a declaration against penal interest is reliable. *Carson v. Peters*, 42 F.3d 384, 387 (7th Cir. 1994). Because the state courts did so in this case, this court will not overturn their judgment.

2.      Late Disclosure of Prosecution Witness Lamanna

Ruhl's second claim is that he was deprived of a fair trial when Officer Lamanna's identity was not revealed until the second day of trial and Lamanna proceeded to testify for the state. (Am. Pet. 26–28.) Ruhl argues that the late disclosure prejudiced him because his counsel, in his opening statement, promised the jury they would not hear any evidence to tie him to the crime. Lamanna's testimony that the men were together in Waukegan hours after the murder undermined that claim, as well as Ruhl's defense that it was really Schubat who acted as Serio's accomplice in the murder. (Am. Pet. 27–28.)

The state appeals court found that the prosecution committed a discovery violation under state law, specifically Illinois Supreme Court Rule 412(a)(1), when it failed to disclose Lamanna's name prior to trial. (Direct Appeal 21–22.) The appeals court based its conclusion on the fact that the state offered no evidence that it had been diligent in attempting to locate Lamanna. (*Id.* at 23.) Nonetheless, the court held that Ruhl did not show that he was prejudiced by the discovery violation because the evidence of his guilt was not close and because there was no reason to believe that Ruhl's counsel could have discredited Lamanna if he had additional time to investigate. (*Id.* at 23–24.)

While Ruhl argues that the state court erred, and he was in fact prejudiced by the discovery violation (Dkt. No. 43 ("Pet'r.'s Reply") at 7), this would at best be a violation of state law, which is not cognizable on habeas review. Ruhl does not explain what clearly established

federal law he believes was violated by the admission of Lamanna's testimony, except as regards

his ineffective assistance of counsel claim, discussed below. It is well-established that "that

there is no constitutional right to discovery in non-capital criminal cases and that the prosecution

has no constitutional obligation to reveal its witnesses prior to trial." *United States v. Cruz-*

*Velasco*, 224 F.3d 654, 665 (7th Cir. 2000) (citing *Weatherford v. Bursey*, 429 U.S. 545, 559

(1977)). Because Ruhl cannot show that the admission of the Lamanna testimony violated

clearly established federal law, the court denies his claim for habeas relief on this basis.

3.    Ineffective Assistance of Counsel

What remains is a tangled web of ineffective assistance of counsel claims. As noted

above, the Amended Petition is difficult to parse, so Respondent treats it as raising the issues that

Ruhl raised on post-conviction review. (Resp't's Answer 32.) The court adopts that position for

the sake of clarity. As such, Ruhl argues that his trial counsel was ineffective for:

> (a) implying to police that Ruhl knew something about the crime, but was afraid to
> reveal it ("disclosure contention"); (b) failing to attend key hearings, including the
> hearing at which McIntosh's testimony was excluded ("attendance contention"); (c)
> failing to call Natywa, McIntosh's fiancé, to corroborate her testimony ("Natywa
> contention"); (d) stipulating that the Illinois courts had jurisdiction even though there
> was some question as to whether the fatal shots were fired in Wisconsin
> ("jurisdictional stipulation contention"); (e) admitting key, disputed facts in his
> opening statement that and promising witnesses counsel could not deliver ("opening
> statement contention"); (f) cross-examining the state's witnesses in a manner that
> was "mind-numbingly pointless and ineffective" ("cross-examination contention");
> (g) giving an "erratic, illogical, [and] unnecessarily vulgar" closing argument
> ("closing argument contention"); (h) failing to seek exclusion of testimony from a
> man named Derrick Banks regarding Serio's request that Banks supply him with a
> weapon ("Banks hearsay contention"); (I) failing to seek exclusion of Schubat's
> testimony regarding Serio's statements that he intended to kill Neubauer ("Schubat
> hearsay contention"); (j) failing to interview certain witnesses who would have
> impeached Schubat ("failure to interview witnesses contention"); (k) failing to
> investigate Neubauer's involvement in the drug trade ("drug trade contention"); (l)
> failing to impeach Schubat on her previous false and inconsistent statements to
> police ("Schubat deception contention"); (m) failing to prepare for Lamanna's

testimony or interview him when the trial court gave him the opportunity to do so ("Lamanna contention"); (n) failing to investigate the phone records tendered in discovery in order to show that there was no proof Schubat made the 2:48 a.m. call to Neubauer from her landline ("voice message contention"); (o) denying Ruhl his right to testify in his own defense ("prohibiting testimony contention); (p) lying to Ruhl and the trial judge about his previous experience ("dishonesty contention"); and (q) failing to move to reconsider the exclusion of McIntosh's testimony ("motion to reconsider contention").

A claim of ineffective assistance is a single claim, no matter how many deficiencies are alleged in support of it. *Stevens v. McBride,* 489 F.3d 883, 894 (7th Cir. 2007). However, because a petitioner is obligated to present the state court with both the facts and law underlying his claim, he can default individual bases for an ineffective assistance claim. *Id.*

A. **Claims that are Procedurally Defaulted**

As a preliminary matter, the court must determine what claims Ruhl has preserved and which claims he has defaulted. The court agrees with Respondent that most of Ruhl's claims are procedurally defaulted. First, Ruhl did not present the disclosure contention or the closing argument contention to the appeals court when he appealed the dismissal of his post-conviction petition. (*See* Dkt. No. 42, Ex. Q.) And while he did present the Banks hearsay contention and the attendance contention to the appeals court, it was not included in his PLA seeking review of the appeals court's ruling on post-conviction review. (*See* Dkt. No. 42, Ex. T.) Because Ruhl did not present these claims through a complete round of state court review, they are defaulted. *Johnson v. Hulett*, 574 F.3d 428, 431 (7th Cir. 2009).

Additionally, the court agrees with Respondent that Ruhl defaulted at least certain of those claims he presented to the state appellate court on post-conviction appeal and which the appellate court deemed forfeited for failure to raise them in his direct appeal. By the court's

reading of the record, the claims the appellate court deemed defaulted were: (1) disclosure contention; (2) dishonesty contention; (3) attendance contention; (4) jurisdictional stipulation contention; (5) the opening statement contention; (6) closing argument contention; (7) failure to interview witnesses contention; (8) Lamanna contention; (9) voice message contention; and (10) prohibiting testimony contention. (Post-Conviction Appeal 17–18.)

This court cannot review claims that have been resolved on independent and adequate state law grounds. *Miranda v. Leibach,* 394 F.3d 984, 991 (7th Cir. 2005). That means that when a petitioner fails to comply with a state procedural rule and the state court finds the claims forfeited, those claims are procedurally defaulted. *Id.* at 991–92. The rule at issue here is Illinois' requirement that issues that are based on facts contained in the trial court record must be raised on direct appeal, or they are forfeited. *People v. Petrenko*, 931 N.E.2d 1198, 1204 (Ill. 2010). This well-established rule of Illinois law is an adequate ground for applying a procedural bar. *See Moleterno v. Nelson*, 114 F.3d 629, 634 (7th Cir. 1997) ("In order to avoid forfeiting his claim in the state courts, the defendant must present his argument in the way and at the time state law requires.").

Certain of Ruhl's claims are clearly based on the trial record, including the jurisdictional stipulation contention, the Lamanna contention, the opening statement contention, and the closing argument contention. These claims are procedurally defaulted. However, as Respondent recognizes, certain of Ruhl's ineffective assistance claims rely at least in part on evidence that was not part of the trial record, meaning that Ruhl should have been allowed to raise them on post-conviction review. *People v. Enis*, 743 N.E.2d 1, 10–11 (Ill. 2000).

These include the: failure to interview witnesses contention, the drug trade contention, the Schubat deception contention, the voice message contention, the prohibiting testimony contention, and the dishonesty contention.  First, Ruhl's argument that his trial counsel failed to interview certain witnesses is based in part upon affidavits presented on post-conviction review and police reports not presented at trial.  The contention that his attorney failed to investigate Neubauer's involvement in drug sales also is based on police reports not presented at trial, as is his contention that his attorney failed to present the full scope of Schubat's deceptive behavior toward police investigating Neubauer's murder.  Ruhl's contention that counsel failed to investigate Schubat's claim that she left a voice message for Neubauer from her landline depends on phone records that were not submitted at trial.  Finally, his contention that trial counsel lied to him about his experience and pressured Ruhl not to testify are based on Ruhl's own affidavit.

The court notes, however, that even if the appeals court erred in finding these contentions forfeited, some of them were defaulted when Ruhl did not raise them in his post-conviction PLA. Specifically, Ruhl did not raise the disclosure contention, the drug trade contention, the prohibiting testimony contention, or the dishonesty contention.  (*See* Dkt. No. 42, Ex. T.) However, Ruhl did raise the failure to interview witnesses contention, the Schubat deception contention, and the voice message contention.  Reading the record in the light most favorable to Ruhl, the court will consider these claims of ineffective assistance on the merits.  The court also will consider on the merits two allegations of ineffective assistance that Respondent agrees are exhausted: the Natywa contention and the Schubat hearsay contention.  First, however, the court must consider whether Ruhl can excuse his procedural defaults

**B.      Excuse of Procedural Defaults**

As noted above, Ruhl can excuse these defaults only if he can show either cause for the default and actual prejudice, or that the failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Ruhl appears to contend that his procedural defaults should be overlooked because he was diligent in retaining counsel to pursue these issues, but his appellate and post-conviction counsel failed to do so. (Pet'r.'s Reply 2–3.) The problem for Ruhl is that although ineffective assistance of counsel can excuse a procedural default, that ineffective assistance is also a constitutional claim that must be raised before the state court or it is procedurally defaulted. *See Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009) ("The result is a tangled web of defaults excused by causes that may themselves be defaulted and require a showing of cause and prejudice — a result that has an 'attractive power for those who like difficult puzzles.'" (internal citations omitted)).

Petitioner did not raise the issue of his appellate counsel's alleged ineffective assistance until his successive post-conviction petition, so it is procedurally defaulted. *See DeLeon v. Hulick*, No. 08 C 2143, 2011 WL 3651276, at *10 (N.D. Ill. Aug. 17, 2011) (citing 725 ILCS 5/122-3, providing that any claim of the substantial denial of constitutional rights not included in an original or amended post-conviction petition is waived). Additionally, as noted above, Ruhl had no right to effective counsel on post-conviction review, and so cannot excuse his defaults on that basis. *Morrison v. Duckworth*, 898 F.2d 1298, 1300–01 (7th Cir. 1990).

Additionally, Ruhl has not presented convincing "new, reliable evidence of innocence" that is so convincing that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Woods v. Schwartz*, 589 F.3d 368, 377 (7th Cir. 2009). The affidavits that Ruhl brings forth primarily include statements from witnesses who say that

Schubat was not frightened of Serio and continued to associate with him after the murder, as well as statements from witnesses who heard Serio confess to the crime. While evidence as to Schubat's continued association with Serio may have undermined her testimony at trial that she was frightened of him, this does not constitute compelling evidence of Ruhl's innocence. Nor do Serio's alleged out-of-court confessions. As discussed above in relation to the exclusion of McIntosh's testimony, the fact that Ruhl and Serio acted in concert with one another means that Serio's self-incriminating statements do not exculpate Ruhl. Because Ruhl has not made a sufficient showing of either cause and prejudice or actual innocence, this court will not consider his defaulted bases for ineffective assistance.

### C.     Claims Reviewed on the Merits

For the reasons discussed above, the court will review the Schubat hearsay contention and the Natywa contention on the merits. Additionally, and as the Respondent concedes (Resp't's Answer 41) because there is at the very least a colorable argument that the state appeals court's holding as to forfeiture was inadequate as to the failure to interview witnesses contention, the Schubat deception contention, and the voice message contention, this court will consider these contentions on the merits.

The governing law for all of the claims of ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, Ruhl must show that: (1) his counsel's conduct fell below an objective level of reasonableness; and (2) absent his counsel's unprofessional errors there was a reasonable probability he would have been acquitted at trial. *Id.* at 687–88, 694. The court does not need to address the *Strickland* prongs in any order and if

either prong is found to be insufficient the court need not address both prongs. *Strickland*, 466 U.S. at 697.

Additionally, before this federal court, Ruhl must show that the state court's application of *Strickland*, in deciding any ineffective counsel claims on the merits, was not just wrong but unreasonable. *See Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) ("The standards created by *Strickland* and § 2254(d) are both 'highly deferential' . . . and when the two apply in tandem, review is 'doubly' so." (internal citations omitted)). The key question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Id.*

This court will turn first to the prejudice prong of *Strickland*. In determining prejudice, counsel's performance must be assessed as a whole. *Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009). It is not enough that counsel made errors, or that a better defense may have been available. *Holman v. Gilmore*, 126 F.3d 876, 882 (7th Cir.1997). The question, rather, is whether counsel "contest[ed] the prosecution's case and advance[d] a good defense. *Id.* The U.S. Supreme Court in *Harrington* emphasized that the bar for demonstrating prejudice is a high one in that "the likelihood of a different result must be substantial, not just conceivable." 131 S. Ct. at 792.

The court finds that counsel's performance at trial was constitutionally adequate. Counsel focused on Schubat, the state's star witness, and argued that it was she, and not Ruhl, who acted as Serio's accomplice. He argued that Schubat's testimony that she thought Ruhl was joking about harming Neubauer was unbelievable. Counsel presented Morton in an effort to show that Schubat and Neubauer's relationship was poor, despite Schubat's testimony otherwise. He argued that there was no evidence that Ruhl knew Neubauer or had any motive to kill him.

He attempted to present McIntosh's testimony.  Clearly, counsel's performance was flawed, but this court cannot find that it was constitutionally deficient in light of the errors alleged by Ruhl.

### 1) *Schubat hearsay contention*

First, as to the Schubat hearsay contention, Ruhl argues that counsel was ineffective for failing to object, on Confrontation Clause grounds, to Schubat's testimony regarding Serio's statements that he intended to kill Neubauer.  The state appeals court rejected this contention on the merits in Ruhl's post-conviction appeal, and its ruling was not erroneous, much less unreasonable.  (*See* Post-Conviction Appeal 14.)  In particular, Schubat testified that she twice heard Serio and Ruhl talking about killing Neubauer, but thought it was a joke.  She also testified that on the night of the murder, she heard Serio ask Ruhl if there was a green, four-door car in the parking lot, and then heard him tell Ruhl to go to the window of the car and shoot Neubauer. As the state appeals court recognized, under *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004), testimonial statements of a witness who is unavailable at trial may not be admitted against the defendant unless the defendant has had a prior opportunity for cross-examination. However, Serio's out-of-court statements, to which Schubat testified, fall within the co-conspirator hearsay exception, and as such are not testimonial.  *See United States v. Hargrove*, 508 F.3d 445, 448–49 (7th Cir. 2007).  The state appeals court appropriately analyzed the *Crawford* issue and found that counsel was not ineffective for failing to object to Schubat's testimony on this basis.  (Post-Conviction Appeal 14.)  Ruhl argues that counsel was ineffective for failing to argue that Serio's statements to McIntosh were likewise admissible as co-conspirator statements.  (Pet'r's Reply 11.)  However, the co-conspirator hearsay exception, under Illinois law, does not extend to statements that are merely a narrative of past occurrences

and which do not further any objectives of the conspiracy. *People v. Coleman*, 931 N.E.2d 268, 271 (Ill. App. Ct. 2010). Consequently, any argument that McIntosh's testimony was admissible on this basis would have failed.

*2) Natywa contention*

As to Ruhl's contention that counsel was ineffective for failing to present Natywa's testimony, the appeals court rejected this contention on direct review because Ruhl did not supply an affidavit from Natywa. Respondent agrees that this contention is preserved, although its procedural history is "somewhat tortured." (Resp't's Answer 47.) Although Ruhl did not raise that claim in his PLA on direct appeal, he did raise it in his first post-conviction petition, in his appeal of the denial of that petition, and in his post-conviction PLA.

With his first post-conviction petition, Ruhl for the first time presented an affidavit from Natywa, dated Nov. 16, 2005. In it, Natywa says that on April 4, 2002, he was working at the Whip Lash with McIntosh when Serio came into the bar. (Dkt. No. 6-2, Ex. M ("Natywa Aff.").) Serio told Natywa and McIntosh that he had just been released from Lake County police custody after being questioned about Neubauer's death. When McIntosh asked why police where questioning him, Serio replied, "I killed him." Natywa heard Serio say that Neubauer was a punk and deserved to die. At that point, Natywa turned away and walked to the end of the bar because he did not want to hear anymore.

Although the state appeals court on post-conviction review rejected the Natywa contention on res judicata grounds because the issue had been raised and rejected on direct appeal, this is not a bar to habeas relief. *Davis v. Lambert*, 388 F.3d 1052, 1058 (7th Cir. 2004). Respondent contends, however, that in reviewing the claim, this court should look to the last

decision on the merits, which was the state appeals court's ruling on direct review. *Sutherland v. Gaetz*, 581 F.3d 614, 617 (7th Cir. 2009). At that point, the court did not have before it the Natywa affidavit.

Ruhl, however, also raised the issue of the Natywa affidavit in his successive post-conviction petition. There, Ruhl argued that the attorney who represented him in his post-trial motion was ineffective for failing to include an affidavit from Natywa to bolster his claim that trial counsel had been ineffective. Additionally, Ruhl argued that his post-conviction counsel had assured him that he would include a claim of ineffectiveness against his post-trial counsel, but failed to do so. That failure prevented Ruhl from obtaining a ruling on the merits as to his claim that trial counsel had been ineffective, he argued.

The trial court denied Ruhl leave to file a successive post-conviction petition. On appeal, the majority assumed that Ruhl had shown cause for failing to present the Natywa affidavit earlier, but nonetheless found that Ruhl had failed to present the gist of a meritorious claim. (Successive Post-Conviction Appeal 8.) The majority found that there was no reason to conclude that Ruhl's claim that this trial counsel was ineffective would have succeeded, even had the Natywa affidavit been timely presented. (*Id.*) The appeals court found that even had Natywa testified at the hearing on the state's motion in limine to bar McIntosh's testimony, the result would have been the same. (*Id.* at 10.) The court reasoned that nothing suggested that Natywa had a stronger relationship with Serio than McIntosh did, although they were from the same neighborhood. (*Id.* at 11.) The court also noted that while Natywa could corroborate McIntosh's testimony, at least in part, he could not corroborate Serio's admission that he fired the shot in the parking lot. (*Id.*)

This is effectively a ruling on the merits, and this court cannot find that it was unreasonable. Reasonable jurists may disagree about the significance of Natywa's affidavit, and in fact a dissenting justice argued that Natywa's testimony would have changed the trial court's decision as to whether to bar McIntosh's testimony. (Successive Appeal 16–18.) But Natywa's testimony would not have provided any independent corroboration of Serio's claim that it was he that fired the shot in the parking lot. Nor was there any evidence that he had a closer relationship with Serio than McIntosh. For these reasons, the state appeals court's determination that Ruhl had not show he was prejudiced by counsel's failure to present Natywa's testimony was a reasonable application of *Strickland*.

### 3) Failure to interview witnesses

As to his claim that counsel failed to interview certain witnesses, the court finds that Ruhl has failed to show that he was prejudiced by this failure. The first witness, Jennifer Shoblom, provided an affidavit, dated November 16, 2005, attesting that she was a friend of both Schubat and Neubauer. (Dkt. No. 6-2, Ex. N.) Neubauer was verbally abusive, and Schubat had suspicious bruises, Shoblom stated. Shoblom stated that on the night Neubauer's body was found, she went to the Whip Lash at the request of Schubat's mother to tell the staff there that Schubat would not be coming in to work. Shoblom stated that she looked in the window on the bar door to see if anyone was there, but it was dark. Serio soon arrived, and she conveyed the message about Schubat. On January 7, 2002, Shoblom saw Schubat at a gathering at Shoblom's home. Shoblom averred that Schubat was acting strangely in that "she seemed odd, nervous, and [was] vomiting a lot." At some point, Serio showed up at the gathering, but Schubat did not

seem afraid of him.  Shoblom added that on the night of Neubauer's wake, she had another gathering at her home that both Schubat and Serio attended.

Ruhl maintains, first, that counsel should have interviewed Shoblom and presented her testimony and that of a man named Scott Owens in order to show that Schubat was not afraid of Serio, contrary to her testimony at trial.  Owens, in an affidavit dated November 16, 2005, averred that he saw Schubat and Serio at the gathering at Shoblom's home.  (Dkt. No. 6-2, Ex. O.)  Owens added that he had known Schubat for about 12 years, and that she and Neubauer never seemed stable, and that Schubat had complained of Neubauer being "physical from time to time."  The court finds that this evidence falls far short of establishing that Schubat did not fear Serio.  Neither Owens nor Shoblom report seeing any interaction between Schubat and Serio. More importantly, as Respondent argues, there is no dispute that Schubat continued to work at the Whip Lash after the murder and that she lied to her family, friends, and police about what she knew about Neubauer's death.  The mere fact that Schubat continued to attend social gatherings at which Serio was present would have added little to the defense case.

Ruhl places great emphasis on the fact that Shoblom claims she went to the Whip Lash a short time after the murder and the window on the Whip Lash door was not broken.  This contradicts Schubat's testimony that Ruhl broke the glass by pounding on the door after shooting Neubauer in the parking lot, Ruhl argues.  (Pet'r's Reply 4.)  The court, however, agrees with Respondent that even assuming Shoblom accurately recalled this detail years after the fact, this at best is collateral impeachment of Schubat's testimony.

Ruhl additionally places great weight on his argument that Amanda Barbaro, a girlfriend of Serio, would have testified that Serio told her that he shot Neubauer in the parking lot.  Ruhl

points to an application for an overhear device in which Jonites averred that a Jane Doe, later identified as Barbaro, told him that Serio confessed to shooting Neubauer outside the bar, transporting his body to the Renaissance Faire, and shooting him again to make sure he was dead. (Dkt. No. 6, Ex. G, at 39–41.) Ruhl does not present an affidavit from Barbaro, however. Her testimony at Serio's trial, to the extent it is recounted in the Illinois Appellate Court's opinion affirming Serio's conviction, was that Serio told her that he and Ruhl transported Neubauer's body to the Renaissance Faire, where Serio shot him to make sure he was dead. *People v. Serio*, 830 N.E.2d 749, 755 (Ill. App. Ct. 2005). Counsel could have reasonably decided that it was poor strategy to call Barbaro at Ruhl's trial when she would have placed Ruhl at the scene of the murder.

Nor has Ruhl shown that trial counsel was ineffective for failing to interview a man named William Niemi, who Ruhl contends would have testified that Serio made an admission to him. Ruhl bases this argument on a motion to withdraw made by the public defender appointed to defend Serio. (Dkt. No. 6-2, Ex. P, at 140–41.) There is no evidence before this court as to what Serio allegedly told Niemi, and therefore no basis to find that Ruhl was prejudiced by his attorney's failure to interview Niemi. For these reasons, the court cannot find that trial counsel was ineffective for failing to interview or call to the stand Shoblom, Owens, Barbaro, and Niemi.

*4) Schubat deception contention*

Ruhl argues that his counsel was ineffective for failing to impeach Schubat with certain additional material, including evidence that the detectives who interviewed her found her deceptive even after she implicated Serio and Ruhl in the murder. (Dkt. No. 6, Ex. F, at 35–37.) Ruhl also points to the results of a computer voice stress analyzer that was administered to

Schubat that he contends showed she was deceptive when she told police she was not involved in the murder and did not know that Neubauer would be killed. (Dkt. No. 6, Ex E, at 25–26.)

There is no reason, however, to think that the results of this stress test would have been admissible at trial or that additional testimony about detectives' observations of Schubat's demeanor would have changed the outcome of the trial. The jury knew that Schubat continued to work at the Whip Lash in the weeks prior to the murder, despite her testimony that Serio made repeated, unwanted advances. (Dkt. No. 42, Ex. F ("Trial Tr.") at 668.) The jury knew that Schubat continued to work there even after the murder (*Id.* at 669), and that she did not tell police what she knew about the murder until they confronted her with their own information about the case. (*Id.* at 680–81.) They knew that Schubat led police on a wild goose chase by accompanying them to clubs in Chicago in order to look for potential suspects. (*Id.* at 802–03.) Ruhl's counsel also impeached Schubat with her prior statements to the police, and she admitted taking Serio to his hotel room on other occasions besides their one sexual encounter in October. (*Id.* at 693–94.) She was confronted with the fact that she never warned Neubauer about Serio's repeated statements that he planned to kill Neubauer. (*Id.* at 729.) In short, there were numerous reasons for the jury to doubt Schubat's testimony, but it nonetheless found her credible.

Ruhl additionally argues that his counsel should have presented evidence of Neubauer's email exchanges with a former girlfriend, which Ruhl contends show that Neubauer wanted to reunite with her and which would have angered Schubat. (Dkt. No. 6, Ex. D.) Even if this is true, however, there is no evidence that Schubat knew about the emails. Ruhl also points to police reports that show that in 1999, Neubauer was charged with domestic battery for putting out a lit cigarette on Schubat's arm. (Dkt. No. 6, at 133–39.) He contends this would have

shown that Schubat had a motive to harm Neubauer. (Am. Pet. 48.) However, as Respondent notes, this incident was remote in time from the murder. Further, the jury knew that Neubauer and Schubat had a somewhat rocky relationship based on Morton's testimony and Schubat's own admissions that their relationship was on-again, off-again. (Dkt. No. 42, Ex. E ("Trial Tr.") at 553–55.) In short, none of the impeachment material to which Ruhl cites is so compelling that it likely would have changed the jury's determination as to Schubat's credibility. As such, trial counsel was not ineffective for failing to pursue these avenues.

    *5) Voice Message Contention*

    Ruhl's final contention is that he was prejudiced when trial counsel failed to pursue the relevant phone records to show that there was no evidence that Schubat called Neubauer at 2:43 a.m. from her landline, as she testified. This is crucial because if the call did not come from Schubat's landline, Ruhl contends, this undermines Detective Jonites' testimony that Schubat could not have both placed the call and helped transport Neubauer's body to Wisconsin. The phone records Ruhl has attached, however, do reflect a voice mail message being left on Neubauer's line at 2:48 a.m. (Dkt. No. 6-2, Ex. K.) Det. Kenneth Urquhart of the Kenosha County Sheriff's Department testified that the message was from Schubat, whose voice he recognized, and that in it, Schubat asked "Where are you?" (Tr. Trans. 455–56.)[4] It is true that the phone records do not show that the call from Schubat came from her landline, but they also do not prove that Schubat lied when she testified that she made the call from her landline. Essentially, they are silent on this issue. Although testimony that a call from Schubat's landline was not reflected on Neubauer's incoming call list might have been helpful to the defense, Ruhl

---

[4]Schubat and Urquhart testified that the voicemail was left at 2:43 a.m. rather than 2:48 a.m., but this difference is not significant.

has not shown that there is a reasonable probability the outcome of his trial would have been different had counsel presented this evidence. Ruhl also points out that Schubat testified to leaving a somewhat lengthier message than Urquhart described, but it is unclear what significance Ruhl places on this discrepancy. Nonetheless, the jury heard Urquhart's testimony and was aware of the discrepancy, so this cannot be a basis for finding trial counsel ineffective. In sum, and taking into account all of his allegations, Ruhl has failed to show that he is entitled to habeas relief on the basis of ineffective assistance of counsel.

### 2. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final judgment adverse to the petitioner. In order to obtain a certificate of appealability, the petitioner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253 (c)(2).

If the claim is denied on the merits, the applicant must show that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). If the claim is denied on procedural grounds, the applicant must show that reasonable jurists would find it debatable whether the claim states the denial of a constitutional right, and that they would find the procedural ruling debatable as well. Because the court finds that reasonable jurists would not find it debatable as to whether Ruhl has stated the denial of a constitutional right, or as to whether he has procedurally defaulted certain claims, the court declines to issue a certificate of appealability.

<u>CONCLUSION</u>

For the reasons stated herein, Ruhl's Amended Petition for a Writ of Habeas Corpus (Dkt. No. 32) is denied. The court declines to issue a Certificate of Appealability.

ENTER:

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: April 27, 2012